1  Charles A. Bird, State Bar No. 56566
   Charles P. Maher, State Bar No. 124748
2  LUCE, FORWARD, HAMILTON & SCRIPPS LLP
   Rincon Center II, 121 Spear Street, Suite 200
3  San Francisco, California 94105-1582
   Telephone No.: 415.356.4600
4  Fax No.: 415.356.4610

5

6  Attorneys for Appellee
   Andrea A. Wirum, Successor-in-Interest to
7  Charles E. Sims Chapter 7 Trustee

8

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12

13  In Re RAMIN YEGANEH,                    Case No. C 07-03256 JSW

14        Debtor,

15
    _____
16
    CHARLES E. SIMS, Trustee             Bankruptcy Case No. 05-30047 TEC
17                                        Adversary Pro. No. 05-3241 TEC
          Appellee,
18                                        **APPELLEE'S BRIEF**
    v.
19
20  ALLIED MANAGEMENT TRUST, and K.
    YEGANEH aka KEN YEGANEH AKA
21  KAIKHOSROW YEGANEH,

22        Appellants.

23  _____

24
          Appellee Andrea A. Wirum, Chapter 7 Trustee in Bankruptcy (the "Trustee"), hereby submits
25
    her appellee's brief.
26

27

28

                                          Case No. C 07-03256 JSW
                                          APPELLEE'S BRIEF

1

# **TABLE OF CONTENTS**

**Page**

I.    BASIS OF APPELLATE JURISDICTION ........................................................ 1

II.    ISSUE PRESENTED ON APPEAL ................................................................. 1

III.    STANDARD OF REVIEW ........................................................................... 1

IV.    SUMMARY OF THE TRUSTEE'S OPENING BRIEF ................................... 1

V.    STATEMENT OF FACTS ............................................................................ 3

    A.    The Adverse Rulings Against the Debtor in the State Suit Which Triggered the Debtor's Fraudulent Transfers of the Five Allied Properties............................................................................................... 3

    B.    The Debtor's Acquisition of the Five Allied Properties Under False Pretenses ......................................................................................... 5

    C.    The Debtor's Fraudulent Transfers of the Five Allied Properties .......... 6

    D.    The Debtor's Bankruptcy Filings............................................................ 6

    E.    The Trustee's Adversary Proceeding to Recover the Allied Properties................................................................................................ 6

    F.    The Trustee's Evidence of Badges of Fraud in Support of Her Motion for Summary Judgment .............................................................. 7

    G.    The Debtor's and Appellants' Discovery Abuses and Assertions of the Fifth Amendment ........................................................................ 11

    H.    The Bankruptcy Court's Limited Exclusion Ruling ............................. 14

    I.    The Appellants Did Not Offer Evidence Sufficient to Create a Genuine Issue of Material Fact in Opposing the Trustee's Motion ..... 14

VI.    ARGUMENT ............................................................................................. 15

    A.    The Appellants Failed to Satisfy Their Burden in Opposing Summary Judgment, Without Considering the Exclusion Order ......... 15

    B.    The Bankruptcy Court's Limited Exclusion Order Was Justified by the Repeated Invocations of the Fifth Amendment and Failures to Produce Discovery ............................................................ 18

    C.    The Trustee Has Standing ..................................................................... 19

VII.    CONCLUSION .......................................................................................... 21

1

2

**<u>TABLE OF AUTHORITIES</u>**

3

**Page(s)**

4

CASES

5

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................ 18

6

*BMG Music v. Martinez*,
    74 F.3d 87 (5th Cir. 1996) ...................................................................................... 15

7

8

*Brinson v. Linda Rose*,
    53 F.3d 1044 (9th Cir. 1995) .................................................................................. 18

9

10

*Brown v. United States*,
    356 U.S. 148 (1958) ................................................................................................ 19

11

*California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir. 1987) ................................................................................ 17

12

13

*Cambridge Electronics Corp. v. MGA Electronics, Inc.*,
    227 F.R.D. 313 (C.D. Cal. 2004) ........................................................................... 15

14

15

*Chambers v. Nasco, Inc.*,
    501 U.S. 32 (1991) .................................................................................................. 19

16

17

*Citizens Bank of Massachusetts v. Marrama*,
    331 B.R. 10 (Bankr. D. Maryland 2005), aff'd 445 F. 3d 518 (1st Cir. 2006) ...... 16

18

*Decker v. Voisenat*,
    214 B.R. 219 (Bankr. N.D. Cal. 1997) ................................................................... 16

19

20

*Federal Deposit Insurance Corp. v. Anchor Properties*,
    13 F.3d 27 (1st Cir. 1994) ...................................................................................... 15

21

22

*Filip v. Bucurenciu*,
    129 Cal.App.4th 825 (2005)............................................................................... 16, 17

23

*French v. Peninsula Bank*,
    338 B.R. 668 (Bankr. D. Maryland 2006)............................................................... 16

24

25

*Hambleton Brothers Lumber Co. v. Balkin Enterprises*,
    397 F.3d 1217 (9th Cir. 2005).................................................................................. 17

26

27

*Heffernan v. Bennett and Armour*,
    110 Cal. App. 2d 564 (1952)................................................................................... 20

28

*Holland Livestock Ranch v. U.S.*,
   714 F.2d 90 (9th Cir. 1983).............................................................................17

*Hydranautics v. FilmTec Corp.*,
   204 F.3d 880 (9th Cir. 2000)..........................................................................21

*In re Cohen*,
   199 B.R. 709 (9th Cir. BAP 1996)..................................................................20

*In re Edmond*,
   934 F.2d 1304 (4th Cir. 1991).........................................................................19

*In re Liquimatic Systems, Inc.*,
   194 F. Supp. 625 (D.C. Va. 1961)...................................................................20

*Kennedy v. Allied Mut. Ins. Co.*,
   952 F.2d 262 (9th Cir. 1991)...........................................................................17

*Lawrence v. Romano*,
   316 B.R. 429 (Bankr. W.D.N.Y. 2004)...........................................................15

*Lawson v. Murray*,
   837 F.2d 653 (4th Cir. 1988)...........................................................................19

*Link v. Wabash R.R. Co.*,
   370 U.S. 626 (1962).........................................................................................19

*Liodas v. Sahadi*,
   19 Cal.3d 278 (1977)........................................................................................17

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).........................................................................................17

*McDonald v. Schumann*,
   2004 Bankr. Lexis 819 (Bankr. N.D. Tex. 2004)......................................15, 17

*Radobenko v. Automated Equip. Co.*,
   520 F.2d 540 (9th Cir. 1975)...........................................................................17

*Shubert v. Dawley*,
   2005 Bankr. Lexis 1593 (Bankr. E.D. Pa. 2005) .....................................16, 17

*Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*,
   504 F.3d 775 (9th Cir. 2007).............................................................................1

*Slatkin v. Neilson*,
   310 B.R. 740 (Bankr. C.D. Cal. 2004)......................................................15, 16

*Stitt v. Williams*,
   919 F.2d 516 (9th Cir. 1990)...........................................................................17

*Stoll v. Gottlieb,*
    305 U.S. 165 (1938) ............................................................................ 20

*Triple S Restaurants, Inc. v. Schilling,*
    422 F.3d 405 (6th Cir. 2005) ............................................................. 16

*Triton Energy Corp. v. Square D Company,*
    68 F.3d 1216 (9th Cir. 1995) ............................................................. 18

*United States of America v. 4003-4005 5th Ave.,*
    55 F.3d 78 (2nd Cir. 1995) ................................................................. 19

*United States v. Real Property at 5208 Los Franciscos Way,*
    385 F.3d 1187 (9th Cir. 2004) ("*U.S. v. Real Property*") ............................. 1, 15, 16

*United States v. Schimmels,*
    127 F.3d 875 (9th Cir. 1997) ............................................................. 20

*Wobogo v. Yeganeh,*
    San Mateo County Superior Court, Case No. 410586 (the "State Suit") ................................... 4


**STATUTES**

11 U.S.C. § 544(b) .................................................................................... 1, 15, 20

28 U.S.C. § 158 ........................................................................................ 1

Cal. Bus. & Prof. Code § 17200 .................................................................... 4

Cal. Civ. Code § 2945.4(g) and § 2945.7 ....................................................... 4

Cal. Civ. Code § 3439.04(a)(1) ................................................................ 1, 3, 16

Cal. Civ. Code § 3439.04(b) ....................................................................... 16

Cal. Civ. Code § 3934.04(a)(1) .................................................................... 7

Section 3439.01(b) of the California Civil Code ............................................ 19

Section 3439.01(c) of the California Civil Code ............................................ 19

Section 3439.04(a) of the California Civil Code ............................................ 20

Federal Rule of Bankruptcy Procedure 7056 ............................................. 1, 15

Federal Rule of Bankruptcy Procedure 8001 ............................................... 1

I.    **BASIS OF APPELLATE JURISDICTION**

This Court has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 158 and Federal Rule of Bankruptcy Procedure 8001.

II.    **ISSUE PRESENTED ON APPEAL**

The issue on appeal is whether the Bankruptcy Court properly granted the Trustee's motion for summary judgment based on Federal Rule of Bankruptcy Procedure 7056, 11 U.S.C. § 544(b), and Cal. Civ. Code § 3439.04(a)(1).  In granting summary judgment, the Bankruptcy Court found that multiple, undisputed badges of fraud established that the Debtor had transferred five parcels of real property to his father and a family trust with the "actual intent to hinder, delay, or defraud" creditors within the meaning of Cal. Civ. Code § 3439.04(a)(1).

III.    **STANDARD OF REVIEW**

The Bankruptcy Court's findings of fact are reviewed under the clearly erroneous standard, and the Bankruptcy Court's conclusions of law are reviewed de novo.  *E.g., Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com),* 504 F.3d 775, 783 (9th Cir. 2007).  The Court must apply a de novo standard of review to the summary judgment itself, despite Appellants' statements to the contrary.  *United States v. Real Property at 5208 Los Franciscos Way*, 385 F.3d 1187, 1192 (9th Cir. 2004) ("*U.S. v. Real Property*")

IV.    **SUMMARY OF THE TRUSTEE'S OPENING BRIEF**

After summary judgment was granted against Ramin Yeganeh (the "Debtor") in a state court case, the Debtor filed bankruptcy and the Appellee was appointed Chapter 7 bankruptcy Trustee.  The Trustee filed an adversary proceeding against the Debtor's father and a family trust (the Appellants) alleging that five pieces of rental property owned by the Debtor had been transferred to the Appellants with the intent to "hinder, delay or defraud" creditors under Cal. Civ. Code § 3439.04(a)(1).  The Bankruptcy Court granted the Trustee's motion for summary judgment, finding that the five transfers had been made before the bankruptcy filing with the intent to hinder, delay or defraud creditors.  The Appellants filed this appeal of the summary judgment.

Section 3439.04(a)(1) enables the Trustee to recover property that has been transferred with the intent to hinder, delay, or defraud creditors.  The Trustee moved for summary judgment based on a

massive amount of evidence of multiple badges of fraud, which taken together established the required intent to hinder, delay, or defraud creditors.  The Trustee's evidence of badges of fraud included the fact that all five properties had been transferred to an insider, they had been transferred in violation of a preliminary injunction order, they had been transferred using false names, and the Debtor and Appellant Ken Yeganeh had given false testimony to hide the transfers from creditors.

In the Bankruptcy Court, the Appellants made no effort to dispute the Trustee's evidence supporting multiple badges of fraud.  On appeal, the Appellants also make no effort to dispute the Trustee's evidence of multiple badges of fraud.  For illustration, the Trustee's evidence in the Bankruptcy Court established that the Debtor transferred all five properties to the Appellants in violation of a state court preliminary injunction order.  The Appellants have never offered conflicting evidence, and they have never disputed this evidence.  The Trustee's evidence established that the Debtor transferred the five properties to an insider, a family trust controlled by the Debtor or his father.  The Appellants have never offered conflicting evidence, and they have never disputed this evidence.  The Trustee's evidence established that the Debtor gave false testimony to cover up the fact that he was the real buyer of the five properties.  The Appellants have never offered conflicting evidence, and they have never disputed this evidence of the Debtor's perjury.

The Appellants' arguments on appeal fail to address the obvious, glaring deficiency in the Appellants' opposition to the summary judgment motion in the Bankruptcy Court, namely, the absence of evidence disputing the Trustee's evidence of multiple badges of fraud.  Instead, the Appellants' opening brief focuses on irrelevant legal arguments, speculation about the fraudulent transfers, and the Bankruptcy Court's exclusion order arising out of the Debtor's and the Appellants' assertions of the Fifth Amendment right against self incrimination during discovery.  Indeed, the exclusion order is immaterial; it did not prevent Appellants from filing evidence in violation of the exclusion order, and the summary judgment is proper even if all of that evidence is considered.

The Appellants make an obtuse argument that the Trustee lacks standing, which is not supported by the facts or the law.  The Trustee filed this adversary proceeding because she needs these five properties in order to pay more than $4 million in claims.  The Appellants also dispute whether the clear and convincing standard or the preponderance of evidence standard applies in determining

1  intent to hinder, delay, or defraud. While this issue is interesting, it is immaterial in light of the

2  Appellants' failure to contest the Trustee's undisputed evidence of multiple badges of fraud. The

3  Appellants claim that the Debtor was not insolvent at the time of the five transfers, which is also

4  irrelevant because insolvency is not a required element under § 3439.04(a)(1), although it is required

5  under other fraudulent transfer statutes that were not part of the summary judgment motion.

6      The Appellants sprinkle their appeal with speculation about the five transfers and whether the

7  Debtor knew the identity of each creditor and the exact amounts of each claim at the time the transfers

8  were made. This is mere speculation and it does not address the multiple badges of fraud established

9  in the Trustee's summary judgment motion. Finally, the Appellants contend that the Bankruptcy

10 Court improperly limited the evidence Appellants could offer in opposing the summary judgment

11 motion. The Bankruptcy Court properly limited the Appellants' evidence because of Ken Yeganeh's

12 assertion of the Fifth Amendment in order to avoid testifying and producing discovery to the Trustee.

13 The Bankruptcy Court's exclusion order was narrowly tailored and appropriate because the factual

14 issues surrounding the assertions of the Fifth Amendment directly related to Ken Yeganeh's main

15 defense in this case, namely, the claim that the Debtor originally bought the five properties for Ken

16 Yeganeh using Ken Yeganeh's money and that Ken Yeganeh has always owned the properties.

17     The Appellants' Opening Brief fails to show that the Bankruptcy Court's order granting

18 summary judgment under Bankruptcy Rule 7056 and § 3439.04(a)(1) was error, so the Bankruptcy

19 Court's order should be affirmed.

20     The Record on Appeal has been designated by the Appellant and the Appellee. For the

21 convenience of the Court, the Appellee has prepared and is filing with this Opening Brief an Excerpt

22 of Record in three volumes which contains excerpts of the documents in the designated record. The

23 references designated in this Brief are to the Excerpt of Record and are identified as "ER" with

24 corresponding page numbers. Cross references to the Designated Record on Appeal by bankruptcy

25 docket numbers are contained in a table of contents to each volume of the Excerpt of Record.

26 **V.     STATEMENT OF FACTS**

27     **A.     The Adverse Rulings Against the Debtor in the State Suit Which Triggered the
        Debtor's Fraudulent Transfers of the Five Allied Properties**

28

Before filing this bankruptcy, the Debtor operated an illegal mortgage brokerage and consulting business, which targeted and preyed on vulnerable homeowners whose mortgages were in foreclosure.  The Debtor would buy victims' homes using illegal tactics, while the homeowners were under extreme financial duress, and his schemes resulted in his acquisition of about 20 single family residences.  In 1999, the Debtor was arrested and charged by the San Mateo County District Attorney with various criminal violations of the California mortgage foreclosure consultants law.  (ER 007:1-4, 012:17-28)  After being charged with 49 felony counts, eventually the Debtor pled no contest to four separate felony counts under Cal. Civ. Code § 2945.4(g) and § 2945.7 in March, 2001.  (ER 028-030)  The San Mateo County Superior Court sentenced the Debtor to five years probation, his broker's license was suspended, and he was ordered not to engage in any mortgage broker activity.  (ER 028-030)   Four victims received over $300,000 in cash restitution in the criminal case.  (ER 028-030)

On October 4, 1999, a group of victims filed a civil suit against the Debtor in San Mateo County Superior Court seeking restitution and other relief under Cal. Bus. & Prof. Code § 17200 based the Debtor's fraudulent and unlawful business practices, *Wobogo v. Yeganeh*, San Mateo County Superior Court, Case No. 410586 (the "State Suit").  (ER 031-054)  On July 30, 2001, the Superior Court granted the plaintiffs' motion for summary adjudication, concluding that the Debtor had violated § 17200 of the California Business and Professions Code. (ER 055-057)  The Superior Court reasoned that when the Debtor pled no contest to the four felony counts, he essentially admitted liability on the § 17200 claims in the civil action. (ER 055-057)  Thus, the Debtor's admissions in the criminal case were considered to be admissions in the State Suit.

After summary adjudication of liability in principle, restitution hearings commenced to determine the appropriate relief for the Debtor's § 17200 violations.  The hearings resulted in the entry of a judgment against the Debtor on 27 restitution claims for approximately $270,000.  (ER 058-081)  The Superior Court later entered a supplemental judgment against the Debtor, adding prejudgment interest of about $130,000, plus $3,452,803.50 in attorney's fees and $32,457.54 in costs.  (ER 082-096)

While the restitution hearings were taking place, the State Suit Plaintiffs became aware that the Debtor had been secretly transferring his properties to avoid creditors.  In order to halt the fraudulent

transfer of properties, on September 26, 2001 the State Suit Plaintiffs moved to modify an existing preliminary injunction to preclude the Debtor from transferring additional properties to third parties. (ER 097-125) The Superior Court granted the motion and entered a modified preliminary injunction order on October 3, 2001. (ER 126-128) The modified injunction enjoined the Debtor from selling, transferring, modifying, hypothecating, or otherwise limiting or disposing of any interest in real property in San Mateo, Santa Clara, San Francisco or Alameda Counties. (ER 126-128)

**B.**     <u>The Debtor's Acquisition of the Five Allied Properties Under False Pretenses</u>

Prior to the entry of the modified preliminary injunction order on October 3, 2001, the Debtor had fraudulently transferred eight properties to his parents or sham family trusts. The Debtor had made these transfers in order to hinder, delay, or defraud his creditors because of the inevitable judgment that would be entered against him in the State Suit. While these eight properties are the subject of other adversary proceedings the Trustee has filed against the Debtor's parents and sham family trusts, they are not the subject of this appeal.

This appeal involves five residential, rental properties the Debtor transferred to a sham family trust, Allied Management Trust, after the summary adjudication motion was granted in the State Suit and after the Superior Court had modified the preliminary injunction and ordered the Debtor not to transfer any of his properties. The five properties (the "Allied Properties") are 2462 Taylor Avenue, Oakland, California ("Taylor Property"); 2300 Auseon Avenue, Oakland, California ("Auseon Property"); 1012 73rd Avenue, Oakland, California ("73rd Property"); 1278 79th Avenue, Oakland, California, (APN 041-4198-052-00) ("79th Property"); and 1086 69th Avenue, Oakland, California ("69th Property").

The Debtor acquired all five properties under similar, false pretenses. Title to the Taylor Property was conveyed to the Debtor in June, 2002 (ER 137:23-25, 138-139); title to the Auseon Property was conveyed in September, 2002 (ER 142:18-21, 143); title to the 73rd Property was conveyed in November, 2002 (ER 145:4-10, 146); title to the 79th Property was conveyed in December, 2002 (ER 148:7-15, 149); and title to the 69th Property was conveyed in January, 2003 (ER 151:5-13, 152). In each case, the grant deed stated that the buyer was "R. Rad", when, in fact, in each case the property was purchased by the Debtor. The Debtor used the alias "R. Rad" on the grant deeds

in order to prevent creditors from learning that he owned the properties. (ER 154:24-25, 155:1-4)

### C.    The Debtor's Fraudulent Transfers of the Five Allied Properties

After the modified injunction prohibited him from transferring properties, the Debtor transferred all five Allied Properties to a sham family trust, Appellant Allied Management Trust ("Allied"). (ER 157:12-25, 158-160)  On March 31, 2003, using the alias "R. Rad" as the grantor, the Debtor conveyed four of the Allied Properties to Allied.  (ER 157:12-25, 159-160)  Then on May 6, 2003, again using the alias "R. Rad", the Debtor conveyed the fifth property, the Auseon Property, to Allied.  (ER 157:12-25, 158)  These are the five fraudulent transfers at issue.

### D.    The Debtor's Bankruptcy Filings

On July 31, 2001, the day after the Superior Court granted the State Suit Plaintiffs' motion for summary adjudication, the Debtor filed a Chapter 13 bankruptcy petition. (ER 161-162)  In an effort to hinder, delay and defraud creditors, the Debtor used an incomplete and inaccurate spelling of his name and the wrong home address in the petition.  The fraudulent nature of the Debtor's bankruptcy filing is evidenced by the fact that two weeks prior to the filing, the Debtor sent the State Court Plaintiffs' counsel a draft bankruptcy petition that contained a complete and accurate spelling of the Debtor's name and his correct home address.  (ER 163-166) After the Debtor had been successful in staying the State Suit for a few days (ER 167), the Debtor voluntarily dismissed the bankruptcy on August 2, 2001. (ER 168)

Once the supplemental judgment was entered in the State Suit on September 9, 2004 (adding over $3 million in attorney's fees and costs to the original judgment), the Debtor filed bankruptcy again, a skeleton chapter 13 petition.  (ER 169-174)  The State Suit Plaintiffs' moved to convert the case to a Chapter 7 proceeding, and the Bankruptcy Court converted the bankruptcy to a Chapter 7 case on January 21, 2005.  Charles E. Sims was appointed Chapter 7 Trustee.  Mr. Sims passed away during the bankruptcy proceedings, and Andrea A. Wirum was appointed to replace Mr. Sims as Chapter 7 Trustee.

### E.    The Trustee's Adversary Proceeding to Recover the Allied Properties

When the Debtor filed his schedules of assets and liabilities in the Chapter 7 bankruptcy, he did not list the five Allied Properties as assets.  (ER 175:26-176:9, 178-183)  The Trustee's

investigation revealed that the Debtor had transferred the five Allied Properties to a trust that was controlled by the Debtor and/or the Debtor's father, Appellant Ken Yeganeh.  The Trustee concluded that the Debtor's transfers of the five Allied Properties were fraudulent transfers under Cal. Civ. Code § 3934.04(a)(1), and he filed this adversary proceeding to recover the five properties in the Bankruptcy Court on February 18, 2005.  (ER 176:14-177:4, 184-187)  On February 22, 2005, Ken Yeganeh, as the purported trustee of Allied, executed a grant deed transferring the Allied Properties from Allied to himself.  (ER 188-189)  After learning of the subsequent transfers of the five Allied Properties to Ken Yeganeh, the Trustee amended his complaint to add Ken Yeganeh as a defendant in the adversary proceeding.   In February, 2005, the Trustee also filed three related adversary proceedings to recover the eight other properties that had been fraudulently transferred by the Debtor to his parents or sham family trusts.

### F.    The Trustee's Evidence of Badges of Fraud in Support of Her Motion for Summary Judgment

The Trustee moved for summary judgment in the adversary proceeding arguing that multiple badges of fraud established that the transfers of the Allied Properties were made with the intent to hinder, delay or defraud creditors under Cal. Civ. Code § 3934.04(a)(1).  The Trustee offered extensive evidence, including more than 100 exhibits, in support of the motion, which included testimony of the Debtor and his parents, pleadings from the State Suit, and declarations proving the Debtor's and Appellants' destruction of evidence and failure to produce evidence to the Trustee during discovery.  The Trustee's evidence of multiple badges of fraud included the following:

First, the Debtor sought to hinder, delay or defraud his creditors by acquiring title to the Allied Properties under a false name:  "R. Rad".  (ER 191:11-13, 137:23-25, 138-139, 142:18-21, 143, 145:4-10, 146, 148:7-15, 149,151:5-13, 152).  In April, 2002, the Debtor gave false testimony about that alias by testifying that some person by the name "R. Rad" was involved in some loan transactions with the properties, that he had no relationship with "R. Rad", and that he had not seen "R. Rad" since 2001. (ER 193:20-25, 194:1-25, 195:1-25, 196:1-25)  In a deposition a year later, on April 25, 2003, the Debtor finally admitted that he was in fact "R. Rad" and that "R. Rad" was an alias. (ER 154:24-25, 155:1-4) The Debtor's use of this alias is significant because it is the alias he had used to acquire

the five Allied Properties in an effort to "avoid" the reach of the preliminary injunction in the State Suit. The Appellants did not offer evidence to contest the Trustee's evidence supporting this badge of fraud.

Second, the Debtor transferred the Allied Properties to an insider, a family trust controlled by the Debtor and/or Ken Yeganeh. (ER 158-160, 198-199) The Appellants did not offer any evidence to rebut the Trustee's evidence proving that the transfers of the Allied Properties were made to an insider.

Third, the Debtor transferred the Allied Properties to an insider after the State Court's entry of summary adjudication against him. (ER 055-057, 158-160) The Appellants did not offer any evidence to contest the Trustee's evidence that the State Suit summary adjudication was entered before the Debtor transferred the five Allied Properties to an insider.

Fourth, the Debtor transferred the Allied Properties in violation of the preliminary injunction order in the State Suit. On October 3, 2001, the State Court entered a modified preliminary injunction order, stating as follows: "IT IS HEREBY ORDERED that the preliminary injunction issued by this Court on March 21, 2000 be modified as follows: (1) Ramin Yeganeh [the Debtor] and/or American Mortgage Realty … are restrained and prohibited from, and shall not, without leave of court, directly or indirectly, sell, transfer…or dispose of any interest which Defendants, and any of them, hold in any real property which is situated in the counties of San Mateo, Santa Clara, San Francisco or Alameda." (ER 126-128) The Debtor transferred the five Allied Properties in March and May, 2003, in violation of the State Court's modified preliminary injunction order. On June 20, 2003, the Debtor was found guilty of contempt of court for violating the October 3, 2001 order and sentenced to 36 days in jail. (ER 013:26-014:5) The Appellants offered no evidence to dispute the Trustee's evidence that the transfers were a violation of the preliminary injunction.

Fifth, no consideration was paid by Allied Management Trust for the five Allied Properties. The Debtor and Ken Yeganeh concede that no consideration was paid by Allied for the five Allied Properties. Instead, they contend that the Allied Properties had always been owned by Ken Yeganeh and the transfers of the five properties from "R. Rad" to Allied was simply to "put them in trust." (ER 201:14-25, 202:1-25, 203:1-13, 204:13-25, 205:1-4) However, at his December 27, 2004

Case No. C 07-03256 JSW
APPELLEE'S BRIEF

deposition taken in a state court case concerning one of the Allied Properties, Ken Yeganeh testified that he could not remember if he gave the Debtor money to put the five properties into Allied Management Trust. (ER 207-208, 211:21-25, 212:1-7)  In his deposition,  Ken Yeganeh testified that he could not remember: (1) how much money he gave the Debtor (ER 215, 218:16-17), (2) whether he gave the Debtor cash or a check (ER 219:7-9), and (3) whether the Debtor used the money Ken Yeganeh gave him to purchase the Allied Properties (ER 219:17-25).  The Appellants offered no evidence to dispute the Trustee's evidence that no consideration was paid for the transfers made in March and May of 2003 when the Allied Properties were transferred by the Debtor to Allied.

Sixth, the Debtor gave false testimony in order to hinder, delay or defraud creditors.  The Debtor repeatedly denied the he was "R. Rad" under oath.  (ER 221:5-17, 222:20-225:10)  Then, in April, 2003, the Debtor admitted that he was "R. Rad."  (ER 154:24-25, 155:1-4)  When the Debtor was deposed in this adversary proceeding he admitted that he had previously given false testimony when he had denied being "R. Rad."  (ER 227:5-11)  The Appellants did not offer evidence to contest the Trustee's evidence that the Debtor had given false testimony.

Seventh, the Debtor gave false testimony about Allied Management Trust.  For example, on May 28, 2003, the Debtor signed a declaration stating that Allied Management Trust is an "independent investor." (ER 228-232)  Later, on June 20, 2003, the Debtor testified at his contempt hearing that he was the trustee and beneficiary of Allied Management Trust. (ER 234:22-235:7)  The Appellants did not offer evidence to contest the Trustee's evidence that the Debtor had given false testimony about Allied Management Trust.

Eighth, after the Debtor transferred the Allied Properties to Allied, he continued to treat the properties as his own.  The document supposedly creating Allied Management Trust even allowed the Debtor to maintain control over the properties as the "trustee" of Allied.  The Debtor's exercise of control over the properties did not change after he purported to resign as the trustee of Allied in July, 2003.  (ER 237)  Ken Yeganeh testified that the Debtor has always collected rent for the properties and paid all of the expenses for the Allied Properties. (ER 239:12-15, 239:23-25, 240:1-25)   Ken Yeganeh never treated the Allied Properties as though they were his properties, until after the Trustee had made this fraudulent transfer claim.  Ken Yeganeh could not say how much he paid for the Allied

Properties. (ER 242:13-17, 243:6-8) Ken Yeganeh could not say what the value of any of the Allied Properties is. (ER 245:2-25) He could not say how much the rental income was or how much the expenses were for the properties. (ER 247:16-20, 248:19-22, 249:1-14) Ken Yeganeh did not know if the Allied Properties have mortgage loans, or if they have ever had mortgage loans. (ER 251:18-21, 252:4-6, 253:1-25) Ken Yeganeh did not even know if he paid the Debtor to manage the properties. (ER 255:1-7) The Appellants did not offer evidence to contest the Trustee's evidence that the Debtor had treated the Allied Properties as his own until the Trustee's fraudulent transfer claim was made.

Ninth, the Debtor and Ken Yeganeh repeatedly asserted the Fifth Amendment in order to prevent the Trustee from obtaining evidence contradicting the Appellants' claims in this case. The Appellants did not offer evidence to contest the fact that there had been repeated assertions of the Fifth Amendment by the Appellants and the Debtor.

Tenth, the Debtor testified that he began discarding and destroying records relating to the Allied Properties and other transferred properties in 1999 in order to avoid having those documents used against him by his creditors. (ER 257:9-25, 258:1-15, 259:6-16) This testimony constitutes an admission by the Debtor that he has destroyed documents with the intent to hinder, delay, or defraud creditors. The Debtor destroyed mortgage loan documents, mortgage loan statements, property tax statements, lease agreements, evidence of lease payments received, records of improvements to the properties, repair invoices, property insurance statements, and utilities statements. (ER 261:10-262:11, 263:22-25, 264:1-24, 265:7-12, 267:5-25, 268:1-3, 269:13-25, 270:1-9, 271:2-25, 272:1-20, 274:21-25, 275:1-18, 276:9-25, 277:15-19, 278:20-25, 279:1-2, 280:23-25, 281:1-25, 282:1-2, 284:25-255:6) The Debtor has admitted under oath that he has "lost" or destroyed records "[b]ecause I'm [the Debtor] involved in this lawsuit where they are trying to hang me with every piece of information whether I tell the truth or not tell the truth. They use anything against me, it's just crazy, including you." (ER 287:22-25, 288:1-21) The Appellants did not offer evidence contesting the Trustee's evidence that the Debtor admitted destroying documents to hinder, delay, or defraud creditors.

In addition to these undisputed badges of fraud, the Debtor and the Appellants engaged in various discovery abuses and assertions of the Fifth Amendment in order to prevent the Trustee from obtaining information about the fraudulent transfers of the Allied Properties. Those discovery abuses

and assertions of the Fifth Amendment are discussed below.

**G.    The Debtor's and Appellants' Discovery Abuses and Assertions of the Fifth Amendment**

The Appellants and the Debtor took extreme steps to fabricate a story to keep the Allied Properties from the reach of the Debtor's creditors, including perjury, abuse of the discovery process, destruction of evidence, and assertion of the Fifth Amendment right against self-incrimination.  Ken Yeganeh first invoked the Fifth Amendment on June 24, 2005 during a Bankruptcy Rule 2004 Examination.  (ER 290:4-13, 291:10-24, 292:16-19)  At that time, Ken Yeganeh claimed that when the Debtor first acquired the Allied Properties in the name of "R. Rad", the Debtor was actually buying the properties for Ken Yeganeh.  (ER 290:4-10)  Yet, Ken Yeganeh repeatedly asserted the Fifth Amendment when asked about how much money he gave to the Debtor to purchase the Allied Properties.  (ER 290:4-13, 291:10-15, 292:16-19, 292:19-293:16)  When Ken Yeganeh received the written transcript, he changed his Fifth Amendment objections to:  "I don't remember."  (ER 296-300)

When Ken Yeganeh was asked the same questions in discovery in the adversary proceeding, he invoked the Fifth Amendment again and refused to answer questions and produce documents relating to his alleged purchase of the Allied Properties.  Specifically, Ken Yeganeh invoked the Fifth Amendment and refused to answer the Trustee's written discovery requests on the following subjects:

> (1)    Whether Ken Yeganeh has ever filed federal and state tax returns (ER 308:23-25, 318:25-319:10);

> (2)    Whether Ken Yeganeh declared rental income from the Allied Properties on his tax returns (ER 308:26-301:1, 319:11-28);

> (3)    The identification of the tenants of the Allied Properties (ER 329:8-11, 333:26-28, 343:15-27; 344:1-3);

> (4)    The amount of rent that had been paid by tenants of the Allied Properties  (ER 329:12-16, 344:4-18); and

> (5)    The identification of the real and personal property that Ken Yeganeh owns and has ever owned.  (ER 329:17-24, 344:19-345:14)

Ken Yeganeh also refused to produce documents relating to income from the Allied Properties, any lease or rental agreements for the Allied Properties and any documents relating to any other property he owns.  (ER 351:7-14, 354:8-355:16)

At his deposition in the adversary proceeding, Ken Yeganeh invoked the Fifth Amendment

11

repeatedly. He refused to answer questions concerning the following topics: information regarding his bank account and income and expenses relating to the Allied Properties (ER 369:14-16, 370:10-17), identification of the tenants of the Allied Properties (ER 372:12-15), information about the collection of rent from the Allied Properties (ER 373:8-13), whether rent payments from the Allied Properties were deposited into his bank account (ER 375:1-6), whether he reported income from Allied Properties on his state and federal tax returns (ER 375:10-16), whether he has ever filed tax returns (ER 375:19-376:3), whether the Debtor reported income from the Allied Properties on his tax returns (ER 376:14-17), any evidence that the Allied Properties were owned by him and not the Debtor (ER 377:1-23), lease agreements for the Allied Properties (ER 378:4-9), payment of expenses for the Allied Properties (ER 380:3-9), properties other than the Allied Properties owned by him (ER 382:3-10), and how much money he gave the Debtor to purchase the properties (ER 384:5-8).

The Debtor also asserted the Fifth Amendment right against self-incrimination when he was deposed in the adversary proceeding. The Debtor refused to answer questions regarding the identity tenants of Allied Properties (ER 386:10-21, 387:25-388:6, 389:9-14, 390:1-3), possible rents from the Allied Properties (ER 388:7-11, 389:5-8, 390:4-9, 394:4-11), the lease agreements for the Allied Properties (ER 394:21-25), and whether he located tenants for the Allied Properties (ER 397:25-398:3). The Debtor also invoked the Fifth Amendment when questioned about his false testimony about the identity of "R. Rad" in prior testimony. (ER 400:25-401:13)

Ken Yeganeh said he could not recall when or how much money he gave to the Debtor to purchase the Allied Properties. (ER 133:15-18, 403:16-17) Neither Ken Yeganeh nor the Debtor produced documents demonstrating that Ken Yeganeh had provided the money to buy the Allied Properties or that Ken Yeganeh was the true owner of the Allied Properties. (ER 131:18-132:5, 132:24-133:10, 135:1-7) The Appellants never produced documents showing that Ken Yeganeh paid the expenses for the Allied Properties in 2002 and 2003. (ER 131:18-132:5, 132:24-133:10, 133:19:26) When the Appellants finally produced documents, they produced documents in the 2004 and 2005 time period, which was after the issue of a fraudulent transfer had arisen. (ER 131:18-132:5, 132:24-133:10) The defendants did not produce: documents evidencing the purchase of the properties; documents showing that Ken Yeganeh gave the Debtor money to purchase the properties at issue;

documents evidencing payment of expenses and income from the properties; documents regarding the lease agreements for the properties; documents identifying the tenants and rental income for the properties; and tax returns and financial records for Allied.  (ER 131:18-132:5, 132:24-133:10)

The Debtor testified that he has destroyed or discarded documents because of the State Suit.  In 1999, boxes of the Debtor's financial records were seized from his home.  The Debtor admitted that, after the documents were returned to him, he destroyed them.  (ER 405:7-20, 406:16-407:19, 409:11-411:1, 412:10-414:6)  Before the seizure of his records in 1999, the Debtor kept records regarding his real property transactions.  (ER 406:16-407:15)  He testified that he no longer keeps or maintains real property records because the plaintiffs had used the records against him in the State Suit.  (ER 287:22-288:24)

In response to the Trustee's demands for supplemental discovery responses, the Appellants eventually produced some documents, (ER 415-419), although the Appellants failed to produce documents relating to the acquisition of the Allied Properties and the true ownership of the properties.  (ER 420-421)  In particular, the Appellants failed to produce:

(1)  the state and federal income tax returns for Ken Yeganeh for the tax years 1999, 2000, 2001, 2002, 2003, 2004, and 2005;

(2)  the state and federal income tax returns for Allied Management Trust;

(3)  the property tax statements for the five properties for the years 1999, 2000, 2001, 2002, and 2003;

(4)  the bank statements for Allied for the years 2000, 2001, 2002, 2003, 2004, and 2005;

(5)  the bank statements for Ken Yeganeh for the years 2000, 2001, 2002, 2003, 2004, and 2005;

(6)  the bank statements and investment accounts, showing the hundreds of thousands of dollars that Ken Yeganeh claims were used to buy the five properties at issue;

(7)  the property insurance bills, invoices and statements for the five properties for the period 1999, 2000, 2001, 2002, 2003, 2004, and 2005;

(8)  the documents and correspondence between the defendants and any tenants of the properties, including all rent payments made by the tenants and all lease and agreements;

(9) the name, address and telephone number of each tenant for each of the five properties for the period 1999 through the present.

The Appellants never produced information and documents relating to these categories of the information in the adversary proceeding.

### H.     The Bankruptcy Court's Limited Exclusion Ruling

In light of the Debtor's and the Appellants' discovery abuses and repeated assertions of the Fifth Amendment in order to avoid producing discovery to the Trustee, the Trustee moved to prevent the Appellants from offering evidence in the adversary proceeding on any of the topics relating to the Appellants' invocation of the Fifth Amendment during discovery.  Appellants and the Debtor had refused to answer deposition questions and written discovery on core factual issues relating to the Appellants' main defense to the Trustee's fraudulent transfer claim.  The Appellants' main defense was that the Allied Properties were originally purchased by the Debtor for the Appellants, and that the Appellants had always been the true owners of the Allied Properties.  The Trustee's discovery sought information and documents directly relevant to the Appellants' main defense.  In particular, the Trustee's discovery sought the Appellants' tax returns showing whether they had reported rental income and expenses for properties; the identity of the tenants so that the Trustee could examine tenants about whether Appellants or the Debtor acted as the owner of the property; rental income records showing whether the rent was paid to Appellants or the Debtor; and mortgage records showing whether the Appellants or the Debtor were the borrowers.

The Bankruptcy Court granted the Trustee's motion, in part, and precluded the Appellants' from offering evidence that they were the true owners of the Allied Properties when the Debtor had originally acquired them.

### I.     The Appellants Did Not Offer Evidence Sufficient to Create a Genuine Issue of Material Fact in Opposing the Trustee's Motion

In the motion for summary judgment, the Trustee offered extensive evidence of 14 badges of fraud proving that the transfers of the Allied Properties were made with the intent to hinder, delay, or defraud creditors.  The most important aspect of the Appellants' opposition to the summary judgment was the Appellants' failure to offer evidence to contest the Trustee's badges of fraud evidence.  The Appellants never offered evidence to contest the Trustee's evidence of the Debtor's perjury.  The Appellants never offered evidence to contest the Trustee's evidence of the Appellants' perjury.  The

Appellants never offered evidence to contest the Trustee's evidence of violations of the State Suit preliminary injunction. The Appellants never offered evidence to contest the Trustee's evidence of the Debtor's use of aliases to buy and transfer the Allied Properties. Now, on appeal, the Appellants fail to argue that their opposition to the summary judgment motion had raised genuine issues of material fact sufficient for the Bankruptcy Court to deny summary judgment.

When the Appellants failed to raise genuine issues of material fact as to the badges of fraud in the Trustee's motion, the Bankruptcy Court was bound under Rule 7056 to grant the motion for summary judgment.

## VI.    ARGUMENT

### A.    The Appellants Failed to Satisfy Their Burden in Opposing Summary Judgment, Without Considering the Exclusion Order

Summary judgment is available in intent-to-defraud fraudulent transfer cases just as it is available in any other case. *U.S. v. Real Property*, 385 F.3d at 1192. When the Trustee used the badges of fraud to meet her initial burden of presenting evidence from which a trier of fact *could* conclude that the Debtor transferred the Allied Properties to Appellants with the purpose to defraud the Debtor's creditors, the burden shifted to Appellants to demonstrate a triable issue of material fact. *Id.* When Appellants failed to meet his burden, granting summary judgment on an issue of actual fraudulent intent was correct and unremarkable. *Id.*; *BMG Music v. Martinez*, 74 F.3d 87, 90 (5th Cir. 1996); *Federal Deposit Insurance Corp. v. Anchor Properties*, 13 F.3d 27 (1st Cir. 1994); *Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313 (C.D. Cal. 2004); *Lawrence v. Romano*, 316 B.R. 429 (Bankr. W.D.N.Y. 2004); *Slatkin v. Neilson*, 310 B.R. 740 (Bankr. C.D. Cal. 2004); *McDonald v. Schumann*, 2004 Bankr. Lexis 819 (Bankr. N.D. Tex. 2004).

Bankruptcy Code § 544(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property … that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title…." 11 U.S.C. § 544(b). According to California's version of the Uniform Fraudulent Conveyance Act, a transfer should be set aside if it was made by a debtor "whether the creditor's claim arose before or after the transfer was made or the

obligation was incurred, if the debtor made the transfer … With actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ. Code § 3439.04(a)(1).

Because direct evidence of intent to defraud can rarely be established, a party like the Trustee needed only to set forth evidence of certain badges of fraud in order to satisfy her burden. *Triple S Restaurants, Inc. v. Schilling*, 422 F.3d 405, 416 (6th Cir. 2005). Cal. Civ. Code § 3439.04(b) provides a list of badges of fraud to be considered in determining whether actual intent to hinder, delay or defraud creditors, including: (1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; (3) Whether the transfer or obligation was disclosed or concealed; (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) Whether the transfer was of substantially all the debtor's assets; (6) Whether the debtor absconded; (7) Whether the debtor removed or concealed assets; (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. *See U.S. v. Real Property*, 385 F.3d at 1187; *Filip v. Bucurenciu*, 129 Cal.App.4th 825, 834 (2005).

These eleven badges of fraud are not exclusive. Courts have identified other facts that are also considered badges of fraud, including: (12) Whether the debtor has failed to keep records and documents so that the true intent of the transfer can be ascertained, see *French v. Peninsula Bank*, 338 B.R. 668, 674-75 (Bankr. D. Maryland 2006), remanded on other grounds 499 F. 3d 345 (4th Cir. 2007); (13) Whether the debtor invokes the Fifth Amendment right against self-incrimination, *Citizens Bank of Massachusetts v. Marrama*, 331 B.R. 10, 15-16 (Bankr. D. Maryland 2005), aff'd 445 F. 3d 518 (1st Cir. 2006); (14) Whether the debtor had admitted an actual intent to defraud creditors *Rosen v. R. Todd Neilson*, 310 B.R. 740, 748 (Bankr. C.D. Cal. 2004); (15) Whether the instrument effecting the transfer is suspicious, *Shubert v. Dawley*, 2005 Bankr. Lexis 1593 (Bankr. E.D. Pa. 2005); (16) Whether the Debtor's testimony was unreliable, dishonest, or evasive, *Decker v. Voisenat*, 214 B.R.

219, 231 (Bankr. N.D. Cal. 1997); (17) Whether there is a voluntary gift to a family member, *McDonald v. Schumann*, 2004 Bankr. Lexis 819 (Bankr. N. D. Texas 2004); and (18) Whether the general chronology of events and transactions indicates that the transfer is fraudulent. *Shubert v. Dawley,* supra.

If unrebutted, evidence establishing only one or two of the badges of fraud creates a strong presumption that a transfer was fraudulent. *McDonald v. Schumann*, 2004 Bankr. Lexis 819 at *23; *Filip v. Bucurenciu*, 129 Cal.App.4th at 834. Under California law the standard of proof of actual fraud is a preponderance of the evidence. *Liodas v. Sahadi*, 19 Cal.3d 278, 293 (1977).

Here, the Trustee submitted undisputed evidence establishing multiple badges of fraud. *Ante*, pp. 7-15

Attempts by Appellants and the Debtor to create a triable issue of material fact failed. First, the Debtor and Ken Yeganeh were barred from attempting to contradict their deposition testimony with declarations targeted at the Trustee's summary judgment showing. A party opposing summary judgment may not submit evidence which contradicts that party's prior version of the facts. *Radobenko v. Automated Equip. Co.*, 520 F.2d 540, 544 (9th Cir. 1975); *Holland Livestock Ranch v. U.S.*, 714 F.2d 90, 93 (9th Cir. 1983). The sham affidavit rule bars a broad range of tactics that could be used to manufacture a genuine issue of material fact contrary to the party's prior testimony. *Hambleton Brothers Lumber Co. v. Balkin Enterprises*, 397 F.3d 1217 (9th Cir. 2005); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).

Even if Ken Yeganeh's evidence did not contradict his and the Debtor's prior testimony, it would not create a triable issue of fact. An opposing party's implausible testimony will not create a genuine issue of material fact unless the non-moving party can "come forward with more persuasive evidence to support their claim…." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Implausible, uncorroborated, and self-serving declarations will not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1470 (9th Cir. 1987); *Stitt v. Williams*, 919 F.2d 516, 523 (9th Cir. 1990). Ken Yeganeh's testimony opposing summary judgment is implausible. In his deposition, Ken Yeganeh testified that he could not remember: (1) how much money he gave the Debtor (ER 218:16-17), (2)

whether he gave him cash or a check (ER 219:7-9), (3) whether the Debtor used the money he gave

him to purchase the Allied Properties (ER 219:17-25), (4) whether Allied Management Trust owned

any other properties other than the five properties at issue in the Allied AP (ER 382:3-20), and (5)

whether there are mortgages on the Allied Properties (ER 251:18-21, 252:4-6, 253:1-25)

Also, conclusory and speculative testimony will not create an issue of fact. *Brinson v. Linda Rose*, 53 F.3d 1044, 1050 (9th Cir. 1995). Here, the testimony of the Debtor and Ken Yeganeh was entirely conclusory, speculative, and uncorroborated by any tangible evidence of any theory other than a family agreement to defraud the Debtor's creditors.

Immaterial disputes of fact will not defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986); *Triton Energy Corp. v. Square D Company*, 68 F.3d 1216 (9th Cir. 1995). Here, the Debtor's declaration is comprised of mostly immaterial testimony that does not relate to the badges of fraud or the intent to hinder, delay or defraud. In particular, the Debtor's complaints about his criminal conviction and the Wobogo case in paragraphs 3, 23, 24, 33, 34, 35, 36, 41, 43, 44, 45, 46, 47, and 48 of his declaration are immaterial and could not be considered in the Bankruptcy Court because they cannot raise a genuine issue of material fact.

At bottom, if all the evidence opposing summary judgment is considered notwithstanding that some of it was barred by the exclusion order, the Trustee established so many badges of fraud beyond dispute that the Bankruptcy Court had no choice but to grant summary judgment. The District Court need not rule on any other issue.

### B.    The Bankruptcy Court's Limited Exclusion Order Was Justified by the Repeated Invocations of the Fifth Amendment and Failures to Produce Discovery

The Trustee fully briefed the exclusion order below. (Appellant's Designation of Record on Appeal, Docket No. 54 (Memorandum in Support of the Trustee's Motion To Preclude Testimony and Exclude Evidence or in the Alternative, Motion To Compel Discovery; Amended Appellant's Designation of Record on Appeal, Docket No. 68, Reply in Support of the Trustee's Motion To Preclude Testimony and Exclude Evidence or in the Alternative To Compel Discovery) No point would be served by repeating that briefing now because (1) the Appellants *filed* all their evidence

regardless of whether the Bankruptcy Court considered it and (2) upon considering all the Appellants' evidence, there was no triable issue of fact or other obstacle to summary judgment. *Ante*, pp. 15-19. Should the Court entertain any independent interest in reviewing the Bankruptcy Court's exclusion order, it is correct for the reasons briefed in the record at the references given just above..

In simple summary, a preclusion order is a remedy to sanction a party for using the Fifth Amendment privilege to "abuse, manipulate or gain an unfair strategic advantage." *United States of America v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2nd Cir. 1995). The Fifth Amendment should not be a "positive invitation to mutilate the truth a party offers to tell." *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988), citing *Brown v. United States*, 356 U.S. 148, 156 (1958); *In re Edmond*, 934 F.2d 1304 (4th Cir. 1991). The Bankruptcy Court properly exercised its inherent power and discretion to control abuses the judicial process in order to effectuate proper disposition of cases. *See, e.g.*, *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43-45 (1991); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-631 (1962).

## C.   **The Trustee Has Standing**

Appellants contest the Trustee's standing on a theory that resort to the fraudulently transferred properties is unnecessary to satisfy creditors. This they base on an argument that certain creditor claims are not valid. The Trustee briefed this argument on the merits below. (Amended Appellee's Counter Designation of Record on Appeal, Docket No. 79, Trustee's Memorandum in Opposition to Defendants' Motion for Summary Judgment; Appellant's Designation of Record on Appeal, Docket No. 81, Reply Memorandum in Support of the Trustee's Motion of the Trustee's Motion for Summary Judgment Based on Actual Fraud, pp. 13-15)

Creditors of the Debtor filed proofs of claim against his estate totaling more than $5 million. "Creditor" is defined in Section 3439.01(c) of the California Civil Code as any person who has a claim. Section 3439.01(b) of the California Civil Code defines a "claim" as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

By court-approved compromises liquidating claims in allowed amounts, the aggregate amount has been reduced by almost $1 million. Of the amount remaining, approximately $1.1 million has

1   been paid to creditors on an interim basis – all of it paid after the hearing on the summary judgment

2   motion at issue in this appeal.

3       The assets disclosed by the Debtor are insufficient to pay a substantial amount to creditors.

4   Therefore, all creditors were prejudiced by the transfers made to Allied Management Trust because all

5   creditors had claims against the Debtor on the date of the transfers.  All of those creditors had standing

6   to bring a fraudulent transfer action to recover those transfers.  The Trustee's standing to bring the

7   fraudulent transfer action is authorized by Section 544(b) of the Bankruptcy Code.

8       Section 3439.04(a) of the California Civil Code provides that "a transfer made … by a debtor

9   is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made

10  …, if the debtor made the transfer … [w]ith actual intent to hinder, delay, or defraud any creditor of

11  the debtor."  Neither malice nor insolvency is required.  *In re Cohen*, 199 B.R. 709, 714 (9th Cir. BAP

12  1996).  It is not relevant whether the Debtor had other property to satisfy the claims of specific

13  creditors.  *In re Liquimatic Systems, Inc.*, 194 F. Supp. 625 (D.C. Va. 1961); *Heffernan v. Bennett and*

14  *Armour*, 110 Cal. App. 2d 564 (1952).

15      While Appellants' argument errs for a multitude of independent reasons, this Court need not

16  expend resources on the argument.  That is because Appellants are precluded from collaterally

17  attacking an order of the Bankruptcy Court that adjudicated the contested claims as valid.  The

18  Bankruptcy Court's order of April 8, 2006, approving the Trustee's compromise of claims,

19  adjudicated and finally quantified the bankruptcy claims arising out of the State Court litigation.  This

20  Court affirmed.  (*In re Yeganeh*, C-06-2788 CW, Order of October 23, 2006.)  Although the Debtor

21  has appealed from this Court to the Ninth Circuit, the April 8, 2006 order collaterally estops

22  relitigation of the validity of the creditor claims.  "[W]here the judgment or decree of the federal court

23  determines a right under a federal statute, that decision is 'final until reversed in an appellate court, or

24  modified or set aside in the court of its rendition.'"  *Stoll v. Gottlieb*, 305 U.S. 165, 170 (1938).  The

25  debtor is sole trustee and beneficiary of Allied Management Trust. (ER 234:22-235:7)  Ken Yeganeh

26  derives any interest he asserts in this litigation from transfers to him by the Debtor individually or as

27  the person controlling Allied Management Trust.  Appellants' standing claim therefore relies upon a

28  theory that Appellants are precluded from asserting.  *See, e.g.*, *United States v. Schimmels*, 127 F.3d

875, 881-82 (9th Cir. 1997) (full explanation of privity concepts in upholding res judicata bar); *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (privity concepts apply to collateral estoppel).

## VII.    **CONCLUSION**

Based on the foregoing, the Bankruptcy Court's order granting summary judgment in favor of the Trustee and entry of judgment against the Appellants should be affirmed.

DATED: March 19, 2008                    LUCE, FORWARD, HAMILTON & SCRIPPS LLP


By: /s/Charles P. Maher, Esq., CSBN 124748
CHARLES A. BIRD
CHARLES P. MAHER
Attorneys for Appellee Andrea A. Wirum,
Successor-in-Interest to Charles E. Sims

301030905.2

Case No. C 07-03256 JSW
APPELLEE'S BRIEF

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re RAMIN YEGANEH, | Case No. C 07-03256 JSW |
| Debtor. | |
| CHARLES E. SIMS, Trustee, | Bankruptcy Case No. 05-30047 TEC |
| Appellee, | Adversary Pro. No. 05-3241 TEC |
| v. | |
| ALLIED MANAGEMENT TRUST, and KEN YEGANEH, | |
| Appellants. | |

## APPELLEE'S EXCERPT OF RECORD

### (Volume I)

Charles A. Bird, CSB 56566
Charles P. Maher, CSB 124748
LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
121 Spear Street, Suite 200
San Francisco, CA 94105
Telephone: (415) 356-4600
Facsimile:  (415) 356-4610


Attorneys for Appellee Andrea A. Wirum,
Successor-in-Interest to Charles E. Sims

**EXCERPT OF RECORD**

**TABLE OF CONTENTS**

Volume I of III

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| Declaration of Emily L. Maxwell in Support of (1) Motion for Summary Judgment Based on Actual Fraud and (2) Motion to Preclude Testimony and Exclude Evidence or in the Alternative, Motion to Compel Discovery | 56 | 1 | ER-001 |
| Notice of Lodgment of Documentary Evidence for Which Judicial Notice is Sought, and Other Deposition and Documentary Evidence in Support of (1) Motion for Summary Judgment Based on Actual Fraud and (2) Motion to Preclude Testimony and Exclude Evidence or in the Alternative, Motion to Compel Discovery | 58 | 2 | ER-019 |
| The findings and orders of the Superior Court of the State of California, County of San Mateo, from a criminal action titled *People v. Ramin Yeganeh* and numbered J2411H1, regarding sentencing of Ramin Yeganeh, and entered on June 14, 2001 | 58 | 3 | ER-028 |
| Complaint for Damages, Restitution, Disgorgement, and Injunctive Relief, filed on October 4, 1999 and commencing a civil action before the Superior court of the State of California, County of San Mateo titled *Edith Ingram and Nozipo Wobogo v. Ramin Yeganeh*, Case No. 410586 ("*Wobogo, et al. v. Yeganeh*") | 58 | 4 | ER-031 |
| Order of the Superior Court of the State of California, County of San Mateo, in *Wobogo, et al. v. Yeganeh*, filed on July 30, 2001 | 58 | 5 | ER-055 |
| Final Decisions on Individual Restitution Claims; Judgment Thereon, filed on June 3, 2004 in *Wobogo, et al. v. Yeganeh* | 58 | 6 | ER-058 |
| Order Re Award of Attorney's Fees, Costs, Prejudgment Interest and Related Findings; Order for Entry of Judgment Thereon, executed on September 9, 2004, in *Wobogo, et al. v. Yeganeh* | 58 | 7 | ER-082 |
| Notice of Motion and Motion to Modify Existing Preliminary Injunction, filed on September 26, 2001 in *Wobogo, et al. v. Yeganeh* | 58 | 8 | ER-097 |

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| Order Modifying Preliminary Injunction, dated October 3, 2001 and filed-stamped October 4, 2001, in *Wobogo, et al. v. Yeganeh* | 58 | 9 | ER-126 |
| Declaration of Jeffrey L. Fillerup in Support of (1) Motion for Summary Judgment Based on Actual Fraud and (2) Motion to Preclude Testimony and Exclude Evidence or in the Alternative, Motion to Compel Discovery (without exhibits) | 56 | 10 | ER-129 |
| Excerpts from the transcript of the Deposition of Ramin Yeganeh in *Sims v. Coast, Sims v. F. Namdaran, Sims v. Advanta,* and *Sims v. Allied* taken on March 29, 2006 ("R. Yeganeh Depo Transcript") , p. 149, ex. 24 | 56 | 11 | ER-136 |
| R. Yeganeh Depo Transcript, p. 152, ex. 26 | 56 | 12 | ER-141 |
| R. Yeganeh Depo Transcript, p. 154, ex. 27 | 56 | 13 | ER-144 |
| R. Yeganeh Depo Transcript, p. 155, ex. 28 | 56 | 14 | ER-147 |
| R. Yeganeh Depo Transcript, p. 156, ex. 29 | 56 | 15 | ER-150 |
| Excerpts from the transcript of an April 25, 2003 deposition of Ramin Yeganeh from a civil action before the Superior Court for the State of California, County of Alameda titled *Rad v. Cheatham*, Case No. WG-03-080151 ("R. Yeganeh April 25, 2003 Depo Transcript"), pp. 44-45 | 58 | 16 | ER-153 |
| R. Yeganeh Depo Transcript, p. 157, exs. 13, 14 | 56 | 17 | ER-156 |
| Ramin Yeganeh's Voluntary Petition to the United States Bankruptcy Court for the Northern District of California, filed on July 31, 2001 | 58 | 18 | ER-161 |
| July 17, 2001 letter sent by Ramin Yeganeh to Renee Glover and Michael Tracy attaching an executed Voluntary Petition for bankruptcy | 58 | 19 | ER-163 |
| Defendant's Notice of Automatic Stay in the Bankruptcy Proceedings, in *Wobogo, et al. v. Yeganeh*, dated July 31, 2001 | 58 | 20 | ER-167 |
| Ramin Yeganeh's Voluntary Dismissal, filed in the United States Bankruptcy Court for the Northern District of California on August 2, 2001 | 58 | 21 | ER-168 |
| Ramin Yeganeh's Voluntary Petition to the United States Bankruptcy Court for the Northern District of California, filed on January 7, 2005 | 58 | 22 | ER-169 |

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| Declaration of Charles E. Sims in Support of (1) Motion for Summary Judgment Based on Actual Fraud and (2) Motion to Preclude Testimony and Exclude Evidence or in the Alternative, Motion to Compel Discovery (with exhibits) | 56 | 23 | ER-175 |
| Complaint for Avoidance and Recovery of Fraudulent Transfers filed in the United States Bankruptcy Court by Charles E. Sims, Trustee, against Allied Management Trust | 56 | 24 | ER-184 |
| Grant Deed, from the Recorder's Office for the County of San Mateo, numbered 2005070809, and dated February 22, 2005, 10:54 a.m. | 56 | 25 | ER-188 |
| Excerpts from the transcript of testimony of Ramin Yeganeh at an April 18, 2002 proceeding in *Wobogo, et al. v. Yeganeh* ("R. Yeganeh April 18, 2002 Testimony"), p. 13 | 56 | 26 | ER-190 |

# Document No. 1

1  Charles P. Maher, State Bar No. 124748
   Jeffrey L. Fillerup, State Bar No. 120543
2  Nhung Le, State Bar No. 209552
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
4  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
5
   Attorneys for Plaintiff
6  CHARLES E. SIMS, Trustee in Bankruptcy

7

8

9                    UNITED STATES BANKRUPTCY COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                            SAN FRANCISCO

12

13 In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                           Chapter 7
14     Debtor.

15 _____

16 CHARLES E. SIMS, Trustee,

17              Plaintiff.                  Adversary Proceeding
                                            No. 05-3241
18 vs.

19 ALLIED MANAGEMENT TRUST and K.          **DECLARATION OF EMILY L.**
   YEGANEH aka KEN YEGANEH aka             **MAXWELL IN SUPPORT OF (1)**
20 KAIKHOSROW YEGANEH,                     **MOTION FOR SUMMARY JUDGMENT**
                                           **BASED ON ACTUAL FRAUD AND (2)**
21              Defendants.                 **MOTION TO PRECLUDE TESTIMONY**
                                           **AND EXCLUDE EVIDENCE OR IN THE**
                                           **ALTERNATIVE, MOTION TO COMPEL**
22                                         **DISCOVERY**

23

24                                         Date:    October 6, 2006
                                           Time:    9:30 a.m.
25 _____     Dept.:   23

26         I, Emily L. Maxwell, declare as follows:

27         1.      I am an attorney at law duly admitted to practice before this Court and a partner

28 with the law firm of DLA Piper Rudnick Gray Cary US LLP, attorney of records for plaintiffs and

                                            1

judgment creditors (the "Judgment Creditors") in the case entitled *Wobogo v. Yeganeh*, San Mateo County Superior Court, Case No. 410586 (the "State Court Action" or "*Wobogo v. Yeganeh*"). I make this declaration of my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth herein. I make this declaration in support of the motion for summary judgment and motion to preclude testimony and exclude evidence filed by Charles E. Sims ("Trustee"), Chapter 7 Trustee for the estate of Ramin Yeganeh ("Debtor").

2.    On October 4, 1999, in the State Court Action, a Complaint for Damages, Restitution, Disgorgement, and Injunctive Relief was filed against the Debtor, alleging, among other things, that the Debtor violated California Business and Professions Code Section 17200. I have worked on this case from approximately Spring of 2001 to the present date, attended numerous hearings, conducted depositions and other discovery and had many conversations with the Debtor during the many instances in which he represented himself in pro per. I have reviewed the files in this case from prior to the Spring of 2001. I am familiar with the pleadings filed in the State Court Action, the written discovery conducted in the case, the depositions taken, the judgment obtained in favor of the plaintiffs, and the efforts made by the Judgment Creditors to collect the judgment obtained against the Debtor.

3.    I am familiar with the Trustee's First Amended Complaint for Avoidance and Recovery of Fraudulent Transfers against Allied Management Trust and K. Yeganeh which seeks to recover the following properties (the "Transferred Properties"):

(a)    2462 Taylor Avenue, Oakland, California (APN 048-5597-001-00);

(b)    2300 Auseon Avenue, Oakland, California (APN 043-4610-023);

(c)    1012 73rd Avenue, Oakland, California (APN 041-4144-009-00);

(d)    1278 79th Avenue, Oakland, California, (APN 041-4198-052-00); and

(e)    1086 69th Avenue, Oakland, California (APN 041-4148-040-00).

4.    Attached to the Trustee's Notice of Lodgment of Documentary Evidence for Which Judicial Notice is Sought, and Other Deposition and Documentary Evidence (the "NOL") filed in

2

1    support of the Trustee's motion for summary judgment and motion to preclude testimony and

2    exclude evidence as **Exhibit 1** is a true and correct copy of a Corporation Grant Deed, from the

3    Recorder's Office for the County of San Mateo, numbered 92130761, and dated August 14, 1992,

4    8:00 a.m.[1]

5          5.      Attached to the NOL as **Exhibit 2** is a true and correct copy of Trustee's Deed

6    Upon Sale, from the Recorder's Office for the County of San Mateo, numbered 99-064489, and

7    dated April 12, 1999, 4:46 p.m.

8          6.      Attached to the NOL as **Exhibit 3** is a true and correct copy of a Trustee's Deed

9    Upon Sale, from the Recorder's Office for the County of San Mateo, numbered 94013528, and

10    dated January 27, 1994, 8:00 a.m.

11          7.      Attached to the NOL as **Exhibit 4** is a true and correct copy of a Trustee's Deed

12    Upon Sale, from the Recorder's Office for the County of San Mateo, numbered 94095889, and

13    dated June 1, 1994, 11:58 a.m.

14          8.      Attached to the NOL as **Exhibit 5** is a true and correct copy of a Trustee's Deed

15    Upon Sale, from the Recorder's Office for the County of Alameda, numbered 98318447, and

16    dated September 14, 1998, 2:27 p.m.

17          9.      Attached to the NOL as **Exhibit 6** is a true and correct copy of a Trustee's Deed

18    Upon Sale, from the Recorder's Office for the County of Alameda, numbered 98350312, and

19    dated October 8, 1998, 3:51 p.m.

20          10.     Attached to the NOL as **Exhibit 7** is a true and correct copy of a Trustee's Deed

21    Upon Sale, from the Recorder's Office for the County of San Mateo, numbered 99-109778, and

22    dated June 25, 1999, 1:37 p.m.

23          11.     Attached to the NOL as **Exhibit 8** is a true and correct copy of a Grant Deed, from

24    the Recorder's Office for the County of San Mateo, numbered 2001-097544, and dated June 28,

25    2001, 4:02 p.m.

26          12.     Attached to the NOL as **Exhibit 9** is a true and correct copy of a Grant Deed, from

27

[1]   The original certified copies of all deeds referred to herein can be provided to the Court upon

28    request.

1    the Recorder's Office for the County of San Mateo, numbered 2001-116170, and dated July 31,

2    2001, 8:12 a.m.

3        13.    Attached to the NOL as **Exhibit 10** is a true and correct copy of a confidentially

4    recorded Accountable Form Number 8642 regarding a Grant Deed filed with the Recorder's

5    Office for the County of San Mateo numbered 2001-116170 (Ex. 9), dated July 31, 2001.

6        14.    Attached to the NOL as **Exhibit 11** is a true and correct copy of a Short Form Deed

7    of Trust, from the Recorder's Office for the County of San Mateo, numbered 2001-149357, and

8    dated September 21, 2001, 4:46 p.m.

9        15.    Attached to the NOL as **Exhibit 12** is a true and correct copy of a Short Form Deed

10   of Trust, from the Recorder's Office for the County of San Mateo, numbered 2001-149356, and

11   dated September 21, 2001, 4:46 p.m.

12       16.    Attached to the NOL as **Exhibit 13** is a true and correct copy of a Grant Deed,

13   from the Recorder's Office for the County of Alameda, numbered 2001363687, and dated

14   September 24, 2001, 1:12 p.m.

15       17.    Attached to the NOL as **Exhibit 14** is a true and correct copy of a Grant Deed,

16   from the Recorder's Office for the County of Alameda, numbered 2002257480, and dated June 11,

17   2002, 8:30 a.m.

18       18.    Attached to the NOL as **Exhibit 15** is a true and correct copy of a Grant Deed,

19   from the Recorder's Office for the County of Alameda, numbered 2002376451, and dated

20   August 28, 2002, 4:56 p.m.

21       19.    Attached to the NOL as **Exhibit 16** is a true and correct copy of a Grant Deed,

22   from the Recorder's Office for the County of Alameda, numbered 2002389914, and dated

23   September 6, 2002, 3:07 p.m.

24       20.    Attached to the NOL as **Exhibit 17** is a true and correct copy of a Grant Deed,

25   from the Recorder's Office for the County of Alameda, numbered 2002539098, and dated

26   November 19, 2002, 1:28 p.m.

27       21.    Attached to the NOL as **Exhibit 18** is a true and correct copy of a Grant Deed,

28   from the Recorder's Office for the County of Alameda, numbered 2002570913, and dated

1  December 6, 2002, 4:06 p.m.

2      22.    Attached to the NOL as **Exhibit 19** is a true and correct copy of a Grant Deed,

3  from the Recorder's Office for the County of Alameda, numbered 2003055001, and dated January

4  29, 2003, 4:08 p.m.

5      23.    Attached to the NOL as **Exhibit 20** is a true and correct copy of a Grant Deed,

6  from the Recorder's Office for the County of Alameda, numbered 2003162534, and dated

7  March 21, 2003, 3:20 p.m.

8      24.    Attached to the NOL as **Exhibit 21** is a true and correct copy of a Grant Deed,

9  from the Recorder's Office for the County of Alameda, numbered 2003265730, and dated May 6,

10  2003, 2:58 p.m.

11      25.    Attached to the NOL as **Exhibit 22** is a true and correct copy of a Grant Deed,

12  from the Recorder's Office for the County of San Mateo, numbered 2005-027160, and dated

13  February 22, 2005, 9:30 a.m.

14      26.    Attached to the NOL as **Exhibit 23** is a true and correct copy of a Grant Deed,

15  from the Recorder's Office for the County of Alameda, numbered 2005070809, and dated

16  February 22, 2005, 10:54 a.m.

17      27.    Attached to the NOL as **Exhibit 24** is a true and correct copy of the results of a

18  search performed on December 14, 2004, of the website of the Tax Collector-Treasurer of the

19  County of San Mateo (www.sanmateocountytaxcollector.org) detailing the payment of secured

20  property taxes on:

21      627 Prospect Row, San Mateo;

22      48 Grant Street, San Mateo; and

23      718 4th Avenue, San Mateo.

24      28.    Attached to the NOL as **Exhibit 25** is a true and correct copy of State of California,

25  County of San Mateo Ordinance Code section 2.184.020.

26      29.    Attached to the NOL as **Exhibit 26** is a true and correct copy of the State of

27  California, County of Alameda General Ordinance Code section 2.04.020.

28      30.    Attached to the NOL as **Exhibit 27** is a true and correct copy of a document

5      **ER - 005**

1  obtained from files belonging to the Debtor which were seized by the police in 1999. The copies

2  of the documents from which this document was gathered were provided to Judgment Creditors'

3  counsel in 2004 pursuant to order of the Judge Pro Tem who had been holding the files for

4  safekeeping. This document appears to be a letter from William L. Whittaker, Clerk of the United

5  States District Court for the Northern District of California, dated January 22, 1988.

6       31.    Attached to the NOL as **Exhibit 28** is a true and correct copy of a document

7  obtained from files belonging to the Debtor which were seized by the police in 1999. The copies

8  of the documents from which this document was gathered were provided to Judgment Creditors'

9  counsel in 2004 pursuant to order of the Judge Pro Tem who had been holding the files for

10  safekeeping. This document appears to be a Certificate of Birth regarding Ramin Yeganeh from

11  the Immigration & Naturalization Service, San Francisco, California.

12       32.    Attached to the NOL as **Exhibit 29** is a true and correct copy of a document

13  obtained from files belonging to the Debtor which were seized by the police in 1999. The copies

14  of the documents from which this document was gathered were provided to Judgment Creditors'

15  counsel in 2004 pursuant to order of the Judge Pro Tem who had been holding the files for

16  safekeeping. This document appears to be a United States passport of Ramin Rad.

17       33.    Attached to the NOL as **Exhibit 30** is a true and correct copy of a Complaint for

18  Damages, Restitution, Disgorgement, and Injunctive Relief, filed on October 4, 1999 and

19  commencing a civil action before the Superior Court of the State of California, County of San

20  Mateo titled *Edith Ingram, on behalf of herself, and Nozipo Wobogo, on behalf of the general*

21  *public v. Ramin Yeganeh, dba American Mortgage Realty, and d/b/a American Mortgage Realty*

22  *and Trust, and Does 1 through 100,* and numbered 410586 ("*Wobogo, et al. v. Yeganeh*").

23       34.    Attached to the NOL as **Exhibit 31** is a true and correct copy of excerpts from

24  Form Interrogatories, in *Wobogo, et al. v. Yeganeh*, served by Edith Ingram on Ramin Yeganeh on

25  July 5, 2000.

26       35.    Attached to the NOL as **Exhibit 32** is a true and correct copy of excerpts from

27  Responses to Form Interrogatories served by Ramin Yeganeh on August 4, 2000 in *Wobogo, et al.*

28  *v. Yeganeh.*

36.    Attached to the NOL as **Exhibit 33** is a true and correct copy of findings and orders of the Superior Court of the State of California, County of San Mateo, in a criminal action titled *People v. Ramin Yeganeh* and numbered J2411H1, regarding sentencing of Ramin Yeganeh, and entered on June 14, 2001.

37.    Attached to the NOL as **Exhibit 34** is a true and correct copy of a July 17, 2001 letter sent by Ramin Yeganeh to Renee Glover and Michael Tracy, attaching a fully executed Voluntary Petition. Ms. Glover and Mr. Tracy are also counsel for Judgment Creditors along with me in *Wobogo, et al. v. Yeganeh.* I obtained this letter from our files.

38.    Attached to the NOL as **Exhibit 35** is a true and correct copy of an order of the Superior Court of the State of California, County of San Mateo, in *Wobogo, et al. v. Yeganeh*, filed on July 30, 2001, regarding Judgment Creditors' motion for summary adjudication.

39.    Attached to the NOL as **Exhibit 36** is a true and correct copy of Ramin Yeganeh's Voluntary Petition to the United States Bankruptcy Court for the Northern District of California, filed on July 31, 2001.

40.    Attached to the NOL as **Exhibit 37** is a true and correct copy of Defendant's Notice of Automatic Stay filed in *Wobogo, et al. v. Yeganeh*, and dated July 31, 2001.

41.    Attached to the NOL as **Exhibit 38** is a true and correct copy of Ramin Yeganeh's Debtor's Voluntary Dismissal, filed in the United States Bankruptcy Court for the Northern District of California on August 2, 2001.

42.    Attached to the NOL as **Exhibit 39** is a true and correct copy of Judgment Creditors' Ex Parte Application for a Temporary Restraining Order and Order to Show Cause Regarding Modification of Existing Preliminary Injunction, dated August 10, 2001, in *Wobogo, et al. v. Yeganeh.* Judgment Creditors sought to file this ex parte application to preclude the Debtor from transferring or encumbering any more of his real property assets. Judgment Creditors gave notice to the Debtor's counsel of their intention to seek such an order and appeared at Court at that time to seek the order. The Superior Court of the State of California, County of San Mateo refused to hear this matter ex parte, but allowed it to be heard on a shortened time, for October 3, 2001.

43.    Attached to the NOL as **Exhibit 40** is a true and correct copy of an Order Shortening Time for Hearing Plaintiff Nozipo Wobogo's Motion for Amendment of Preliminary Injunction, filed on September 26, 2001 in *Wobogo, et al. v. Yeganeh*.

44.    Attached to the NOL as **Exhibit 41** is a true and correct copy of Judgment Creditors' Motion to Modify Existing Preliminary Injunction, filed on September 26, 2001 in *Wobogo, et al. v. Yeganeh*.

45.    Attached to the NOL as **Exhibit 42** is a true and correct copy of an Order Modifying Preliminary Injunction, dated October 3, 2001 and file-stamped October 4, 2001 in *Wobogo, et al. v. Yeganeh*.

46.    Attached to the NOL as **Exhibit 43** is a true and correct copy of Plaintiffs' Deposition by Written Questions Propounded to Defendant Ramin Yeganeh, dated March 15, 2002, in *Wobogo, et al. v. Yeganeh.* These questions were propounded pursuant to Court order.

47.    Attached to the NOL as **Exhibit 44** is a true and correct copy of Defendant's Verified Responses to Plaintiffs' Written Deposition Questions, Pursuant to Court Order, filed on March 29, 2002, in *Wobogo, et al. v. Yeganeh*.

48.    Attached to the NOL as **Exhibit 45** is a true and correct copy of a Declaration and Instrument of Trust regarding Allied Management Trust, produced by Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.* Judgment Creditors do not concede the authenticity of this document or that a trust actually exists, but offer this document as the document produced by the Debtor on that topic.

49.    Attached to the NOL as **Exhibit 46** is a true and correct copy of an Order Regarding Confidential Records, filed on May 28, 2003, in *Wobogo, et al. v. Yeganeh*.

50.    Attached to the NOL as **Exhibit 47** is a true and correct copy of a Complaint of Phyllis Suzy-Q Shoop filed in the Superior Court of the State of California, County of Alameda on February 18, 2004 against James Jones; Michael Jones; R. Rad a.k.a. K. Rad a.k.a. Ray Rad a.k.a. Ramin Yeganeh a.k.a. Ramin Rad Yeganeh; and Allied Management Trust, Case No. RG04141525.

51.    Attached to the NOL as **Exhibit 48** is a true and correct copy of the Final Decisions on Individual Restitution Claims; Judgment Thereon, filed on June 3, 2004 in *Wobogo, et al. v.*

1   *Yeganeh.*

2       52.    Attached to the NOL as **Exhibit 49** is a true and correct copy of an Order Re

3   Award of Attorney's Fees, Costs, Prejudgment Interest and Related Findings; Order for Entry of

4   Judgment Thereon, executed on September 9, 2004 in *Wobogo, et al. v. Yeganeh.*

5       53.    Attached to the NOL as **Exhibit 50** is a true and correct copy of Defendant's Ex

6   Parte Application for Temporary Restraining Order Prohibiting Plaintiff's Attorneys from

7   Copying or Disseminating his Personal and Confidential Files Pending Hearing on Motion for a

8   Protective Order; Application for Order Setting Hearing in 21 Days Re Personal Service, dated

9   September 16, 2004, in *Wobogo, et al. v. Yeganeh.*

10      54.    Attached to the NOL as **Exhibit 51** is a true and correct copy of the Motion for

11  Protective Order Re Copying of Defendant's Personal & Confidential Files by Plainitff (sic), dated

12  September 16, 2004, filed by Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*

13      55.    Attached to the NOL as **Exhibit 52** is a true and correct copy of the Notice of

14  Motion and Motion for Termination of Stipulation for Appointment of Temporary Judge

15  Blackman, dated September 17, 2004, filed by Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*

16      56.    Attached to the NOL as **Exhibit 53** is a true and correct copy of the Notice of

17  Motion and Motion to Vacate/Modify September 9, 2004 Judgment, dated September 24, 2004,

18  filed by Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*  The Debtor also filed a motion to stay

19  execution of the judgment without a bond.  Both of these motions and the motion to terminate the

20  temporary judge were denied the morning of January 7, 2005.

21      57.    Attached to the NOL as **Exhibit 54** is a true and correct copy of Plaintiff Nozipo

22  Wobogo's Request for Production of Documents to Defendant Ramin Yeganeh, served on October

23  15, 2004, in *Wobogo, et al. v. Yeganeh.*

24      58.    I am familiar with the document requests to the Debtor in the case of *Wobogo, et*

25  *al. v. Yeganeh* and the subpoenas and document requests to Farin Yeganeh and Ken Yeganeh in

26  the bankruptcy case.  I also am familiar with the documents produced in response to these

27  requests.  Despite numerous document demands, neither the Debtor nor his mother produced the

28  trust formation documents for the Advanta Trust or the Coast Development Trust.  The Debtor has

1  also failed to produce any meaningful financial documentation since 1999, when his records were
2  seized by the police.

3          59.     Attached to the NOL as **Exhibit 55** is a true and correct copy of Defendant's
4  Responses to Plaintiff's Demand for Documents, served on November 14, 2004, in *Wobogo, et al.*
5  *v. Yeganeh.*

6          60.     Attached to the NOL as **Exhibit 56** is a true and correct copy of Defendant's
7  Further Responses to Plaintiff's Demand for Documents, served on November 29, 2004, in
8  *Wobogo, et al. v. Yeganeh.*

9          61.     Attached to the NOL as **Exhibit 57** is a true and correct copy of Notice of Motion
10 and Motion for Stay of Enforcement of the June 3, 2004 Judgment, the September 9, 2004 Order,
11 and the September 14, 2004 Judgment Pending Appeal, dated December 15, 2004, in *Wobogo, et*
12 *al. v. Yeganeh.*

13         62.     Attached to the NOL as **Exhibit 58** is a true and correct copy of Ramin Yeganeh's
14 Voluntary Petition to the United States Bankruptcy Court for the Northern District of California,
15 filed on January 7, 2005.

16         63.     Attached to the NOL as **Exhibit 59** is a true and correct copy of a Complaint for
17 Avoidance and Recovery of Fraudulent Transfers filed in the United States Bankruptcy Court by
18 the U.S. Trustee, Charles E. Sims, against Advanta Trust, dated February 18, 2005.

19         64.     Attached to the NOL as **Exhibit 60** is a true and correct copy of a Complaint for
20 Avoidance and Recovery of Fraudulent Transfers filed in the United States Bankruptcy Court by
21 the U.S. Trustee, Charles E. Sims, against Allied Management Trust, dated February 18, 2005.

22         65.     Attached to the NOL as **Exhibit 61** is a true and correct copy of a Complaint for
23 Avoidance and Recovery of Fraudulent Transfers filed in the United States Bankruptcy Court by
24 the U.S. Trustee, Charles E. Sims, against F. Namdaran (a.k.a. Fran Namdaran, a.k.a. Farin
25 Namdaran, a.k.a. Farin Yeganeh, a.k.a. Fran Yeganeh), dated February 18, 2005.

26         66.     Attached to the NOL as **Exhibit 62** is a true and correct copy of a Complaint for
27 Avoidance and Recovery of Fraudulent Transfers filed in the United States Bankruptcy Court by
28 the U.S. Trustee, Charles E. Sims, against Coast Development Trust, dated February 18, 2005.

67.    Attached to the NOL as **Exhibit 63** is a true and correct copy of a Subpoena in a Case Under the Bankruptcy Code, issued by the United States Bankruptcy Court for the Northern District of California, to Farin Yeganeh, dated June 13, 2005.

68.    Attached to the NOL as **Exhibit 64** are true and correct copies of excerpts from the transcript of a June 8, 2000 deposition of Fran Farin Yeganeh in *Wobogo, et al. v. Yeganeh.*

69.    Attached to the NOL as **Exhibit 65** are true and correct copies of excerpts from the transcript of testimony of Ramin Yeganeh at an April 18, 2002 proceeding in *Wobogo, et al. v. Yeganeh.*

70.    Attached to the NOL as **Exhibit 66** are true and correct copies of excerpts from the transcript of an April 25, 2003 deposition of Ramin Yeganeh from a civil action before the Superior Court for the State of California, County of Alameda titled *Rad v. Cheatham* and numbered WG-03-080151.

71.    Attached to the NOL as **Exhibit 67** are true and correct copies of excerpts from the transcript of testimony of Ramin Yeganeh at a June 20, 2003 proceeding regarding Ramin Yeganeh's contempt of court orders in *Wobogo, et al. v. Yeganeh.*

72.    Attached to the NOL as **Exhibit 68** are true and correct copies of excerpts from the transcript of a November 30, 2004 examination of Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*

73.    Attached to the NOL as **Exhibit 69** are true and correct excerpts from the transcript of a December 10, 2004 examination of Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*

74.    Attached to the NOL as **Exhibit 70** are true and correct excerpts from the transcript of a December 20, 2004 examination of Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*

75.    Attached to the NOL as **Exhibit 71** are true and correct excerpts from the transcript of a December 27, 2004 deposition of Farin Yeganeh in a civil action before the Superior Court of the State of California, County of Alameda titled *Phyllis Suzy-Q Shoop v. James Jones; Michael Jones; R. Rad a.k.a. K. Rad a.k.a. Ray Rad a.k.a. Ramin Yeganeh a.k.a. Ramin Rad Yeganeh; and Allied Management Trust* and numbered RG-04-141525.

76.    Attached to the NOL as **Exhibit 72** are true and correct copies of excerpts from the transcript of a December 28, 2004 examination of Ramin Yeganeh in *Wobogo, et al. v. Yeganeh.*

77.    Attached to the NOL as **Exhibit 73** are true and correct copies of excerpts from the transcript of the testimony of the Debtor at the March 9, 2005 Meeting of Creditors.

78.    Attached to NOL as **Exhibit 74** are true and correct copies of excerpts from the transcript of a June 1, 2005 examination of Ramin Yeganeh.

79.    Attached to the NOL as **Exhibit 75** are true and correct copies of excerpts from the transcript of a June 9, 2005 examination of Ramin Yeganeh.

80.    Attached to the NOL as **Exhibit 76** are true and correct copies of excerpts from the transcript of a June 23, 2005 examination of Farin Namdaran Yeganeh.

81.    Attached to the NOL as **Exhibit 77** are true and correct copies of excerpts from the transcript of a June 24, 2005 examination of Kaikhosrow Yeganeh.

82.    Attached to the NOL as **Exhibit 78** is a true and correct copy of the Summary of Schedules regarding Ramin Yeganeh from the above-captioned Chapter 7 bankruptcy.

83.    Attached to the NOL as **Exhibit 79** is a true and correct copy of a Short Form Deed of Trust, from the Recorder's Office for the County of San Francisco, numbered 2001-H027415-00, and dated September 24, 2001, 2:05 p.m.

84.    I am informed and believe that, in 1999, the police seized the Debtor's records, including real property transaction records, bank statements, mortgage information, utility bills and tax documents, from his home. Based on my review of the documents seized, the Debtor was very meticulous with recordkeeping prior to the 1999 seizure. However, after the 1999 seizure, the Debtor appears to have kept minimal records. I was unable to obtain significant documents from the Debtor or his parents relating to real property transactions by the Debtor or the Debtor's parents occurring after 1999. My firm has had to obtain many of the relevant documents regarding the Debtor's real property transactions after 1999 from our investigation. Indeed, Debtor has often told me that he discards all financial documents since the 1999 seizure.

85.    I am informed and believe that, in 1999, as part of a criminal investigation of the Debtor's mortgage consulting business, San Mateo County executed a search warrant and seized files from the Debtor's business. In the criminal proceeding against the Debtor, the criminal court

1   concluded that the search warrant by which the files were seized was insufficient to cover all of

2   the files.  As a result, all of the Debtor's files that had been seized were excluded from the criminal

3   case, except for the four original victims.  The Debtor eventually pleaded no contest to four felony

4   counts relating to these four original victims.  In the civil case, I learned that the seized files

5   disclosed violations against over 200 Bay Area homeowners.  The civil case was not affected by

6   the evidentiary ruling in the criminal case, so the civil case proceeded on behalf of various victims

7   in addition to the four original victims identified in the County's search warrant.

8       86.     On July 30, 2001, the San Mateo Superior Court granted the Judgment Creditors'

9   motion for summary adjudication, concluding that the Debtor had violated Section 17200, and

10  restitution hearings commenced to determine the appropriate relief for the 17200 violations.

11  Attached to the NOL as **Exhibit 35** is a true and correct copy of the order granting summary

12  adjudication.  Attached to the NOL as **Exhibit 48** is a true and court copy of the judgment entered

13  on June 3, 2004 by the San Mateo Superior Court on the 27 restitution claims.  Attached to the

14  NOL as **Exhibit 49** is the supplemental judgment entered on September 9, 2004 by the San Mateo

15  Superior Court, adding prejudgment interest, attorney's fees and costs to the June 3, 2004

16  judgment.

17      87.     Before the filing of this bankruptcy case, the Debtor sometimes denied that he had

18  any involvement in Coast Development Trust, Allied Management Trust and Advanta Trust.  It is

19  my belief that the Debtor formed or created these trusts so that he could protect his properties from

20  being executed on by his creditors and to throw the Judgment Creditors off track.  For instance,

21  the only trust for which the Debtor or his parents have produced a trust document of which I am

22  aware is Allied Management Trust.  That trust document is dated May 6, 2003.  However, four of

23  the five properties transferred to Allied Management Trust were transferred to that trust before the

24  date of the trust document (i.e. before May 6, 2003).  I have never seen any formation documents

25  for the other two trusts although they were repeatedly requested in discovery.

26      88.     On June 20, 2003, the Debtor was found guilty of contempt of court for violating

27  court orders prohibiting him from engaging in certain real property transactions and contempt of

28  court during his testimony that day.  Farin Yeganeh and Ken Yeganeh were present at the June 20,

1    2003 contempt proceeding.  The Debtor was sentenced to 36 days in jail and taken immediately in

2    to custody.  Subsequent to the Debtor's incarceration, our investigation of the Debtor's real estate

3    transactions led us to suspect that "F. Namdaran" was the Debtor's mother.  Both the Debtor and

4    his mother later confirmed that "F. Namdaran" was, in fact, the Debtor's mother and not a man

5    named "Fred" as the Debtor had previously stated under oath in responses to interrogatories.

6            89.    In anticipation of recovering and selling the properties transferred by the Debtor,

7    my firm caused to be served on the Debtor's parents and recorded in the real estate records of the

8    appropriate county the following writs of execution:

9            a.    Attached to the NOL as **Exhibit 80** is a true and correct copy of the Notice

10           of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of

11           the County of San Mateo as Document Number 2004-236000, against the real property

12           located at 48 N. Grant Street, San Mateo, California.

13           b.    Attached to the NOL as **Exhibit 81** is a true and correct copy of the Notice

14           of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of

15           the County of San Mateo as Document Number 2004-235995, against the real property

16           located at 718 E. 4th Avenue, San Mateo, California.

17           c.    Attached to the NOL as **Exhibit 82** is a true and correct copy of the Notice

18           of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of

19           the County of San Mateo as Document Number 2004-235999, against the real property

20           located at 627 Prospect Row, San Mateo, California.

21           d.    Attached to the NOL as **Exhibit 83** is a true and correct copy of the Notice

22           of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of

23           the County of Alameda as Document Number 2004532716, against the real property

24           located at 6853 Simson Street, Oakland, California.

25           e.    Attached to the NOL as **Exhibit 84** is a true and correct copy of the Notice

26           of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of

27           the County of Alameda as Document Number 2004532717, against the real property

28           located at 394 Sparling Drive, Hayward, California.

f.      Attached to the NOL as **Exhibit 85** is a true and correct copy of the Notice of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of the County of San Mateo as Document Number 2004-235996, against the real property located at 1659 Linda Mar Blvd, Pacifica, California.

g.      Attached to the NOL as **Exhibit 86** is a true and correct copy of the Notice of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of the County of San Mateo as Document Number 2004-235998, against the real property located at 139 Francisco Drive, South San Francisco, California.

h.      Attached to the NOL as **Exhibit 87** is a true and correct copy of the Notice of Levy under Writ of Execution recorded on December 1, 2004, in the Official Records of the County of San Mateo as Document Number 2004-235997, against the real property located at 115 Francisco Drive, South San Francisco, California.

90.     I have conducted depositions of the Debtor and his parents and have attended several depositions and examinations of the Debtor and his parents. Based on my experience, it is my opinion the Debtor and his parents have repeatedly committed perjury to protect the properties subject to the Trustee's four adversary proceedings. I have reviewed transcripts from various court proceedings, depositions and examinations. The following are examples of just a few of the many instances where I believe the Debtor committed perjury:

a.      On April 18, 2002, the Debtor testified under oath before Judge Pro Tem Blackman in the State Court Action and denied that he had any relationship with R. Rad. (*See* Ex. 65 at 13:11-13, 118:20-121:10) One year later, on April 25, 2003, the Debtor was deposed in connection with a lawsuit (*Rad v. Cheatham*, Case No. WG-03-080151, filed in Alameda Superior Court) involving property purchased under the alias, "R. Rad." In that deposition, the Debtor finally admitted that *he* was "R. Rad." (*See* Ex. 66 at 44:24-45:4)

b.      On April 18, 2002, the Debtor testified that "F. Namdaran" was a man named Fred or a woman whose name he could not recall. (*See* Ex. 65 at 31:20-32:20) He also testified that Coast Development Trust was called "Coast Developers," that he did not

know who the principals were, but that one was an "Asian guy" and that he met with them at their offices at least once. (*See* Ex. 65 at 38:23-41:14)  Later, during a court proceeding on January 23, 2004, the Debtor admitted that F. Namdaran was his mother and Coast Development Trust belongs to his parents, not some "Asian" guy. (*See* Ex. 88 at 14:12-15:4)  Attached to the NOL as **Exhibit 88** is a true and correct copy of the transcript of statements of Ramin Yeganeh at a January 23, 2004 ex parte hearing before Judge Mark R. Forcum in *Wobogo, et al. v. Yeganeh*.  However, on December 20, 2004, at his judgment debtor exam, the Debtor again denied that he knew the names of anyone associated with Coast Development Trust. (*See* Ex. 70 at 510:15-23)  Then, at his Rule 2004 examination in June, 2005, the Debtor testified again that Coast Development Trust belongs to his parents. (*See* Ex. 75 at 229:10-17)  I believe these conflicting statements regarding this trust cannot be reconciled unless one concludes they are proof of Debtor's obvious perjury.

       c.     On May 28, 2003, the Debtor declared that Allied Management Trust is an "independent investor" and that he had no interest in the trust.  Attached to the NOL as **Exhibit 89** is a true and correct copy of the declaration signed by the Debtor and dated May 28, 2003 filed in support of his Opposition to Plaintiff's Ex Parte Application for Order to Show Cause re Contempt of Court.  Later, on June 20, 2003, the Debtor testified that he is the trustee and beneficiary of Allied Management Trust. (*See* Ex. 90 at 52:22-53:7)  Attached to the NOL as **Exhibit 90** are true and correct copies of excerpts from the June 20, 2003 contempt hearing in *Wobogo, et al. v. Yeganeh*.

       d.     On November 30, 2004 and December 20, 2004, at his judgment debtor examination, the Debtor testified that he did not know the trustees of Advanta Trust. (*See* Ex. 68 at 54:25-56:4, Ex. 70 at 561:6-18, 564:22-565:2, 570:20-25)  I am informed and believe that the Debtor now alleges that Advanta Trust belongs to his mother. (*See* Ex. 75 293:11-294:7)

       91.     I also believe that the Debtor's mother, Farin Yeganeh, has perjured herself. Contrary to what Farin Yeganeh now asserts in the actions filed by the Trustee against her, Ms. Yeganeh previously testified that she never purchased any real property from the Debtor and never

1    gave him money to purchase real property. She further testified that she knew nothing about

2    Advanta Trust. (*See* Ex. 71 at 29:14-31:3) She also testified in June 2000 that she only owned

3    three pieces of real estate, none of which are subject to the Trustee's adversary proceedings

4    against her. (*See* Ex. 64 at 209:17-210:21) This is significant because most of the properties

5    involved in this case were transferred to her by the Debtor before her June 2000 deposition. Thus,

6    her failure to identify these properties shows she did not and does not hold the properties for

7    herself and is, in my opinion, evidence of her perjury as well.

8        92.    Prior to this bankruptcy filing, the Debtor filed for bankruptcy to stay the State

9    Court Action. On July 31, 2001 (one day after the San Mateo Superior Court granted summary

10   adjudication in favor of the Judgment Creditors), the Debtor filed a voluntary petition with a

11   misspelling of his name and an incorrect address. (*See* Ex. 36) However, the version of that

12   document that was served on my firm as counsel for the Judgment Creditors ten days **before** the

13   July 31, 2001 filing did *not* contain the spelling and address error. (*See* Exs. 34 and 37) I believe

14   that the Debtor purposefully misspelled his name on the petition filed with the Court.

15       93.    In another instance, the Debtor submitted a forged settlement agreement into

16   evidence in the State Court Action. The Debtor later claimed he did not forge the document and

17   accused my firm of forging a document which would have extinguished our client's rights. The

18   Superior Court found in the June 3, 2004 Judgment (see pg. 22 of the Judgment attached as

19   Exhibit 81) that the settlement agreement submitted by the Debtor was a forgery.

20       94.    Attached to the NOL as **Exhibit 91** is a true and correct copy of a chronology that I

21   prepared which summarizes facts and events relating to the Debtor's efforts to defraud creditors by

22   transferring the Transferred Properties to his mother and father. As the facts and exhibits

23   mentioned above indicate, there are voluminous documents, transcripts, and pleadings supporting

24   the contention that the Debtor has intentionally transferred the Transferred Properties to defraud

25   creditors. Pursuant to Federal Rule of Evidence 1006, as of the date that document was created, I

26   believed that key events from these voluminous documents, transcripts, and pleadings are

27   accurately summarized in Exhibit 91. I have recently reviewed this document again and although

28   it does not include some of the Debtor's activities after January 7, 2005 which I believe also

1 | demonstrate fraudulent conveyance and perjury took place, I continue to believe that this
2 | document accurately reflects the key events discussed therein. If called upon to do so, I could
3 | testify to the matters set forth in Exhibit 91.

4 |     95.    Based upon the foregoing, if I were called as a witness in this case, I would testify
5 | that I believe the Debtor transferred the Transferred Properties in order to defraud the Judgment
6 | Creditors and other creditors.

7 |     I declare under penalty of perjury under the laws of the State of California and of the
8 | United States that the above statements are true and that if called as a witness I could and would
9 | testify to their truthfulness. This declaration was executed on the 21st day of August 2006 in San
10 | Francisco, California.

12 | Emily L. Maxwell

205165.1

# Document No. 2

1  Charles P. Maher, State Bar No. 124748
   Jeffrey L. Fillerup, State Bar No. 120543
2  Nhung Le, State Bar No. 209552
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
4  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
5
   Attorneys for Plaintiff
6  CHARLES E. SIMS, Trustee in Bankruptcy

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11  In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                            Chapter 7
12         Debtor.

13  CHARLES E. SIMS, Trustee,

14              Plaintiff.
                                            Adversary Proceeding
15  vs.                                     No. 05-3241

16  ALLIED MANAGEMENT TRUST and K.
    YEGANEH aka KEN YEGANEH aka             NOTICE OF LODGMENT OF
17  KAIKHOSROW YEGANEH,                     DOCUMENTARY EVIDENCE FOR
                                            WHICH JUDICIAL NOTICE IS
18              Defendants.                 SOUGHT, AND OTHER DEPOSITION
                                            AND DOCUMENTARY EVIDENCE IN
19                                          SUPPORT OF (1) MOTION FOR
                                            SUMMARY JUDGMENT BASED ON
20                                          ACTUAL FRAUD, AND (2) MOTION TO
                                            PRECLUDE TESTIMONY AND
21                                          EXCLUDE EVIDENCE OR IN THE
                                            ALTERNATIVE, MOTION TO COMPEL
22                                          DISCOVERY

23                                          Date:    October 6, 2006
                                            Time:    9:30 a.m.
24                                          Dept.:   23

25

26      **PLEASE TAKE NOTICE** that Plaintiff Charles E. Sims, Trustee in bankruptcy for the

27  estate of Ramin Yeganeh, hereby lodges the following documentary evidence with the Court in

28  support of Plaintiff's Motion for Summary Judgment Based on Actual Fraud and Motion to

                                    1

1   Preclude Testimony and Exclude Evidence or In the Alternative, Motion to Compel Discovery:

2   **EXHIBIT 1**   Corporation Grant Deed, from the Recorder's Office for the County of San Mateo,

3   numbered 92130761, and dated August 14, 1992, 8:00 a.m.

4   **EXHIBIT 2**   Trustee's Deed Upon Sale, from the Recorder's Office for the County of San

5   Mateo, numbered 99-064489, and dated April 12, 1999, 4:46 p.m..

6   **EXHIBIT 3**   Trustee's Deed Upon Sale, from the Recorder's Office for the County of San

7   Mateo, numbered 94013528, and dated January 27, 1994, 8:00 a.m.

8   **EXHIBIT 4**   Trustee's Deed Upon Sale, from the Recorder's Office for the County of San

9   Mateo, numbered 94095889, and dated June 1, 1994, 11:58 a.m.

10  **EXHIBIT 5**   Trustee's Deed Upon Sale, from the Recorder's Office for the County of Alameda,

11  numbered 98318447, and dated September 14, 1998, 2:27 p.m.

12  **EXHIBIT 6**   Trustee's Deed Upon Sale, from the Recorder's Office for the County of Alameda,

13  numbered 98350312, and dated October 8, 1998, 3:51 p.m.

14  **EXHIBIT 7**   Trustee's Deed Upon Sale, from the Recorder's Office for the County of San

15  Mateo, numbered 99-109778, and dated June 25, 1999, 1:37 p.m.

16  **EXHIBIT 8**   Grant Deed, from the Recorder's Office for the County of San Mateo, numbered

17  2001-097544, and dated June 28, 2001, 4:02 p.m.

18  **EXHIBIT 9**   Grant Deed, from the Recorder's Office for the County of San Mateo, numbered

19  2001-116170, and dated July 31, 2001, 8:12 a.m.

20  **EXHIBIT 10** Confidentially recorded Accountable Form Number 8642 regarding a Grant Deed

21  filed with the Recorder's Office for the County of San Mateo numbered 2001-116170 (Ex. 9),

22  dated July 31, 2001.

23  **EXHIBIT 11** Short Form Deed of Trust, from the Recorder's Office for the County of San

24  Mateo, numbered 2001-149357, and dated September 21, 2001, 4:46 p.m.

25  **EXHIBIT 12** Short Form Deed of Trust, from the Recorder's Office for the County of San

26  Mateo, numbered 2001-149356, and dated September 21, 2001, 4:46 p.m.

27  **EXHIBIT 13** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

28  2001363687, and dated September 24, 2001, 1:12 p.m.

1   **EXHIBIT 14** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

2   2002257480, and dated June 11, 2002, 8:30 a.m.

3   **EXHIBIT 15** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

4   2002376451, and dated August 28, 2002, 4:56 p.m.

5   **EXHIBIT 16** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

6   2002389914, and dated September 6, 2002, 3:07 p.m.

7   **EXHIBIT 17** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

8   2002539098, and dated November 19, 2002, 1:28 p.m.

9   **EXHIBIT 18** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

10   2002570913, and dated December 6, 2002, 4:06 p.m.

11   **EXHIBIT 19** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

12   2003055001, and dated January 29, 2003, 4:08 p.m.

13   **EXHIBIT 20** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

14   2003162534, and dated March 21, 2003, 3:20 p.m.

15   **EXHIBIT 21** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

16   2003265730, and dated May 6, 2003, 2:58 p.m.

17   **EXHIBIT 22** Grant Deed, from the Recorder's Office for the County of San Mateo, numbered

18   2005-027160, and dated February 22, 2005, 9:30 a.m.

19   **EXHIBIT 23** Grant Deed, from the Recorder's Office for the County of Alameda, numbered

20   2005070809, and dated February 22, 2005, 10:54 a.m.

21   **EXHIBIT 24** A print-out, dated December 14, 2004, from the website of the Tax Collector-

22   Treasurer of the County of San Mateo (www.sanmateocountytaxcollector.org) detailing the

23   payment of secured property taxes on 627 Prospect Row, San Mateo; 48 Grant Street, San Mateo;

24   and 718 4th Avenue, San Mateo.

25   **EXHIBIT 25** State of California, County of San Mateo Ordinance Code section 2.184.020.

26   **EXHIBIT 26** State of California, County of Alameda General Ordinance Code section 2.04.020.

27   **EXHIBIT 27** Letter from William L. Whittaker, Clerk of the United States District Court for the

28   Northern District of California, dated January 22, 1988; document obtained from copies of Ramin

1    Yeganeh's files seized by the San Mateo Police Department in 1999. Originals believed discarded

2    by Ramin Yeganeh based on Mr. Yeganeh's testimony that he discarded originals when they were

3    returned to him.

4    **EXHIBIT 28** Certificate of Birth regarding Ramin Yeganeh from the Immigration &

5    Naturalization Service, San Francisco, California; document obtained from copies of Ramin

6    Yeganeh's files seized by the San Mateo Police Department in 1999. Originals believed discarded

7    by Yeganeh based on Yeganeh's testimony that he discarded originals when they were returned to

8    him.

9    **EXHIBIT 29** United States passport of Ramin Rad; document obtained from copies of Yeganeh's

10   files seized by the San Mateo Police Department in 1999. Originals believed discarded by Ramin

11   Yeganeh based on Mr. Yeganeh's testimony that he discarded originals when they were returned

12   to him.

13   **EXHIBIT 30** Complaint for Damages, Restitution, Disgorgement, and Injunctive Relief, filed on

14   October 4, 1999 and commencing a civil action before the Superior Court of the State of

15   California, County of San Mateo titled *Edith Ingram and Nozipo Wobogo v. Ramin Yeganeh* and

16   numbered 410586 ("*Wobogo, et al. v. Yeganeh*").    The plaintiffs in *Wobogo, et al. v. Yeganeh* are

17   hereinafter referred to as the "Judgment Creditors."

18   **EXHIBIT 31** Excerpts from Form Interrogatories in *Wobogo, et al. v. Yeganeh*, served by Edith

19   Ingram on Ramin Yeganeh on July 5, 2000.

20   **EXHIBIT 32** Excerpts from  Responses to Form Interrogatories served by Ramin Yeganeh on

21   August 4, 2000 in *Wobogo, et al. v. Yeganeh.*

22   **EXHIBIT 33** The findings and orders of the Superior Court of the State of California, County of

23   San Mateo, from a criminal action titled *People v. Ramin Yeganeh* and numbered J2411H1,

24   regarding sentencing of Ramin Yeganeh, and entered on June 14, 2001.

25   **EXHIBIT 34** July 17, 2001 letter sent by Ramin Yeganeh to Renee Glover and Michael Tracy

26   attaching an executed Voluntary Petition for bankruptcy.

27   **EXHIBIT 35** An order of the Superior Court of the State of California, County of San Mateo, in

28   *Wobogo, et al. v. Yeganeh*, filed on July 30, 2001, regarding Judgment Creditors' motion for

4

1    summary adjudication.

2    **EXHIBIT 36** Ramin Yeganeh's Voluntary Petition to the United States Bankruptcy Court for the

3    Northern District of California, filed on July 31, 2001.

4    **EXHIBIT 37** Defendant's Notice of Automatic Stay in the Bankruptcy Proceedings, in *Wobogo,*

5    *et al. v. Yeganeh*, dated July 31, 2001.

6    **EXHIBIT 38** Ramin Yeganeh's Voluntary Dismissal, filed in the United States Bankruptcy Court

7    for the Northern District of California on August 2, 2001.

8    **EXHIBIT 39** Judgment Creditors' Ex Parte Application for a Temporary Restraining Order and

9    Order to Show Cause Regarding Modification of Existing Preliminary Injunction, dated August

10    10, 2001, in *Wobogo, et al. v. Yeganeh*.

11    **EXHIBIT 40** Order Shortening Time for Hearing Plaintiff Nozipo Wobogo's Motion for

12    Amendment of Preliminary Injunction, filed on September 26, 2001 in *Wobogo, et al. v. Yeganeh*.

13    **EXHIBIT 41** Judgment Creditors' Motion to Modify Existing Preliminary Injunction, filed on

14    September 26, 2001 in *Wobogo, et al. v. Yeganeh*.

15    **EXHIBIT 42** Order Modifying Preliminary Injunction, dated October 3, 2001 and file-stamped

16    October 4, 2001, in *Wobogo, et al. v. Yeganeh*.

17    **EXHIBIT 43** Plaintiffs' Deposition by Written Questions Propounded to Defendant Ramin

18    Yeganeh, dated March 15, 2002, in *Wobogo, et al. v. Yeganeh*.

19    **EXHIBIT 44** Defendant's Verified Responses to Plaintiff's Written Deposition Questions,

20    Pursuant to Court Order, filed on March 29, 2002, in *Wobogo, et al. v. Yeganeh*.

21    **EXHIBIT 45** Declaration and Instrument of Trust regarding Allied Management Trust, produced

22    by Ramin Yeganeh in *Wobogo, et al. v. Yeganeh*; document obtained from Yeganeh.

23    **EXHIBIT 46** Order Regarding Confidential Records, filed on May 28, 2003, in *Wobogo, et al. v.*

24    *Yeganeh*.

25    **EXHIBIT 47** Complaint of Phyllis Suzy-Q Shoop filed in the Superior Court of the State of

26    California, County of Alameda on February 18, 2004 against James Jones; Michael Jones; R. Rad

27    a.k.a. K. Rad a.k.a. Ray Rad a.k.a. Ramin Yeganeh a.k.a. Ramin Rad Yeganeh; and Allied

28    Management Trust, Case No. RG04141525.

1  **EXHIBIT 48** Final Decisions on Individual Restitution Claims; Judgment Thereon, filed on June

2  3, 2004 in *Wobogo, et al. v. Yeganeh*.

3  **EXHIBIT 49** Order Re Award of Attorney's Fees, Costs, Prejudgment Interest and Related

4  Findings; Order for Entry of Judgment Thereon, executed on September 9, 2004 in *Wobogo, et al.*

5  *v. Yeganeh*.

6  **EXHIBIT 50** Defendant's Ex Parte Application for Temporary Restraining Order Prohibiting

7  Plaintiff's Attorneys from Copying or Disseminating his Personal and Confidential Files Pending

8  Hearing on Motion for a Protective Order; Application for Order Setting Hearing in 21 Days Re

9  Personal Service, dated September 16, 2004, in *Wobogo, et al. v. Yeganeh*.

10  **EXHIBIT 51** Motion for Protective Order Re Copying of Defendant's Personal & Confidential

11  Files by Plaintff (sic), dated September 16, 2004, in *Wobogo, et al. v. Yeganeh*.

12  **EXHIBIT 52** Notice of Motion and Motion for Termination of Stipulation for Appointment of

13  Temporary Judge Blackman, dated September 17, 2004, in *Wobogo, et al. v. Yeganeh*.

14  **EXHIBIT 53** Notice of Motion and Motion to Vacate/Modify September 9, 2004 Judgment,

15  dated September 24, 2004, in *Wobogo, et al. v. Yeganeh*.

16  **EXHIBIT 54** Plaintiff Nozipo Wobogo's Request for Production of Documents to Defendant

17  Ramin Yeganeh, served on October 15, 2004, in *Wobogo, et al. v. Yeganeh*.

18  **EXHIBIT 55** Defendant's Responses to Plaintiff's Demand for Documents, served on November

19  14, 2004, in *Wobogo, et al. v. Yeganeh*.

20  **EXHIBIT 56** Defendant's Further Responses to Plaintiff's Demand for Documents, served on

21  November 29, 2004, in *Wobogo, et al. v. Yeganeh*.

22  **EXHIBIT 57** Notice of Motion and Motion for Stay of Enforcement of the June 3, 2004

23  Judgment, the September 9, 2004 Order, and the September 14, 2004 Judgment Pending Appeal,

24  dated December 15, 2004, in *Wobogo, et al. v. Yeganeh*.

25  **EXHIBIT 58** Ramin Yeganeh's Voluntary Petition to the United States Bankruptcy Court for the

26  Northern District of California, filed on January 7, 2005.

27  **EXHIBIT 59** Complaint for Avoidance and Recovery of Fraudulent Transfers filed in the United

28  States Bankruptcy Court by the U.S. Trustee, Charles E. Sims, against Advanta Trust, dated

6

1 | February 18, 2005.

2 | **EXHIBIT 60** Complaint for Avoidance and Recovery of Fraudulent Transfers filed in the United

3 | States Bankruptcy Court by the U.S. Trustee, Charles E. Sims, against Allied Management Trust,

4 | dated February 18, 2005.

5 | **EXHIBIT 61** Complaint for Avoidance and Recovery of Fraudulent Transfers filed in the United

6 | States Bankruptcy Court by the U.S. Trustee, Charles E. Sims, against F. Namdaran (a.k.a. Fran

7 | Namdaran, a.k.a. Farin Namdaran, a.k.a. Farin Yeganeh, a.k.a. Fran Yeganeh), dated February 18,

8 | 2005.

9 | **EXHIBIT 62** Complaint for Avoidance and Recovery of Fraudulent Transfers filed in the United

10 | States Bankruptcy Court by the U.S. Trustee, Charles E. Sims, against Coast Development Trust,

11 | dated February 18, 2005.

12 | **EXHIBIT 63** Subpoena in a Case Under the Bankruptcy Code, issued by the United States

13 | Bankruptcy Court for the Northern District of California, to Farin Yeganeh, dated June 13, 2005.

14 | **EXHIBIT 64** Excerpts from the transcript of a June 8, 2000 deposition of Fran Farin Yeganeh in

15 | *Wobogo, et al. v. Yeganeh.*

16 | **EXHIBIT 65** Excerpts from the transcript of testimony of Ramin Yeganeh at an April 18, 2002

17 | proceeding in *Wobogo, et al. v. Yeganeh.*

18 | **EXHIBIT 66** Excerpts from the transcript of an April 25, 2003 deposition of Ramin Yeganeh

19 | from a civil action before the Superior Court for the State of California, County of Alameda titled

20 | Rad v. Cheatham and numbered WG-03-080151.

21 | **EXHIBIT 67** Excerpts from the transcript of a June 20, 2003 proceeding regarding Ramin

22 | Yeganeh in *Wobogo, et al. v. Yeganeh.*

23 | **EXHIBIT 68** Excerpts from the transcript of a November 30, 2004 examination of Ramin

24 | Yeganeh in *Wobogo, et al. v. Yeganeh.*

25 | **EXHIBIT 69** Excerpts from the transcript of a December 10, 2004 examination of Ramin

26 | Yeganeh in *Wobogo, et al. v. Yeganeh.*

27 | **EXHIBIT 70** Excerpts from the transcript of a December 20, 2004 examination of Ramin

28 | Yeganeh in *Wobogo, et al. v. Yeganeh.*

1  **EXHIBIT 71** Excerpts from the transcript of a December 27, 2004 deposition of Farin Yeganeh

2  from a civil action before the Superior Court of the State of California, County of Alameda titled

3  *Phyllis Suzy-Q Shoop v. James Jones; Michael Jones; R. Rad a.k.a. K. Rad a.k.a. R*ay Rad a.k.a.

4  Ramin Yeganeh a.k.a. Ramin Rad Yeganeh; and Allied Management Trust and numbered RG-04-

5  141525.

6  **EXHIBIT 72** Excerpts from the transcript of a December 28, 2004 examination of Ramin

7  Yeganeh in *Wobogo, et al. v. Yeganeh.*

8  **EXHIBIT 73** Transcript excerpts from a March 9, 2005 Meeting of Creditors regarding Ramin

9  Yeganeh.

10  **EXHIBIT 74** Excerpts from the transcript of a June 1, 2005 examination of Ramin Yeganeh.

11  **EXHIBIT 75** Excerpts from the transcript of a June 9, 2005 examination of Ramin Yeganeh.

12  **EXHIBIT 76** Excerpts from the transcript of a June 23, 2005 examination of Farin Namdaran

13  Yeganeh.

14  **EXHIBIT 77** Excerpts from the transcript of a June 24, 2005 examination of Kaikhosrow

15  Yeganeh.

16  **EXHIBIT 78** Summary of Schedules regarding Ramin Yeganeh from the above-captioned

17  Chapter 7 bankruptcy.

18  **EXHIBIT 79** Short Form Deed of Trust, from the Recorder's Office for the County of San

19  Francisco, numbered 2001-H027415-00, and dated September 24, 2001, 2:05 p.m.

20  **EXHIBIT 80** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

21  Official Records of the County of San Mateo as Document Number 2004-236000, against the real

22  property located at 48 N. Grant Street, San Mateo, California.

23  **EXHIBIT 81** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

24  Official Records of the County of San Mateo as Document Number 2004-235995, against the real

25  property located at 718 E. 4th Avenue, San Mateo, California.

26  **EXHIBIT 82** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

27  Official Records of the County of San Mateo as Document Number 2004-235999, against the real

28  property located at 627 Prospect Row, San Mateo, California.

1   **EXHIBIT 83** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

2   Official Records of the County of Alameda as Document Number 2004532716, against the real

3   property located at 6853 Simson Street, Oakland, California.

4   **EXHIBIT 84** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

5   Official Records of the County of Alameda as Document Number 2004532717, against the real

6   property located at 394 Sparling Drive, Hayward, California.

7   **EXHIBIT 85** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

8   Official Records of the County of San Mateo as Document Number 2004-235996, against the real

9   property located at 1659 Linda Mar Blvd, Pacifica, California.

10  **EXHIBIT 86** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

11  Official Records of the County of San Mateo as Document Number 2004-235998, against the real

12  property located at 139 Francisco Drive, South San Francisco, California.

13  **EXHIBIT 87** Notice of Levy under Writ of Execution recorded on December 1, 2004, in the

14  Official Records of the County of San Mateo as Document Number 2004-235997, against the real

15  property located at 115 Francisco Drive, South San Francisco, California.

16  **EXHIBIT 88** Transcript of testimony of Ramin Yeganeh at a January 23, 2004 ex parte hearing

17  before Judge Mark R. Forcum in *Wobogo, et al. v. Yeganeh.*

18  **EXHIBIT 89** Declaration signed by Ramin Yeganeh and dated May 28, 2003 filed in support of

19  his Opposition to Plaintiff's Ex Parte Application for Order to Show Cause re Contempt of Court.

20  **EXHIBIT 90** Excerpts from the June 20, 2003 contempt hearing in *Wobogo, et al. v. Yeganeh.*

21  **EXHIBIT 91** Chronology prepared by Emily L. Maxwell which summarizes facts and events

22  relating to Ramin Yeganeh's efforts to defraud creditors by transferring properties to his mother

23  and father.

24  DATED: September 8, 2006          LUCE, FORWARD, HAMILTON & SCRIPPS LLP

25

26  By: _____

27  NHUNG LE,
    Attorneys for Plaintiff CHARLES E. SIMS

28  205496.1

9

ER - 027

# Document No. 3

```
J2411H1           SUPERIOR COURT - HALL OF JUSTICE & RECORDS          07/05/01
SAN MATEO CJIS          IN AND FOR THE COUNTY OF SAN MATEO            13:30
ORGANIZATION: SC
```

CASE NO. SC046012 A      DATE: 06/08/01      TIME: 09:00        DEPT.: 14

PEOPLE VS. RAMIN YEGANEH

JUDGE:    ROSEMARY PFEIFFER, JUDGE      CLERK:       ROSA VEGA
REPORTER: SONIA KOLOKOURIS              2ND CLERK:   NONE
D.A.:     PETER LYNCH                   DEFENSE CO: JOHN HALLEY

PROCEEDINGS: SENTENCING
_____
CHARGES: 3. CC 2945.4(G)
         7. CC 2945.4(G)
         23. CC 2945.4(G) W/PC 803(C)(1)
         38. CC 2945.4(G)
_____
DEFENDANT PRESENT.

THE COURT MAKES THE FOLLOWING FINDINGS AND/OR ORDERS:

DEFENDANT IS ADMITTED TO SUPERVISED PROBATION FOR A
     PERIOD OF 5 YEAR(S), 0 MONTH(S) UPON THE FOLLOWING TERMS
     AND CONDITIONS:

DEFENDANT SHALL PAY A $200.00 RESTITUTION FUND FINE AS
     MANDATED BY PENAL CODE SECTION 1202.4 PLUS 10 % OR $0.00
     COLLECTION FEE.

PAYMENTS TO BE MADE TO PROBATION DEPARTMENT.

AS TO COUNT 3 DEFENDANT SHALL SERVE 0 YEAR(S), 0
     MONTH(S), 60 DAY(S) IN THE COUNTY JAIL.

AS TO COUNT 7 DEFENDANT SHALL SERVE 0 YEAR(S), 0
     MONTH(S), 60 DAY(S) IN THE COUNTY JAIL.

AS TO COUNT 23 DEFENDANT SHALL SERVE 0 YEAR(S), 0
     MONTH(S), 60 DAY(S) IN THE COUNTY JAIL.

DEFENDANT SHALL SERVE A TOTAL OF 0 DAY(S), 6 MONTH(S), 0
     YEAR(S) IN THE COUNTY JAIL.

CREDIT FOR 23 ACTUAL DAYS SERVED, PLUS 0 DAYS GOOD
     TIME/WORK TIME PLUS 0 PROGRAM TIME FOR A TOTAL OF 23.

99

ER - 028

CASE NO. SC046012 A      DATE: 06/08/01      TIME: 09:00      DEPT.: 14
PEOPLE VS. RAMIN YEGANEH

EXECUTION OF SENTENCE STAYED TO 08/11/2001 AT 10:00 A.M.
    . DEFENDANT ORDERED TO REPORT TO JAIL ON SUCH DAY AND
    TIME.

EXECUTION OF SENTENCE STAYED TO 10/13/2001 AT 10:00 A.M.
    . DEFENDANT ORDERED TO REPORT TO JAIL ON SUCH DAY AND
    TIME.

SHERIFF'S WORK PROGRAM RECOMMENDED.

DEFENDANT TO OBEY ALL RULES AND REGULATIONS OF THE JAIL
    FACILITY OR INSTITUTION IN WHICH PLACED.

DEFT. TO SERVE 60 DAYS EACH OF SWP FOR SURRENDAR DATES
    OF 8-11-01 AND 10-13-01.

MOTION TO ALLOW DEFT. TO COMPLETE REMAINING BALANCE OF
    JAIL SENTENCE TO BE HEARD ON 9-14-01 IN DEPT. 14.

DEFENDANT'S BROKER'S LICENSE IS SUSPENDED FOR 5 YEARS.

DEFT. IS TO REFRAIN FROM MORTGAGE BROKER ACTIVITY FOR 5
    YEARS IN THE COUNTY OF SAN MATEO..

DEFENDANT SHALL MAKE RESTITUTION IN AMOUNT OF $40,275.54

ABOVE RESTITUTION ORDERED FOR HARRISON PAYABLE FORTHWITH

DEFENDANT SHALL MAKE RESTITUTION IN AMOUNT OF $1,776.00.

ABOVE RESTITUTION ORDERED FOR EPA LAW PROJECT PAYABLE
    FORTHWITH.

RESTITUTION AS TO MS. INGRAM ORDERED SATISFIED.

CONDITIONS OF PROBATION (IN ADDITION TO THE USUAL
    CONDITIONS RE: SUPERVISION, EMPLOYMENT, OBEDIENCE OF
    LAWS, REMAINING IN STATE AND KEEPING PROBATION OFFICER
    ADVISED OF WHEREABOUTS):

100

CASE NO. SC046012 A      DATE: 06/08/01      TIME: 09:00      DEPT.: 14
PEOPLE VS. RAMIN YEGANEH

DEFENDANT SHALL SUBMIT TO SEARCH AND SEIZURE OF HIS/HER
    PERSON, PLACE OF RESIDENCE OR AREA UNDER HIS/HER
    CONTROL, OR VEHICLE, BY ANY PROBATION OFFICER OR PEACE
    OFFICER, DURING THE DAY OR NIGHT, WITH OR WITHOUT
    HIS/HER CONSENT, WITH OR WITHOUT A SEARCH WARRANT, AND
    WITHOUT REGARD TO PROBABLE CAUSE.

DEFENDANT ACCEPTED TERMS AND CONDITIONS OF PROBATION.

ALL ORIGINAL SENTENCE ELEMENTS FOR THIS PROCEEDINGS
    ENTERED.

ENTERED ON CJIS BY ROSA VEGA DATE 06/14/2001.

101

# Document No. 4

COPY

1  ROBERT B. HAWK (Bar No. 118054)
   WILLIAM J. JAMES (Bar No. 174627)
2  MICHAEL M. MARKMAN (Bar No. 191388)
   ERIKA E. BARNES (Bar No. 197309)
3  HELLER EHRMAN WHITE & McAULIFFE
4  525 University Avenue
   Palo Alto, California 94301-1900
5  Telephone: (650) 324-7000
6  Facsimile: (650) 324-0638

7
   Attorneys for Plaintiffs EDITH M. INGRAM and NOZIPO WOBOGO
8

9  R. RENEE GLOVER (Bar No. 157793)
   JAMES J. DAVIS, JR. (Bar No. 130991)
10 East Palo Alto Community Law Project
   1395 Bay Road
11 East Palo Alto, CA 94303
12 Telephone: (650) 853-1600
   Facsimile: (650) 853-1608
13

14 Attorneys for Plaintiff NOZIPO WOBOGO

15

16        SUPERIOR COURT OF THE STATE OF CALIFORNIA

17            COUNTY OF SAN MATEO

18 EDITH M. INGRAM, on behalf of herself,  )  Case No.    **410586**
19 and NOZIPO WOBOGO, on behalf of the     )
20 general public,                         )
                                           )
21              Plaintiffs,                )  COMPLAINT FOR DAMAGES,
                                           )  RESTITUTION, DISGORGEMENT
22        v.                               )  AND INJUNCTIVE RELIEF
                                           )
23                                         )
   RAMIN YEGANEH, d/b/a American           )
24 Mortgage Realty, and d/b/a American     )
   Mortgage, Realty, And Invest, and DOES 1 )
25 through 100,                            )
                                           )
26                                         )
27              Defendant.                 )
                                           )
28 _____)

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

62

ENDORSED FILED
SAN MATEO COUNTY

OCT 0 4 1999

Clerk of the Superior Court
By  SARAH OLMEDA
     DEPUTY CLERK

## THE PARTIES

1.    Plaintiff, Edith M. Ingram ("Ms. Ingram"), is an individual who formerly resided at 410 Newbridge Street in the City of Menlo Park in San Mateo County, California. Ms. Ingram resided in this home for approximately 40 years, ending in February 1999.

2.    Plaintiff, Nozipo Wobogo ("Ms. Wobogo"), is an individual currently residing in East Palo Alto, California. Plaintiff Ms. Wobogo brings claims on behalf of the general public.

3.    Plaintiffs are informed and believe that defendant Ramin "Ray" Yeganeh ("Yeganeh") is an individual residing in San Mateo, California and is a licensed real estate broker in the state of California.

4.    Plaintiffs are informed and believe that defendant Yeganeh does business as American Mortgage Realty, and American Mortgage, Realty, And Invest.

5.    Plaintiffs are informed and believe that third party Ocwen Financial Services, d/b/a Ocwen Federal Bank and/or Ocwen Financial Corporation (together "Ocwen") is domiciled in West Palm Beach, Florida and has numerous contacts with California, including offices in Walnut Creek, San Jose and Daly City, California.

6.    The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 100, inclusive, and each of them, are presently not known to plaintiffs, who therefore sues these defendants by such fictitious names. Plaintiffs will seek to amend this complaint and include those Doe defendants' true names and capacities when they are ascertained. Plaintiffs are informed and believe that each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by plaintiffs.

1

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

# ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

## Yeganeh Pitches His "Assistance" to Ms. Ingram Through Deception and Misrepresentation

7.      In 1995, Ms. Ingram took out a first mortgage on her home at 410 Newbridge Street, Menlo Park.  On or about October 31, 1996, she received a notice of default and election to sell from the bank which held the mortgage (the "Mortgage Holder").

8.      In late 1996, Yeganeh approached Ms. Ingram at her home.  He informed Ms. Ingram that he was aware her house was in foreclosure and said that he could help her avoid foreclosure.  Ms. Ingram declined Yeganeh's offers, explaining that she intended to file for bankruptcy and that she understood that, among other effects, filing bankruptcy would prevent foreclosure.  Yeganeh returned approximately one week later, representing to Ms. Ingram that he had spoken with the Mortgage Holder and that it would not allow Ms. Ingram to file for bankruptcy.  Ms. Ingram, nonetheless, again declined Yeganeh's offers.

9.      However,  Yeganeh persisted in contacting Ms. Ingram, repeatedly representing that the Mortgage Holder would not allow her to file for bankruptcy, and offering to make her a loan.  Yeganeh eventually convinced Ms. Ingram that she needed his assistance.  In reliance on Yeganeh's statements, Ms. Ingram did not file for bankruptcy, instead turning to Yeganeh for help.

10.      Based on Yeganeh's representations, Ms. Ingram ultimately agreed to take a loan from Yeganeh (the "First Loan").  Although Ms. Ingram desired a loan only in an amount to cover the amount then overdue on her existing mortgage, approximately $2,850, Yeganeh arranged for a loan in the amount of $9,300 -- over three times the amount that Ms. Ingram sought to borrow.

11.      In the course of inducing Ms. Ingram to take the loan, Yeganeh made a number of factual misrepresentations, all intended to induce Ms. Ingram to take the loan that he arranged.  He told Ms. Ingram that her loan would have to be higher than the amount overdue on her first mortgage, because of high attorneys' fees for the Mortgage Holder. Yeganeh stated that these fees amounted to several thousand dollars.  However, unknown to

2

1  Ms. Ingram, the Mortgage Holder was asserting a claim for only a fraction of this amount
2  for attorneys' fees. Further, Yeganeh told Ms. Ingram he personally was only receiving a
3  minimal sum from her loan. However, he actually took several thousand dollars in "fees"
4  from the loan proceeds.

5    12.    Ms. Ingram relied on Yeganeh's statements concerning the amounts due for
6  attorneys fees. Further, Ms. Ingram relied on Yeganeh's statements that he would be
7  receiving only a minimal sum from the loan. As a result of her reliance, Ms. Ingram
8  ultimately borrowed $9,300 -- over three times the amount she needed.

9    13.    On or about December 24, 1996, Yeganeh recorded a short form deed of trust
10  for $9,300 against 410 Newbridge Street, naming himself as both the Trustee and the
11  Beneficiary.

12    14.    In the course of convincing Ms. Ingram to take the loan, Yeganeh failed to
13  inform Ms. Ingram of her right under the Truth in Lending Act to rescind the loan within
14  three days, and failed to provide a form by which she could exercise this right. Yeganeh
15  also failed to provide written disclosures required under the Truth in Lending Act and the
16  California Business and Professions Code. In addition, despite knowing of Ms. Ingram's
17  very limited financial resources and flexibility, he arranged the loan for a short term with a
18  balloon payment of the entire amount due at the maturity of the loan.

19    **The Second Loan: Defendants Tighten Their Grip**

20    15.    On two later occasions, Yeganeh convinced Ms. Ingram to take additional
21  loans to refinance her loan with him.

22    16.    When Ms. Ingram could not pay the entire balloon payment at the end of the
23  First Loan, Yeganeh provided the papers for a second loan (the "Second Loan").
24  Thereupon, Yeganeh replaced the $9,300 deed of trust against Ms. Ingram's home with a
25  deed of trust for $19,000 -- a $9,700 increase.

26    17.    Yeganeh again failed to inform Ms. Ingram of her right under the Truth in
27  Lending Act to rescind the loan within three days, and failed to provide forms by which she
28  could exercise this right. Again, Yeganeh also failed to provide written disclosures required

3

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

1  under the Truth in Lending Act and the California Business and Professions Code.  In

2  addition, he again arranged the loans for short terms with balloon payments of the entire

3  amount due at the maturity of the loan.

### The Third Loan: Defendants Develop a Choke Hold

5  18.    When she could not pay the entire balloon payment at the end of the Second

6  Loan, Yeganeh provided the papers for a third loan (the "Third Loan").  When Ms. Ingram

7  signed these papers, Yeganeh replaced the $19,000 deed of trust against Ms. Ingram's home

8  with a deed of trust for $24,000 -- a $5,000 increase.

9  19.    Yeganeh again failed to inform Ms. Ingram of her right under the Truth in

10  Lending Act to rescind the loan within three days, and failed to provide forms by which she

11  could exercise this right.  Again, Yeganeh also failed to provide written disclosures required

12  under the Truth in Lending Act and the California Business and Professions Code.  In

13  addition, he again arranged the loans for short terms with balloon payments of the entire

14  amount due at the maturity of the loan.

15  20.    Thus, by or about late October 1997, less than one year from when Ms.

16  Ingram had desired to borrow only $2,851, Yeganeh held a deed of trust against Ms.

17  Ingram's home for $24,000.

### Defendants Arrange the Ocwen Loan to Force Ms. Ingram From Her Home

19  21.    Yeganeh continually urged Ms. Ingram to take a new mortgage to consolidate

20  her first mortgage and her loans from him.  Yeganeh represented to Ms. Ingram that he

21  could easily find her a new mortgage with a monthly payment at or below $800, and at or

22  below an 8% interest rate.  Although Ms. Ingram informed Yeganeh that her entire monthly

23  income was less than $1,200, Yeganeh assured her that he could obtain a loan on the

24  specific terms he had promised.  In reliance on Yeganeh's statements that he could obtain a

25  loan for her on terms she could afford, Ms. Ingram did not seek out alternate loan sources.

26  22.    In or about December 1997, Yeganeh represented to Ms. Ingram that he had

27  obtained a loan for her from third party Ocwen (the "Ocwen Loan").  He did not disclose to

28  Ms. Ingram that the loan would involve a monthly payment of $1,148, nearly her entire

4

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

66

monthly income. He also did not disclose to her that the interest rate would be adjustable, from 10.99% to 17.49%.

23.    Unknown to Ms. Ingram, Yeganeh falsified Ms. Ingram's loan application with Ocwen, falsely indicating to Ocwen that Ms. Ingram's income was $1,000 more per month than it actually was.

24.    In or about late 1997, Yeganeh represented to Ms. Ingram that he had obtained a payoff figure for her first mortgage. He told her she should not make any further payments to the Mortgage Holder, because such payments would change the payoff figure. In reliance on Yeganeh's statements, Ms. Ingram stopped making monthly payments to the Mortgage Holder, and her first mortgage became overdue.

25.    In or about early January 1998, Yeganeh told Ms. Ingram that the loan papers were ready for her signature and picked her up in his car. In the car, he angrily told her that if she did not accept the loan he would personally foreclose on her, and that she had no choice but to accept previously undisclosed loan terms including the $1148 monthly payment. Yeganeh told Ms. Ingram that the loan he had obtained was her only option to save her house.

26.    Yeganeh brought Ms. Ingram to the title company to sign the loan papers shortly before closing time. Ms. Ingram learned of the interest rate for the first time at the title company. Mr. Yeganeh was the only individual explaining the meaning of the documents to Ms. Ingram, and hurried her through the documents. Ms. Ingram, relying on Yeganeh's statements and believing she had no other options, signed the loan papers.

**Defendants Try to Evict Ms. Ingram From Her Home**

27.    Ms. Ingram could not afford the Ocwen loan. Five months after Ms. Ingram signed the Ocwen loan, Ocwen sent her a notice of default and election to sell. Then, on or about September 18, 1998, a notice of trustee's sale was recorded, stating that the house would be put up for sale on October 6, 1998. On or about October 6, 1998, Ms. Ingram filed for bankruptcy. On or about the same day, Yeganeh purchased Ms. Ingram's home. A

5

COMPLAINT FOR DAMAGES. RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

few weeks later, on or about October 26, 1998, Yeganeh filed an unlawful detainer action for possession only against Ms. Ingram in San Mateo County Municipal Court.

28.    On or about November 6, 1998, a San Mateo County sheriff served a writ for possession on Ms. Ingram at 410 Newbridge Street.  Ms. Ingram showed the sheriff her papers indicating she had filed for bankruptcy, and the sheriff informed Ms. Ingram she had a right to remain in the house.

29.    Following this failed attempt to evict Ms. Ingram, Yeganeh arranged for a second attempt in late November or December 1998.  Yeganeh knocked on Ms. Ingram's door.  When he received no answer, Yeganeh used a screw driver to remove the door knob of the front door security gate at Ms. Ingram's home.  Ms. Ingram then opened the wooden front door slightly, standing behind the door.  Yeganeh forcibly pushed through the wooden door, knocking Ms. Ingram backwards.  Yeganeh then kicked in the door to Ms. Ingram's separately locked bedroom, breaking through a door panel.

30.    Shortly thereafter, a San Mateo County sheriff appeared with the writ for possession.  After learning of Yeganeh's behavior, the sheriff refused to enforce the writ.  On or about January 9, 1998, the writ for possession was returned unsatisfied to the court.  No further writ authorizing Yeganeh to take possession of Ms. Ingram's home was issued.

## Yeganeh Illegally Takes Ms. Ingram's Home

31.    On or about the evening of February 4, 1999, Yeganeh again went to Ms. Ingram's home.  Yeganeh again used a screwdriver to unscrew the doorknob of the front door security gate.

32.    Yeganeh also called the Menlo Park police department and requested their assistance in taking possession of Ms. Ingram's home.  Two Menlo Park police officers arrived shortly after Yeganeh arrived.  Yeganeh then turned off the electricity to Ms. Ingram's home.  The officers informed Ms. Ingram that she had to leave immediately and could only take a coat, her purse and her dog.  Ms. Ingram left the house with literally only the clothes on her back, her purse and her dog.  The officers escorted Ms. Ingram from her

6

COMPLAINT FOR DAMAGES, RESTITUTION, DISGORGEMENT AND INJUNCTIVE RELIEF

68

1  home, leaving Yeganeh with possession of the house and in possession of all of Ms.

2  Ingram's personal property in and around the house.

3      33.    In the days following this incident, Ms. Ingram repeatedly telephoned

4  Yeganeh, attempting to retrieve her personal property. Yeganeh stated that her personal

5  property now belonged to him. Within approximately a week of obtaining possession of

6  Ms. Ingram's home, Yeganeh had appropriated for himself, thrown away and/or given away

7  all of Ms. Ingram's personal possessions, not allowing Ms. Ingram to recover any of her

8  belongings.

9  **ADDITIONAL EVIDENCE OF DEFENDANTS' PATTERN AND PRACTICE OF**
10  **UNLAWFUL, FRAUDULENT, AND UNFAIR BUSINESS PRACTICES**

11      34.    Plaintiffs are informed and believe that beginning in 1996, or even earlier,

12  Yeganeh began perpetuating unlawful, fraudulent and unfair lending and mortgage

13  brokering practices against numerous homeowners in the Bay Area, targeting, in particular,

14  homeowners who Yeganeh perceived as vulnerable, e.g., because of their age, health,

15  financial distress and/or lack of business sophistication.

16      35.    Plaintiffs are informed and believe that Yeganeh currently holds title to in

17  excess of twenty properties in the San Francisco Bay Area, including approximately twelve

18  properties in San Mateo County, with public records indicating the majority of these

19  properties were obtained through foreclosure sales.

20      36.    Plaintiffs are informed and believe that defendants, and each of them, have

21  engaged in a pattern of unlawful, fraudulent and unfair business practices, including, but not

22  limited to: intentionally targeting low-income senior citizens and disabled home owners;

23  falsely representing the status of Yeganeh as a foreclosure specialist who could save homes

24  from foreclosure; making personal loans and arranging third-party loans which the victims

25  cannot afford; intentionally misrepresenting the terms of loans; making material

26  misrepresentations concerning loans and loan terms; making false and misleading

27  statements about the remedies or alternatives available to the homeowners to deal with

28  foreclosure procedures; extorting funds from elderly persons in violation of laws protecting

7

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

the elderly; offering and making personal loans without complying with 15 U.S.C. §§1601 et seq. and Regulation Z and California Business and Professions Code §§ 10240 et seq., including failing to provide required disclosures; forging documents provided by homeowners in furtherance of defendants' schemes; abusing civil process; threatening homeowners with civil sanctions if they do not accept loans on unfair terms and conditions; arranging and/or making loans with unconscionably high interest rates; suing victims for unearned broker's fees; intentionally misrepresenting which parties receive fees or other funds from loans; and participating in related schemes for collecting unearned "broker's fees" and other fees, and fraudulently and unlawfully obtaining title to houses.

## FIRST CAUSE OF ACTION
### Violations of the Truth in Lending Act
### 15 U.S.C. §§ 1601 et seq. & Regulation Z
### (by plaintiff Ms. Ingram against all defendants)

37.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 36 above as if set forth fully herein.

38.    As set forth above, defendants violated the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq., and Regulation Z promulgated thereunder, 12 C.F.R. Part 226, by failing to disclose to Ms. Ingram the true terms of the mortgages that defendants intended to provide. Specifically, Yeganeh represented that the loan amounts were only as high as necessary to cover fees from third parties and that he would only receive minimal sums from the loans. However, defendants received fees of several thousand dollars from each of the loans Yeganeh provided.

39.    Defendants further violated the Truth in Lending Act and Regulation Z thereunder, by failing to disclose to Ms. Ingram the true terms of the mortgages that defendants intended to obtain from Ocwen Financial Services. Specifically, defendants represented that the loan would have an interest rate of no higher than 8% with monthly payments no higher than $800. Defendants instead arranged a loan from Ocwen at an adjustable rate of 10.99%-17.49% with a monthly payment of $1,148.

8

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

40.    Defendants further violated the Truth in Lending Act and Regulation Z by failing to make the required disclosures to Ms. Ingram of her right, under 15 U.S.C. §1635(a), to rescind the transactions; by failing to provide Ms. Ingram with a copy of any disclosure relating to her right to rescission; by failing to provide Ms. Ingram with a form to be used to exercise her right of rescission; and by failing, as set forth above, to disclose the true material terms of the transaction so that Ms. Ingram could make an informed decision about whether she should exercise her right of rescission.

41.    Defendants further violated the Truth in Lending Act and Regulation Z promulgated thereunder, by failing to provide Ms. Ingram with specific written disclosures as required under 15 U.S.C. §1638(a). In particular, disclosures defendants failed to provide included, but are not limited to: a statement of Ms. Ingram's right to obtain a written itemization of the amount financed; the finance charge; the finance charge as an annual percentage rate; and descriptive explanations of the terms "amount financed," "finance charge," "annual percentage rate," "total of payments," and "total sale price."

42.    Defendants further violated the Truth in Lending Act and Regulation Z promulgated thereunder, by failing to provide Ms. Ingram with specific written disclosures as required under 15 U.S.C. §1639, including failing to provide the following disclosures:

- "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application."
- "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan;" and
- the annual percentage rate.

43.    Defendants further violated the Act Truth in Lending Act and Regulation Z promulgated thereunder, by failing to provide disclosures three business days prior to consummation of the transaction, by providing loans with balloon payments, and by providing credit without regard to Ms. Ingram's payment ability.

9

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

71

ER - 040

44. Ms. Ingram first learned of these failures to disclose in 1999. In addition, defendants fraudulently concealed the relationship between Yeganeh and American Mortgage Realty, thus fraudulently concealing the true sums going to Yeganeh for the First Loan, Second Loan, Third Loan and the Ocwen Loan. Defendants also fraudulently concealed that the Second Loan and Third Loan were separate loans from the First Loan, and not merely extensions of payment terms, and fraudulently concealed the true terms of the loans.

45. The above-described violations of the Truth in Lending Act give rise to Ms. Ingram's right to seek civil damages pursuant to 15 U.S.C. §1640.

## SECOND CAUSE OF ACTION
### Fraud: loans from defendants
### (by plaintiff Ms. Ingram against all defendants)

46. Plaintiff Ms. Ingram incorporates paragraphs 1 through 45 above as if set forth fully herein.

47. The statements made by defendants set forth above, concerning defendants' First, Second and Third Loans to Ms. Ingram, were false and misleading when made. By affirmative misrepresentations and/or omissions, defendants represented to Ms. Ingram that the Mortgage Holder would not allow her to file for bankruptcy, that the amount of the loans they proposed were necessary to make her payments with her first mortgage current and to refinance her loans with him, and that he would only receive minimal sums from the loans.

48. At the time defendants made each of the representations set forth above, they knew, or should have known, that the true terms of the loans they were arranging for Ms. Ingram differed materially from the terms they had represented to her. Defendants failed to communicate the true facts and concealed them from Ms. Ingram.

49. As a real estate broker and mortgage loan broker, Yeganeh owed Ms. Ingram fiduciary duties of disclosure, good faith, honesty, inquiry and fair dealing concerning the proposed and actual loans he made and/or arranged for Ms. Ingram. In addition, Yeganeh

10

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

72

1    held a position of trust as a licensed real estate broker, and portrayed himself as possessing

2    superior knowledge about home loans and other mortgages.

3        50.    At the time defendants made these misrepresentations and/or omissions,

4    defendants intended to induce Ms. Ingram to rely on the misrepresentations and/or

5    omissions by agreeing to enter into the purported transactions with them.

6        51.    Ms. Ingram relied on these misrepresentations by agreeing to take the loans,

7    agreeing to the amounts of the loans, and in not seeking alternative loan sources.

8        52.    Ms. Ingram has suffered damages, in an amount to be proved at trial, as a

9    result of her reliance on these misrepresentations.

10       53.    Defendants acted willfully, intentionally, maliciously, wantonly and

11   despicably in perpetrating the frauds against Ms. Ingram as set forth above.

12
## THIRD CAUSE OF ACTION
13
### Fraud: Ocwen loan
### (by plaintiff Ms. Ingram against all defendants)
14

15       54.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 53 above as if set

16   forth fully herein.

17       55.    The statements made by defendants concerning the Ocwen loan, as set forth

18   above, were false and misleading when made.  By affirmative misrepresentations and/or

19   omissions, defendants represented to Ms. Ingram that she would receive a loan at an interest

20   rate of no higher than 8% with a resulting monthly payment of $800 or less.  The loan

21   defendants actually contemplated arranging (and actually arranged) for Ms. Ingram had a

22   much higher interest rate and much higher monthly payment.

23       56.    At the time defendants made each of the representations set forth above, they

24   knew, or should have known, that the true terms of the loan they were arranging for Ms.

25   Ingram differed materially from the terms they had represented to her.  Defendants failed to

26   communicate the true facts and concealed them from Ms. Ingram.

27       57.    As a real estate broker and mortgage loan broker, Yeganeh owed Ms. Ingram

28   fiduciary duties of disclosure, good faith, honesty, inquiry and fair dealing concerning the

11

COMPLAINT FOR DAMAGES. RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

proposed and actual loans he made and/or arranged for Ms. Ingram. In addition, Yeganeh

held a position of trust as a licensed real estate broker, and portrayed himself as possessing

superior knowledge about home loans and other mortgages.

58.    Defendants intended for Ms. Ingram to rely on these misrepresentations and

omissions by agreeing to enter into the purported transaction with Ocwen.

59.    Ms. Ingram relied on these misrepresentations by agreeing to take the loan,

agreeing to the amount of the loan, and in not seeking alternative loan sources.

60.    Ms. Ingram has suffered damages, in an amount to be proved at trial, as a

result of her reliance on these misrepresentations.

61.    Defendants acted willfully, intentionally, maliciously, wantonly and

despicably in perpetrating the frauds against Ms. Ingram as set forth above.

## FOURTH CAUSE OF ACTION
### Negligent Misrepresentation: loans from defendants
### (by plaintiff Ms. Ingram against all defendants)

62.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 61 above as if set

forth fully herein.

63.    The statements set forth above, concerning defendants' First, Second and

Third Loans to Ms. Ingram, were false and misleading when made. By affirmative

misrepresentations and/or omissions, defendants represented to Ms. Ingram that the

Mortgage Holder would not allow her to file for bankruptcy, that the amount of the loans he

proposed were necessary to make her payments with her first mortgage current and to

refinance her loans with him, and that he would only receive minimal sums from the loans.

64.    At the time defendants made the representations set forth above, they should

have known that they were false.

65.    As a real estate broker and mortgage loan broker, Yeganeh owed Ms. Ingram

fiduciary duties of disclosure, good faith, honesty, inquiry and fair dealing concerning the

proposed and actual loans he made and/or arranged for Ms. Ingram. In addition, Yeganeh

12

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

1  held a position of trust as a licensed real estate broker, portrayed himself as possessing
2  superior knowledge about home loans and other mortgages.
3       66. ·    At the time they made these misrepresentations and/or omissions, defendants
4  intended to induce Ms. Ingram to rely on the misrepresentations and/or omissions by
5  agreeing to enter into the purported transactions with them that are subjects of the action.
6       67.    Ms. Ingram relied on these misrepresentations by agreeing to take the loans,
7  agreeing to the amount of the loans, and in not seeking alternative loan sources.
8       68.    Ms. Ingram has suffered damages, in an amount to be proved at trial.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation: Ocwen loan**
**(by plaintiff Ms. Ingram against all defendants)**

11       69.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 68 above as if set
12  forth fully herein.
13       70.    The statements made by defendants concerning the Ocwen loan, as set forth
14  above, were false and misleading when made.  By affirmative misrepresentations and/or
15  omissions, defendants represented to Ms. Ingram that she would receive a loan at an interest
16  rate of no higher than 8% with a resulting monthly payment of $800 or less.  The loan
17  defendants actually contemplated arranging for Ms. Ingram had a much higher interest rate
18  and much higher monthly payment.
19       71.    At the time defendants made the representations set forth above, they should
20  have known that the true terms of the loan they were arranging for Ms. Ingram differed
21  materially from the terms he had represented to her.  Defendants failed to communicate
22  these facts and concealed them from Ms. Ingram.
23       72.    As a real estate broker and mortgage loan broker, Yeganeh owed Ms. Ingram
24  fiduciary duties of disclosure, good faith, honesty, inquiry and fair dealing concerning the
25  proposed and actual loans he made and/or arranged for Ms. Ingram.  In addition, Yeganeh
26  held a position of trust as a licensed real estate broker, and portrayed himself as possessing
27  superior knowledge about home loans and other mortgages.
28

13

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

73.     Defendants intended for Ms. Ingram to rely on these misrepresentations and omissions by agreeing to enter into the purported transaction with Ocwen.

74.     Ms. Ingram relied on these misrepresentations by agreeing to take the loan, agreeing to the amount of the loan, and in not seeking alternative loan sources.

75.     Ms. Ingram has suffered damages, in an amount to be proved at trial.

### SIXTH CAUSE OF ACTION
**California Business and Professions Code §§ 10240 et seq.**
**(by plaintiff Ms. Ingram against all defendants)**

76.     Plaintiff Ms. Ingram incorporates paragraphs 1 through 75 above as if set forth fully herein.

77.     Yeganeh is a licensed real estate broker in the State of California.  Real estate brokers are subject to California Business and Professions Code §§ 10240 et seq.

78.     Yeganeh violated California Business and Professions Code §§ 10240 et seq, by failing, for each of the three loans from Yeganeh to Ms. Ingram and for the Ocwen loan to provide Ms. Ingram with proper written statements including all thirteen elements required by California Business and Professions Code §10241.  These written disclosures Yeganeh failed to make included, but are not limited to:

* the actual maximum costs and expenses of making the loan;
* the brokerage or commissions Yeganeh would receive;
* estimated amounts to be paid on the order of the borrower;
* the interest rate;
* the balloon payment notice; and
* the statement of use of broker-controlled funds.

79.     Yeganeh further violated California Business and Professions Code §§ 10240 et seq, by failing, for each of the three loans from Yeganeh to Ms. Ingram and for the Ocwen loan, to provide Ms. Ingram with proper written disclosures within required times.

80.     Ms. Ingram has suffered damages, in an amount to be proved at trial.

14

COMPLAINT FOR DAMAGES, RESTITUTION,
DISORGEMENT AND INJUNCTIVE RELIEF

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (by plaintiff Ms. Ingram against Yeganeh)

81.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 80 above as if set forth fully herein.

82.    Ms. Ingram is a retired 64-year-old woman.  Ms. Ingram resided at 410 Newbridge Street for approximately 40 years, ending on or about February 4, 1999.

83.    In the course of defrauding Ms. Ingram out of her home of forty years, Yeganeh committed a number of intentional, highly unreasonable acts.  Such unreasonable acts included, but are not limited to, the following:

- Yeganeh perpetrated the frauds set forth above with the intent of dispossessing Ms. Ingram of her home;

- on several separate occasions, Yeganeh appeared at Ms. Ingram's home, yelled at her and verbally abused her;

- Yeganeh intentionally kicked his foot through Ms. Ingram's bedroom door;

- Yeganeh intentionally forcibly pushed his way through Ms. Ingram's front door while Ms. Ingram stood behind the door, causing Ms. Ingram to fall backwards;

- on at least two occasions, Yeganeh removed, or caused to be removed, the fuses from the electrical box to Ms. Ingram's home, while Ms. Ingram resided there; and

- Yeganeh intentionally caused to be thrown out, given away or otherwise misappropriated all of Ms. Ingram's personal possessions remaining in and around Ms. Ingram's home at the time Yeganeh obtained possession of the premises.

84.    These acts were unreasonable, and Yeganeh intended to cause or should have realized they would be likely to cause Ms. Ingram emotional distress.  Ms. Ingram, in fact, suffered great emotional distress because of these acts.

85.    Ms. Ingram has been damaged in an amount to be proved at trial.

15

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

## EIGHTH CAUSE OF ACTION
### Abuse of Process: Eviction
### (by plaintiff Ms. Ingram against all defendants)

86.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 85 above as if set forth fully herein.

87.    On or about November 5, 1998, a writ for possession of the property at 410 Newbridge Street was issued.  This writ was returned to the Court unsatisfied on or about January 7, 1999.  No further writ was issued.

88.    On or about February 4, 1999, Yeganeh convinced the Menlo Park police to effect the eviction of Ms. Ingram, contrary to law.

89.    Yeganeh misused the court process of unlawful detainer in forcing an eviction without a valid writ of possession.  Yeganeh further misused the court process of unlawful detainer in forcing an eviction with the assistance of police officers, who do not have authority to enforce writs of possession or otherwise effect evictions.  The ulterior purpose and motivation of Yeganeh in misusing the process in these manners was to obtain the collateral advantage over Ms. Ingram of forcing Ms. Ingram from her home and obtaining possession of Ms. Ingram's personal possessions.  Yeganeh acted willfully, intentionally, maliciously, wantonly and despicably in forcing Ms. Ingram from her home in this manner.

90.    Ms. Ingram has been damaged in an amount to be proved at trial.

## NINTH CAUSE OF ACTION
### Battery
### (by plaintiff Ms. Ingram against Yeganeh)

91.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 90 above as if set forth fully herein.

92.    As set forth above, Yeganeh caused a harmful and offensive contact with Ms. Ingram's person, when he, knowing that Ms. Ingram was standing behind a door, forcibly pushed the door back, knocking Ms. Ingram backwards.  In so doing, Yeganeh acted with the intent to make a contact with Ms. Ingram's person.  Ms. Ingram did not consent to this

16

COMPLAINT FOR DAMAGES, RESTITUTION,
DISORGEMENT AND INJUNCTIVE RELIEF

78

1   act by Yeganeh.  Yeganeh's above-mentioned conduct was willful, intentional, malicious,
2   wanton and despicable and was intended to oppress and cause injury to plaintiff.

3       93.    Ms. Ingram has suffered damages as a proximate result of this act, in an
4   amount to be proved at trial.

### TENTH CAUSE OF ACTION
### Assault
### (by plaintiff Ms. Ingram against Yeganeh)

7       94.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 93 above as if set
8   forth fully herein.

9       95.    In doing the acts alleged above, Yeganeh intended to cause or to place Ms.
10  Ingram in apprehension of a harmful or offensive contact with her person.  As a result of
11  Yeganeh's acts as alleged above, Ms. Ingram, in fact, was placed in great apprehension of a
12  harmful or offensive contact with her person.  Ms. Ingram did not consent to this act by
13  Yeganeh.  Yeganeh's above-mentioned conduct was willful, intentional, malicious, wanton
14  and despicable and was intended to oppress and cause injury to plaintiff.

15      96.    Ms. Ingram has suffered damages as a proximate result of this act, in an
16  amount to be proved at trial.

### ELEVENTH CAUSE OF ACTION
### Conversion
### (by plaintiff Ms. Ingram against all defendants)

20      97.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 96 above as if set
21  forth fully herein.

22      98.    At the time Yeganeh obtained possession of Ms. Ingram's home, on or about
23  February 4, 1999, Ms. Ingram owned and/or had the right to possession to all tangible
24  personal property in or around her home.

25      99.    Yeganeh converted the personal property mentioned above to his own use.
26  Ms. Ingram demanded return of her personal property.  However, Yeganeh prevented her
27  from repossessing the property.  Yeganeh acted willfully, intentionally, maliciously.

28

17

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

79

1  wantonly, and despicably in throwing away, giving away or otherwise misappropriating all

2  of Ms. Ingram's personal property, despite her demands for possession.

3      100:   Ms. Ingram was damaged by an amount to be proved at trial.

### TWELFTH CAUSE OF ACTION
**Forcible Entry and Detainer**
**(by plaintiff Ms. Ingram against all defendants)**

6      101.   Plaintiff Ms. Ingram incorporates paragraphs 1 through 100 above as if set

7  forth fully herein.

8      102.   Ms. Ingram remained in actual and peaceable possession of her home until or

9  about February 4, 1999.

10     103.   On or about February 4, 1999, Yeganeh entered Ms. Ingram's home through

11 intentionally acting to remove the doorknob from the front door security gate. Further, on

12 or about February 4, 1999, Yeganeh entered Ms. Ingram's home through threatening

13 conduct, with the assistance of Menlo Park police officers. Further, on or about February 4,

14 1999, Yeganeh, with intent to terminate the occupancy of Ms. Ingram from her home,

15 willfully caused interruption of electricity to Ms. Ingram's home, being the property she

16 used as her residence.

17     104.   In addition, on or about February 4, 1999, Yeganeh turned Ms. Ingram out of

18 her home by force, threats and/or menacing conduct. Yeganeh then assumed possession of

19 Ms. Ingram's home and from that time forward, prevented Ms. Ingram from reobtaining

20 possession. In doing these acts, Yeganeh acted willfully, intentionally, with malice,

21 wantonly, and oppressively.

22     105.   Ms. Ingram has been damaged in an amount to be proved at trial.

### THIRTEENTH CAUSE OF ACTION
**Civil Action for Deprivation of Due Process Rights**
**42 U.S.C. §1983**
**(by plaintiff Ms. Ingram against Yeganeh)**

26     106.   Plaintiff Ms. Ingram incorporates paragraphs 1 through 105 above as if set

27 forth fully herein.

28

18

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

107.    By engaging Menlo Park police officers in order to illegally gain possession of Ms. Ingram's home, Yeganeh acted under color of state law in effecting the unlawful eviction.

108.    By using self-help and police aid to take possession of Ms. Ingram's home, Yeganeh violated Ms. Ingram's due process rights to proper notice and prior judicial hearing before eviction.

109.    Yeganeh's wrongful actions alleged above are in violation of 42 U.S.C. §1983 because they deprived Ms. Ingram of rights, benefits and privileges secured by the United States Constitution.  Yeganeh's conduct was willful, intentional, malicious, wanton and despicable in conscious disregard of the rights of Ms. Ingram.

110.    Ms. Ingram has been damaged in an amount to be proved at trial.

### FOURTEENTH CAUSE OF ACTION
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(by plaintiff Ms. Ingram against all defendants)**

111.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 110 above as if set forth fully herein.

112.    Defendants breached their implied covenant of good faith and fair dealing with respect to the First Loan, Second Loan, Third Loan and the Ocwen Loan, and each of them.

113.    Defendants' breach is accompanied by fraud, as set forth above.

114.    Further, the means used to breach the contracts constituted by the First Loan, Second Loan, Third Loan and the Ocwen Loan, and each of them, involved deceit and/or undue coercion toward Ms. Ingram.  Such deceit and/or undue coercion was intentional.

115.    Further, these breaches by defendants were intentional, and defendants intended, were aware, or should have been aware that such breaches would cause or were substantially certain to cause severe harm in the form of mental anguish, personal hardship, and/or substantial consequential damages.

116.    These acts by defendants did not constitute socially useful business practices.

19

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

81

ER - 050

117.    Ms. Ingram has been damaged in an amount to be proved at trial.

## FIFTEENTH CAUSE OF ACTION
### Unfair Business Practices Act
### California Business and Professions Code § 17200
### (by plaintiff Ms. Ingram against all defendants)

118.    Plaintiff Ms. Ingram incorporates paragraphs 1 through 117 above as if set forth fully herein.

119.    By engaging in the business practices alleged above, including, but not limited to, their violations of 15 U.S.C. §§1601 et seq. and Regulation Z, California Business and Professions Code §§10240 et seq. and 42 U.S.C. §1983, intentional misrepresentations and omissions concerning home loans, defendants have engaged -- and on information and belief continue to engage -- in unlawful, fraudulent and unfair business practices with respect to Ms. Ingram.  Those business practices constitute unfair competition within the meaning of Business and Professions Code section 17200 et seq. Those business practices above are immoral, oppressive and unscrupulous.  In addition, these practices were undertaken in violation of enumerated public policies, including policy established in 15 U.S.C. §§ 1601 et seq. and Regulation Z and statutes protecting the elderly.  Further, these practices serve no legitimate business purpose and, if any purpose were found, the benefit to any alleged legitimate business interests of defendants is far outweighed by the substantial harm to Ms. Ingram that has resulted from the practices.

120.    Ms. Ingram has been harmed by the above mentioned acts.

## SIXTEENTH CAUSES OF ACTION
### Unfair Business Practices Act
### California Business and Professions Code § 17200
### (by plaintiff Ms. Wobogo against all defendants)

121.    Plaintiff Ms. Wobogo, on behalf of the general public, incorporates paragraphs 1 through 120 above as if set forth fully herein.  Plaintiff Ms. Wobogo asserts this claim as a private attorney general in the interests of the general public, in accordance with Business and Professions Code section 17203.

20

122.   By engaging in the business practices alleged above, including, but not limited to, their violations of 15 U.S.C. §§1601 et seq. and Regulation Z, California Business and Professions Code §§10240 et seq. and 42 U.S.C. §1983, intentional misrepresentations and omissions concerning home loans, defendants have engaged -- and on information and belief continue to engage -- in unlawful, fraudulent and unfair business practices which constitute unfair competition within the meaning of Business and Professions Code section 17200 et seq. Those business practices above are immoral, oppressive and unscrupulous. In addition, these practices were undertaken in violation of enumerated public policies, including policy established in 15 U.S.C. §§ 1601 et seq. and Regulation Z and statutes protecting the elderly. Further, these practices serve no legitimate business purpose and, if any purpose were found, the benefit to any alleged legitimate business interests of defendants is far outweighed by the substantial harm to low-income homeowners and the elderly that results from the practices.

123.   Members of the general public who have been solicited and/or have accepted "help" from defendants have been harmed by the above mentioned acts.

124.   Plaintiff Ms. Wobogo and the general public have no adequate remedy at law or otherwise to restrain the acts or omissions of defendants, in that the damages suffered and that will be suffered by the general public as a consequence of defendants' acts are not subject to accurate determination and would not make the general public whole.

125.   By bringing this action as a private attorney general within the meaning of Business and Professions Code section 17203, plaintiff Ms. Wobogo seeks to enforce important rights affecting the public interest.

## PRAYER

WHEREFORE plaintiff Edith M. Ingram respectfully prays for relief as follows:

On plaintiffs' First Cause of Action, for Violations of the Truth in Lending Act:

1.   Actual damages pursuant to 15 U.S.C. §1640(a) in an amount to be proved at trial;

21

COMPLAINT FOR DAMAGES, RESTITUTION, DISGORGEMENT AND INJUNCTIVE RELIEF

83

1       2.    Twice the amount of finance charges in connection with the loans with

2   Yeganeh and twice the amount of finance charges in connection with the loan with Ocwen

3   Financial Services, pursuant to 15 U.S.C. §1640(a);

4       3.    In the alternative, for $2,000 pursuant to 15 U.S.C. §1640(a);

5       4.    An amount equal to the sum of all finance charges and fees paid by the

6   consumer, pursuant to 15 U.S.C. §1640(a);

7       5.    Costs and attorneys fees incurred in bringing and prosecuting this action, to

8   the extent provided for under applicable federal law; and

9       6.    Such other, further, or different relief as the Court may deem just and proper.

10  On plaintiffs' Second and Third Causes of Action, for Fraud:

11      1.    Actual damages in an amount to be proved at trial;

12      2.    Imposition of a constructive trust on the proceeds of the sale of 410

13  Newbridge Street;

14      3.    Punitive damages in an amount sufficient to punish defendants and deter

15  future wrongdoing;

16      4.    In the alternative, for restitution to Ms. Ingram of any fees or other

17  consideration paid to defendants, or each of them, in connection with each of Yeganeh's

18  three loans to Ms. Ingram and for restitution to Ms. Ingram of any fees or other

19  consideration paid to defendants, or each of them, in connection with the Ocwen loan.

20      5.    Costs and attorneys fees incurred in bringing and prosecuting this action, to

21  the extent provided for under applicable law; and

22      6.    Such other, further, or different relief as the Court may deem just and proper.

23  On plaintiffs' Fourth and Fifth Causes of Action, for Negligent Misrepresentation:

24      1.    Actual damages in an amount to be proved at trial;

25      2.    Imposition of a constructive trust on the proceeds of the sale of 410

26  Newbridge Street;

27      3.    In the alternative, for restitution to Ms. Ingram of any fees or other

28  consideration paid to defendants, or each of them, in connection with each of Yeganeh's

22

COMPLAINT FOR DAMAGES, RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

1  three loans to Ms. Ingram and for restitution to Ms. Ingram of any fees or other

2  consideration paid to defendants, or each of them, in connection with the Ocwen loan.

3       4.  ·    Costs and attorneys fees incurred in bringing and prosecuting this action, to

4  the extent provided for under applicable law; and

5       5.     Such other, further, or different relief as the Court may deem just and proper.

6  On plaintiffs' Sixth Cause of Action, for Violation of California Business and

7  Professions Code §§ 10240 et seq.:

8       1.     Treble damages of excess charges pursuant to California Business and

9  Professions Code §10246;

10      2.     Costs and attorneys fees incurred in bringing and prosecuting this action, to

11 the extent provided for under applicable law; and

12      3.     Such other, further, or different relief as the Court may deem just and proper.

13 On plaintiffs' Seventh Cause of Action, for Intentional Infliction of Emotional

14 Distress:

15      1.     Compensatory damages;

16      2.     Such other, further, or different relief as the Court may deem just and proper.

17 On plaintiffs' Eighth Cause of Action, for Abuse of Process:

18      1.     Actual damages in an amount to be proved at trial;

19      2.     Damages for mental and emotional distress;

20      3.     Punitive damages in an amount sufficient to punish defendants and deter

21 future wrongdoing;

22      4.     A permanent injunction preventing Yeganeh from seeking to use police

23 officers to effect evictions in the future;

24      5.     Costs and attorneys fees incurred in bringing and prosecuting this action, to

25 the extent provided for under applicable law; and

26      6.     Such other, further, or different relief as the Court may deem just and proper.

27 On plaintiffs' Ninth and Tenth Causes of Action, for Assault and Battery:

28      1.     Actual damages in an amount to be proved at trial;

23

COMPLAINT FOR DAMAGES. RESTITUTION,
DISGORGEMENT AND INJUNCTIVE RELIEF

# Document No. 5

Sent by:LAW OFFICES BCS      Jan-22-02 04:12pm      from 6500733168+0586771477      Page 1

JUL 31 2001

SMITH, BENTLEY & HARTNETT

**FILED**
SAN MATEO COUNTY

JUL 3 0 2001

SUPERIOR COURT OF THE STATE OF CALIFORNIA

Clerk of the Superior Court

DEPUTY CLERK

IN AND FOR THE COUNTY OF SAN MATEO

Edith M. Ingram, Et al.                          Case No. 410586

      Plaintiffs,

Vs.                                              **ORDER**

Ramin Yeganeh, Et al.

      Defendants.

_____/

The Cross Motions for Summary Adjudication of defendant Ramin Yeganeh and plaintiff Nozipo Wobogo on the 16th Cause of Action came on regularly for hearing on June 21, 2001. Linda Lane, Mike Tracy of Gary Cary Ware & Freidenrich LLP and Renee Glover of East Palo Alto Community Law Project appeared on behalf of Plaintiff Nozipo Wobogo. Charles Smith of Smith, Bentley & Hartnett appeared on behalf of the defendant. The court having taken the matter under submission, now rules as follows:

The requests of both plaintiff and defendant for judicial notice are GRANTED.

The plaintiff's objections to the declaration of Robert Goodell are sustained as follows: Paragraphs 4, 5, 6, 8, 10 sustained on the basis of lack of foundation and lack of personal knowledge. Paragraphs 7 and 9 sustained on lack of foundation grounds. Each of these paragraphs is stricken.

The plaintiff's objections to the Hoglund declaration are sustained as follows: Sustained on lack of foundation and lack of personal knowledge grounds. The Exhibits are all stricken as hearsay, further the supporting declaration is lacking in foundation and lacking personal knowledge sufficient to support the consideration of the exhibits.

Plaintiff Wobogo's objection to the Smith declaration, Exhibit E, is sustained as lacking personal knowledge, authentication and on foundation grounds. Additionally, Exhibit E is hearsay.

01/22/2002 TUE 16:12   [TX/RX NO 9957] ☑001

106

ER - 055

Sent by:LAW OFFICES BCS    Jan-22-02 04:12pm    From 6508733160+8586771477    Page 2

Plaintiff's motion to strike the untimely reply to the opposition brief of plaintiff on defendant Yeganeh's Motion for Summary Adjudication is DENIED. Although untimely, the timeliness of the argument contained therein is not per se prejudicial to the defendant.

The Motion to Strike defendant's unsigned declaration is GRANTED. Unsigned declarations are admissible only if they are certified by the declarant to be true. see CCP 2015.5 This assures trustworthiness of the evidence. Here despite ample time to sign or certify the unsigned declaration belatedly offered, defendant Yeganeh has not done so. Further, no real justification has been offered as to why Yeganeh failed to submit his declaration in support of his motion in the first instance, instead offering an unsigned declaration in support of an untimely reply. The manifest prejudice to the opposing party is that they then are deprived of meaningfully responding to the untimely and unsigned declaration except by the present objection. Reliance on such an unsigned, uncertified declaration for any purpose is unwarranted.

Defendant Yeganeh's Motion for Summary Adjudication as to the 16th cause of action is denied. Defendant has failed to satisfy their burden of proof under CCP 437c(o)(2). Defendant's motion ignores the bulk of plaintiff's theories against him. Additionally, as discussed further, there is a failure of evidence supporting any defense proffered by Yeganeh and the evidence supports adjudication in favor of plaintiff.

Plaintiff Wobogo's Motion for Summary Adjudication of the 16th cause of action is GRANTED.

The felony convictions in the criminal case do not serve as collateral estoppel on the issues involved in the present civil action. Rather, as the decisions in Teitelbaum Furs, Inc v. Dominion Insurance Co. Ltd. (1962) 58 Cal 2d 601 and Pease v. Pease (1988) 201 Cal App 3d 29,33; make clear, the effect of a plea in the related civil case is that of an admission. The party making the admission is provided an opportunity in the civil case to come forward and explain the pleas. See Interinsurance Exchange v Flores (1996) 45 Cal App 4th 661, 672; County of Los Angeles v Civil Service Commission (1995) 39 Cal App 4th 620, 629, fn.8.

Defendant Yeganeh was provided an opportunity to come forward and explain the circumstances in the plea, yet Yeganeh offered no declaration in opposition to the present motion bearing on any explanation of the pleas. No other evidentiary explanation of the pleas is offered.

In particular, the new evidence establishes without competent rebuttal, that the defendant acted as a foreclosure consultant within the meaning of Civil Code section 2945 and excludes the possibility that he was exempt from its provisions.

Sent by:LAW OFFICES BCS      Jan-22-02 04:13pm      From 65007331607050677147Y      Page 3

In combination with the other evidence offered in support of plaintiff's motion, plaintiff satisfies her burden under CCP 437o(o)(1). The burden shifts to the defendant to show a triable issue of material fact exists as to the cause of action or a defense thereto. The competent evidence submitted fails to satisfy defendant's burden.

IT IS SO ORDERED.

DATED:_____JUN 2 7 2001

_____
HONORABLE GEORGE A. MIRAM

# Document No. 6

1

2

3
ENDORSED FILED
SAN MATEO COUNTY

4
JUN - 3 2004

5
Clerk of the Superior Court

6
By    SIOLO SALA
DEPUTY CLERK

7

8
SUPERIOR COURT OF THE STATE OF CALIFORNIA

9
COUNTY OF SAN MATEO

10

11
EDITH M. INGRAM, on behalf of            ) CASE NO. 410586
herself, and NOZIPO WOBOGO, on           )
12
behalf of the general public,            )
13                                         )
Plaintiffs,                              ) **FINAL DECISIONS ON INDIVIDUAL**
14                                         ) **RESTITUTION CLAIMS;**
vs.                                      ) **JUDGMENT THEREON**
15                                         )
RAMIN YEGANEH, dba American              )
16 Mortgage Realty, and dba American      )
Mortgage Realty, And Invest, et al.,     )
17                                         )
Defendants.                              )
18 ───────────────────────────────── )

19

20

21

22
<u>**FINAL DECISIONS ON INDIVIDUAL RESTITUTION CLAIMS;**</u>
23
<u>**JUDGMENT THEREON**</u>

24
    Upon hearing the restitution claims of the individual plaintiffs in this case as set

25
forth below, receiving evidence and argument from and in behalf of plaintiff claimants

26
herein and defendant R. YEGANEH, and good cause appearing therefore, the Court finds

27
and rules as follows, for the following claimants:

28

1
FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1

## INDEX TO INDIVIDUAL DECISIONS

2

3    **Claimant**                                              **Page**

4    CHAND and LACHAN ................................  4

5    LOUDD ...........................................  7

6    PORTER ..........................................  10

7    ROBERSON ........................................  12

8    TUIPULOTU .......................................  13

9    DOCKERY .........................................  15

10    PIEDOT ..........................................  17

11    PICKENS .........................................  19

12    HO ..............................................  23

13    LAUESE ..........................................  23

14    TURNER ..........................................  26

15    PENNEY, GLORIA...................................  27

16    JACKSON, JOE and JOANNAH.........................  29

17    JACKSON, YOLANDA ................................  31

18    ALARCON .........................................  33

19    PENNEY, GWENDOLYN ...............................  36

20    TRAIL ...........................................  37

21    WRIGHT and HEARNE ...............................  39

22    HELVIE ..........................................  43

23    SECOND BAPTIST CHURCH of FOWLER .............  45

24    MAGANA ..........................................  46

25    SEGURA and RIVERA ...............................  48

26    STEVENS .........................................  50

27    JACKSON-CHRISTIAN ...............................  51

28

2

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

| **Claimant** | **Page** |
|---|---|
| BEASLEY ......................................................... | 53 |
| CAREY ............................................................. | 55 |
| WILLIAMS ...................................................... | 57 |
| MABUTAS ....................................................... | 60 |
| HOPGOOD ....................................................... | 62 |

///

///

///

///

///

///

///

///

///

///

3

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

# DECISIONS

### RE CLAIMANTS HARI CHAND,

### KRISHNA CHAND, AND SHALEN LACHAN

A hearing concerning the restitution claims of claimants HARI CHAND, KRISHNA CHAND and SHALEN LACHAN was held before the Hon. John S. Blackman, Temporary Judge, on April 9 and April 10, 2002, at 1820 Gateway Drive, Suite 320, San Mateo, California. Appearing for plaintiffs CHAND and LACHAN were Linda L. Lane, Esq. Appearing for defendant R. YEGANEH was William E. Gilg, Esq. Also present were Emily Maxwell, Esq., Renee Glover, Esq., and defendant R. YEGANEH. HARI CHAND, KRISHNA CHAND and SHALEN LACHAN also appeared and gave testimony.

Upon receipt of evidence and argument, good cause appearing therefore, the court rules as follows:

Claimants HARI CHAND, KRISHNA CHAND and SHALEN LACHAN were victims of the wrongful conduct of defendant R. YEGANEH as pleaded in the complaint on file herein and as set forth in the Wrongful Practices and Remedies Table (see Ex. "A" to this Decision),[1] specifically:

### 1. UNLAWFUL LOAN BROKERAGE PRACTICES

#### A. Direct (Personal) Loans from Yeganeh

(1) Failure to enter into advance written contract for services;

(2) Failure to disclose maximum estimated and/or actual loan costs and fees to be charged at time and in manner required by statute (through use of blank, pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

(3) Failure to notify consumer of three-day right to rescind;

---

[1] The document attached as Exhibit "A" hereto was crafted at the outset of the case to act as a template for hearing the claims herein. It was attached as Ex. "A" to this court's Order re Scheduling and Conduct of Restitution Hearings signed March 25, 2002 and filed herein on March 27, 2002.

4

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1    (4) Permitting and encouraging client to execute blank or partial notes

2 and security instruments;

3    (5) Excessive loan brokerage fees

4    (6) Excessive interest rates

5    (7) Unlawful balloon notes (non-amortizing loans payable in less than

6 5 years);

7    (8) Failure to issue mandatory warning re enhanced risk of loss

8 because of balloon note;

9    (9) Pattern and practice of making loans without regard to borrower's

10 ability to repay based on current and anticipated income;

11    (10) Submission of demands for reconveyance into third party escrow

12 which included inflated third-party fees, rolled over excesses, and/or excessive charges for

13 reconveyance.

14    B. Third Party Loan Brokerage (Non-Duplicative of Practices Covered in

15 Section A above)

16    (1) Permitting and encouraging homeowner consumer to sign multiple

17 copies of blank loan application forms;

18    (2) Willful falsification of client loan application documents;

19    (3) Alteration of financial documents received from clients without

20 their knowledge or consent to support false statements made in loan applications;

21    (4) Falsification of client signatures and/or dates of signatures on loan

22 applications;

23    (5) Creation or alteration of third party appraisals submitted to lender

24 as part of loan application;

25    (6) Alteration of publicly-recorded documents and submission to third

26 parties to support placement of loan, in derogation of third party lien rights, without

27 knowledge of consumer;

28

5

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1         (7) Failure to deliver appraisal to borrower (SHALEN only, not

2 CHANDS)

3         (8) Taking undisclosed compensation, commission or profit (Yield

4 Spread Premium).

5         C. Foreclosure Consulting (Non-Duplicative of Practices Covered in

6           Sections A and B above)

7         (1) Securing compensation with lien on real and personal property/

8 Acquiring of interest in property in foreclosure;

9         (2) Claim, demand or collection of compensation prior to date that all

10 services were completely performed;

11         (3) Claim, demand or collection of compensation exceeding 10% of

12 personal loan.

13         **Restitution and Other Relief**

14     The court further rules that claimants HARI CHAND, KRISHNA CHAND and

15 SHALEN LACHAN are entitled to recover the following sums from defendant R.

16 YEGANEH as restitution for the above-mentioned wrongful conduct:

17     HARI AND KRISHNA CHAND:

18       1. Return of $1,745.48 in fees and charges for first direct personal loan

19       2. Return of $3,442.59 in fees and charges for second direct personal loan

20       3. Return of $5,600.00 in brokerage fees and costs for first third party loan

21       4. Return of $4,380.00 in brokerage fees and costs for second third party loan

22       5. Return of $1,250.00 as "rent" for their own home

23     SHALEN LACHAN:

24       1. Return of $335.18 in fees and charges for third direct loan

25     The court, in recognition of the "Order Providing for Reconveyance of Real

26 Property Interest and Securing of Funds Pending Resolution of Restitution Claim

27 (Chand/Lachen) [sic]," (hereinafter referred to as "Reconveyance Order of April 14,

28

6

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1  2003"), filed herein on April 14, 2003, hereby further orders that all funds sequestered and

2  held in escrow pursuant to said Reconveyance Order of April 14, 2003 shall be released to

3  HARI CHAND, KRISHNA CHAND and SHALEN LACHAN  forthwith.

4  Claimants' request for 'return' of $79,000 in homeowners' equity is denied.

5  **Interest**

6  The court finds that the 'trigger dates' for the beginning of running of pre-judgment

7  interest on the above-mentioned amounts are as follows:

8  HARI AND KRISHNA CHAND:

9  1. $1,745.48 (July 17, 1997)

10  2. $3,442.59 (February 1, 1999)

11  3. $5,600.00 (July 17, 1997)

12  4. $4,380.00 (February 9, 1999)

13  5. $1,250.00 (September 20, 1998)

14  SHALEN LACHAN:

15  1. $335.18 (February 1, 1999)

16  Interest shall be calculated at the rate of seven percent (7%) per annum, simple

17  interest.

18  **Fees, Costs and Sanctions**

19  Claimants HARI CHAND, KRISHNA CHAND and SHALEN LACHAN are

20  prevailing parties in this phase of the claim.  The issues of entitlement to attorney's fees,

21  costs, and sanctions are reserved, and will be decided at a later date.

22

23  \* \* \*

24

25  **RE CLAIMANTS KATHERINE and WEBSTER LOUDD**

26  A hearing concerning the restitution claims of claimants KATHERINE and

27  WEBSTER LOUDD was held before the Hon. John S. Blackman, Temporary Judge, on

28

7

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1  April 11, 2002, at 1820 Gateway Drive, Suite 320, San Mateo, California.   Appearing for

2  plaintiffs Mr. and Mrs. LOUDD were Linda J. Lane, Esq. Emily Maxwell, Esq. and Renee

3  Glover, Esq.  Appearing for defendant R. YEGANEH was William E. Gilg, Esq.  Also

4  present were defendant R. YEGANEH.  Plaintiffs KATHERINE and WEBSTER

5  LOUDD also appeared and gave testimony.

6          Upon receipt of evidence and argument, good cause appearing therefore, the court

7  rules as follows:

8          Plaintiffs KATHERINE and WEBSTER LOUDD were victims of the wrongful

9  conduct of defendant R. YEGANEH as pleaded in the complaint on file herein and as set

10  forth in the Wrongful Practices and Remedies Table herein (see Ex. "A" hereto),

11  specifically:

12          1. UNLAWFUL LOAN BROKERAGE PRACTICES

13              A. Direct Personal Loans:  None

14              B. Third Party Loan Brokerage

15                  (1) Failure to enter into advance written contract for services;

16                  (2) Failure to disclose maximum estimated and/or actual loan costs

17  and fees to be charged at time and in manner required by statute (through use of blank,

18  pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

19                  (3) Failure to notify consumer of three-day right to rescind;

20                  (4) Permitting and encouraging client to execute blank or partial notes

21  and security instruments;

22                  (5) Excessive loan brokerage fees;

23                  (6) Excessive interest rates;

24                  (7) Willful falsification of client loan application documents;

25                  (8) Alteration of financial documents received from clients without

26  their knowledge or consent to support false statements made in loan applications;

27                  (9) Falsification of client signatures and/or dates of signature on loan

28

8

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

229

1  applications;

2           (10) Taking undisclosed compensation, commission or profit (Yield

3  Spread Premium).

4  //

5  **<u>Restitution and Other Relief</u>**

6      The court further rules that claimants KATHERINE and WEBSTER LOUDD are

7  entitled to recover the following sums from defendant R. YEGANEH as restitution for the

8  above-mentioned wrongful conduct:

9      1.  Return of $6,995.00 in fees and charges for first third party loan (203 Garden

10  Street)

11      2.  Return of $7,470.00 in fees and charges for second third party loan (2370

12  Dumbarton Street)

13      3.  Reimbursement of $5,893.90 (prepayment penalty on 203 Garden Street)

14      4.  Reimbursement of $6,040.80 (prepayment penalty on 2370 Dumbarton Street)

15  **<u>Interest</u>**

16      The court finds that the 'trigger dates' for the beginning of running of pre-judgment

17  interest on the above-mentioned amounts are as follows:

18      1.  $6,995.00 (October 29, 1998)

19      2.  $7,740.00 (November 4, 1999)

20      3.  $5,893.90 (May 1, 2002)

21      4.  $6,040.80 (May 1, 2002)

22      Interest shall be calculated at the rate of seven percent (7%) per annum, simple

23  interest.

24  **<u>Fees, Costs and Sanctions</u>**

25      Claimants KATHERINE and WEBSTER LOUDD are prevailing parties in this

26  phase of the claim.  The issues of entitlement to attorney's fees, costs, and sanctions are

27  reserved, and will be decided at a later date.

28

9

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

* * *

### RE CLAIMANT GEORGE PORTER

A hearing concerning the restitution claims of claimant GEORGE PORTER was held before the Hon. John S. Blackman, Temporary Judge, on October 9, 2003, at 411 Borel Avenue, Suite 425, San Mateo, California.  Appearing for plaintiff GEORGE PORTER was Aaron Wainscoat, Esq.  No appearance was made for defendant R. YEGANEH.  Plaintiff GEORGE PORTER did not appear.

Upon receipt of evidence and argument, good cause appearing therefore, the court rules as follows:

Claimant GEORGE PORTER was a victim of the wrongful conduct of defendant R. YEGANEH as pleaded in the complaint on file herein and as set forth in the Wrongful Practices and Remedies Table herein (see Ex. "A" hereto), specifically:

1. UNLAWFUL LOAN BROKERAGE PRACTICES

    A. Direct (Personal) Loans from Yeganeh

        (1) Failure to enter into advance written contract for services;

        (2) Failure to disclose maximum estimated and/or actual loan costs and fees to be charged at time and in manner required by statute (through use of blank, pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

        (3) Failure to notify consumer of three-day right to rescind;

        (4) Permitting and encouraging client to execute blank or partial notes and security instruments;

        (5) Excessive loan brokerage fees;

        (6) Excessive interest rates;

        (7) Unlawful balloon note (non-amortizing loans payable in less than 5 years);

        (8) Failure to issue mandatory warning re enhanced risk of loss

10

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1    because of balloon note;

2            (9) Pattern and practice of making loans without regard to borrower's

3    ability to repay based on current and anticipated income;

4          B. <u>Third Party Loan Brokerage (Non-Duplicative of Practices Covered in</u>

5    <u>Section A above)</u>

6            (1) Permitting and encouraging homeowner consumer to sign multiple

7    copies of blank loan application forms;

8            (2) Willful falsification of client loan application documents;

9            (3) Willful overcharge or inflation of costs for third party services

10   rendered and pass-through of inflated amounts to client without disclosure;

11           (4) Taking undisclosed compensation, commission or profit (Yield

12   Spread Premium).

13                  **Restitution and Other Relief**

14       The court further rules that claimant GEORGE PORTER is entitled to recover the

15   following sums from defendant R. YEGANEH as restitution for the above-mentioned

16   wrongful conduct:

17       1.  Return of $4,594.52 in fees and charges for direct personal loan

18       2.  Return of $7,257.00 in brokerage fees and costs on third party loan

19                          **Interest**

20       The court finds that the 'trigger dates' for the beginning of running of pre-judgment

21   interest on the above-mentioned amounts are as follows:

22       1.  $4,594.52 (February 26, 1999)

23       2.  $7257.00 (November 9, 1998)

24       Interest shall be calculated at the rate of seven percent (7%) per annum, simple

25   interest.

26                  **Fees, Costs and Sanctions**

27       Claimant GEORGE PORTER is a prevailing party in this phase of the claim.  The

28

                    11

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1  issues of entitlement to attorney's fees, costs, and sanctions are reserved, and will be

2  decided at a later date.

3

4                                        * * *

5

6                        **RE CLAIMANT WILLIE ROBERSON**

7        A hearing concerning the restitution claims of claimant WILLIE ROBERSON was

8  held before the Hon. John S. Blackman, Temporary Judge, on October 9, 2003, at 411

9  Borel Avenue, Suite 425, San Mateo, California. Appearing for plaintiff WILLIE

10  ROBERSON was Aaron Wainscoat, Esq. No appearance was made for defendant R.

11  YEGANEH. Plaintiff WILLIE ROBERSON did not appear.

12        Upon receipt of evidence and argument, good cause appearing therefore, the court

13  rules as follows:

14        Plaintiff WILLIE ROBERSON was a victim of the wrongful conduct of defendant

15  R. YEGANEH as pleaded in the complaint on file herein and as set forth in the Wrongful

16  Practices and Remedies Table herein (see Ex. "A" hereto), specifically:

17        1. <u>UNLAWFUL LOAN BROKERAGE PRACTICES</u>

18            A. <u>Direct (Personal) Loans from Yeganeh</u>: None

19            B. <u>Third Party Loan Brokerage (Non-Duplicative of Practices Covered in</u>

20  <u>Section A above)</u>

21                (1) Permitting and encouraging homeowner consumer to sign multiple

22  copies of blank loan application forms;

23                (2) Willful falsification of client loan application documents;

24                        **Restitution and Other Relief**

25        The court further rules that claimant WILLIE ROBERSON is entitled to recover

26  the following sums from defendant R. YEGANEH as restitution for the above-mentioned

27  wrongful conduct:

28

                                        12
                        _____
                        FINAL DECISIONS ON INDIVIDUAL
                        RESTITUTION CLAIMS; JUDGMENT
                        THEREON

1       1.  Return of $486.00 in brokerage fees for third party loan

2                        **Interest**

3       The court finds that the 'trigger date' for the beginning of running of pre-judgment

4    interest on the above-mentioned amount is as follows:

5       1.  $486.00 (July 24, 1998)

6       Interest shall be calculated at the rate of seven percent (7%) per annum, simple

7    interest.

8              **Fees, Costs and Sanctions**

9       Claimant WILLIE ROBERSON is a prevailing party in this phase of the claim.  The

10   issues of entitlement to attorney's fees, costs, and sanctions are reserved, and will be

11   decided at a later date.

12

13                       * * *

14

15         **RE CLAIMANTS SIONE and SENOLITA TUIPULOTU**

16      A hearing concerning the restitution claims of claimants SIONE and SENOLITA

17   TUIPULOTU was held before the Hon. John S. Blackman, Temporary Judge, on October

18   10, 2003, at 411 Borel Avenue, Suite 425, San Mateo, California.  Appearing for plaintiffs

19   SIONE and SENOLITA TUIPULOTU was Lindsay A. Havern, Esq. No appearance was

20   made for defendant R. YEGANEH.  Plaintiff SIONE TUIPULOTU was also present, and

21   gave testimony.

22      Upon receipt of evidence and argument, good cause appearing therefore, the court

23   rules as follows:

24      Plaintiffs SIONE and SENOLITA TUIPULOTU were victims of the wrongful

25   conduct of defendant R. YEGANEH as pleaded in the complaint on file herein and as set

26   forth in the Wrongful Practices and Remedies Table herein (see Ex. "A" hereto),

27   specifically:

28

                    13

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1   I. UNLAWFUL LOAN BROKERAGE PRACTICES

2         A. Direct (Personal) Loans from Yeganeh

3               (1) Failure to enter into advance written contract for services;

4               (2) Failure to disclose maximum estimated and/or actual loan costs

5   and fees to be charged at time and in manner required by statute (through use of blank,

6   pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

7               (3) Failure to notify consumer of three-day right to rescind;

8               (4) Permitting and encouraging client to execute blank or partial notes

9   and security instruments;

10              (5) Excessive loan brokerage fees;

11              (6) Excessive interest rates;

12              (7) Unlawful balloon note (non-amortizing loans payable in less than

13  5 years);

14              (8) Failure to issue mandatory warning re enhanced risk of loss

15  because of balloon note;

16              (9) Pattern and practice of making loans without regard to borrower's

17  ability to repay based on current and anticipated income;

18        B. Third Party Loan Brokerage (Non-Duplicative of Practices Covered in

19  Section A above)

20              (1) Permitting and encouraging homeowner consumer to sign multiple

21  copies of blank loan application forms;

22              (2) Willful falsification of client loan application documents;

23              (3) Alteration of financial documents received from clients without

24  their knowledge or consent to support false statements made in loan applications;

25              (4) Falsification of client signatures and/or dates of signature on loan

26  applications;

27              (5) Taking undisclosed compensation, commission or profit (Yield

28

14

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1  Spread Premium).

2       C. Foreclosure Consulting (Non-Duplicative of Practices Covered in

3       Sections A and B above)

4              (1) Same as listed above in Sections A. and B, including claim,

5  demand or collection of compensation exceeding 10% of personal loan.

6              **Restitution and Other Relief**

7       The court further rules that claimants SIONE and SENOLITA TUIPULOTU are

8  entitled to recover the following sums from defendant R. YEGANEH as restitution for the

9  above-mentioned wrongful conduct:

10      1.  Return of $1,769.49 in fees and charges for direct personal loan

11      2.  Return of $8,442.50 in brokerage fees and costs on third party loan

12              **Interest**

13      The court finds that the 'trigger dates' for the beginning of running of pre-judgment

14  interest on the above-mentioned amounts are as follows:

15      1.  $1,769.49 (March 25, 1999)

16      2.  $8,442.50 (August 7, 1998)

17      Interest shall be calculated at the rate of seven percent (7%) per annum, simple

18  interest.

19              **Fees, Costs and Sanctions**

20      Claimants SIONE and SENOLITA TUIPULOTU are prevailing parties in this

21  phase of the claim.  The issues of entitlement to attorney's fees, costs, and sanctions are

22  reserved, and will be decided at a later date.

23

24              *  *  *

25

26              **RE CLAIMANT CHERYL DOCKERY**

27      A hearing concerning the restitution claims of claimant CHERYL DOCKERY was

28

15

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1   held before the Hon. John S. Blackman, Temporary Judge, on November 5, 2003, at 411

2   Borel Avenue, Suite 425, San Mateo, California.  Appearing for plaintiff CHERYL

3   DOCKERY was Alysson Russell Snow, Esq.  Defendant R. YEGANEH was present in his

4   own behalf, in pro per.  Plaintiff CHERYL DOCKERY did not attend.

5       Upon receipt of evidence and argument, good cause appearing therefore, the court

6   rules as follows:

7       Plaintiff CHERYL DOCKERY was a victim of the wrongful conduct of defendant

8   R. YEGANEH as pleaded in the complaint on file herein and as set forth in the Wrongful

9   Practices and Remedies Table herein (see Ex. "A" hereto), specifically:

10      1. <u>UNLAWFUL LOAN BROKERAGE PRACTICES</u>

11          A. <u>Third Party Loan Brokerage</u>

12              (1) Failure to disclose maximum estimated and/or actual loan costs

13  and fees to be charged at time and in manner required by statute (through use of blank,

14  pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

15              (2) Failure to notify consumer of three-day right to rescind;

16              (3) Excessive loan brokerage fees;

17              (4) Pattern and practice of making loans without regard to borrower's

18  ability to repay based on current and anticipated income;

19              (5) Permitting and encouraging homeowner consumer to sign multiple

20  copies of blank loan application forms;

21              (6) Willful falsification of client loan application documents;

22              (7) Alteration of financial documents received from clients without

23  their knowledge or consent to support false statements made in loan applications;

24              (8) Falsification of client signatures and/or dates of signature on loan

25  applications;

26              (9) Failure to deliver appraisal to borrower;

27              (10) Willful overcharge or inflation of costs for third party services

28

16

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1  rendered and pass-through of inflated amounts to client without disclosure;

2            (11) Taking undisclosed compensation, commission or profit (Yield

3  Spread Premium).

### Restitution and Other Relief

5      The court further rules that claimant CHERYL DOCKERY is entitled to recover

6  the following sums from defendant R. YEGANEH as restitution for the above-mentioned

7  wrongful conduct:

8      1. Return of $10,970 in fees and charges for third party loan.

### Interest

10     The court finds that the 'trigger date' for the beginning of running of pre-judgment

11  interest on the above-mentioned amounts is as follows:

12     1. $10,970.00 (May 15, 1997)

13     Interest shall be calculated at the rate of seven percent (7%) per annum, simple

14  interest.

### Fees, Costs and Sanctions

16     Claimant CHERYL DOCKERY is a prevailing party in this phase of the claim.  The

17  issues of entitlement to attorney's fees, costs, and sanctions are reserved, and will be

18  decided at a later date.

19

20                    *  *  *

21

### RE CLAIMANTS ROY C. PIEDOT and ROSE LYLLIAN F. PIEDOT

23     A hearing concerning the restitution claims of claimants ROY C. PIEDOT and

24  ROSE LYLLIAN F. PIEDOT was held before the Hon. John S. Blackman, Temporary

25  Judge, on November 5, 2003, at 411 Borel Avenue, Suite 425, San Mateo, California.

26  Appearing for plaintiffs ROY C. PIEDOT and ROSE LYLLIAN F. PIEDOT was Alysson

27  Russell Snow, Esq.  Defendant R. YEGANEH was present, in pro per.  Plaintiffs ROY C.

28

                          17
                          _____
                          FINAL DECISIONS ON INDIVIDUAL
                          RESTITUTION CLAIMS; JUDGMENT
                          THEREON

1    PIEDOT and ROSE LYLLIAN F. PIEDOT were also present, and gave testimony.

2    Upon receipt of evidence and argument, good cause appearing therefore, the court

3    rules as follows:

4    Plaintiffs ROY C. PIEDOT and ROSE LYLLIAN F. PIEDOT were victims of the

5    wrongful conduct of defendant R. YEGANEH as pleaded in the complaint on file herein

6    and as set forth in the Wrongful Practices and Remedies Table herein (see Ex. "A" hereto),

7    specifically:

8    I. UNLAWFUL LOAN BROKERAGE PRACTICES

9    A. Third Party Loan Brokerage

10   (1) Failure to disclose maximum estimated and/or actual loan costs

11   and fees to be charged at time and in manner required by statute (through use of blank,

12   pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

13   (2) Failure to notify consumer of three-day right to rescind;

14   (3) Unlawful balloon note (non-amortizing loans payable in less than

15   5 years);

16   (4) Failure to issue mandatory warning re enhanced risk of loss

17   because of balloon note;

18   (5) Pattern and practice of making loans without regard to borrower's

19   ability to repay based on current and anticipated income;

20   (6) Permitting and encouraging homeowner consumer to sign multiple

21   copies of blank loan application forms;

22   (7) Willful falsification of client loan application documents;

23   (8) Falsification of client signatures and/or dates of signature on loan

24   applications;

25   (9) Failure to deliver appraisal to borrower;

26   **Restitution and Other Relief**

27   The court further rules that claimants ROY C. PIEDOT and ROSE LYLLIAN F.

28

18

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1    PIEDOT are entitled to recover the following sums from defendant R. YEGANEH as

2    restitution for the above-mentioned wrongful conduct:

3        1. Return of $5,850.00 in fees and charges for third party loan

4                                **Interest**

5        The court finds that the 'trigger date' for the beginning of running of pre-judgment

6    interest on the above-mentioned amount is as follows:

7        1. $1,745.48 (October 7, 1997)

8        Interest shall be calculated at the rate of seven percent (7%) per annum, simple

9    interest.

10                        **Fees, Costs and Sanctions**

11        Claimants  ROY C. PIEDOT and ROSE LYLLIAN F. PIEDOT are prevailing

12    parties in this phase of the claim.  The issues of entitlement to attorney's fees, costs, and

13    sanctions are reserved, and will be decided at a later date.

14

15                                * * *

16

17                    **RE CLAIMANT LUCY MAE PICKENS**

18        A hearing concerning the restitution claims of claimant LUCY MAE PICKENS was

19    held before the Hon. John S. Blackman, Temporary Judge, on November 6, 2003, at 411

20    Borel Avenue, Suite 425, San Mateo, California.  Appearing for plaintiff LUCY MAE

21    PICKENS was Alysson Russell Snow, Esq.  Defendant RAMIN YEGANEH appeared in

22    his own behalf, in pro per.  Plaintiff LUCY MAE PICKENS also attended and gave

23    testimony.

24        Upon receipt of evidence and argument, good cause appearing therefore, the court

25    rules as follows:

26        Plaintiff LUCY MAE PICKENS was a victim of the wrongful conduct of defendant

27    R. YEGANEH as pleaded in the complaint on file herein and as set forth in the Wrongful

28

                                    19
                        _____
                        FINAL DECISIONS ON INDIVIDUAL
                        RESTITUTION CLAIMS; JUDGMENT
                        THEREON

                                                240

1   Practices and Remedies Table herein (see Ex. "A" to this court's Order re Scheduling and

2   Conduct of Restitution Hearings signed March 25, 2002 and filed herein on March 27,

3   2002), specifically:

4       1. <u>UNLAWFUL LOAN BROKERAGE PRACTICES</u>

5           A. <u>Third Party and First Party Loans</u>

6               (1) Failure to enter into advance written contract for services;

7               (2) Failure to disclose maximum estimated and/or actual loan costs

8   and fees to be charged at time and in manner required by statute (through use of blank,

9   pre-signed Good Faith Estimate of Settlement Costs and Truth in Lending Statements);

10              (3) Failure to notify consumer of three-day right to rescind;

11              (4) Permitting and encouraging client to execute blank or partial notes

12  and security instruments;

13              (5) Excessive loan brokerage fees;

14              (6) Excessive interest rates;

15              (7) Unlawful balloon notes (non-amortizing loans payable in less than

16  5 years);

17              (8) Failure to issue mandatory warning re enhanced risk of loss

18  because of balloon notes;

19              (9) Pattern and practice of making loans without regard to borrower's

20  ability to repay based on current and anticipated income;

21              (10) "Rolling Over"/"Churning" (repeated re-issuance of inflated

22  notes and deeds of trust as forbearance when consumer cannot pay inflated and/or unlawful

23  sums due on face of note);

24              (11) Permitting and encouraging homeowner consumer to sign

25  multiple copies of blank loan application forms;

26              (12) Willful falsification of client loan application documents;

27              (13) Alteration of financial documents received from clients without

28

            20

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

1    their knowledge or consent to support false statements made in loan applications;

2                    (14) Failure to deliver appraisal to borrower;

3                    (15) Willful overcharge or inflation of costs for third party services

4    rendered and pass-through of inflated amounts to client without disclosure;

5                    (16) Taking undisclosed compensation, commission or profit (Yield

6    Spread Premium).

7                    **Restitution and Other Relief**

8        The court further rules that claimant LUCY MAE PICKENS is entitled to recover

9    the following sums from defendant R. YEGANEH as restitution for the above-mentioned

10   wrongful conduct:

11       1. Return of $17,975.00 in fees and charges for Ocwen loan on 156 North Humboldt

12   Street, San Mateo (made 6/25/98)

13       2. Return of $500.00 in undisclosed fees for personal loan (made 11/24/98);

14       3. Return of $6,745.00 in fees and charges for Long Beach Mortgage loan on 1680

15   Tulane Avenue, East Palo Alto (made 12/9/98)

16       4. The Court finds that first party loans in the following amounts which defendant

17   claims were made were in fact not made:

18                    (a) $14,000 ("service note" dated 6/25/98)

19                    (b) $3,500 (Balloon Note No. 1[2] dated 9/1/99)

20                    (c) $10,000 (Balloon Note No. 2 dated 12/1/99)

21                    (d) $32,250 (Balloon Note No. 3 dated 8/1/99)

22                    (e) $10,000 (Balloon Note No. 4 dated 6/28/99)

23                    (f) $15,200 (Balloon Note No. 5 dated 7/1/99)

24   and therefore any deeds of trust purporting to secure such loans are hereby declared null

25   and void, and any and all promissory notes purporting to evidence such loans are hereby

26   _____

27        [2] For ease of reference, the Court adopts the nomenclature used by plaintiffs in their hearing brief
     filed for Mrs. Pickens, pp. 2-6.

28

                                    21

                    FINAL DECISIONS ON INDIVIDUAL
                    RESTITUTION CLAIMS; JUDGMENT
                    THEREON

1  cancelled. Defendant R. YEGANEH is ordered to provide evidence of full reconveyance

2  of any of the aforementioned deeds of trust and deliver original reconveyances to counsel

3  for claimants within 30 days of Notice of Entry of Judgment herein.

4      The Court notes that even if any of the above-referenced loans were in fact made,

5  the transactions were so rife with failures to meet the legal requirements for such loans

6  (such as failing to make statutory disclosures, problems with loan documentation, breaches

7  of fiduciary duties, etc.) that restitution of the amounts of the loans would have been

8  ordered anyway.

9                          **Interest**

10     The court finds that the 'trigger date' for the beginning of running of pre-judgment

11 interest on the above-mentioned amounts as follows:

12     1. $17,975.00  (6/25/98)

13     2. $500.00 (11/24/98)

14     3. $6,745.00 (12/9/98)

15     Interest shall be calculated at the rate of seven percent (7%) per annum, simple

16 interest.

17     The Court further finds that the purported signature of Lucy Mae Pickens on the

18 Settlement Agreement proffered by defendant is a forgery, and therefore defendant has not

19 disproved claimant's prima facie case. The Court took no evidence concerning and makes

20 no finding or ruling concerning who perpetrated the forgery.

21                  **Fees, Costs and Sanctions**

22     Claimant LUCY MAE PICKENS is a prevailing party in this phase of the claim.

23 The issues of entitlement to attorney's fees, costs, and sanctions are reserved, and will be

24 decided at a later date.

25

26                          *  *  *

27

28

                          22

                          FINAL DECISIONS ON INDIVIDUAL
                          RESTITUTION CLAIMS; JUDGMENT
                          THEREON

1  **RE CLAIMANTS TIN TAK HO and LUCILLA HO**

2  A hearing concerning the restitution claims of claimants TIN TAK HO and

3  LUCILLA HO was held before the Hon. John S. Blackman, Temporary Judge, on

4  November 11, 2003, at 411 Borel Avenue, Suite 425, San Mateo, California.  Appearing for

5  plaintiffs TIN TAK HO and LUCILLA HO was Ludmila Yamalova, Esq.  Defendant

6  RAMIN YEGANEH appeared in his own behalf, in pro per.  Neither plaintiff TIN TAK

7  HO no LUCILLA HO were present.

8  Upon receipt of evidence and argument, good cause appearing therefore, the court

9  rules as follows:

10  Plaintiffs TIN TAK HO and LUCILLA HO were not the victims of any wrongful

11  conduct of defendant R. YEGANEH as pleaded in the complaint on file herein and as set

12  forth in the Wrongful Practices and Remedies Table herein (see Ex. "A" hereto),

13  specifically conduct amounting to abuse of process in connection with renting property

14  from Mr. YEGANEH.

15  **Restitution and Other Relief**

16  The court further rules that claimants TIN TAK HO and LUCILLA HO shall not

17  recover any sums from defendant R. YEGANEH or be provided any relief in these

18  proceedings.

19  **Fees, Costs and Sanctions**

20  Claimants TIN TAK HO and LUCILLA HO are not prevailing parties in this phase

21  of the claim, therefore they will not be awarded any attorney's fees, costs or sanctions in

22  these proceedings.

23

24  * * *

25

26  **RE CLAIMANTS MALIAEME LAUESE and LATANOA LAUESE**

27  A hearing concerning the restitution claims of claimants MALIAEME LAUESE

28

23

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

ER - 080                        244

1    and LATANOA LAUESE was held before the Hon. John S. Blackman, Temporary Judge,

2    on November 11, 2003, at 411 Borel Avenue, Suite 425, San Mateo, California.  Appearing

3    for plaintiffs MALIAEME LAUESE and LATANOA LAUESE was Ludmila Yamalova,

4    Esq.  Defendant RAMIN YEGANEH appeared in his own behalf, in pro per.  Plaintiffs

5    MALIAEME LAUESE and LATANOA LAUESE also appeared, and gave testimony.

6    Also present was Ilaisa Faletau.

7          Upon receipt of evidence and argument, good cause appearing therefore, the court

8    rules as follows:

9          Plaintiffs MALIAEME LAUESE and LATANOA LAUESE were victims of the

10   wrongful conduct of defendant R. YEGANEH as pleaded in the complaint on file herein

11   and as set forth in the Wrongful Practices and Remedies Table herein (see Ex. "A" hereto),

12   specifically:

13        1. <u>UNLAWFUL LOAN BROKERAGE PRACTICES</u>

14             A.  Third Party Loan

15                  (1) Failure to disclose maximum estimated and/or actual loan costs

16   and fees to be charged at time and in manner required by statute (through use of blank,

17   pre-signed Truth in Lending Statement);

18                  (2)  Excessive loan brokerage fees;

19                  (3) Excessive interest rates;

20                  (4) Permitting and encouraging homeowner consumer to sign multiple

21   copies of blank loan application forms;

22                  (5) Willful falsification of client loan application documents;

23                  (6) Alteration of financial documents received from clients without

24   their knowledge or consent to support false statements made in loan applications;

25                  (7) Falsification of client dates of signature on loan applications;

26                  (8) Creation or alteration of third party appraisals submitted to lender

27   as part of loan application;

28

24

FINAL DECISIONS ON INDIVIDUAL
RESTITUTION CLAIMS; JUDGMENT
THEREON

# Document No. 7

1

2

3

4

5

6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                              COUNTY OF SAN MATEO

10

11    EDITH M. INGRAM, on behalf of          )    CASE NO. 410586
      herself, and NOZIPO WOBOGO, on         )
12    behalf of the general public,          )
                                             )
13                  Plaintiffs,              )    ORDER RE AWARD OF ATTORNEY'S
                                             )    FEES, COSTS, PREJUDGMENT
14                                           )    INTEREST AND RELATED FINDINGS;
      vs.                                     )    ORDER FOR ENTRY OF JUDGMENT
15                                           )    THEREON
      RAMIN YEGANEH, dba American            )
16    Mortgage Realty, and dba American      )
      Mortgage Realty, And Invest, et al.,   )
17                                           )
                    Defendants.              )
18    _____       )

19

20         A hearing re plaintiffs' application for award of attorney's fees and costs and related

21    matters was duly noticed and held at the offices of Farbstein & Blackman, APC, 411 Borel

22    Avenue, Suite 425, San Mateo, California, on August 26, 2004.  Attending the hearing were

23    Emily Maxwell, Esq., Michael Tracy, Esq. and Reneé Glover Chantler, Esq. for plaintiffs,

24    and William Gilg, Esq. and George Eshoo, Esq. for defendant.  Defendant RAMIN

25    YEGANEH was also present.

26         Briefs were filed by both parties.  This order was issued in tentative form and served

27    on counsel herein on September 3, 2004 by both fax and U.S. Mail, in order for the parties

28
                                             1
                            _____
                            ORDER RE AWARD OF FEES, COSTS,
                            PREJUDGMENT INTEREST AND RELATED
                            FINDINGS; ORDER FOR ENTRY OF

1    to check for any corrections that may need to be made. The parties have not responded to

2    the court's request for corrections or changes to this order. Upon review of the papers

3    submitted by each side, the file in this action and oral argument of counsel, and good cause

4    appearing therefor,

5        The Court hereby finds and orders as follows:

6    **Attorney's Fees**

7        1. The work of attorneys for plaintiffs in this case has met the criteria for an award

8    of attorneys fees under *Code of Civil Procedure* section 1021.5. Their work has resulted in

9    the enforcement of important rights affecting the public interest. (See, e.g., *Woodland Hills*

10   *Residents Assoc. v. City Council* (1979) 23 Cal.3d 917, 931, and *Beasley v. Wells Fargo Bank*

11   (1991) 235 Cal.App.3d 1407. Their work has conferred a significant benefit on a large class

12   of persons, and on the general public as well. The amounts of money restored to

13   individuals through plaintiff attorneys' work may not seem like much to defendant, but

14   these are highly significant amounts of money to many of the claimants, many of whom live

15   very modestly. Plaintiff attorneys' actions in prosecuting this suit have also prevented a

16   large number of members of the public from falling victim to the same practices as the

17   named claimants herein, through the vigorous prosecution of this lawsuit as well as by way

18   of obtaining injunctions.

19       2. Private enforcement was required in this case. Private enforcement was risky,

20   and was a tremendous financial burden on the lawyers who performed the services. The

21   Court finds that the recoveries by each claimant herein should be personal to them, and the

22   interests of justice dictate that attorney's fees should not be awarded out of the fund of

23   recovery in this case.

24       3. In making its ruling, the Court has taken into account the factors announced in

25   cases concerning an award of fees under *Code of Civil Procedure* section 1021.5 (see, e.g.,

26   *Serrano v. Priest* (1977) 20 Cal.3d 25, at p. 49). The factual and legal questions involved in

27   this case were novel and difficult. The complexity of the case, together with defendant's

28

2

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED

1    evasive and obstreperous conduct as outlined in several of the previous orders issued in this

2    case made this case more time-consuming for plaintiffs' attorneys than it otherwise might

3    have been, and thus precluded other employment by those attorneys while they were

4    engaged with this case.  The contingent nature of getting any recovery in this case made this

5    a very risky case for plaintiffs' attorneys to engage in, especially because of defendant's

6    proclivity for hiding his assets.  Defendant has argued that plaintiffs' attorneys in essence

7    overbilled on this case, for example by having more than one attorney make appearances in

8    court, and by presenting lengthy papers.  However, defendant has presented no compelling,

9    specific evidence that shows that plaintiffs overworked this case or did not legitimately

10   spend the amount of hours they are claiming they spent.  The Court finds that the time

11   expended by plaintiffs' counsel in terms of manning their case was reasonable under the

12   difficult circumstances of this case.  The Court notes that a great deal of the time and effort

13   expended by plaintiffs' attorneys in this case was in fact necessitated by defendant's own

14   obstreperous, evasive behavior. Defendant should not be allowed to benefit from his own

15   misdeeds by relying on his own misconduct in order to reduce the amount of hours

16   plaintiffs' attorneys are allowed to state in their fee claim.  (See, e.g., *Stokus v. Marsh* (1990)

17   217 Cal.App.3d 653-654.)   The Court has also taken into account the fact that plaintiffs'

18   attorneys and staff spent many hours for which they are not seeking reimbursement, as

19   stated in plaintiffs' moving papers.

20        4. Defendant does not actively dispute the hourly rates proposed by plaintiffs'

21   attorneys as being excessive for this type of case, and certainly produces no evidence to

22   counter plaintiffs's attorneys' claims on this topic.  Given the novelty and difficulty of the

23   questions involved, the skill displayed in presenting the issues, the customary fees, the

24   results obtained, and the experience, reputation, and the ability of the attorneys involved

25   (see, e.g., *Page v. Something Weird Video* (CD CAL 1996), 960 F. Supp. 1438, 1446-1447),

26   the Court finds that the hourly rates for which plaintiffs' attorneys request approval are

27   reasonable under the circumstances and context of this case, and for this type of case.

28

3

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED

1       5. The Court finds that the base lodestar amount of attorney's fees to be awarded in

2    this case is $1,765,769.00 to the Gray, Cary firm, and $536,100.00 to Reneé Glover

3    Chantler, for a total base award to plaintiffs of $2,301,869.00 in attorney's fees. The Court

4    further finds, based upon all of the evidence in this case, upon the Court's observations

5    concerning the difficulty and risk to plaintiffs' attorneys in bringing and prosecuting this

6    action, upon the Court's observations of defendant's conduct throughout this litigation

7    which has dramatically prolonged this litigation and made it much more involved and

8    expensive than it ever had to be, and upon the principles of fairness and equity, that a

9    multiplier of 1.5 should be applied to the lodestar attorney fee amount. After applying that

10   multiplier, the Court therefore awards plaintiffs a total of $3,452,803.50 as and for

11   attorney's fees in this case, and defendant is ordered to pay that amount to plaintiffs'

12   attorneys forthwith.

13      <u>Costs</u>

14      6. The Court finds that based upon the evidence presented to it, plaintiffs are

15   entitled to recover costs expended for filing fees; court transcripts; deposition transcripts;

16   witness expenses and subpoenas and summonses; interpreters; Fed Ex and other courier

17   services; private investigators for locating claimants; and appraisals, but are not entitled to

18   costs claimed under the categories of photocopying (no differentiation between allowable

19   and non-allowable photocopying); postage; travel (no differentiation between travel for

20   deposition, which would be allowable, and other travel, which would not); or electronic

21   searches. Thus the Court awards $32,457.54 as and for costs to plaintiffs, and the Court

22   orders defendant to pay said costs to plaintiffs' attorneys forthwith.

23      <u>Prejudgment Interest</u>

24      7. The Court has previously found that the recovering claimants are entitled to

25   prejudgment interest (see, e.g., *Irwin v. Mascott* (ND CAL 2000) 112 F.Supp.2d 937, 956).

26   The rationale is that plaintiff claimants were deprived of the use of the money they either

27   paid to defendant or were induced to pay to others because of defendant's actionable

28

4

**ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED**

conduct. The claimants herein should be made whole by receiving interest on money they

would otherwise have had if not for defendant's actionable conduct, and in order to prevent

unjust enrichment to defendant by having the use of claimants' money. The Court now

finds that the recovering claimants listed below are entitled to receive the following

amounts of prejudgment interest, calculated from the "Trigger Date" listed below through

the date of entry of the restitution awards in this case, i.e., through June 3, 2004:


| Claimant | Amount | Trigger Date | Amount of Prejudgment Interest Awarded |
|---|---|---|---|

**HARI CHAND and KRISHNA CHAND:**

|   1. $1,745.48 (July 17, 1997) | $840.84 |
|   2. $3,442.59 (February 1, 1999) | $1,286.11 |
|   3. $5,600.00 (July 17, 1997) | $2,696.20 |
|   4. $4,380.00 (February 9, 1999) | $1,629.60 |
|   5. $1,250.00 (September 20, 1998) | $498.88 |

**SHALEN LACHAN:**

|   1. $335.18 (February 1, 1999) | $125.20 |

**KATHERINE and WEBSTER LOUDD:**

|   1. $6,995.00 (October 29, 1998) | $2,739.34 |
|   2. $7,740.00 (November 4, 1999) | $2,325.61 |
|   3. $5,893.90 (May 1, 2002) | $862.44 |
|   4. $6,040.80 (May 1, 2002) | $883.95 |

**GEORGE PORTER:**

|   1. $4,594.52 (February 26, 1999) | $1,694.45 |
|   2. $7257.00 (November 9, 1998) | $2,826.64 |

**WILLIE ROBERSON:**

|   1. $486.00 (July 24, 1998) | $199.38 |

5

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED

1    SIONE TUIPULOTU and SENOLITA TUIPULOTU:

2         1. $1,769.49 (March 25, 1999)         $643.05

3         2. $8,442.50 (August 7, 1998)         $3,440.63

4    CHERYL DOCKERY:

5         1. $10,970.00 (May 15, 1997)         $5,415.28

6    ROY C. PIEDOT and ROSE LYLLIAN F. PIEDOT:

7         1. $1,745.48 (October 7, 1997)         $2,725.14

8    LUCY MAE PICKENS:

9         1. $17,975.00  (June 25, 1998)         $7,743.66

10        2. $500.00 (November 24, 1998)         $193.31

11        3. $6,745.00 (December 9, 1998)         $2,588.41

12   MALIAEME LAUESE and LATANOA LAUESE:

13        1. $10,427.50 (September 29, 1999)         $3,413.68

14   ADOLPHURS TURNER and NADINE TURNER:

15        1. $5,748.00 (December 3, 1996)         $3,018.26

16   GLORIA PENNEY:

17        1. $7,045.00 (September 5, 1997)         $3,325.06

18   JOE L. JACKSON and JOANNAH JACKSON:

19        1. $5,562.50 (September 22, 1998)         $2,217.88

20   YOLANDA JACKSON:

21        1. $6,757.00 (October 23, 1998)         $2,653.92

22   PHILLIP ALARCON:

23        1. $7,500.15 (August 4, 1998)         $3,060.87

24        2. $7,510.00 (August 4, 1998)         $3,064.89

25   GWENDOLYN PENNEY:

26        1. $184.00 (August 19, 1999)         $61.72

27   ///

28                                    6

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED

1  SAMUEL TRAIL and JOAN TRAIL:

2      1. $5,872.00 (April 24, 1998)          $2,373.90

3      2. $7,605.00 (April 24, 1998)          $3,074.50

4  BARBARA A. WRIGHT and KENNETH HEARNE, SR.:

5      1. $695.00 (August 25, 1996)          $378.28

6      2. $5,950.00 (October 22, 1996)        $3,172.26

7      3. $6,750.00 (July 17, 1997)          $3,250.54

8      4. $5,415.00 (February 20, 1998)       $2,382.30

9  PAMELA GENE HELVIE:

10     1. $5,700 (June 10, 1997)             $2,785.35

11     2. $5,770 (October 14, 1998)          $2,276.21

12  SECOND BAPTIST CHURCH OF FOWLER:

13     1. $3,400.00 (October 4, 1995)         $2,061.78

14     2. $1,075.00 (March 25, 1996)          $616.62

15  DOROTEO MAGANA:

16     1. $6,058.75 (October 7, 1996)         $3,283.28

17     2. $6,141.25 (August 25, 1998)         $2,481.58

18  YOLANDA SEGURA and ROSA RIVERA:

19     1. $5,654.86 (August 12, 1999)         $1,903.30

20  HENRY STEVENS:

21     1. $7,680.00 (January 26, 1999)        $2,878.01

22  LULA JACKSON-CHRISTIAN:

23     1. $5,641.00 ($February 26, 1998)      $2,302.16

24     2. $7,095.00 (January 19, 1999)        $$2,668.29

25  WILLIAM LEE BEASLEY II:

26     1. $6,442.50 (May 14, 1999)           $2,279.61

27  ///

28                          7

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED
FINDINGS: ORDER FOR ENTRY OF

1  **CLEO CAREY:**

2      1. $3,895.00 (November 24, 1998)        $1,505.93

3  **LEONARD WILLIAMS:**

4      1. $2,929.08 (June 25, 1998)        $1,217.87

5      2. $3,508.71 (July 1, 1999)        $1,198.43

6      3. $6838.54 (June 25, 1998)        $2,483.35

7  **ROMEO MABUTAS and FELY MABUTAS:**

8      1. $7,720.00 (February 11, 1999)        $2,689.31

9      2. $11,895.00 (February 18, 1999)        $4,405.06

10  ///

11      <u>**Procedure Re Judgment**</u>

12      8. Since the inception of this action and assignment of all matters to the Temporary

13  Judge, plaintiff has continuously sought, and the Temporary Judge has contemplated that

14  plaintiff would be seeking, a permanent injunction. This was discussed several times in

15  unreported hearings with counsel for both sides. Until June of 2004 defense counsel never

16  raised any objections to this or brought anything to the court's attention that would

17  contradict this. The last line of the Court's Judgment issued on June 3, 2004 was referring

18  to the anticipated permanent injunction hearing (and pending potential sanctions hearings)

19  when it stated, "All pending or further motions shall be scheduled for hearing after

20  consultation with the Temporary Judge."

21      9. Although this Court's Scheduling Order of June 9, 2004 and the June 3, 2004

22  Final Judgment of Restitution do not expressly mention injunctive relief, this Court had

23  always contemplated, at the time both orders were issued, that plaintiff would be moving

24  for a permanent injunction in this case, and that the Temporary Judge would rule on that

25  motion. Defendant refused to honor his stipulated commitment and court order to fund

26  the process of having the Temporary Judge hear the permanent injunction. This was

27  discussed during an unreported telephonic hearing before this Temporary Judge on June 9,

28

8

**ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED**

Farbstein & Blackma   /9/2004   11:25   PAGE 10/     RightFax

1  2004, when defendant's counsel flatly stated that defendant would not pay for any more

2  services by the Temporary Judge. Since the Temporary Judge informed the parties'

3  counsel that there were barely enough, and possibly not enough, fees still on deposit with

4  the Temporary Judge to pay for his fees to be incurred in concluding adjudication of the

5  attorney's fees and costs application, it was understood by everyone that defendant was

6  refusing to pay the Temporary Judge to rule upon the permanent injunction. When

7  defendant's counsel informed the Temporary Judge that his client would no longer pay any

8  money to fund the use of a Temporary Judge, plaintiff's counsel suggested that instead of

9  fighting that, it might be more expedient to bring the matter of the permanent injunction

10 back before Judge Forcum or another sitting judge. It was also noted at the time that for

11 one reason or another, all of the prior injunction hearings in the case had been held before

12 and ruled upon by a sitting superior court judge anyway. Defendant's counsel agreed to

13 having a sitting judge hear the permanent injunction. This Temporary Judge offered to San

14 Mateo County Presiding Judge Mark Forcum that he would hear the matter without first

15 being given a down payment on fees to cover that work, even in the face of defendant's

16 refusal to pay for the Temporary Judge's services in this case. However, Judge Forcum

17 assigned the matter to a sitting judge (Hon. Carl Holm), and that matter is still pending

18 before Judge Holm.

19     10. Plaintiff's counsel estimated that a hearing on the permanent injunction would

20 take perhaps only 15 minutes or so if heard by this Temporary Judge. The Temporary

21 Judge has presided over this case for over two years and has heard hours and hours of

22 evidence and has read and reviewed boxes and boxes worth of legal briefing and

23 presentation of evidence by counsel. The Temporary Judge estimates that he would have

24 required approximately another two to five hours' worth of time to review papers, hear and

25 rule upon plaintiffs' application for permanent injunction.

26     11. It has always been the intent of the Court to issue its final decision on the

27 restitution claims first; then to hear and rule on the attorney's fees and cost application;

28

9

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED

1   then to hear and rule upon plaintiffs' outstanding motion for permanent injunction; and

2   then to hear and rule upon any other miscellaneous motions that were still pending and still

3   needed to be dealt with (such as any pending sanctions motions, motions concerning

4   defendants' documents, and the like); and that at the end of that process there would be

5   one final judgment in the case.

6            **Disposition of Defendant's Papers Seized by the Police on September 18, 1999**

7            12.  The Court further finds, after hearing argument from counsel and after

8   reviewing defendant's boxes of documents at length *in camera* with him and his counsel,

9   that defendant's state and federal income tax records initially seized by the police are

10  confidential and are not to be produced to plaintiffs' counsel.  The Temporary Judge

11  returned those tax records directly to defendant on August 26, 2004, at the end of the

12  hearing on attorney's fees and costs.  The Court further rules that plaintiffs' attorneys may

13  copy the remainder of defendants' documents previously held by the Temporary Judge, and

14  once copies are made, those documents will be returned to defendant.  The documents

15  were requested years ago by plaintiffs in discovery.  The court finds the documents that are

16  produced to plaintiffs by this order to be relevant to plaintiffs' prosecution of their case and

17  to the enforcement and collection of the judgment this court has ordered.

18           **Defendant's Request for Stay of Enforcement**

19           13.  Through a series of letters beginning in late August, 2004, defendant generally

20  requested that the Court issue an order staying enforcement of plaintiffs' judgment pending

21  appeal, and specifically requested that defendant not have to obtain a bond with regard to

22  certain real properties for which the judgment ordered defendant to furnish proof of full

23  reconveyance.  The parties briefed the matter via letter briefs.  The Court, having

24  considered the argument and authority put forth by defendant and plaintiffs, and based

25  upon its review of the file herein and familiarity with the underlying evidence, claims and

26  defenses, issued a tentative decisions stating that it intended to rule that it would not issue a

27  stay of enforcement of the judgment at this time, and that pending any appeal of this

28                                      10

ORDER RE AWARD OF FEES, COSTS,
PREJUDGMENT INTEREST AND RELATED
~~FINDINGS; ORDER FOR ENTRY OF~~

Farbstein & Blackma    /9/2004    11:25    PAGE 12/    RightFax

1  matter defendant would be required to post a bond or bonds equal in amount to the

2  appraised value of each item of real property which is the subject of the court's prior order

3  concerning full reconveyance of deeds of trust, in order to stay enforcement of such

4  reconveyances pending appeal.  However, by letter to the Court dated September 7, 2004

5  (copy attached hereto as Ex. "A"), defendant's counsel withdrew the request for stay of

6  enforcement, and acquiesced in plaintiffs' intention to proceed with enforcement of that

7  portion of the court's order concerning reconveyance of deeds of trust as mentioned in the

8  Court's June 3, 2004 judgment.  This order is without prejudice to defendant's ability to

9  renew any attempt permitted by law to stay enforcement of all or any portion of this Court's

10  judgment herein pending appeal.

11      13. Judgment shall issue forthwith in accordance with the decisions set forth herein

12  and, together with any further final rulings from the Court on outstanding matters, shall

13  merge with the June 3, 2004 judgment and the judgment set forth therein.

14      IT IS SO ORDERED.

15  Dated: _9/9/04_

                                JOHN S. BLACKMAN
16                              Temporary Judge of the Superior Court

17

18

19

20

21

22

23

24

25

26

27

28      11

                        ORDER RE AWARD OF FEES, COSTS,
                        PREJUDGMENT INTEREST AND RELATED

09/09/2004 THU 11:23  [TX/RX NO 7085]  Ø012

ER - 092                                296

**WILLIAM E. GILG**
Attorney at Law
305 San Bruno Avenue West
San Bruno, CA 94066
(650) 871-8647
(650) 873-3168 (fax)

September 7, 2004

JOHN BLACKMAN, ESQ.
Farbstein & Blackman
411 Borel Ave., Suite 425
San Mateo, CA 94402-3518

Re: Wobogo v. Yeganeh

Dear Judge Blackman:

I am responding to your September 3, 2004 letter regarding the bond issue on the full reconveyances of deeds of trust.

Pursuant to Code of Civil Procedure section 917.3, my client has already deposited the originals of the full reconveyances of the deeds of trust required by your June 3, 2004 Judgment in this matter with the clerk of the Superior Court on August 17, 2004. A copy of same has been provided to you on August 19, 2004. It is not necessary to do appraisals or to post bonds in the amount of the properties' present value because it is a lot cheaper for my client to obtain another set of the original reconveyances of the deeds of trust and deliver them directly to plaintiff's attorneys tomorrow, September 8, 2004, pursuant to your June 3, 2004 Judgment.

My client does not want to be held responsible for the costs and expenses associated with the appraisals and bonding process when your June 3, 2004 Judgment (page 22) clearly states that he may deliver the original full reconveyances of the deeds of trust to plaintiff's attorneys.

Therefore tomorrow, September 8, 2004, my client will deliver another set of original full reconveyances of the deeds of trust according to your June 3, 2004 Judgment directly to plaintiff's attorney, Gray Cary. Then it will be up to plaintiff's attorneys to distribute the original reconveyances to the appropriate claimant.

Your cooperation is appreciated.

Sincerely,

BILL GILG, Attorney for Defendant

EXHIBIT "A"

Farbstein & Blackma    )/9/2004    11:25    PAGE 14/        RightFax

cc:George Eshoo
   Renee Glover
   Emily Maxwell

2

09/09/2004 THU 11:23  [TX/RX NO 7085]  Ø014

1                          **PROOF OF SERVICE**
                              _Ingram v. Yeganeh_
2              San Mateo County Superior Court Case No. 410586

3          I am a resident of the State of California, over the age of 18 years, and not a party to
the within action. I am employed in the office of a member of the bar of this court at whose
4  direction this service was made. My business address is 411 Borel Avenue, Suite 425, San
Mateo, California 94402-3518. On September 9, 2004, I served the following document(s):
5

6    **ORDER RE AWARD OF ATTORNEY'S FEES, COSTS, PREJUDGMENT INTEREST
        AND RELATED FINDINGS; ORDER FOR ENTRY OF JUDGMENT THEREON**

7  on the following person(s) by the method(s) indicated below:

8  Michael S. Tracy, Esq.                    Attorneys for Plaintiffs
   Gray Cary                                 _Fax: 1-858-677-1477_
9  4365 Executive Drive, Suite 1100
   San Diego, CA 92121
10

11  Emily Maxwell, Esq.                      Attorneys for Plaintiffs
    Gray Cary                                _Fax: 1-415-836-2501_
12  153 Townsend Street, Suite 800
    San Francisco, CA  94107

13  Renee Glover Chantler, Esq.              Attorneys for Plaintiffs
    840 East El Camino Real, 2nd Floor  _1-408-716-2659_
14  Sunnyvale, CA 94087

15  William E. Gilg, Esq.                    Attorneys for Defendant Ramin Yeganeh
    305 San Bruno Avenue West                _Fax: 650-873-3168_
16  San Bruno, CA 94066

17  George P. Eshoo, Esq.                    Attorneys for Defendant Ramin Yeganeh
    702 Marshall Street, Suite 500           _Fax: 650-364-3054_
18  Redwood City, CA 94063

19  [XX]    By transmitting via facsimile on this date from fax number (650) 554-6240 the
            document(s) listed above to the fax number(s) set forth herein. The transmission
20          was completed before 5:00 p.m. and was reported complete and without error. The
            transmission report(s) is/are attached to this proof of service. Service by fax was
21          made by confirmed written agreement of the parties so served.

22
           I declare under penalty of perjury under the laws of the United States and the State
23  of California that the above is true and correct. Executed at San Mateo, California, on
    September 9, 2004.
24
                                            _Suzanne T. Farbstein_
25                                          _____
                                                SUZANNE T. FARBSTEIN
26

27

28                                      12
                                        _____
                                        ORDER RE AWARD OF FEES, COSTS,
                                        PREJUDGMENT INTEREST AND RELATED
                                        FINDINGS; ORDER FOR ENTRY OF

Case 4:07-cv-03256-CW    Document 18-4    Filed 03/19/2008    Page 41 of 71  S 9/9/04
Farbstein & Blackmar  /9/2004   11:25   PAGE 1/1    RightFax

PWD

LAW OFFICES OF
# FARBSTEIN & BLACKMAN
A PROFESSIONAL CORPORATION
411 BOREL AVENUE
SUITE 425
SAN MATEO, CALIFORNIA 94402-3518
www.farbstein.com

DONALD F. FARBSTEIN
JOHN F. FARBSTEIN
MICHAEL A. FARBSTEIN
JOHN SOMERS BLACKMAN
GARY R. GLEASON
MARGARET A. BURTON*
*ALSO ADMITTED IN NEVADA

TELEPHONE
(650) 554-6200

FACSIMILE
(650) 554-6240

E-MAIL ADDRESS
info@farbstein.com

# CONFIDENTIAL
# FACSIMILE COMMUNICATION

Thursday, September 09, 2004 11:24:42 AM

To:  Michael S. Tracy, Esq.

From:  Suzanne Farbstein

Your Facsimile No.:  1-858-677-1477

Number of Pages, including this cover sheet:  15

ORIGINAL

If you have not properly received all of this facsimile transmission, please call (650) 554-6200.

## THIS IS A LEGALLY PRIVILEGED AND CONFIDENTIAL COMMUNICATION

This facsimile transmission contains legally privileged and confidential information intended only for the use of the individual or entity named above. Any dissemination, distribution, broadcast, or copying of this transmission by anyone other than the named individual or entity above is prohibited. If you receive this transmission in error, immediately notify Farbstein & Blackman by collect call at (650) 554-6200. Farbstein & Blackman will arrange for return of the original transmission at no cost to you.

09/09/2004 THU 11:23  [TX/RX NO 7085] @001

# Document No. 8

1   MICHAEL S. TRACY (Bar No. 101456)
    EMILY L. MAXWELL (Bar No. 185646)
2   LINDA L. LANE (Bar No. 211206)
    **GRAY CARY WARE & FREIDENRICH** LLP
3   401 B Street, Suite 1700
    San Diego, CA 92101-4297
4   Tel: 619-699-3620/3555
    Fax: 619-699-2701
5

6   R. RENEE GLOVER (Bar No. 157793)
    **EAST PALO ALTO COMMUNITY LAW PROJECT**
7   1395 Bay Road
    East Palo Alto, CA 94303
8   Tel: (650) 853-1600
    Fax: (650) 853-1608
9

10  Attorneys for Plaintiff NOZIPO WOBOGO

11              SUPERIOR COURT OF CALIFORNIA

12              COUNTY OF SAN MATEO

13

14  EDITH M. INGRAM, on behalf of herself,    CASE NO. 410586
    and NOZIPO WOBOGO, on behalf of the
15  general public,                           **NOTICE OF MOTION AND MOTION TO**
                                              **MODIFY EXISTING PRELIMINARY**
16          Plaintiffs,                       **INJUNCTION**

17      v.                                    Date:  10/3/01
                                              Time:  9 AM
18  RAMIN YEGANEH, d/b/a American             Dept: _14
    Mortgage Realty and d/b/a American        Judge: Hon. Rosemary Pfeiffer
19  Mortgage Realty, and Invest, and DOES 1   Complaint:   October 4, 1999
    through 100,
20
            Defendants.
21

22

23

24  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

25      YOU ARE HEREBY NOTIFIED THAT on October 3, 2001, at 9:00AM, in

26  Department No. 14 of this Court, located at 800 North Humboldt Street, San Mateo, California,

27  Plaintiff NOZIPO WOBOGO, on behalf of the general public, will move and hereby does move

28  the Court for an order modifying the existing preliminary injunction in this case.

ENDORSED FILED
SAN MATEO COUNTY

SEP 2 6 2001

Clerk of the Superior Court
By     SIOLO SALA
            DEPUTY CLERK

-1-

GRAY CARY WARE      SD\1468482.1              NOTICE OF MOTION AND MOTION TO MODIFY EXISTING PRELIMINARY
& FREIDENRICH ...    9999990.00117                        INJUNCTION

                                                                                    117

1      This motion is based upon a material change in the facts of this case since the injunction

2  was granted.  The requested modification is requested to serve the ends of justice.  In particular,

3  the modification would prevent Defendant Yeganeh from transferring or otherwise disposing of

4  his real property assets pending the resolution of this matter.  The amendment is necessary

5  because Defendant Yeganeh is seeking to avoid the eventual judgment against him in this matter.

6  On July 30, 2001, Defendant lost a summary adjudication motion in this case.  Pursuant to the

7  court's order on the summary adjudication motion, Yeganeh is liable for violation of Business

8  and Professions Code section 17200 for his unfair, unlawful and fraudulent business practices.

9  Yeganeh is systematically disposing of all of his assets in an effort to preclude the public from

10 obtaining the restitution relief they are now entitled to under Section 17200.  A modification of

11 the existing preliminary injunction to prevent Yeganeh from disposing of the assets necessary to

12 make restitution to his victims is just and necessary.  Without such an order, Yeganeh will render

13 the judgment in this case meaningless because there will be nothing left to give his victims.

14     This motion will be based upon this notice; the Declaration of Emily L. Maxwell, the

15 Declaration of R. Renee Glover, and memorandum of points and authorities, all of which are

16 served and filed herewith, as well as upon the complete files and records in this action.

17 Respectfully submitted,

18 DATED:  September 25, 2001

19         **GRAY CARY WARE & FREIDENRICH** LLP

20

21         By

22            MICHAEL S. TRACY
           EMILY L. MAXWELL
           LINDA L. LANE

23            Attorneys for NOZIPO WOBOGO

24     **EAST PALO ALTO COMMUNITY LAW PROJECT**
           R. RENEE GLOVER

25            Attorneys for NOZIPO WOBOGO

26

27

28

-2-

GRAY CARY WARE
& FREIDENRICH ...
SD\1468482.1
9999050-900117
NOTICE OF MOTION AND MOTION TO MODIFY EXISTING PRELIMINARY
INJUNCTION

118

ER - 098

1   MICHAEL S. TRACY (Bar No. 101456)
    EMILY L. MAXWELL (Bar No. 185646)
2   LINDA L. LANE (Bar No. 211206)
    **GRAY CARY WARE & FREIDENRICH** LLP
3   401 B Street, Suite 1700
    San Diego, CA 92101-4297
4   Tel: 619-699-3620/3555
    Fax: 619-699-2701
5

6   R. RENEE GLOVER Bar No. 157793)
    **EAST PALO ALTO COMMUNITY LAW PROJECT**
    1395 Bay Road
7   East Palo Alto, CA 94303
    Tel: (650) 853-1600
8   Fax: (650) 853-1608

9   Attorneys for Plaintiff NOZIPO WOBOGO

**ENDORSED FILED**
SAN MATEO COUNTY

SEP 2 6 2001

Clerk of the Superior Court
By _SIOLO SALA_
DEPUTY CLERK

10

11

12

13   EDITH M. INGRAM, on behalf of herself,
    and NOZIPO WOBOGO, on behalf of the
14   general public,

15         Plaintiffs,

16       v.

17   RAMIN YEGANEH, d/b/a American
    Mortgage Realty and d/b/a American
18   Mortgage Realty, and Invest, and DOES 1
    through 100,
19

20         Defendants.

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN MATEO

CASE NO. 410586

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION TO MODIFY THE
EXISTING PRELIMINARY INJUNCTION**

Date:
Time:
Dept: 14
Judge: Hon. Rosemary Pfeiffer
Complaint: October 4, 1999

21

22

23

24

25

26

27

28

SD\1469559.1
9999050-900117

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *PLAINTIFF'S*
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

1  I.    INTRODUCTION.

2       On July 30, 2001, the Court granted the general public's motion for summary adjudication

3  of its section 17200 cause of action, finding Defendant Ramin Yeganeh liable for violation of that

4  statute.  As such, the Court has now officially concluded that, indeed, Defendant Ramin Yeganeh

5  ("Defendant" or "Yeganeh") has methodically victimized the general public through his unlawful,

6  fraudulent, and/or unfair lending and mortgage brokering practices.  With liability established, the

7  restitutionary or damages phase of the trial is all that remains.  On August 3, 2001, and again on

8  August 10, 2001, Defendant Yeganeh settled this dispute on the record before the Court.  Later, in

9  September, Yeganeh refused to comply with the terms of the Settlement Agreement.

10 Accordingly, Judge Kemp, the settlement judge, has vacated the settlement and returned this

11 matter to the Master Calendar Department to be set for trial.

12      Now, more than ever, Plaintiffs deserve the protection requested in this motion.  As

13 Plaintiffs enter into the restitutionary phase of these proceedings in determining how much money

14 is owed to them by Yeganeh, Defendant is actively attempting to preclude any meaningful

15 restitution for his victims.  Defendant's conduct and the underlying evidence in this lawsuit

16 demonstrate that his strategy is to systematically delay this civil case (and his preceding criminal

17 case) in an attempt to obfuscate and dissipate his assets.  His recent shenanigans with the

18 settlement provide even further proof of this pattern of conduct.  In short, Yeganeh owes

19 hundreds of thousands and potentially millions of dollars to the victims of his Section 17200

20 violations and is doing everything in his power to dissipate his assets before judgment is entered.

21      On July 27, 2001, counsel for Plaintiffs confirmed their suspicion that Yeganeh is

22 systematically disposing of his real property assets in an attempt to liquidate and dissipate these

23 assets.  This new evidence, combined with Yeganeh's numerous threats to declare bankruptcy, his

24 avoidance of any and all substantive responses to discovery, his obfuscation of all of his assets,

25 his numerous attempts to delay this trial, his actual Chapter 13 bankruptcy filing and his refusal to

26 comply with the terms of the Settlement Agreement consented to before the Court have all led to

27 the filing of this motion for modification of the existing preliminary injunction.  Plaintiffs request

28 that the preliminary injunction be modified to prohibit Yeganeh from selling or otherwise

-1-

GRAY CARY WARE    SD\1469539.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

120

ER - 100

1   disposing of his property, without prior court approval. Defendant was previously ordered to

2   refrain from transferring property as part of the proceedings before the Court on August 10, 2001,

3   the day the Settlement Agreement was put on the record. Subsequently, Yeganeh has indicated

4   that he was not ordered to refrain from selling property. (Maxwell Decl., ¶ 2.) An order to

5   preclude the dissipation of assets is desperately needed. This modification to the preliminary

6   injunction is necessary to maintain the status quo pending the final resolution of this matter.

7   Without some interim relief, Yeganeh will render any award against him hollow and meaningless,

8   as all of the assets necessary to fulfill such an award will be long gone.

9   **II.     STATEMENT OF FACTS.**

10          This Court issued a preliminary injunction in this case on March 21, 2000. Such

11  injunction was issued on the strength of the facts surrounding only *four* of Yeganeh's victims:

12  Edith Ingram, Harrington Evans, and Mr. and Mrs. Harrison.[1] Now, over a year later, counsel for

13  Plaintiffs have reviewed more than 180 of Defendant's business files. Each of these files

14  evidences separate out-of-pocket losses and illustrates the breadth and pervasiveness of

15  Yeganeh's deceptive practices. Based on Yeganeh's own records, counsel for Plaintiffs believe

16  Yeganeh has defrauded over 150 individuals to whom he potentially owes hundreds of thousands,

17  if not millions, of dollars in restitutionary relief.[2] In fact, the parties now defunct Settlement

18  Agreement had Yeganeh paying well in excess of $1.5 million to settle the claims against him.

19          Yeganeh has been transferring his assets, often in secret "confidential recordations" at the

---

[1] On March 20, 2001, Yeganeh pled no contest to four felony counts of section 2945.4(g) for actions taken with respect to these four victims. In so pleading, Yeganeh admitted that on four separate occasions he willfully and unlawfully, while acting as a foreclosure consultant, induced or attempted to induce an owner of real property to enter into a contract which violated section 2945. *See* Cal. Civ. Code § 2945.4. This Court has determined that these criminal pleas have the force and effect of admissions to each and every element of the charged offenses. *See Interinsurance Exchange of Automobile Club of Southern Cal. v. Flores*, 45 Cal. App. 4th 661, 672 (1996).

[2] Other than those victims already disclosed to this Court, Plaintiffs' counsel is reluctant to disclose the specifics of any of these accused files in this publicly filed motion. Yeganeh has been harassing each of these disclosed victims and applying pressure with respect to the testimony they may present at trial. Therefore, Plaintiffs' counsel is prepared to give the Court, in camera, all of the documents that support the many examples of illegal and fraudulent activity set forth in this motion.

28

-2-

1  Recorder's office. (See Glover Decl. ¶¶ 6-12 and Exs. A-E thereto.) He transfers property and

2  then fails to report it as part of his bankruptcy petition. (Cf. Glover Dec. ¶ 5 and Maxwell Decl.

3  ¶ 3, Ex. A thereto.) In fact, he did not even list any of the properties he owned or the proceeds

4  from his sale of property in this petition. (Cf. Glover Decl. Ex. C and Maxwell Decl. Ex. A.)

5      Yeganeh's bad faith bankruptcy tactics and his transfers of property are elements of

6  Yeganeh's plan to delay while he sells off all of the assets necessary to provide his victims with

7  the restitution to which they are legally entitled.

8  **III.    EXAMPLES OF YEGANEH'S ILLEGAL AND FRAUDULENT CONDUCT.**

9      Upon review of the numerous files maintained by Yeganeh, various violations of law and

10  fraudulent acts become evident. Plaintiffs have already prevailed on their sixteenth cause of

11  action against Yeganeh for violation of Business and Professions Code section 17200. A non-

12  exhaustive list of the Section 17200 violations for which Plaintiffs now seek restitution includes

13  the following:

14    •  Violating California Business and Professions Code section 10240 ("section 10240")

15  by failing to make required disclosures, requiring victims to sign blank loan documents and real

16  estate documents, and charging fees and costs in excess of statutory limit;

17    •  Violating the Truth in Lending Act ("TILA") by requiring victims to sign blank forms

18  and requiring balloon payments on short term loans;

19    •  Forging and manufacturing real estate documents, listing inaccurate income figures in

20  an attempt to secure oppressive loans, altering deeds of trust, providing false declarations of

21  service and other fraudulent documents in eviction proceedings;

22    •  Charging and failing to disclose oppressive yield spread premiums;

23    •  Requiring his clients to sign agreements guaranteeing payment to Yeganeh and

24  releasing him from any prospective liability; and

25    •  Purchasing clients' homes at foreclosure sales when they could not make the payments

26  on the loans he procured for them.

27  /////

28  /////

-3-

GRAY CARY WARE    |  SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

ER - 102

122

## IV.    SPECIFIC VICTIMS OF YEGANEH'S ILLEGAL AND FRAUDULENT ACTIONS.

This motion will not address in detail those transactions with Yeganeh's victims which are already before this Court in the form of declarations by Yeganeh's victims including:  Edith Ingram, Kenneth Hearne, Benjetta Carr (on behalf of her parents, the late Herbert and Mae Ella Harrison), Sione Tuipulotu, Barbara Wright, and Harrington Evans.  However, some review of these facts is necessary to put this motion into perspective.

### A.    Ingram, Hearne, Harrisons, Tuipulotu, Wright, Evans, Loudd.

As noted, Edith Ingram, Kenneth Hearne, Benjetta Carr (on behalf of her parents, the late Herbert and Mae Ella Harrison), Sione Tuipulotu, Barbara Wright, Katherine Loudd and Harrington Evans have all submitted declarations, signed under penalty of perjury, detailing their transactions with Yeganeh.  Yeganeh has made it his practice to seek out homeowners in danger of losing their home to foreclosure.  He represents himself as a foreclosure specialist that can help save their homes.  (*See, e.g.,* Ingram Decl. ¶ 2; Hearne Decl. ¶¶ 5, 6, 11; Carr Decl. ¶ 6; Tuipulotu Decl. ¶ 2-3.)[3]  He simply appears at their homes uninvited.  (Wright Decl. ¶ 5; Evans Decl. ¶ 5; Tuipulotu Decl. ¶ 2.)

Yeganeh's practice is then to offer to arrange refinancing with a third party and, frequently, provide loans from his own funds to temporarily cure the homeowner's default.  (Evans Decl. ¶¶ 11, 13; Hearne Decl. ¶ 6.)  Although Yeganeh appears to offer help, in many cases his "loans" begin an escalating cycle in which the homeowner is pulled deeper and deeper into debt while the equity in the home is drained for Yeganeh's benefit.

Yeganeh accomplishes much of this by routinely inducing his clients to sign blank documents related to their real estate transactions.  (Carr Decl. ¶¶ 15-18; Ingram Decl. ¶¶ 5-7, 12).  He does so despite his affirmative legal obligation to ensure that no one accepts a real estate loan

---

[3] All of these declarations are already on file with this Court as part of the preliminary injunction papers which lead to the Court's March 21, 2000 *preliminary injunction order*.  To avoid re-filing voluminous amounts of paper, those documents are not re-filed with this motion, but are simply incorporated herein by this reference.

-4-

GRAY CARY WARE    SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

123

ER - 103

1   from him without receiving the required financial disclosures. In several instances where Yeganeh

2   has made personal loans, homeowners were presented with partial deeds of trust—the ultimate

3   instrument through which a home can be lost—to sign and notarize. Yet, many times Yeganeh fails

4   to tell his clients the extent of their financial exposure on the instruments they sign. (Wright Decl.

5   ¶¶ 13, 17, 23 & Exs. 8, 10-11; Tuipulotu Decl. ¶ 14 & Ex. 9; Carr Decl. ¶¶ 7-8 & Exs. 1, 3.)

6   Yeganeh's victims have often been deceived into accepting loans with increasingly higher payment

7   terms, which he knew the homeowners could never meet. And, he has induced clients to sign notes

8   and deeds of trust far in excess of the amount necessary to cure their defaults. (Wright Decl. ¶ 15;

9   Tuipulotu Decl. ¶¶ 14-15; Evans Decl. ¶¶ 12, 19-20, 24, 26, 28.)

10          At times, Yeganeh does not even tell his clients that the documents they are signing give him

11  an interest in their homes. (Wright Decl. ¶¶ 15-17; Hearne Decl. ¶¶ 8-9.) Further, he fails to tell

12  them that these security instruments include thousands of dollars of *undisclosed* fees and costs.

13  (Evans Decl. ¶¶ 14-16; Tuipulotu Decl. ¶ 13.) These fees and costs are exorbitant -- sometimes

14  exceeding 50% of the loan principle. (Carr Decl. ¶ 7, Ex. 1-2 (imposing nearly $8500 in fees on a

15  $29,900 loan); *id.* ¶ 8, Ex. 2-3 (charging over $9000 in fees on a $49,900 loan four days later); *id.*

16  ¶ 9, Ex. 4 (charging $4650 in fees for a $77,000 loan exactly one month after brokering the $29,900

17  loan); Tuipulotu Decl. ¶¶ 12-15, Exs. 8-9 (demanding $2500 repayment for a $1000 loan)). In

18  virtually every case revealed by plaintiffs' investigations, Yeganeh has imposed fees and costs

19  without required written disclosures and without informing the homeowners of their statutory right

20  to cancel the loan within three days. (Ingram Decl. ¶¶ 5-7; Evans Decl. ¶¶ 14, 26, 30, 33; Tuipulotu

21  Decl. ¶ 13; Yeganeh's Separate Statement of Undisputed Facts ¶¶ 11-17, 20-23.)

22          When homeowners are unable to pay the balloon payments on loans from Yeganeh, he

23  makes a *new* loan for a significantly higher principal, with a higher interest rate, and with higher fees

24  for his "services." (Evans Decl. ¶¶ 16, 18, 22, 27; Ingram Decl. ¶¶ 6-7, 9-10.) He then charges

25  thousands of dollars more for his forbearance. (Evans Decl. ¶¶ 8, 12-15.) Yeganeh secures his loans

26  with new deeds of trust on the homeowners' residences. (Verified Answer, ¶¶ 13, 16, 18; Evans

27  Decl. ¶¶ 5, 10, 14-15.)

28  /////

-5-

GRAY CARY WARE    SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

124

ER - 104

1    With his clients significantly indebted to him, Yeganeh arranges to have his clients' homes

2  foreclosed on, so that he can complete his scam by purchasing the homes at foreclosure sales for

3  prices much lower than their true market value.  Even if the home were ultimately refinanced,

4  Yeganeh would make thousands of dollars more through escrow for his services.  (Carr Decl. ¶ 10.)

5  If the homeowners refused to refinance, Defendant foreclosed himself, replacing himself on the

6  Deeds of Trust with a third party, so that he could then purchase the home at the foreclosure sale.

7  (Evans Decl. ¶ 6.)

8    Yeganeh admits that as a real estate broker and a mortgage loan broker he owes fiduciary

9  duties of disclosure, good faith, honesty, integrity, and fair dealing as to loans he makes and/or

10  arranges for his clients.  (Verified Answer ¶¶ 70-75.)  Yet, Yeganeh's actions show nothing but

11  contempt for his fiduciary duties.  Even in those cases where homeowners have not ultimately lost

12  their homes to Yeganeh, he has routinely engaged in unlawful, unfair and fraudulent acts, including:

13  inducing clients to sign blank documents; failing to inform clients of their three-day right to rescind;

14  collecting unconscionably high fees; charging unconscionably high interest rates; requiring balloon

15  payments on short term loans; purchasing clients' homes at foreclosure sales; and forgeries.

16    **B.**    **Yeganeh "Churned" Loans so that Clients Would Eventually Be in Debt to**

17  **Yeganeh for Much More than They Originally Contemplated.**

18    Upon review of Yeganeh's business files, his practice of "churning" loans becomes evident.

19  Yeganeh approaches a victim who only needs a minimal loan in order to cure the default on their

20  current loan or mortgage.  Yeganeh then offers to make a short-term loan to this individual for much

21  more money than is needed and fixes the loan at an extremely high interest rate and charges

22  outrageous fees, thereby ensuring that the individual will default on the loan.  Yeganeh then comes

23  back in and offers to loan that individual a higher amount of money at an equally high interest rate

24  with even more additional fees to satisfy the debt that Yeganeh already holds.  This pattern of

25  "churning" keeps going on until the individual ends up owing an amount that he will never be able to

26  pay off.

27  /////

28  /////

-6-

GRAY CARY WARE    SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

125

ER - 105

1    For example, in more than one scenario, Yeganeh approached an individual who was in

2  default on an existing loan in an amount between $2000-$3000.[4]  In a series of transactions, this

3  individual ended up owing Yeganeh $195,000 and paying him close to $40,000 in fees, after the

4  house went into foreclosure and Yeganeh himself purchased his client's home.  Yeganeh then

5  almost immediately sold the same house back to the victims for a purchase price exceeding the

6  amount he paid at the foreclosure sale by $60,000.  The restitutionary relief due to these

7  individuals alone exceeds $100,000.

8    **C.    Fraudulent and Forged Documents Submitted to Third-Party Lenders.**

9    A review of Yeganeh's business files uncovers a massive amount of different types of fraud

10  and forgery perpetrated against the individual victims as well as third party lending institutions who

11  issued some of the outside loans.

12    One of Yeganeh's client files shows that Yeganeh fraudulently changed the at-issue deeds of

13  trust to make it appear that there was no second mortgage on the house.  Yeganeh literally

14  manufactured the documents to substitute the name of the holder of the second deed of trust so that

15  no second deed of trust would appear.  He did so because the lender conditioned the refinancing of

16  the home on paying off the second mortgage.  Yeganeh defrauded the lender so he could earn his

17  fees.

18    Yeganeh's files also show that he falsified bank account statements to make it seem that his

19  clients had larger amounts of money in their bank accounts than they actually did in order to allow

20  them to qualify for larger amounts of loans.  For instance, in one file, a Verification of Deposit

21  shows that a client has $400 dollars in a bank account identified by a bank account number.  A later

22  copy of that same Verification of Deposition shows that the amount has been changed and now the

23  victim has $10,720 in that same bank account.  In a different file for a different victim, the same

24  account number and same amount of $10,720 is shown to exist in this second client's Verification of

25

26  [4] As noted above, counsel for Plaintiffs will provide the Court with all documents supporting its
    factual allegations so that the Court can review these documents in camera.  Defendant Yeganeh
27  has succeeded in finding and harassing many of the witnesses that Plaintiffs have contacted and
    the newly found witnesses in Yeganeh's business files should be protected from his harassment.

28

-7-

GRAY CARY WARE    SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

126

ER - 106

1    Deposit. Yeganeh simply recycles his forged documents to provide support to lenders for the high

2    loans given to his clients.

3    V.    **THE MODIFICATION OF THE EXISTING PRELIMINARY INJUNCTION IS**

4          **NECESSARY AND APPROPRIATE.**

5          The general public seeks this injunctive relief in order to maintain the status quo and ensure

6    the viability of any restitutionary award ultimately entered in this case. As such, Plaintiffs request a

7    modification to the existing preliminary injunction precluding Yeganeh from transferring or

8    otherwise disposing of any of his real property assets without prior court approval. <u>The Court has</u>

9    <u>already determined that Defendant violated section 17200</u>. As such, Plaintiffs are entitled to

10   restitutionary relief, which encompasses *all of the money they paid or lost to Yeganeh, including the*

11   *equity in their homes that they lost to Yeganeh.* The requested injunctive relief is necessary to

12   preclude Defendant from encumbering, removing, destroying, mishandling, impairing, disposing,

13   concealing or otherwise transferring any of his property before such recovery can be made.

14   Yeganeh has already demonstrated a propensity for fraudulent practices, including his overall

15   business practices, his bad faith bankruptcy petition[5] and the apparent fraudulent conveyances of

16   the Linda Mar Avenue and Grand Avenue properties. Without this order, Yeganeh will destroy,

17   hide and manipulate his assets, damaging the effectiveness of any restitutionary award against him

18   and thwarting the judicial process as a whole. In short, without this Order, Yeganeh will transfer

19   away the assets necessary to repair the harm he has done to his victims.

20         Modification of the existing preliminary injunction is appropriate under California Civil

21   Code section 533 because there has been a material change in the facts upon which the injunction

22   was granted and the ends of justice would be served by its modification. Cal. Civ. Code § 533.

23   Plaintiffs seek modification of this initial injunction to prohibit the liquidation of any of Yeganeh's

24   assets (including the selling of any of Yeganeh's pieces of real property) without prior court order

25

26   [5] The bankruptcy petition Yeganeh filed was dismissed shortly thereafter. He did not spell his
     name correctly (to avoid anyone searching his properties and credit to discover the bankruptcy)
27   nor did he provide the required schedules of his assets. (See Maxwell Decl. Ex. A.) The entire
     bankruptcy was a sham.

28

-8-

GRAY CARY WARE    SDU469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
& FREIDENRICH    0000050 000117    MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

ER - 107    127

1   in order to secure the potential judgment that is sought against Yeganeh.  Since March 21, 2000, the

2   date of the initial preliminary injunction, counsel for Plaintiffs have discovered many more of

3   Yeganeh's unlawful and fraudulent practices, as well as the victims of those practices.  Moreover,

4   Plaintiffs' counsel has learned that Yeganeh has transferred two properties through a secret

5   "confidential recording"—one on Grand Avenue and one on Linda Mar Avenue.  Yeganeh never

6   mentioned the sale of these properties during the settlement negotiations in this case (where he

7   claimed he had no cash), nor did he list them or the proceeds from their sale in his bankruptcy

8   petition.  (See Maxwell Decl. ¶ Ex. A, the entire bankruptcy petition of Mr. Yeganeh).  In short,

9   Yeganeh has already demonstrated a propensity to commit precisely the kind of asset hiding the

10  requested order is designed to prevent.

11         Counsel for plaintiffs have reviewed over 180 business files evidencing the breadth and

12  pervasiveness of Yeganeh's illegal and deceptive actions.  Based on Yeganeh's own records,

13  counsel for Plaintiffs have reason to believe that Yeganeh has defrauded over 150 individuals to

14  whom he potentially owes hundreds of thousands, and potentially millions, of dollars in

15  restitutionary relief.  Therefore, modification of the existing preliminary injunction is needed and

16  should be granted because Plaintiffs have established a probable validity of this claims as well as

17  immediate danger that Yeganeh will dispose of the only assets available to pay restitution to the

18  victims of his Section 17200 violations.

19     **A.    Plaintiffs Have Established the Probable Validity of Their Claim to Relief.**

20         Here, the general public has established the validity of its claim to take possession of

21  Yeganeh's assets.  As noted above, this Court granted the general public's claim for summary

22  adjudication, thereby establishing Yeganeh's liability pursuant to section 17200.  Additionally,

23  with over 150 victims in real estate transactions, the restitution will certainly be hundreds of

24  thousands, if not millions of dollars.  Therefore, Plaintiffs have established the probable validity

25  /////

26  /////

27  /////

28  /////

-9-

GRAY CARY WARE    SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

128

ER - 108

1   of its claim to possession of the assets.  In fact, they have already established their Section 17200

2   claim.[6]

3      **B.      Plaintiffs Have Established That There Is Immediate Danger That Yeganeh's**

4              **Property May Be Unavailable By Reason Of Transfer, Concealment, Or**
                **Removal.**

5          Plaintiffs have also established that there is an immediate danger of these assets being sold

6   and/or transferred if this Court does not modify the existing injunction as requested.  The

7   evidence shows that Defendant is transferring and encumbering his assets.  Additionally,

8   Yeganeh's pattern of conduct in which he has continually delayed this case, and hidden his true

9   financial situation, creates serious concerns about what he is doing.  It seems apparent that his is

10  seeking to squirrel away his assets before judgment and collection.

11         There have been a number of delays in the trial of this case which have been instigated by

12  Yeganeh since the original trial date of September 18, 2000.  (Glover Decl. ¶ 3.)  In all but one

13  instance, the trial has been continued to accommodate Defendant.  (*Id.*)  Three times the trial was

14  continued because of Yeganeh's then-pending criminal trial, (which his criminal counsel, John

15  Halley, would then immediately move to postpone on the grounds that it needed to track the civil

16  action), and twice to accommodate Yeganeh's need to find new counsel and have them get up to

17  speed in this case.  (*Id.*)  Two of these continuances have occurred within two weeks of trial, and

18  one of them occurred 72 hours before trial.  (*Id.*)

19         Throughout the pendency of this litigation, Yeganeh has repeatedly threatened to file

20  bankruptcy to avoid payment of restitution and attorneys' fees which might become payable if he

21  was found liable. (Glover Decl. ¶ 4.)  On July 31, 2001, Yeganeh actually filed a Chapter 13

22

---

[6] Although Defendant may request a bond, the Court should exercise its discretion to allow the
23   modification without a bond. Here, the members of the general public who are represented in this
     litigation are *indigent* and therefore should not be forced to pay an undertaking. *Conover v. Hall*,
24   11 Cal. 3d 842, 850-852 (1974) (California courts retain a common law authority to waive the
     undertaking bond for poor litigants). Furthermore, Plaintiffs are asking this Court to prohibit
25   Yeganeh from encumbering or otherwise disposing of any of his property, real or personal,
     without prior Court approval. Therefore, this is not an appropriate case for an undertaking
26   because Yeganeh is not giving up any of his property and is not prohibited from selling his
     property, he is merely forced to get Court approval for any such encumbrance. To the extent this
27   Court requires an undertaking, Plaintiffs will post an undertaking in that required sum, but request
     that the Court consider Plaintiffs' indigence in setting the sum.

28

-10-

GRAY CARY WARE
& FREIDENRICH...

8D\1469559.1
0909050.0901117

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

129

ER - 109

1    bankruptcy. (See Maxwell Decl. ¶ 3, Ex. A.) This bankruptcy was voluntarily dismissed on

2    August 2, 2001. (Id.) As discussed more fully above, Yeganeh did not list all of his assets in that

3    petition. (Id.) If fact, it is clear that Yeganeh intended to thwart the judicial process through his

4    bankruptcy filing. He threatened to file bankruptcy to delay these proceedings. (See Glover

5    Decl.) He filed a bankruptcy petition that did not include his true assets, particularly his many

6    properties or the proceeds from the sales of the Grand Avenue and Linda Mar properties. His

7    bankruptcy petition did not even correctly state his name. When it seemed the parties had settled

8    this case, just a matter of days after he filed the bankruptcy petition, he dismissed the petition. He

9    then was able to pay over $30,000 in cash to begin the claims notification procedure set forth in

10    the Settlement Agreement. The intent of these acts is clear: Yeganeh has had and continues to

11    have a plan contrary to law and equity to delay and preclude the general public from recovering.

12    In short, Yeganeh has shown an unabated willingness to do whatever he can to avoid his

13    responsibility to pay restitution to his victims. He simply wants to dispose of his assets as best he

14    can and then claim that he has no funds to make his victims whole.

15        Defendant has not been clandestine about his motives. He has made it his practice to

16    personally call counsel for Plaintiffs, sometimes multiple times in one day, to tell counsel that if

17    the case were not settled along the lines he proposed, he would declare bankruptcy. (Glover Decl.

18    ¶ 5.) Yeganeh also stated that he refused to pay "any money" to Ms. Ingram and "those people"

19    and "those kind of people" and did not want to "encourage them." (Id.) Yeganeh's phone calls

20    and messages are internally inconsistent and contradictory about his inability to pay the costs of

21    settlement. (Id.)

22        As part of the initial investigations into Defendant's activities, and at times throughout

23    this litigation, Plaintiffs have investigated Yeganeh's real property holdings. (Glover Decl. ¶ 5.)

24    This was done in part to assess which homeowners may have been victimized by Yeganeh, since

25    he has failed and refused to respond to any substantive discovery in this case whether through

26    written discovery or deposition. Attached as Exhibits A, B and C to the Declaration of

27    Ms. Glover are true and correct copies of property searches done by Plaintiffs showing the scope

28    of Yeganeh's real property holdings as of 1999, as of August 7, 2001, and a chart showing what

-11-

GRAY CARY WARE    SD\1469559.1    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

130

ER - 110

1   Plaintiff's investigation of available research sources (many of which are months behind)

2   demonstrates his holdings may be as of today.  The trend is clear:  Yeganeh is selling off and

3   concealing his assets.  It is clear from these searches that Yeganeh has liquidated or transferred

4   substantial property interests since the commencement of this litigation and during the nearly one-

5   year delay in trial.  (*Id.* ¶ 6.)  Moreover, even after Judge Kemp ordered him not to transfer

6   property, he claimed no such order was made.  (*See* Maxwell Decl. ¶ 3.)

7        Furthermore, both in his criminal and civil case, Yeganeh has refused to disclose any

8   information about his financial position even when he has been required to do so by an officer of

9   the Court.  (Glover Decl. ¶ 7.)  For example, in settlement discussions before the Honorable

10  Margaret Kemp, as part of a discussion to determine whether Yeganeh could acquire sufficient

11  funds to pay a settlement, Defendant thrice refused to answer direct questions from Judge Kemp

12  about the price he was seeking for 395 Sequoia Avenue, Redwood City, California (a property

13  which has been offered on the open market for some time and which Yeganeh has offered to use

14  as a property deposit for settlement).  (*Id.*)  Another telling example of Yeganeh's ongoing

15  attempt to obfuscate the truth and hide his financial assets is the Restitution Report authored for

16  this Court by Bruce C. Mabardy, Deputy Probation Officer, on April 17, 2001.  (*Id.* ¶ 8.)  In this

17  report, Deputy Mabardy states:

18          On Wednesday, April 4, 2001, this writer met with defendant at the
            Probation Department for the purpose of conducting an interview
19          regarding the issue of restitution. . . .  Upon reviewing the
            application presented by the defendant . . . the defendant left his
20          financial statement completely blank . . . .  The defendant also
            noted that he has no current income.  This writer questioned this as
21          district attorney documentation showed that he owns between
            twenty and thirty pieces of property.  The defendant stood by his
22          statement that he had no income and also stated that he had no
            recollection as to the value of the property that he owns. . . .  This
23          writer explained to the defendant several times that the probation
            officer was acting on behalf of the Court in trying to determine his
24          assets and whether or not restitution could be made to victims.  This
            writer also told defendant that his level of cooperation would be
25          reported to the Court.  The defendant did not change his mind
            whatsoever and refused to answer what this writer believed were
26          crucial questions concerning his financial situation and how it may
            impact the victims receiving their rightful restitution. . . .
27  Mr. Yeganeh has not been cooperative with this department or the
    Court in presenting a true picture of his financial situation.

28

-12-

GRAY CARY WARE   SD\1469559.1   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
    0000050-000117   MOTION TO MODIFY EXISTING PRELIMINARY INJUNCTION

ER - 111                    131

1   (Glover Decl. ¶ 9.)  Yeganeh's interview with Deputy Mabardy illustrates his attempt to hide his

2   financial assets even from the probation officer tasks to learn about Yeganeh's assets in order to

3   evaluate his potential to pay restitution to his victims through the criminal system.

4        In July and August during settlement negotiations, while claiming that he had no cash,

5   Yeganeh did not disclose that on June 28, 2001, he sold two lots located at 1657 Linda Mar

6   Avenue in Pacifica, California.  (Glover Decl. ¶ 11.)  Later, he sold the Grand Avenue property

7   under similar conditions.  Even though sales of property are deemed public, Yeganeh sought to

8   keep the sale secret by asserting in the Records Office that the transaction was "confidential."

9        Yeganeh went so far as to file a bad faith Chapter 13 bankruptcy on July 31, 2001.

10  Defendant's bankruptcy petition failed to attach, as is required, a schedule of his assets.  (*See*

11  Maxwell Decl., Ex. A.)  Furthermore, his petition deliberately misspelled his name and

12  misrepresented his residential address so that anyone checking title on his properties would not

13  discover his bankruptcy filing.  (*Id.*) [7] Then, on August 2, 2001, Yeganeh voluntarily dismissed

14  his bankruptcy filing and signed a settlement agreement with Plaintiffs.  (*Id.*)  That Settlement

15  Agreement was put on the record before two different judges in this Court, yet Yeganeh is

16  reneging.  This motion is being made because Yeganeh has reneged on the Settlement Agreement

17  he consented to before this Court and will now certainly be trying to stash his remaining assets

18  before judgment.

19        A preliminary injunction is intended to preserve the status quo.  *See Cal. State Univ.,*

20  _____

21  [7]  That this was deliberate misrepresentation by Yeganeh, and not inadvertant, is further
    evidenced by Yeganeh's "Notice of Operation of the Automatic Stay" which he filed in the San
22  Mateo Superior Court on July 31, 2001, the day before a scheduled hearing on Plaintiffs' motion
    to compel Yeganeh to respond to written discovery.  Glover Decl., ¶5 and Exhibit A1 thereto. The
23  Notice of the automatic stay has Yeganeh's name and address shown and spelled correctly in the
    caption.  His name also appears correctly spelled in the signature block.  *Id.* Within the body of
24  the notice, however Yeganeh has typed the phrase "R. Yaganeh has filed for bankruptcy" – a
    misspelling of his name identical to that shown on his bankruptcy petition.  This Notice of the
25  automatic stay was filed 24 hours after Yeganeh's bankruptcy filing, and two days *before*
    Yeganeh's voluntary dismissal petition was filed – a dismissal form which preserves the
26  misspelling of Yeganeh's name appearing in his bankruptcy petition. Plaintiffs have received a
    great deal of correspondence and pleadings from Yeganeh in the two years of this litigation, but
27  these are the only two instances where Yeganeh has mispelled his name, even in letters which
    otherwise contain typographical errors.  Glover Decl., ¶5

28

-13-

ER - 112

132

1    *Hayward v. Nat'l. Collegiate Athletic Assn.*, 47 Cal. App.3d 533, 543 (1975). Consistent with

2    this purpose, Plaintiffs request the Court enjoin Yeganeh and any other person or entity, though

3    not a party to this action, who may be acting for, or in concert with, Defendant, from transferring

4    or concealing Yeganeh's property or any proceeds he received from the sale of any of his

5    properties (particularly the Linda Mar and Grand Avenue properties.) The evidence demonstrates

6    that the status quo is in jeopardy: Defendant is stalling the resolution of this matter, going so far

7    as to declare bankruptcy and back out of the settlement. All the while, he is using the time his

8    tactics buy him to dispose of whatever property he has left. Thus, based on the evidence available

9    at this time, Plaintiffs have demonstrated the irreparable injury facing them if the injunction is not

10    modified.

11        The balancing of the equities and the parties' interests weigh in favor of Plaintiffs.

12    Yeganeh has continued to delay this Court and obfuscate his assets. Consequently, there is no

13    unfair prejudice to Defendant if he is precluded from transferring his ill-gotten gain. Therefore,

14    the balancing of the equities weighs in favor of the general public and the injunction can and

15    should be modified as set forth herein.

16    Dated: September 25, 2001

        GRAY CARY WARE & FREIDENRICH LLP
17            MICHAEL S. TRACY
            EMILY L. MAXWELL
18            LINDA D. LANE

19

20    By_____

21            Attorneys for Plaintiff NOZIPO WOBOGO

        EAST PALO ALTO COMMUNITY LAW PROJECT
22            R. RENEE GLOVER
            Attorneys for Plaintiff NOZIPO WOBOGO
23

24

25

26

27

28

GRAY CARY WARE    SD\1469559.1

MICHAEL S. TRACY (Bar No. 101456)
EMILY L. MAXWELL (Bar No. 185646)
LINDA L. LANE (Bar No. 211206)
GRAY CARY WARE & FREIDENRICH LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: 619-699-3620/3555
Fax: 619-699-2701

R. RENEE GLOVER (Bar No. 157793)
EAST PALO ALTO COMMUNITY LAW PROJECT
1395 Bay Road
East Palo Alto, CA 94303
Tel: (650) 853-1600
Fax: (650) 853-1608

Attorneys for Plaintiff NOZIPO WOBOGO

**ENDORSED FILED**
SAN MATEO COUNTY

SEP 2 6 2001

Clerk of the Superior Court
By ____SICLO SALA____
DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| EDITH M. INGRAM, on behalf of herself, and NOZIPO WOBOGO, on behalf of the general public, | CASE NO. 410586 |
| Plaintiffs, | **DECLARATION OF EMILY L. MAXWELL IN SUPPORT OF PLAINTIFF'S MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION** |
| v. | Date: |
| RAMIN YEGANEH, d/b/a American Mortgage Realty and d/b/a American Mortgage Realty, and Invest, and DOES 1 through 100, | Time:<br>Dept: _14<br>Judge: Hon. Rosemary Pfeiffer<br>Complaint:    October 4, 1999 |
| Defendants. | |

I, Emily L. Maxwell, declare as follows:

1.    I am an attorney licensed to practice in the state of California and am an associate at Gray Cary Ware & Freidenrich LLP, attorneys of record for Plaintiff Nozipo Wobogo, the private attorney general, in this action. The facts set forth in this Declaration are based upon my own personal knowledge, except as is stated on information and belief.

-1-

GRAY CARY WARE
& FREIDENRICH LLP

SDA1464482.1
999050-900117

DECLARATION OF EMILY L. MAXWELL IN SUPPORT OF PLAINTIFF'S MOTION
TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

134

2.    On September 18, 2001, I had a telephone conversation with the Defendant, Mr. Yeganeh. During my telephone conversation with Mr. Yeganeh, he told me that he did not believe that there was any order precluding him from transferring his property. He gave me the impression that he was still transferring his properties anytime he saw fit. On information and belief, there was a previous court order which precludes Mr. Yeganeh from this activity. I was not present at the Court proceedings where that order was made, but other attorneys from my office were present and have confirmed that such an order was made. Staff from my office are currently trying to obtain a copy of the transcript for August 10, 2001 (the day I am informed and believe Mr. Yeganeh was ordered to refrain from transferring properties). On September 19, 2001, I appeared at a hearing before Judge Kemp, the settlement judge in this case. At that hearing, Judge Kemp found that the parties settlement was unworkable and sent the matter back to the Master Calendar for trial. When asked specifically about her previous order that Mr. Yeganeh refrain from transferring his property, Judge Kemp responded that all such orders were made in the service of the parties' settlement and were vacated along with the parties' settlement agreement.

4.    The documents supporting Plaintiffs' claims regarding Mr. Yeganeh's bad faith bankruptcy are attached hereto as Exhibit A. As the Court can see in these documents, Mr. Yeganeh filed documents in the bankruptcy court that did not include the required schedules and in which he spelled his name wrong (presumably to preclude the filing from affecting his credit and to prevent anyone interested in his bankruptcy from confirming that he does, in fact, own numerous properties throughout Northern California). Not only did he misspell his last name, he also used only a first initial for his first name. This incomplete reference to his first name was obviously intended to further confuse his identification and decrease the chance that his bankruptcy filing would be linked to him. (See Ex. A.) I have reviewed hundreds of documents prepared by Mr. Yeganeh. On that basis, I conclude that Mr. Yeganeh knows how to spell his name, but chose to identify himself as I have noted above to impede his identification as described above. Mr. Yeganeh dismissed the bankruptcy petition, without ever correcting the misspelling, just days after it was filed. (See Ex. A.) Not coincidentally, Yeganeh dismissed the

-2-

GRAY CARY WARE
& FREIDENRICH LLP

SDA\464482.1
9999050-000117

DECLARATION OF EMILY L. MAXWELL IN SUPPORT OF PLAINTIFF'S MOTION
TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

1   bankruptcy petition immediately after the parties entered in the settlement agreement in this case

2   — the agreement he now reneged upon.

3       I declare under penalty of perjury that the foregoing is true and correct and that this

4   declaration was executed in San Diego, California on September 24, 2001.

5

6

7                          EMILY L. MAXWELL

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GRAY CARY WARE   SD\1463482.1       -3-

& FREIDENRICH LLP   9999050-900117   DECLARATION OF EMILY L. MAXWELL IN SUPPORT OF PLAINTIFF'S MOTION
TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

136

ER - 116

08/01/2001  09:24  65005316°9                EPACLP                              PAGE  02

Form B1 (Official Form) - (Rev. 3/98)

## UNITED STATES BANKRUPTCY COURT
### __Northern__ District of __California__

Voluntary Petition

| Name of Debtor (If Individual, enter Last, First, Middle): | Name of Joint Debtor (Spouse) (Last, First, Middle) |
|---|---|
| Yaganeh, R. | |

| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names): |
|---|---|

| Soc. Sec./Tax I.D. No. (If more than one, state all): | Soc. Sec./Tax I.D. No. (If more than one, state all): |
|---|---|

| Street Address of Debtor (No. & Street, City, State, & Zip Code) | Street Address of Joint Debtor (No. & Street, City, State, & Zip Code) |
|---|---|
| 395 Sequoia Ave | |
| Redwood City, CA 94061 | |

| County of Residence or of the Principal Place of Business: __San Mateo County__ | County of Residence or of the Principal Place of Business: |
|---|---|

| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
|---|---|

Location of Principal Assets of Business Debtor (if different from street address above):

### Information Regarding the Debtor

**Venue** (Check any applicable box)
- ☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.
- ☐ This petition is being filed by a corporation or partnership under chapter 11 and the debtor acknowledges that a Venue Disclosure Form is required to be filed by General Order 97-02.

| Type of Debtor (Check all boxes that apply) | | Chapter or Section of Bankruptcy Code Under Which the Petition is Filed (Check one box) |
|---|---|---|
| ☒ Individual(s)  ☐ Railroad | | ☐ Chapter 7  ☐ Chapter 11  ☒ Chapter 13 |
| ☐ Corporation  ☐ Stockbroker | | ☐ Chapter 9  ☐ Chapter 12 |
| ☐ Partnership  ☐ Commodity Broker | | ☐ Sec. 304 - Case Ancillary to foreign proceeding |
| ☐ Other | | |

| Nature of Debts (Check one box) | | Filing Fee (Check one box) |
|---|---|---|
| ☒ Consumer/Non-Business  ☐ Business | | ☒ Full Filing Fee attached |
| | | ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |

| Chapter 11 Small Business (Check all boxes that apply) |
|---|
| ☐ Debtor is a small business as defined in 11 U.S.C. § 101 |
| ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional) |

**Statistical/Administrative Information** (Estimates only)
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☒ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

Estimated Number of Creditors

| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0- $50,000 | $50,001- $100,000 | $100,001- $500,000 | $500,001- $1 million | $1,000,001- $10 million | $10,000,001- $50 million | $50,000,001- $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

Estimated Debts

| $0- $50,000 | $50,001- $100,000 | $100,001- $500,000 | $500,001- $1 million | $1,000,001- $10 million | $10,000,001- $50 million | $50,000,001- $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

Case # 01-31983 SFC13
Debtor: R. Yaganeh

Judge: Thomas E. Carlson
Trustee: David Burchard
341 Mtg:  Name Assigned

Tentative - Notice to be mailed
Chapter 13        Office 3-SF
Filed: 10:38 A.M, 07/31/01
Order for Relief
Clerk, U.S. Bankruptcy Court
Northern District of California
Rcpt.# 030810075 - DC
TOTAL PAID: $185.00
Inc R. Yazaneh

ATTORNEY

137

ER - 117

Form B1 (Official Form 1) Page Two - (Rev. 1/98)

| **Voluntary Petition**<br>(This page must be completed and filed in every case) | Name of Debtor(s):<br>Tagameh, R. | **FORM B1,**<br>**Page 2** |
|---|---|---|

Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet) none

| Location<br>Where Filed: | Case Number: | Date Filed: |
|---|---|---|

Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet) none

| Name of Debtor: | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

### Signatures

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct. (If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7) I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _R. _____
Signature of Debtor

X _____
Signature of Joint Debtor

(650) 343-6530/(650) 343-0593 fax
Telephone and Fax Number (if not represented by attorney)

7/27/01
Date

**Signature of Attorney**

X _____
Signature of Attorney for Debtor(s)

_____
Printed Name of Attorney for Debtor(s)

_____
Firm Name

_____
Address

_____
Telephone and Fax Number

_____          _____
Date                                   Bar Number

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

X _____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

**Signature of Non-Attorney Petition Preparer**

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed or Typed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

_____
Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.

**Exhibit "A"**
(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

**Exhibit "B"**
(To be completed if debtor is an individual whose debts are primarily consumer debts) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that (he or she) may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____          _____
Signature of Attorney for Debtor(s)          Date

RECEIVED TIME    AUG. 1    9:32AM

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

AUG - 2 2001

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

In re                                        )        Case No. 01-31983 SFC13
                                             )
R. Yaganeh                                   )        Debtor's Voluntary Dismissal
                                             )
                                             )

The petitioner/debtor in the above-entitled case hereby
voluntarily dismisses this bankruptcy case.

_____
R. Yaganeh/debtor

139

1  MICHAEL S. TRACY (Bar No. 101456)
   EMILY L. MAXWELL (Bar No. 185646)
2  LINDA L. LANE (Bar No. 211206)
   **GRAY CARY WARE & FREIDENRICH LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel: 619-699-3620/3555
   Fax: 619-699-2701
5

**RECEIVED**

SEP 2 6 2001

CLERK OF THE SUPERIOR COURT
SAN MATEO COUNTY

6  R. RENEE GLOVER (Bar No. 157793)
   **EAST PALO ALTO COMMUNITY LAW PROJECT**
7  1395 Bay Road
   East Palo Alto, CA 94303
8  Tel: (650) 853-1600
   Fax: (650) 853-1608
9

10  Attorneys for Plaintiff NOZIPO WOBOGO

11                    SUPERIOR COURT OF CALIFORNIA

12                       COUNTY OF SAN MATEO

13

14  EDITH M. INGRAM, on behalf of herself,        CASE NO.  410586
    and NOZIPO WOBOGO, on behalf of the
15  general public,                               **[PROPOSED] ORDER MODIFYING**
                                                  **PERMANENT INJUNCTION**
16              Plaintiffs,
                                                  Date:
17        v.                                      Time:
                                                  Dept:      14
18  RAMIN YEGANEH, d/b/a American                 Judge:     Hon. Rosemary Pfeiffer
    Mortgage Realty and d/b/a American            Complaint: October 4, 1999
19  Mortgage Realty, and Invest, and DOES 1
    through 100,
20
                Defendants.
21

22        Plaintiff Nozipo Wobogo, on behalf of the general public, brought a motion to modify the

23  existing preliminary injunction in this case based on occurrences since the issuance of the

24  preliminary injunction.  The parties appeared before the Court on _____

25  The Court reviewed the parties' submissions and heard argument regarding their respective

26  positions.

27  /////

28
                                          -1-

ER - 120                                    140

/////

**GOOD CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED** that the preliminary injunction issued by this Court on March 21, 2000 be modified as follows:

(1) Ramin Yeganeh and/or American Mortgage Realty and/or American Mortgage Realty and Invest, their agents, assigns, attorneys and representatives (hereafter referred to collectively, for the purposes of this Order, as "Defendants") are restrained and prohibited from, and shall not, without leave of Court, directly or indirectly, sell, transfer, modify, encumber, hypothecate or otherwise limit or dispose of any interest which Defendants, and any of them, hold in real property which is situated in the counties of San Mateo, Santa Clara, San Francisco or Alameda. If any Defendant has already entered into any contract, written or oral, providing that it is to sell, transfer, encumber or hypothecate any real property interests held by Defendants, and any of them, in any of the above counties, Defendants shall not be permitted to close escrow on, or otherwise complete that sale, transfer, encumbrance or hypothecation without leave of this Court. Leave of Court shall be conditioned upon the establishment of an escrow account and deposit of all sums payable to Defendants into that account, unless Defendants demonstrate to the satisfaction of the Court that these funds are not required to satisfy the judgment against Defendants and secure restitution to the general public in this case.

(2) Defendants are restrained and prohibited from, and shall not, without leave of Court, sell, transfer, or modify ownership, or otherwise dispose of any sums due and payable to, or held in any escrow or other account for the benefit of, Defendants, that relate to the sale, lease, transfer, hypothecation or limitation of any real property interest held by Defendants, and any of them. Leave of Court shall be conditioned upon the establishment of an escrow account and deposit into that account of all sums due and payable to, or held in any escrow or other account for the benefit of Defendants into

-2-



1   that account, unless Defendants demonstrate to the satisfaction of the Court that these

2   funds are not required to satisfy the judgment against Defendants and secure

3   restitution to the general public in this case.

4   **IT IS SO ORDERED.**

5   Dated: October _____, 2001

6

7

8                                            _____
                                             Hon. Rosemary Pfeiffer
                                             Judge of the Superior Court
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GRAY CARY WARE    SD\1468518.1                    [PROPOSED] ORDER
& FREIDENRICH LLP  9999050-900117

1   MICHAEL S. TRACY (No. 101456)
    LINDA L. LANE (No. 211206)
2   M. RAY HARTMAN III (No. 211205)
    **GRAY CARY WARE & FREIDENRICH LLP**
3   401 B Street, Suite 1700
    San Diego, CA 92101-4297
4   Tel: (619) 699-3620
    Fax: (619) 699-2701
5

6   R. RENEE GLOVER (No. 157793)
    **EAST PALO ALTO COMMUNITY LAW PROJECT**
7   1395 Bay Road
    East Palo Alto, CA 94303
8   Tel: (650) 853-1600
    Fax: (650) 853-1608
9

10  Attorneys for Plaintiff NOZIPO WOBOGO

11                    SUPERIOR COURT OF CALIFORNIA

12                       COUNTY OF SAN MATEO

13
    EDITH M. INGRAM, on behalf of herself,        CASE NO. 410586
14  and NOZIPO WOBOGO, on behalf of the
    general public,                               DECLARATION OF SERVICE
15
             Plaintiffs,
16
         v.
17
    RAMIN YEGANEH, d/b/a American
18  Mortgage Realty and d/b/a American
    Mortgage Realty, and Invest, and DOES 1
19  through 100,
20           Defendants.

21
        I am a resident of the State of California, over the age of eighteen years, and not a party to
22  the within action. My business address is East Palo Alto Community Law Project, 1395 Bay
23  Road, East Palo Alto, CA 94303. On September 25 and 26, 2001, I served the within documents
    described as: **SEE ATTACHED LIST FOR ALL DOCUMENTS SERVED** on the following
24  parties to this cause by hand delivering a copy of the above document(s) as follows:

25  Charles Smith, Esq.                    Ramin Yeganeh
    San Mateo County Superior Court        724 East 4ᵗʰ Avenue
26  400 County Center                      San Mateo, California 94401
    Redwood City, CA 94063
27  **Counsel for Ramin Yeganeh**

28

GRAY CARY WARE       SD\1440196.1                          DECLARATION OF SERVICE
& FREIDENRICH LLP     9999050-900117

ENDORSED FILED
SAN MATEO COUNTY

OCT - 2 2001

Clerk of the Superior Court
By ___SIOLO SALA___
        DEPUTY CLERK

1   ☑   By leaving a copy of the above document(s) with a receptionist in the offices of
2        the above addressee(s) (as to Charles Smith on September 26, 2001)

3   ☐   Finding no person in the office at a time between the hours of 9:00 a.m. and 5:00
         p.m. when the service was made, the above document(s) were left in a
4        conspicuous place in the office (see CCP § 1011(a)).

5   ☐   The office of the attorney of record was closed between the hours of 9:00 a.m.
         and 5:00 p.m. and his residence address was either unknown or no one over the
6        age of 18 years was at such residence and, therefore, I placed a copy of the above
         document(s) in the U.S. mail with postage thereon fully prepaid in a post office,
         mailbox, sub-post office, substation, mail chute, or other like facility regularly
7        maintained by the U.S. Postal Service in San Mateo, California.

8   ☑   by personally delivering the document(s) listed above to the person(s) set forth
         above (As to Ramin Yeganeh on September 25, 2001)
9

10       I declare under penalty of perjury under the laws of the State of California that the above
11  is true and correct.

12       Executed on September 26, 2001, at East Palo Alto, California.

13

14                                              R. RENEE GLOVER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SD\1440196.1
                                     9999050-900117

DECLARATION OF SERVICE

144

*Ingram and Wobogo vs. Yeganeh, et al.*
Case No. 410586

List of Documents Served:

1. ORDER SHORTENING TIME FOR HEARING ON PLAINTIFF'S MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

2. DECLARATION OF R. RENEE GLOVER IN SUPPORT OF EX PARTE APPLICATION FOR AN ORDER SHORTENING TIME TO HEAR PLAINTIFFS' MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION;

3. EX PARTE APPLICATION FOR ORDER SHORTENING TIME REGARDING PLAINTIFF'S MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

4. NOTICE OF MOTION AND PLAINTIFF'S MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

5. DECLARATION OF EMILY MAXWELL IN SUPPORT OF PLAINTIFFS' MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION;

6. DECLARATION OF R. RENEE GLOVER IN SUPPORT OF PLAINTIFFS' MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION;

7. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO PLAINTIFFS' MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION;

8. [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION TO MODIFY THE EXISTING PRELIMINARY INJUNCTION

145

ER - 125

# Document No. 9

**ENDORSED FILED**
SAN MATEO COUNTY

OCT - 4 2001

Clerk of the Superior Court
By F. MORNEAU
CLERK

**RECEIVED**

SEP 2 6 2001

CLERK OF THE SUPERIOR COURT
SAN MATEO COUNTY

1  MICHAEL S. TRACY (Bar No. 101456)
   EMILY L. MAXWELL (Bar No. 185646)
2  LINDA L. LANE (Bar No. 211206)
   **GRAY CARY WARE & FREIDENRICH LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619-699-3620/3555
   Fax: 619-699-2701
5
6  R. RENEE GLOVER (Bar No. 157793)
   **EAST PALO ALTO COMMUNITY LAW PROJECT**
7  1395 Bay Road
   East Palo Alto, CA 94303
8  Tel: (650) 853-1600
   Fax: (650) 853-1608
9
10 Attorneys for Plaintiff NOZIPO WOBOGO
11
12 SUPERIOR COURT OF CALIFORNIA
13 COUNTY OF SAN MATEO
14 EDITH M. INGRAM, on behalf of herself,      CASE NO. 410586
   and NOZIPO WOBOGO, on behalf of the
15 general public,                             **[PROPOSED] ORDER MODIFYING**
                                               ~~PERMANENT~~ INJUNCTION
16         Plaintiffs,                         PRELIMINARY
                                               Date:      10/3/01
17    v.                                       Time:      9:00 AM
                                               Dept:      14
18 RAMIN YEGANEH, d/b/a American               Judge:     Hon. Rosemary Pfeiffer
   Mortgage Realty and d/b/a American          Complaint: October 4, 1999
19 Mortgage Realty, and Invest, and DOES 1
   through 100,
20
           Defendants.
21
22         Plaintiff Nozipo Wobogo, on behalf of the general public, brought a motion to modify the
23 existing preliminary injunction in this case based on occurrences since the issuance of the
24 preliminary injunction. The parties appeared before the Court on *October 3, 2001.*
25 The Court reviewed the parties' submissions and heard argument regarding their respective
26 positions.
27 /////
28

                                               -1-

///// 1

2      GOOD CAUSE APPEARING THEREFORE, IT IS HEREBY **ORDERED** that the

3  preliminary injunction issued by this Court on March 21, 2000 be modified as follows:

4

5      (1) Ramin Yeganeh and/or American Mortgage Realty and/or American Mortgage Realty

6          and Invest, their agents, assigns, attorneys and representatives (hereafter referred to

7          collectively, for the purposes of this Order, as "Defendants") are restrained and

8          prohibited from, and shall not, without leave of Court, directly or indirectly, sell,

9          transfer, modify, encumber, hypothecate or otherwise limit or dispose of any interest

10         which Defendants, and any of them, hold in real property which is situated in the

11         counties of San Mateo, Santa Clara, San Francisco or Alameda.  If any Defendant has

12         already entered into any contract, written or oral, providing that it is to sell, transfer,

13         encumber or hypothecate any real property interests held by Defendants, and any of

14         them, in any of the above counties, Defendants shall not be permitted to close escrow

15         on, or otherwise complete that sale, transfer, encumbrance or hypothecation without

16         leave of this Court.  Leave of Court shall be conditioned upon the establishment of an

17         escrow account and deposit of all sums payable to Defendants into that account, unless

18         Defendants demonstrate to the satisfaction of the Court that these funds are not

19         required to satisfy the judgment against Defendants and secure restitution to the

20         general public in this case.

21     (2) Defendants are restrained and prohibited from, and shall not, without leave of Court,

22         sell, transfer, or modify ownership, or otherwise dispose of any sums due and payable

23         to, or held in any escrow or other account for the benefit of, Defendants, that relate to

24         the sale, lease, transfer, hypothecation or limitation of any real property interest held

25         by Defendants, and any of them.  Leave of Court shall be conditioned upon the

26         establishment of an escrow account and deposit into that account of all sums due and

27         payable to, or held in any escrow or other account for the benefit of Defendants into

28

-2-

GRAY CARY WARE
& FREIDENRICH LLP

SD\1468518.1
9999050-900117

[PROPOSED] ORDER

147

ER - 127

1     that account, unless Defendants demonstrate to the satisfaction of the Court that these

2     funds are not required to satisfy the judgment against Defendants and secure

3     restitution to the general public in this case.

4     **IT IS SO ORDERED.**

5     Dated: October 3, 2001

6

7

8                   Hon. Rosemary Pfeiffer
                   Judge of the Superior Court

9

10

11

12

13     (3) The Court shall retain jurisdiction to permit

14     Ramin Yeganeh, upon application to and order of

15     this Court, to withdraw from the escrow

16     accounts provided for in this modified Injunction

17     those sums that the Court finds are necessary for

18     Ramin Yeganeh and American Mortgage Realty

19     to pay attorney's fees and costs incurred in connection

20     with this case and necessary living expenses. (20)

21     (4) Except as specifically modified herein,

22     all provisions of this Court's preliminary

23     injunction dated March 21, 2000 remain in

24     full force and effect.

25

26

27

28

-3-

GRAY CARY WARE
& FREIDENRICH LLP    SD\1468518.1
           9999050-900117                   [PROPOSED] ORDER

148

ER - 128

# Document No. 10

1  Charles P. Maher, State Bar No. 124748
   Jeffrey L. Fillerup, State Bar No. 120543
2  Nhung Le, State Bar No. 209552
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
4  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
5
   Attorneys for Plaintiff
6  CHARLES E. SIMS, Trustee in Bankruptcy

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11 In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                           Chapter 7
12        Debtor.

13 CHARLES E. SIMS, Trustee,

14              Plaintiff.

15 vs.                                     Adversary Proceeding
                                           No. 05-3241
16 ALLIED MANAGEMENT TRUST and K.
   YEGANEH aka KEN YEGANEH aka             **DECLARATION OF JEFFREY L.**
17 KAIKHOSROW YEGANEH,                     **FILLERUP IN SUPPORT OF (1)**
                                           **MOTION FOR SUMMARY JUDGMENT**
18              Defendants.                **BASED ON ACTUAL FRAUD, AND (2)**
                                           **MOTION TO PRECLUDE TESTIMONY**
19                                         **AND EXCLUDE EVIDENCE OR IN THE**
                                           **ALTERNATIVE, MOTION TO COMPEL**
20                                         **DISCOVERY**

21                                         Date:    October 6, 2006
                                           Time:    9:30 a.m.
22                                         Dept.:   23

23

24

25

26        I, Jeffrey L. Fillerup, declare as follows:

27        1.      I am an attorney licensed to practice in all state and federal courts in the State of

28 California.  I am one of the lawyers representing the trustee, Charles E. Sims (the "Trustee" or

                                           1

"Plaintiff"), in the above-referenced bankruptcy.  I am a litigation partner in the law firm of Luce, Forward, Hamilton & Scripps LLP ("Luce, Forward").  Luce, Forward has been authorized by this Court to represent the Trustee in this bankruptcy.  Luce, Forward filed four adversary proceedings in this case, which are identified as Adversary Proceeding Nos. 05-3240, 05-3241, 05-3242, and 05-3243.  I make this declaration of my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth herein.  I make this declaration in support of the Trustee's motion for summary judgment and motion to exclude testimony and evidence.

2.     I am the attorney primarily handling the discovery and litigation in this adversary proceeding (AP No. 05-3241), as well as Adversary Proceeding Nos. 05-3240, 05-3242, and 05-3243.  I have prepared and served written interrogatories, requests for admission, and document requests on the defendants in all four adversary proceedings on behalf of the Trustee.  I have reviewed all of the defendants' responses to this written discovery.  I have also taken the following depositions on behalf of the Trustee in the four adversary proceedings:  Ramin Yeganeh (the "Debtor");  the Debtor's mother, Farin Yeganeh aka F. Namdaran;  and the Debtor's father, K. Yeganeh aka "Ken" Yeganeh.  The discovery cut-off date for this adversary proceeding was April 3, 2006.

3.     Attached hereto as **Exhibit 92** is a true and correct copy of the Initial Disclosures served by the Defendants in this adversary proceeding,  *Sims v. Allied Management Trust, et al.*, Adv. Pro. 05-3241 ("*Sims v. Allied*").     To date, Allied Management Trust and K. Yeganeh have not amended or supplemented the initial disclosures.

4.     Attached hereto as **Exhibit 93** is a true and correct copy of the Request for Admissions (Set One - Allied Management Trust) propounded by Plaintiff on Defendant Allied Management Trust on August 10, 2005 in *Sims v. Allied*.

5.     Attached hereto as **Exhibit 94** is a true and correct copy of the Defendant's Responses to Requests for Admissions served on Plaintiff by Defendant Allied Management Trust and dated October 21, 2005 in *Sims v. Allied*.

6.     Attached hereto as **Exhibit 95** is a true and correct copy of the Interrogatories (Set

1    One - Allied Management Trust) propounded by Plaintiff on Defendant Allied Management Trust

2    on August 10, 2005 in *Sims v. Allied.*

3          7.       Attached hereto as **Exhibit 96** is a true and correct copy of the Defendant's

4    Responses to Interrogatories served on Plaintiff by Defendant Allied Management Trust and dated

5    October 21, 2005 in *Sims v. Allied.*

6          8.       Attached hereto as **Exhibit 97** is a true and correct copy of the  Supplemental

7    Responses to Interrogatories served on Plaintiff by Defendant Allied Management Trust and dated

8    March 24, 2006 in *Sims v. Allied.*

9          9.       Attached hereto as **Exhibit 98** is a true and correct copy of the Request for

10   Production of Documents (Set One - Allied Management Trust) propounded by Plaintiff on

11   Defendant Allied Management Trust on August 10, 2005 in *Sims v. Allied.*

12         10.      Attached hereto as **Exhibit 99** is a true and correct copy of the Defendant's

13   Responses to Requests for Production of Documents served on Plaintiff by Defendant Allied

14   Management Trust and dated October 21, 2005 in *Sims v. Allied.*

15         11.      Attached hereto as **Exhibit 100** is a true and correct copy of the Supplemental

16   Responses to Requests for Production of Documents served on Plaintiff by Defendant Allied

17   Management Trust and dated March 24, 2006 in *Sims v. Allied.*

18         12.      I have reviewed the documents produced by Allied Management Trust in response

19   to Plaintiff's Request for Production of Documents (Set One - Allied Management Trust) attached

20   hereto as Exhibit 98.    In response to the Request for Production of Documents, Allied

21   Management Trust produced grant deeds, tax bills for the properties for 2005 and 2006, a trust

22   document for Allied Management Trust,   and a document purporting to memorialize the

23   resignation of "R.Rad" as trustee for Allied Management Trust.   Allied Management Trust

24   objected and invoked the Fifth Amendment in response to requests for all documents evidencing

25   the sources of its income, written lease agreements, and documents evidencing any real and

26   personal property owned by it.  Allied Management Trust later withdrew its objections to the three

27   category of documents but did not produce documents responsive to the three requests.  *See*

28   Exhibit 100.  Allied Management Trust failed to produce the following documents:   documents

1   evidencing the purchase of the properties; documents showing that K. Yeganeh gave the Debtor

2   money to purchase the properties at issue; documents evidencing payment of expenses and

3   income from the properties; documents regarding the lease agreements for the properties;

4   documents identifying the tenants and rental income for the properties; and tax returns and

5   financial records for Allied Management Trust.

6       13.    Attached hereto as **Exhibit 101** is a true and correct copy of the Request for

7   Admissions (Set One - K. Yeganeh) propounded by Plaintiff on Defendant K. Yeganeh on August

8   10, 2005 in *Sims v. Allied*.

9       14.    Attached hereto as **Exhibit 102** is a true and correct copy of the Defendant's

10  Responses to Requests for Admissions served on Plaintiff by Defendant K. Yeganeh and dated

11  October 21, 2005 in *Sims v. Allied*.

12      15.    Attached hereto as **Exhibit 103** is a true and correct copy of the Interrogatories (Set

13  One - K. Yeganeh) propounded by Plaintiff on Defendant K. Yeganeh on August 10, 2005 in *Sims*

14  *v. Allied*.

15      16.    Attached hereto as **Exhibit 104** is a true and correct copy of the Defendant's

16  Responses to Interrogatories served on Plaintiff by Defendant K. Yeganeh and dated October 21,

17  2005 in *Sims v. Allied*.

18      17.    Attached hereto as **Exhibit 105** is a true and correct copy of the Request for

19  Production of Documents (Set One - K. Yeganeh) propounded by Plaintiff on Defendant K.

20  Yeganeh on August 9, 2005 in *Sims v. Allied*.

21      18.    Attached hereto as **Exhibit 106** is a true and correct copy of the Defendant's

22  Responses to Requests for Production of Documents served on Plaintiff by Defendant K. Yeganeh

23  and dated October 21, 2005 in *Sims v. Allied*.

24      19.    I have reviewed the documents produced by K. Yeganeh in response to Plaintiff's

25  Request for Production of Documents (Set One - K. Yeganeh) attached hereto as Exhibit 105. K.

26  Yeganeh produced grant deeds, tax bills for 2005 and 2006, receipts for tax payments from 2004

27  and 2005 (the receipts do not show who made the payments), insurance statements/certificates for

28  2005 through 2006, checks from K. Yeganeh's bank account for tax payments for 2004 and 2005

1    and mortgage payments for 2004 through 2006, a trust document for Allied Management Trust

2    and a document purporting to memorialize the resignation of "R.Rad" as trustee for Allied

3    Management Trust.   K. Yeganeh invoked the Fifth Amendment in response to requests for all

4    documents evidencing the sources of his income, written lease agreements, and documents

5    evidencing any real and personal property owned by him.   K. Yeganeh failed to produce the

6    following documents: documents evidencing the purchase of the properties; any documents

7    showing that he  gave the Debtor money to purchase the properties; any documents evidencing

8    payment of expenses and income from the properties; any documents regarding the lease

9    agreements, tenants or rental income for the properties; and any tax returns and financial records

10   of Allied Management Trust.

11        20.     Attached hereto as **Exhibit 107** is a true and correct copy of the Subpoena in an

12   Adversary Proceeding dated March 9, 2006 issued on Ramin Yeganeh by Plaintiff in *Sims v.*

13   *Allied.*   As set forth below, Mr. Yeganeh did not produce any documents in response to this

14   Subpoena at his deposition on March 29, 2006.

15        21.     I took the deposition of defendant K. Yeganeh on March 28, 2006, and a written

16   transcript was prepared of that deposition.    Attached hereto as **Exhibit 108** are true and correct

17   copies of portions of the deposition  testimony of K. Yeganeh given  at his deposition on March

18   28, 2006 in  *Sims v. Allied,* including Exhibits 4 and 5.

19        22.     I took the deposition of the Debtor, Ramin Yeganeh,  on March 29, 2006  in *Sims v.*

20   *Coast*, *Sims v. F. Namdaran*, *Sims v. Advanta*, and *Sims v. Allied*, and a written transcript of that

21   deposition was prepared.    Attached hereto as **Exhibit 109** are true and correct copies of portions

22   of the deposition  testimony of Ramin Yeganeh given at  his deposition on March 29, 2006, along

23   with certain documents that were marked as exhibits during the deposition:  Exhibits  13, 14, 24,

24   25, 26, 27, 28 and 29.     The subpoenas issued in connection with this deposition required Ramin

25   Yeganeh to produce certain documents.  *See* Exhibit 107.    Mr. Yeganeh did not produce any

26   documents at his deposition in response to the Subpoena.

27        23.     After reviewing the discovery responses served by the defendants in the above four

28   identified adversary proceedings, I found that the defendants' responses to some of the discovery

5

1 | requests were either incomplete, non-responsive or insufficient.  Jonathan G. Chance represents all

2 | of the defendants in the four adversary proceedings.  On March 6, 2006, I sent a meet and confer

3 | letter to Mr. Chance attempting to obtain supplemental responses to the Trustee's written

4 | discovery.  Attached hereto as **Exhibit 110** is a true and correct copy of my letter to Mr. Chance

5 | dated March 6, 2006.  I gave the defendants until March 10, 2006 to advise me if supplemental

6 | responses would be made.  Mr. Chance informed me that no supplemental responses would be

7 | made.  Attached hereto as **Exhibit 111** is a true and correct copy of my letter to Mr. Chance and

8 | William E. Gilg (the Debtor's counsel) dated March 14, 2006 after I learned that the defendants

9 | would not be supplementing their written discovery responses.

10 |     24.     I again wrote to Mr. Chance and Mr. Gilg on March 15, 2006 regarding the

11 | defendants' failure to supplement discovery responses.  Attached hereto as **Exhibit 112** is a true

12 | and correct copy of my letter to Mr. Chance and Mr. Gilg dated March 15, 2006.  Mr. Chance and

13 | Mr. Gilg assured me that supplemental responses to the written discovery would be provided by

14 | March 27, 2006, when the depositions of the defendants were set to commence.  Mr. Chance also

15 | advised me that the objections set forth in the defendants' prior responses would be withdrawn.

16 | Attached hereto as **Exhibit 113** is a true and correct copy of the March 17, 2006 letter (which I

17 | received on March 21, 2006) from Mr. Chance providing me with these assurances.  Attached

18 | hereto as **Exhibit 114** is a true and correct copy of the March 21, 2006 letter from Mr. Gilg

19 | providing me with these assurances and stating that a motion to compel is not necessary.

20 |     25.     I relied on Mr. Chance and Mr. Gilg's assurances that supplemental discovery

21 | responses would be provided during or at the depositions.  During the week of March 27, 2006,

22 | depositions in the four adversary proceeding commenced, and I discovered that the assurances

23 | made to me by Mr. Chance and Mr. Gilg were not accurate.  During the depositions of the

24 | defendants and the Debtor, the defendants continued to refuse to provide me with information and

25 | evidence in this case based upon a number of objections, including the Fifth Amendment right

26 | against self-incrimination.   Attached hereto as **Exhibit 115** is a true and correct copy of my letter

27 | to Mr. Chance dated March 27, 2006, which sets forth the documents the defendants failed to

28 | produce.

26.    To date, the Trustee and I have not received the documents set forth in my March 27, 2006 letter to Mr. Chance. I received some cashier's checks which were sent with a cover letter dated April 7, 2006 from William E. Gilg. Attached hereto as **Exhibit 116** is a true and correct copy of the April 7, 2006 letter from Mr. Gilg with copies of the enclosures. Mr. Gilg indicates in his letter that the cashier's checks are from the 1990's; however, the date on these cashier's checks are illegible. Further, Mr. Gilg and K. Yeganeh did not explain how the cashier's checks relate to the purchase of the Allied Properties.

27.    Attached hereto as **Exhibit 117** is the document which the defendant produced to the Trustee in response to document requests served on them by the Trustee, which purports to create Allied Management Trust. The Trustee has taken the position that this document is a fraud.

28.    Attached hereto as **Exhibit 118** is a handwritten note, with the date "July 11, 2003" written on it, and purporting to be signed by "R. Rad". The Debtor has claimed in this case that this document proves that he resigned as the trustee of Allied Management Trust. This document was produced to the Trustee by Allied Management Trust and K. Yeganeh in response to document requests served on them by the Trustee. The Trustee has taken the position that this document is a fraud.

I declare under penalty of perjury that the above statements are true and that if called as a witness I could and would testify to their truthfulness. This declaration was executed on the 8th day of September 2006 in San Francisco, California.

/s/ Jeffrey L. Fillerup

205438.1

7

**ER - 135**

# Document No. 11

1          IN THE UNITED STATES BANKRUPTCY COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3                         - - -
    In Re: RAMIN YEGANEH,                    CERTIFIED COPY
4                Debtor.
    ----------------------------------)
5   CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                 Plaintiff,            ) Adversary Proceeding
6   vs.                                ) No. 05-3243
                                       )
7   ADVANTA TRUST and FARIN YEGANEH,   )
    aka F. NAMDARAN aka FRAN NAMDARAN  )
8   aka FARIN NAMDARAN aka FRAN        )
    YEGANEH,                           )
9                Defendants.           )
    ----------------------------------)
10  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                 Plaintiff,            ) Adversary Proceeding
11  vs.                                ) No. 05-3240
                                       )
12  F. NAMDARAN aka FRAN NAMDARAN aka  )
    FARIN NAMDARAN aka FARIN YEGANEH   )
13  aka FRAN YEGANEH,                  )
                 Defendants.           )
14  ----------------------------------)
    CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
15               Plaintiff,            ) Adversary Proceeding
    vs.                                ) No. 05-3241
16                                     )
    ALLIED MANAGEMENT TRUST and K.     )
17  YEGANEH aka KEN YEGANEH aka        )
    KAIKHOSROW YEGANEH,                )
18               Defendants.           )
    ----------------------------------)
19  CHARLES E. SIMS, Trustee,          ) No. 05-30047
                 Plaintiff,            ) Adversary Proceeding
20  vs.                                ) No. 05-3242
                                       )
21  COAST DEVELOPMENT TRUST and FARIN  )
    YEGANEH aka F. NAMDARAN aka FRAN   )
22  NAMDARAN aka FARIN NAMDARAN aka    )DEPOSITION OF
    FRAN YEGANEH,                      )RAMIN YEGANEH
23               Defendants.           )REDWOOD CITY, CALIFORNIA
    ----------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033

                                                            1

1   this document says.

2   Q   So, you assume that purchase price is correct?

3   A   That's correct.

4   Q   Did you ever obtain a mortgage loan using 115 or 139

5   Francisco as collateral for the loan?

6   A   I don't remember if I did.

7   Q   Do you know if your mother ever obtained a loan using

8   those two properties?

9   A   I don't know.

10      (Whereupon, Exhibit 24 was marked for Identification.)

11  BY MR. FILLERUP:

12  Q   I'm handing you what's been marked as Exhibit 24.  Would

13  you review Exhibit 24.

14  A   That's the same as Exhibit 12.  It's just an enlarged

15  version of Exhibit 12.

16  Q   Let me see 24.  I put this on the wrong document.  So,

17  I'm handing you what has been remarked as Exhibit 24.  I had

18  marked the incorrect document.

19      So, this is a new document and I've put the Exhibit 24

20  stamp on it.  So would you review Exhibit 24 and tell me what it

21  is.

22  A   Yes, it's a Grant Deed for the property on Taylor Street.

23  Q   Is Exhibit 24 the deed in which you originally obtained

24  title to the 2464 Taylor Avenue property?

25  A   Yes.

RECORDING REQUESTED BY:
Fidelity National Title Company
Escrow No  151683-LL
Title Order No  00151683

When Recorded Mail Document
and Tax Statement To:
R. Rad
P.O. BOX 322
San Mateo, CA  94401

2002257480  06/11/2002 08:30 AM
OFFICIAL RECORDS OF   RECORDING FEE: 23.00
ALAMEDA COUNTY        COUNTY TAX:   209.00
PATRICK O'CONNELL     CITY TAX:    2850 00

3    PGS

APN. 048-5597-001

**GRANT DEED**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

The undersigned grantor(s) declare(s)
Documentary transfer tax is $209.00    City tax $ 2,850.00
[ X ]  computed on full value of property conveyed, or
[    ]  computed on full value less value of liens or encumbrances remaining at time of sale,
[    ]  Unincorporated Area    City of Oakland

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,    Walter L. Davis, A Married Man
as his Sole and Separate Property

hereby GRANT(S) to    R. Rad, A Single Man

the following described real property in the City of Oakland
County of Alameda, State of California:
SEE EXHIBIT ONE ATTACHED HERETO AND MADE A PART HEREOF

EXHIBIT
24
3/29/06

DATED:  June 5, 2002

STATE OF CALIFORNIA
COUNTY OF _Alameda_
ON _June 6, 2002_ before me,
_Ling Lee,_ personally appeared
_Walter L. Davis_

_(Walter)_
Walter L. Davis

personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

LING LEE
COMM. #1346485
NOTARY PUBLIC-CALIFORNIA
COUNTY OF ALAMEDA
My Comm. Expires April 10, 2005

Witness my hand (and official seal)

Signature _Ling Lee_

MAIL TAX STATEMENTS AS DIRECTED ABOVE

FD-213 (Rev 7/96)                    GRANT DEED

35

# ILLEGIBLE NOTARY SEAL DECLARATION

## (Government Code 27361.7)

I declare under penalty of perjury that the notary seal on the document

to which this statement is attached, reads as follows:

NAME OF NOTARY PUBLIC: _Ling Lee_

COMMISSION NUMBER: _1346635_

NOTARY PUBLIC STATE: _CALIFORNIA_

COUNTY: _Alameda_

MY COMM. EXPIRES: _4/10/06_
                              (DATE)

SIGNATURE OF DECLARANT: _____

PRINT NAME OF DECLARANT: _J. Perez._

CITY & STATE OF EXECUTION: _OAKLAND, CA._

DATE SIGNED: _6/11/12_

### THE ABOVE INFORMATION MUST BE LEGIBLE FOR SCANNING

)

36

Escrow No. 151683-LL
Title Order No 00151683

# EXHIBIT ONE

Portion of Lot 3, Block A, Map of Toler Heights, filed September 30, 1907, Map Book 23, page 34, Alameda County Records, described as follows:

Beginning at a point on the Southeastern line of Taylor Avenue, distant thereon Southeasterly line of Thermal (formerly Derby) Street, as shown on said map; thence South 32 degrees 23' 40" East tot he Southeastern line of said Block A; thence South 71 degrees 33' West along said line of said Block A. to the Northeastern line of MacArthur (formerly Foothill) Boulevard, as shown on said map; thence Northwesterly and along said line of MacArthur Boulevard, 17.49 feet to the Southeastern line of Taylor Avenue; thence Northeasterly thereon, 94.84 feet, more or less, to the point of beginning.

37

# Document No. 12

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                  NORTHERN DISTRICT OF CALIFORNIA
 3                           - - -
    In Re: RAMIN YEGANEH,                    CERTIFIED COPY
 4                 Debtor.
    --------------------------------)
 5  CHARLES E. SIMS, Trustee,        ) No. 05-30047 TEC
                   Plaintiff,        ) Adversary Proceeding
 6  vs.                              ) No. 05-3243
                                     )
 7  ADVANTA TRUST and FARIN YEGANEH  )
    aka F. NAMDARAN aka FRAN NAMDARAN)
 8  aka FARIN NAMDARAN aka FRAN      )
    YEGANEH,                         )
 9                 Defendants.       )
    --------------------------------)
10  CHARLES E. SIMS, Trustee,        ) No. 05-30047 TEC
                   Plaintiff,        ) Adversary Proceeding
11  vs.                              ) No. 05-3240
                                     )
12  F. NAMDARAN aka FRAN NAMDARAN aka)
    FARIN NAMDARAN aka FARIN YEGANEH )
13  aka FRAN YEGANEH,                )
                   Defendants.       )
14  --------------------------------)
    CHARLES E. SIMS, Trustee,        ) No. 05-30047 TEC
15                 Plaintiff,        ) Adversary Proceeding
    vs.                              ) No. 05-3241
16                                   )
    ALLIED MANAGEMENT TRUST and K.   )
17  YEGANEH aka KEN YEGANEH aka      )
    KAIKHOSROW YEGANEH,              )
18                 Defendants.       )
    --------------------------------)
19  CHARLES E. SIMS, Trustee,        ) No. 05-30047
                   Plaintiff,        ) Adversary Proceeding
20  vs.                              ) No. 05-3242
                                     )
21  COAST DEVELOPMENT TRUST and FARIN)
    YEGANEH aka F. NAMDARAN aka FRAN )
22  NAMDARAN aka FARIN NAMDARAN aka  )DEPOSITION OF
    FRAN YEGANEH,                    )RAMIN YEGANEH
23                 Defendants.       )REDWOOD CITY, CALIFORNIA
    --------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033
```

                                                              1

1    Q    What is Exhibit 25?

2    A    Exhibit 25 is the Grant Deed for the property on Auseon

3    Avenue in Oakland.

4    Q    And is this the deed in which you originally obtained

5    title to the 2300 Auseon property?

6    A    Well, this deed here is not dated, so I think there is

7    another deed.  I don't think this deed here is correct.  So

8    there must be another one because it's not dated.

9    Q    Let me mark this as Exhibit 26.

10        (Whereupon, Exhibit 26 was marked for Identification.)

11   BY MR. FILLERUP:

12   Q    So please review Exhibits 25 and 26.  And then tell me

13   what Exhibits 25 and 26 are.

14   A    I don't think Exhibit 25 is-- I don't think Exhibit 25 is

15   the correct deed because it's not dated.  Exhibit 26 looks like

16   the correct deed because it is dated and it's for the property

17   on Auseon Avenue in Oakland.

18   Q    Is Exhibit 26 the document that originally, in which you

19   originally obtained title to the 2300 Auseon Avenue property?

20   A    I don't know exactly but I assume so.  It's from a long

21   time ago.

22   Q    Did you personally negotiate the transaction in which you

23   obtained title to the 300 Auseon Avenue property?

24   A    I don't remember.

25   Q    How much did you pay for the 2300 Auseon Avenue property?

152

**ER - 142**

Recording Requested by:

WHEN RECORDED MAIL TO:

R. Rad
P.O.Box 322
San Mateo, CA  94401

**2002389914** 09/06/2002 03:07 PM
OFFICIAL RECORDS OF   RECORDING FEE    7 00
ALAMEDA COUNTY        COUNTY TAX      11 00
PATRICK O'CONNELL     CITY TAX       150 00

1   PG

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN:  043-4610-023

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX is $ 11 -                    $ 150 -              City
X   Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances
    remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
  Phyllis S. Shoop, an unmarried woman
hereby GRANT(S) to
  R. Rad, a single man
all the real property situated in the City of   Oakland,    Alameda County   , State of California, described as:
  Lot 1, Block 11, Auseon's Moss Tract, filed September 11, 1907,
  in Book 23, Page 31 of Maps, Alameda County Records.

  APN 043-4610-023

  property commonly known as: 2300 Auseon Ave, Oakland

EXHIBIT
26
3/29/06

Dated.  8/29/2002

STATE OF CALIFORNIA
COUNTY OF _Alameda_  }ss
On _Aug. 29, 2002_ before me _Carmen C Sanchez_
personally appeared _Phyllis S. Shoop_

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument

WITNESS my hand and official seal

Signature _Carmen C Sanchez_

Phyllis S. Shoop





(This area for official notarial seal)

MAIL TAX
STATEMENTS TO:  above

# Document No. 13

1              IN THE UNITED STATES BANKRUPTCY COURT
2                 NORTHERN DISTRICT OF CALIFORNIA
3                            - - -

In Re: RAMIN YEGANEH,                      CERTIFIED COPY
4                 Debtor.
------------------------------------)
5  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                  Plaintiff,          ) Adversary Proceeding
6  vs.                                ) No. 05-3243
                                      )
7  ADVANTA TRUST and FARIN YEGANEH    )
   aka F. NAMDARAN aka FRAN NAMDARAN  )
8  aka FARIN NAMDARAN aka FRAN        )
   YEGANEH,                           )
9                 Defendants.         )
------------------------------------)
10 CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                  Plaintiff,          ) Adversary Proceeding
11 vs.                                ) No. 05-3240
                                      )
12 F. NAMDARAN aka FRAN NAMDARAN aka  )
   FARIN NAMDARAN aka FARIN YEGANEH   )
13 aka FRAN YEGANEH,                  )
                  Defendants.         )
14 ------------------------------------)
   CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
15                Plaintiff,          ) Adversary Proceeding
   vs.                                ) No. 05-3241
16                                    )
   ALLIED MANAGEMENT TRUST and K.     )
17 YEGANEH aka KEN YEGANEH aka        )
   KAIKHOSROW YEGANEH,                )
18                Defendants.         )
------------------------------------)
19 CHARLES E. SIMS, Trustee,          ) No. 05-30047
                  Plaintiff,          ) Adversary Proceeding
20 vs.                                ) No. 05-3242
                                      )
21 COAST DEVELOPMENT TRUST and FARIN  )
   YEGANEH aka F. NAMDARAN aka FRAN   )
22 NAMDARAN aka FARIN NAMDARAN aka    )DEPOSITION OF
   FRAN YEGANEH,                      )RAMIN YEGANEH
23                Defendants.         )REDWOOD CITY, CALIFORNIA
------------------------------------)MARCH 29, 2006
24 ATKINSON-BAKER, INC.
   (800) 288-3376
25 REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
   FILE NO. 9F09033

                                                              1

1    A    I don't remember.

2         (Whereupon, Exhibit 27 was marked for Identification.)

3    BY MR. FILLERUP:

4    Q    I'm handing you what's been marked as Exhibit 27.  Would

5    you review Exhibit 27 and tell me what Exhibit 27 is?

6    A    It's a Grant Deed for the property on 73rd Avenue in

7    Oakland.

8    Q    And is this the deed in which you originally acquired

9    title in your name to the 1012 73rd Avenue property?

10   A    Yes.

11   Q    How much did you pay for the 1012 73rd Avenue property?

12   A    I don't remember.

13   Q    Do you remember the circumstances under which you

14   purchased the property?

15   A    No.

16   Q    Do you recall that you paid $31,000 for this property?

17   A    No, I don't.

18   Q    Do you recall whether you had paid more than $100,000 for

19   this property?

20   A    No, I don't remember the specifics.

21   Q    Do you recall whether you had personally negotiated the

22   purchase of this property?

23   A    No, I don't.

24   Q    Do you know whether your parents had been involved in

25   the, in negotiating the purchase of this property?

154

Recording Requested by:

&

WHEN RECORDED MAIL TO:

R. Rad
P.O.Box 322
San Mateo, CA 94401

**2002539098** 11/19/2002 01:28 PM
OFFICIAL RECORDS OF    RECORDING FEE 7.00
ALAMEDA COUNTY         COUNTY TAX:   34.10
PATRICK O'CONNELL      CITY TAX.    465.00

1  PG

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 041-4144-009

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 34.10                    $ 465.00      City
X   Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances
    remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

   Julie A. Rodgers,   an unmarried woman

hereby GRANT(S) to

   R. Rad, a single man

all the real property situated in the City of Oakland, County of Alameda   , State of California, described as:

       Lots 41 and 42, Block 21, Map of Resubdivision of the Townsite
       of Fitchburg, formerly Fitchburg, Lots, filed May 18, 1892, Map
       Book 17, page 9, Alameda County Records.

       APN 041-4144-009

       commonly known as: 1012 73rd Ave, Oakland

Dated:  11/16/02

Julie A. Rodgers

STATE OF CALIFORNIA
COUNTY OF  Alameda  }ss
On 11-16-02  before me, Lynn A Worthington,

personally appeared  Julie A.
Rodgers

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature

MAIL TAX
STATEMENTS TO:  above

LYNN A. WORTHINGTON
COMM. # 1228683
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
COMM. EXP. JULY 30, 2003

**EXHIBIT**
**27**
3/29/06

(This area for official notarial seal)

41

ER - 146

# Document No. 14

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                           - - -
    In Re: RAMIN YEGANEH,                CERTIFIED COPY
 4                Debtor.
    -----------------------------------)
 5  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                  Plaintiff,           ) Adversary Proceeding
 6  vs.                                ) No. 05-3243
                                       )
 7  ADVANTA TRUST and FARIN YEGANEH    )
    aka F. NAMDARAN aka FRAN NAMDARAN  )
 8  aka FARIN NAMDARAN aka FRAN        )
    YEGANEH,                           )
 9                Defendants.          )
    -----------------------------------)
10  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                  Plaintiff,           ) Adversary Proceeding
11  vs.                                ) No. 05-3240
                                       )
12  F. NAMDARAN aka FRAN NAMDARAN aka  )
    FARIN NAMDARAN aka FARIN YEGANEH   )
13  aka FRAN YEGANEH,                  )
                  Defendants.          )
14  -----------------------------------)
    CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
15                Plaintiff,           ) Adversary Proceeding
    vs.                                ) No. 05-3241
16                                     )
    ALLIED MANAGEMENT TRUST and K.     )
17  YEGANEH aka KEN YEGANEH aka        )
    KAIKHOSROW YEGANEH,                )
18                Defendants.          )
    -----------------------------------)
19  CHARLES E. SIMS, Trustee,          ) No. 05-30047
                  Plaintiff,           ) Adversary Proceeding
20  vs.                                ) No. 05-3242
                                       )
21  COAST DEVELOPMENT TRUST and FARIN  )
    YEGANEH aka F. NAMDARAN aka FRAN   )
22  NAMDARAN aka FARIN NAMDARAN aka    )DEPOSITION OF
    FRAN YEGANEH,                      )RAMIN YEGANEH
23                Defendants.          )REDWOOD CITY, CALIFORNIA
    -----------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033
```

1

1    A    No, I don't.

2    Q    Do you know whether you obtained a mortgage loan on this

3    property?

4    A    No, I don't remember.

5    (Whereupon, Exhibit 28 was marked for Identification.)

6    BY MR. FILLERUP:

7    Q    I'm handing you what's been marked as Exhibit 28.  Would

8    you review Exhibit 28 and tell me what Exhibit 28 is?

9    A    Yeah, it's a Grant Deed for the property on 79th Avenue

10    in Oakland.

11    Q    And what was the purchase price?

12    A    I don't remember.

13    Q    Is this the deed in which you originally obtained title

14    in your name to the 1278 79th Avenue property?

15    A    Yes, I believe so.

16    Q    Do you recall whether you paid more than $100,000 for

17    this property?

18    A    No, I don't.

19    Q    Do you recall the circumstances surrounding your purchase

20    of this property?

21    A    No, I don't.

22    Q    Do you recall whether you or your parents had personally

23    negotiated the purchase of this property?

24    A    No, I don't recall.

25    Q    Do you know if there was ever a mortgage loan on this

Recording Requested by:

and

WHEN RECORDED MAIL TO:

R. Rad
P.O.Box 322
San Mateo, CA   94401



2002570913  12/06/2002 04:06 PM
OFFICIAL RECORDS OF     RECORDING FEE: 7.00
ALAMEDA COUNTY          COUNTY TAX:   110.00
PATRICK O'CONNELL       CITY TAX:    1500.00

1   PG

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 041-4198-052

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 110             $  1500              City
X   Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances
    remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Robert K. Scott and Alyssa R. Scott, husband & wife as joint tenants

hereby GRANT(S) to

R. Rad, a single man

all the real property situated in the City of Oakland, Alameda County          , State of California, described as:

Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of
Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda
County Records.
APN 041-4198-052
property commonly known as: 1278 79th Ave, Oakland, CA

Dated: 12/6/02

STATE OF CALIFORNIA
COUNTY OF  Alameda                              }ss
On  Dec 6 2002 before me  James Rudsill

personally appeared  Robert K Scott
                     Alyssa R Scott

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature   James Rudsill

MAIL TAX
STATEMENTS TO:  above

_____ Robert K. Scott

_____ Alyssa R. Scott

JAMES RUDSILL
COMM. #1219111
NOTARY PUBLIC-CALIFORNIA
COUNTY OF ALAMEDA
My Comm. Expires June 6, 2005

(This area for official notarial seal)



EXHIBIT
28
3/29/06

42

# Document No. 15

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                           - - -
    In Re: RAMIN YEGANEH,                CERTIFIED COPY
 4                 Debtor.
    ----------------------------------)
 5  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                   Plaintiff,          ) Adversary Proceeding
 6  vs.                                ) No. 05-3243
                                       )
 7  ADVANTA TRUST and FARIN YEGANEH    )
    aka F. NAMDARAN aka FRAN NAMDARAN  )
 8  aka FARIN NAMDARAN aka FRAN        )
    YEGANEH,                           )
 9                 Defendants.         )
    ----------------------------------)
10  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                   Plaintiff,          ) Adversary Proceeding
11  vs.                                ) No. 05-3240
                                       )
12  F. NAMDARAN aka FRAN NAMDARAN aka  )
    FARIN NAMDARAN aka FARIN YEGANEH   )
13  aka FRAN YEGANEH,                  )
                   Defendants.         )
14  ----------------------------------)
    CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
15                 Plaintiff,          ) Adversary Proceeding
    vs.                                ) No. 05-3241
16                                     )
    ALLIED MANAGEMENT TRUST and K.     )
17  YEGANEH aka KEN YEGANEH aka        )
    KAIKHOSROW YEGANEH,                )
18                 Defendants.         )
    ----------------------------------)
19  CHARLES E. SIMS, Trustee,          ) No. 05-30047
                   Plaintiff,          ) Adversary Proceeding
20  vs.                                ) No. 05-3242
                                       )
21  COAST DEVELOPMENT TRUST and FARIN  )
    YEGANEH aka F. NAMDARAN aka FRAN   )
22  NAMDARAN aka FARIN NAMDARAN aka    )DEPOSITION OF
    FRAN YEGANEH,                      )RAMIN YEGANEH
23                 Defendants.         )REDWOOD CITY, CALIFORNIA
    ----------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033
```

1

1    property since the time that you acquired title?

2      A    No, I don't recall.

3          (Whereupon, Exhibit 29 was marked for Identification.)

4    BY MR. FILLERUP:

5      Q    I'm handing you what's been marked as Exhibit 29.  Will

6    you please review Exhibit 29?

7      A    Okay.

8      Q    What is Exhibit 29?

9      A    It's a Grant Deed for the property on 69th Avenue in

10   Oakland.

11     Q    And is this the document in which you originally obtained

12   title in your name to the 1086 69th Avenue property?

13     A    I don't remember the particulars, but it looks like it.

14     Q    What was the purchase price of this property?

15     A    I don't remember.

16     Q    Did you personally negotiate the purchase of this

17   property?

18     A    I don't remember.

19     Q    Do you know whether your parents were involved in

20   personally negotiating the purchase of this property?

21     A    I don't remember.

22     Q    Do you know if you obtain a mortgage loan in connection

23   with the purchase of this property?

24     A    I don't remember.

25     Q    Do you know if there's ever been a mortgage loan on this

156

Recording Requested by:

and

**WHEN RECORDED MAIL TO:**

R. Rad
P.O.Box 322
San Mateo, CA  94401

**2003055001** 01/29/2003 04:03 PM
OFFICIAL RECORDS OF    RECORDING FEE:   17.00
ALAMEDA COUNTY    COUNTY TAX:     38.50
PATRICK O'CONNELL    CITY TAX:      525.00

1    PG

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 041-4148-040

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 38.50    $ 525.00    City

X   Computed on the consideration or value of property conveyed; OR

___   Computed on the consideration or value less or encumbrances
remaining at time of sale.

**FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,**

  Love Perry Jones, an unmarried man

hereby GRANT(S) to

  R. Rad, a single man

all the real property situated in the City of Oakland, County of Alameda    State of California, described as:
Commencing at a point on the Southeastern line of 68th Avenue seventy-two
feet, two inches Southwesterly from the intersection thereof with the South-
western line of Hamilton Street, as the said Avenue and Street are shown upon
the Map hereinafter referred to; running thence Southwesterly along the said
line of 68th Avenue thirty-five feet; thence at right angles Southeasterly
one hundred feet; thence at right angle Northeasterly thirty-five feet; thenc
at right angles Northwesterly one hundred feet to the point of beginning.
Being a portion of lots numbered 1, 2, and 5 in Block numbered 25, as the
said Lots and Block are shown upon that certain Map entitled, "Fitchburg
Homestead Lots; filed June 25, 1870 in the Office of the County Recorder of
Alameda County.    APN 041-4148-040
property commonly known as: 1086 69th Ave, Oakland

Dated: 1/29/03

Love Perry Jones

STATE OF CALIFORNIA
COUNTY OF Alameda    }ss
On 01/29/03  before me  Carmen C Sanchez

personally appeared Love Perry Jones

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature  Carmen C Sanchez

MAIL TAX
STATEMENTS TO:  above

CARMEN C. SANCHEZ
COMM. # 1350666
NOTARY PUBLIC - CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires Sept. 25, 2003

EXHIBIT
29

(This area for official notarial seal)

43

# Document No. 16

1

2

3         SUPERIOR COURT OF THE STATE OF CALIFORNIA

4                    COUNTY OF ALAMEDA

5           ALLEN E. BROUSSARD JUSTICE CENTER

6                       --oOo--

7    RAD,                          )
                                   )
8              Plaintiff,          )
                                   )
9         vs.                      ) Case No. WG-03-080151
                                   )
10   CHEATHAM,                     )
                                   )
11             Defendant.          )
     _____)

12

13                   DEPOSITION OF

14               RAMIN RAD YEGANEH

15   _____

16              Friday, April 25, 2003

17               (Pages 1 - 229)

18

19                  CERTIFIED COPY

20

21

22

23

24   REPORTED BY: JULIE R. HEAD, RPR, CRR, CSR 9399   332836

25

                                              1



global court reporting • large case specialists
legal videography • litigation support • trial presentation
Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040   Fax 415-359-2050   www.legalink.com

RAMIN RAD YEGANEH

1     A.   Yeah, that's what it says.

2     Q.   Okay.  Were you the borrower in this document?

3     A.   Yes.

4     Q.   Okay.  And the lender, it says R. Rad.  Can

5 you tell me who that is?

6     A.   I don't know where you got this information.

7 There's -- I have no idea where you got this

8 information, but -- I'm sorry, what was the question?

9     Q.   Do -- Well, let me ask you this:  Did you ever

10 borrow money from an R. Rad?  $250,000 from an R. Rad?

11     A.   250,000?

12     Q.   Um-hum.

13     A.   Here it says 400,000.

14     Q.   Right.  Did you ever borrow 400,000 from an R.

15 Rad?

16     A.   Did I ever borrow 400,000 from R. Rad?  So,

17 what does that have to do with this case?  I mean, I

18 have loans on my properties, if that's what you're

19 trying to get at.

20     Q.   What I'm asking is, who is the R. Rad?

21     A.   I'm sorry, I -- I mean, what are you -- what

22 are you trying to get at?  What are you trying to get

23 at?

24     Q.   You have signed documents under oath in this

25 case that your name is R. Rad.

44

RAMIN RAD YEGANEH

1    A.    Right.

2    Q.    You've testified today at this deposition that

3    your name is Ramin Rad Yeganeh.

4    A.    Right.

5    Q.    What I put before you is a document showing a

6    loan between Ramin Yeganeh and R. Rad, and what I'm

7    asking you, is this R. Rad yourself or is it some other

8    person?

9    A.    You can put loans against your own properties

10   if you want to, if that's what you're trying to get at,

11   okay.  So -- And, besides, there are other people with

12   the same last name as I am, okay, so I don't know what

13   you're trying to get at, here.  So, the answer is,

14   for -- Are you asking me for this specific property?

15   Q.    Yes.

16   A.    This specific property is irrelevant to

17   this -- to this case.

18   Q.    So, are you refusing to answer?

19   A.    Yes, I am refusing to answer because this is

20   irrelevant.

21         Let's get something clear, here.  What I own

22   or what I don't own, whether I have any mortgages on my

23   property, who my lenders are, whatever, that's

24   irrelevant to this case.  Okay.  Before my attorney told

25   me what questions I should answer, what questions I

45

# Document No. 17

1         IN THE UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               - - -

In Re: RAMIN YEGANEH,          CERTIFIED COPY

4         Debtor.

---------------------------------)

5  CHARLES E. SIMS, Trustee,    ) No. 05-30047 TEC

           Plaintiff,   ) Adversary Proceeding

6  vs.                   ) No. 05-3243

                        )

7  ADVANTA TRUST and FARIN YEGANEH  )

  aka F. NAMDARAN aka FRAN NAMDARAN )

8  aka FARIN NAMDARAN aka FRAN    )

  YEGANEH,                 )

9         Defendants.   )

---------------------------------)

10  CHARLES E. SIMS, Trustee,    ) No. 05-30047 TEC

           Plaintiff,   ) Adversary Proceeding

11  vs.                  ) No. 05-3240

                        )

12  F. NAMDARAN aka FRAN NAMDARAN aka )

  FARIN NAMDARAN aka FARIN YEGANEH )

13  aka FRAN YEGANEH,        )

         Defendants.   )

14  ---------------------------------)

  CHARLES E. SIMS, Trustee,    ) No. 05-30047 TEC

15          Plaintiff,   ) Adversary Proceeding

  vs.                  ) No. 05-3241

16                      )

  ALLIED MANAGEMENT TRUST and K.   )

17  YEGANEH aka KEN YEGANEH aka    )

  KAIKHOSROW YEGANEH,       )

18         Defendants.   )

---------------------------------)

19  CHARLES E. SIMS, Trustee,    ) No. 05-30047

           Plaintiff,   ) Adversary Proceeding

20  vs.                  ) No. 05-3242

                        )

21  COAST DEVELOPMENT TRUST and FARIN )

  YEGANEH aka F. NAMDARAN aka FRAN )

22  NAMDARAN aka FARIN NAMDARAN aka )DEPOSITION OF

  FRAN YEGANEH,          )RAMIN YEGANEH

23         Defendants.   )REDWOOD CITY, CALIFORNIA

---------------------------------)MARCH 29, 2006

24  ATKINSON-BAKER, INC.

  (800) 288-3376

25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646

  FILE NO. 9F09033

1

1    property?

2    A    I don't remember.

3    Q    What's that exhibit number?

4    A    Exhibit 29.

5    Q    Would you please look at Exhibits 26-- I'm sorry.

6    Exhibits 25, 26, 27, 28, and 29.

7    A    Okay.

8    Q    And Exhibit 24.

9    A    Okay.

10    Q    Exhibit 24 is the 2464 Taylor Avenue deed?

11    A    Yes.

12    Q    So, are Exhibits 24 through 29 the deeds for properties

13    that you eventually transferred to Allied Management Trust?

14    A    Yeah, they're the deeds or the Allied Management Trust

15    properties.

16    Q    And at some point you had transferred those properties to

17    Allied Management Trust; correct?

18    A    Well if you want to call it that, sure.  Yes.

19    Q    Well, tell me what exhibit it was that you transferred,

20    where you transferred these properties to Allied Management

21    Trust.

22    A    I'm sure I saw one of these.  Do you want me to go

23    through all these?

24    Q    Yes, sir please.

25    A    Give me a second.  Exhibits 13 and 14.

Recording Requested by:

and

WHEN RECORDED MAIL TO:

Allied Management Trust
2462 Taylor Ave
Oakland, CA  94605



2003265730    05/06/2003 02:58 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:              7.00
COUNTY TAX:                 1.10
CITY TAX:                  15.00

1    PG

THIS SPACE FOR RECORDER'S USE ONLY:

## GRANT DEED

APN: 043-4610-023

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 1.10            $ 15        City
X    Computed on the consideration or value of property conveyed; OR
___  Computed on the consideration or value less or encumbrances
     remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
R. Rad, a single man

hereby GRANT(S) to

Allied Management Trust

all the real property situated in the City of Oakland, County of Alameda    , State of California, described as:

Lot 1, Block 11, Auseon's Moss Tract, filed September 11, 1907
in Book 23, Page 31 of Maps, Alameda County Records.
APN 043-4610-023

Dated: MAY 5, 2003

STATE OF CALIFORNIA
COUNTY OF ALAMEDA
On MAY 6, 2003 before me Betty J. Moore

personally appeared R. RAD

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Betty Jo Moore_

MAIL TAX
STATEMENTS TO:    above

R. Rad

BETTY J. MOORE
Commission # 1260788
Notary Public - California
Alameda County
My Comm. Expires Apr 14, 2004

502

EXHIBIT
13
3/29/06

this area for official notarial seal)

Yiganeh
EXHIBIT NO. 6
11/30/04

ER - 158

Recording Requested by:

and

WHEN RECORDED MAIL TO:

Allied Management Trust
2462 Taylor Avenue
Oakland, CA  94605



2003162534 03/21/2003 03:20 PM
OFFICIAL RECORDS OF    RECORDING FEE: 20.00
ALAMEDA COUNTY        COUNTY TAX:    11.00
PATRICK O'CONNELL     CITY TAX:     150.00

2  PGS

THIS SPACE FOR RECORDER'S USE ONLY:

## GRANT DEED

APN:  048-5597-001
      041-4198-052
      041-4140-040
      041-4144-009

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER TAX IS: $ 11.00              $ 150.00          City

X   Computed on the consideration or value of property conveyed; OR
    Computed on the consideration or value less or encumbrances remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

R. Rad, a single man

hereby GRANT(S) to

Allied Management Trust

all the real property situated in the City of Oakland, County of Alameda . State of California, described as:

see attached Exhibit "A"

Dated: March 21, 2003

STATE OF CALIFORNIA
COUNTY OF Alameda                    }ss
On 3-21-2003 before me Karen M. Scott

personally appeared R. Rad

personally known to me or proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Karen M Scott

MAIL TAX
STATEMENTS TO:  above

R. Rad
R. Rad

KAREN M. SCOTT
COMM. 81390130
Notary Public-California
ALAMEDA COUNTY
My Comm. Exp. May 27, 2003

499

(This area for official notarial seal)

EXHIBIT
14
3-17-09 mc

Exhibit "A"

Portion of Lot 3, Block A, Map of Toler Heights, filed September 30, 1907, Map Book 23, page 34, Alameda County Records, described as follows:

Beginning at a point on the Southeastern line of Taylor Avenue, distant thereon Southeasterly line of Thermal(formerly Derby) Street as shown on said map; thence South 32 degrees 23'40" East to the Southeastern line of said Block A; thence South 71 degrees 33' West along said line of said Block A, to the Northeastern line of MacArthur (formerly Foothill) Boulevard, as shown on said map; thence Northwesterly and along said line of MacArthur Boulevard, 17.49 feet to the Southeastern line of Taylor Avenue; thence Northeasterly thereon, 94.84 feet, more or less, to the point of beginning.
APN: 048-5597-001

Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda County Records.
APN: 041-4198-052

Commencing at a point on the Southeastern line of 68th Avenue seventy-two feet, two inches Southwesterly from the intersection thereof with the Southwestern line of Hamilton Street, as the said Avenue and street are shown upon the Map hereinafter referred to; running thence Southwesterly along the said line of 68th Avenue thirty-five feet; thence at right angles Southeasterly one hundred feet; thence at right angle Northeasterly thirty-five feet; thence at right angles Northwesterly one hundred feet to the point of beginning. Being a portion of lots numbered 1, 2, and 5 in Block numbered 25, as the said Lots and Block are shown upon that certain Map entitled, "Fitchburg Homestead Lots;"filed June 25, 1870 in the Office of the County Recorder of Alameda County.
APN: 041-4148-040

Lots 41 and 42, Block 21, Map of Resubdivision of the Townsite of Fitchburg, formerly Fitchburg, Lots, filed May 18, 1892, Map Book 17, page 9, Alameda County Records.
APN: 041-4144-009

# Document No. 18

08/01/2001  09:24  6508531608                    EPACLP                              PAGE  02

Form B1 (Official Form) - (Rev. 3/98)

## UNITED STATES BANKRUPTCY COURT
### ___Northern___ District of ___California___

**Voluntary Petition**

| Name of Debtor (If Individual, enter Last, First, Middle): | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| Yaganeh, R. | |

| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names): |
|---|---|
| | |

| Soc. Sec./Tax I.D. No. (If more than one, state all) | Soc. Sec./Tax I.D. No. (If more than one, state all): |
|---|---|
| | |

| Street Address of Debtor (No. & Street, City, State, & Zip Code) | Street Address of Joint Debtor (No. & Street, City, State, & Zip Code) |
|---|---|
| 395 Sequoia Ave<br><br>Redwood City, CA  94061 | |

| County of Residence or of the Principal Place of Business:  San Mateo County | County of Residence or of the Principal Place of Business: |
|---|---|

| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
|---|---|
| | |

| Location of Principal Assets of Business Debtor (if different from street address above) |
|---|

### Information Regarding the Debtor

**Venue** (Check any applicable box)
- ☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.
- ☐ This petition is being filed by a corporation or partnership under chapter 11 and the debtor acknowledges that a Venue Disclosure Form is required to be filed by General Order 97-02.

**Type of Debtor** (Check all boxes that apply)
- ☑ Individual(s)
- ☐ Corporation
- ☐ Partnership
- ☐ Other _____
- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity Broker

**Chapter or Section of Bankruptcy Code Under Which the Petition is Filed** (Check one box)
- ☐ Chapter 7
- ☐ Chapter 11
- ☑ Chapter 13
- ☐ Chapter 9
- ☐ Chapter 12
- ☐ Sec. 304 - Case Ancillary to foreign proceeding

**Nature of Debts** (Check one box)
- ☑ Consumer/Non-Business
- ☐ Business

**Filing Fee** (Check one box)
- ☑ Full Filing Fee attached
- ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3.

**Chapter 11 Small Business** (Check all boxes that apply)
- ☐ Debtor is a small business as defined in 11 U.S.C. § 101
- ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(b) (Optional)

**Statistical/Administrative Information** (Estimates only)
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☑ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

**Estimated Number of Creditors**

| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|
| ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |

**Estimated Assets**

| $0 - $50,000 | $50,001 - $100,000 | $100,001 - $500,000 | $500,001 - $1 million | $1,000,001 - $10 million | $10,000,001 - $50 million | $50,000,001 - $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |

**Estimated Debts**

| $0 - $50,000 | $50,001 - $100,000 | $100,001 - $500,000 | $500,001 - $1 million | $1,000,001 - $10 million | $10,000,001 - $50 million | $50,000,001 - $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |

Case # 01-31983 SFC13
Debtor: R. Yaganeh

Judge: Thomas E. Carlson
Trustee David Burchard
341 Mtg. None Assigned

Tentative - Notice to be mailed
Chapter 13      Office 3-SF
Filed: 10:38 AM, 07/31/01
Order for Relief
Clerk, U.S. Bankruptcy Court
Northern District of California
Rcpt # 030010075 - DC
TOTAL PAID: $185.00
by: R. Yaganeh

ATTORNEY

109

**ER - 161**

| $50,000 | $100,000 | $500,000 | $1 million | $10 million | $50 million | $100 million | more than $100 million | TOTAL PAID: $185.00 by: R. Yaganeh | |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | |

Form B1 (Official Form 1) Page Two - (Rev. 1/98)

## Voluntary Petition
*(This page must be completed and filed in every case)*

Name of Debtor(s): Yaganeh, R.

**FORM B1,
Page 2**

**Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)** none

| Location Where Filed: | Case Number: | Date Filed: |
|---|---|---|

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)** none

| Name of Debtor: | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

### Signatures

#### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct. (If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7) I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor
(650)343-6530/ (650)343-0593 fax
Telephone and Fax Number (if not represented by attorney)
7/27/01
Date

#### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

X _____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

#### Signature of Attorney

X _____
Signature of Attorney for Debtor(s)

_____
Printed Name of Attorney for Debtor(s)

_____
Firm Name

_____
Address

_____
Telephone and Fax Number

_____
Date            Bar Number

#### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed or Typed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

_____
Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.

#### Exhibit "A"
(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)
☐   Exhibit A is attached and made a part of this petition.

#### Exhibit "B"
(To be completed if debtor is an individual whose debts are primarily consumer debts) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that (he or she) may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____
Signature of Attorney for Debtor(s)         Date

RECEIVED TIME  AUG. 1.   9:32AM          PRINT TIME  AUG. 1.   9:44AM          110

ER - 162

# Document No. 19

**FILE**

R. Yeganeh
724 E 4th Ave
San Mateo, CA 94401
(650) 343-6530

July 17, 2001

to: Renee Clover
East Palo Alto Community Law Project
1395 Bay Rd, East Palo Alto, CA 94303

Michael Tracy
Gray Cary Ware & Freidenrich, LLP
401 B St, Suite 1700
San Diego, CA 92101

re: case#410586
case#412706

Dear Ms Glover & Mr Tracy:

Attached is a copy of my Chapter 13 Bankruptcy. As you are aware, bankruptcy proceedings will stop all lawsuits for about one year. If you decide to pursue the Wobogo case or the Evans case to trial after the abovementioned automatic stay has expired, and even if you succeed at trial (highly unlikely) and attempt to extort additional monies from me in the form of attorney's fees, your judgment will be discharged. If any portion of your judgment survives, it will be unsecured, and paid out over a 5 year period, if there are funds available.

Therefore, before you incur any additional unnecessary expenses by arranging another deposition, I suggest we all sit down to see if we can settle this case.

My position has always been that if anyone feels that he/she has been wronged by me, they can always submit a claim, if we are unable to settle it, it can go to a neutral arbitrator, and if there is a judgment rendered against me for damages, I will pay. Any pre-bankruptcy settlement agreement is exempt from bankruptcy.

In all honesty, I can not put up a huge amount of cash, as you requested in your original settlement offer on 5/7/2001. I simply do not have the cash, otherwise I would have taken your original offer. My entire savings, the money I have saved for over 11 years, over $275,000 went to settle Ingram's causes of action, and the rest I had to borrow from my parents to pay for Harrison's restitution. I simply do not have any more money. I have a couple of properties whose equities I can use to settle the claims as they come in. But as I mentioned earlier, I can not pay exhorbitant attorney's fees which you now demand.

If you honestly tell me your real attorney's fees (as of 5/7/2001 you requested $25,000 in attorney's fees), and work out the other details, I am sure we can sit down and workout something. But now is the time to do it if you are serious. If not, it is more cost effective for me to file for bankruptcy, now that I have nothing more to lose.

Your prompt consideration of this matter is greatly appreciated.

Sincerely,

R. Yeganeh

Form B1 (Official Form) · (Rev. 3/98)

| UNITED STATES BANKRUPTCY COURT | Voluntary Petition |
|---|---|
| Northern District of California | |

| Name of Debtor (if individual, enter Last, First, Middle):<br><br>Yeganeh, R. | Name of Joint Debtor (Spouse) (Last, First, Middle) |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names) |
| Soc. Sec./Tax I.D. No. (if more than one, state all) | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code)<br><br>724 E. 4th Ave<br>San Mateo, CA  94401 | Street Address of Joint Debtor (No. & Street, City, State, & Zip Code) |
| County of Residence or of the<br>Principal Place of Business:  San Mateo County | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from street address above) | |

## Information Regarding the Debtor (Check the Applicable Boxes)

**Venue** (Check any applicable box)
- ☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.
- ☐ This petition is being filed by a corporation or partnership under chapter 11 and the debtor acknowledges that a Venue Disclosure Form is required to be filed by General Order 97-02.

| **Type of Debtor** (Check all boxes that apply) | | | **Chapter or Section of Bankruptcy Code Under Which**<br>**the Petition is Filed** (Check one box) | | | |
|---|---|---|---|---|---|---|
| ☒ Individual(s) | ☐ Railroad | | ☐ Chapter 7 | ☐ Chapter 11 | ☒ Chapter 13 | |
| ☐ Corporation | ☐ Stockbroker | | ☐ Chapter 9 | ☐ Chapter 12 | | |
| ☐ Partnership | ☐ Commodity Broker | | ☐ Sec. 304 - Case Ancillary to foreign proceeding | | | |
| ☐ Other _____ | | | | | | |

| **Nature of Debts** (Check one box) | | **Filing Fee** (Check one box) |
|---|---|---|
| ☒ Consumer/Non-Business | ☐ Business | ☒ Full Filing Fee attached |

| **Chapter 11 Small Business** (Check all boxes that apply) | ☐ Filing Fee to be paid in installments (Applicable to individuals only) |
|---|---|
| ☐ Debtor is a small business as defined in 11 U.S.C. § 101 | Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |
| ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional) | |

**Statistical/Administrative Information** (Estimates only)
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☒ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

| **Estimated Number of Creditors** | | | | | | THIS SPACE FOR<br>COURT USE ONLY |
|---|---|---|---|---|---|---|
| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over | |
| ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | |

| **Estimated Assets** | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 -<br>$50,000 | $50,001-<br>$100,000 | $100,001-<br>$500,000 | $500,001-<br>$1 million | $1,000,001-<br>$10 million | $10,000,001-<br>$50 million | $50,000,001-<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

| **Estimated Debts** | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 -<br>$50,000 | $50,001-<br>$100,000 | $100,001-<br>$500,000 | $500,001-<br>$1 million | $1,000,001-<br>$10 million | $10,000,001-<br>$50 million | $50,000,001-<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

07/19/2001 THU 12:27  [TX/RX NO 7971]

103

Form B1 (Official Form 1) Page Two - (Rev. 3/98)

| Voluntary Petition | Name of Debtor(s): | **FORM B1,** |
| *(This page must be completed and filed in every case)* | Yeganeh, R. | **Page 2** |

| Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet) | | none |
| --- | --- | --- |
| Location Where Filed: | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet) | | none |
| --- | --- | --- |
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of Debtor (Corporation/Partnership) |
| --- | --- |
| I declare under penalty of perjury that the information provided in this petition is true and correct. [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.<br><br>I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _R~_ <br>Signature of Debtor<br><br>X _____<br>Signature of Joint Debtor<br><br>(650) 343-6530/(650) 343-0593 fax<br>Telephone and Fax Number (If not represented by attorney)<br><br>7/17/01<br>Date | I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.<br><br>The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.<br><br>X _____<br>Signature of Authorized Individual<br><br>X _____<br>Printed Name of Authorized Individual<br><br>_____<br>Title of Authorized Individual<br><br>_____<br>Date |

| Signature of Attorney | Signature of Non-Attorney Petition Preparer |
| --- | --- |
| X _____<br>Signature of Attorney for Debtor(s)<br><br>_____<br>Printed Name of Attorney for Debtor(s)<br><br>_____<br>Firm Name<br><br>_____<br>Address<br><br>_____<br>Telephone and Fax Number<br><br>_____        _____<br>Date                Bar Number | I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.<br><br>_____<br>Printed or Typed Name of Bankruptcy Petition Preparer<br><br>_____<br>Social Security Number<br><br>_____<br>Address<br><br>Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document: |

| **Exhibit "A"**<br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)<br>☐ Exhibit A is attached and made a part of this petition . | If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person. |
| --- | --- |
| **Exhibit "B"**<br>(To be completed if debtor is an individual whose debts are primarily consumer debts) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br><br>X _____        _____<br>Signature of Attorney for Debtor(s)        Date | _____<br>Signature of Bankruptcy Petition Preparer<br><br>_____<br>Date<br><br>A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156. |

07/19/2001 THU 12:27  [TX/RX NO 7971]

104

Local Rule 104 - (Rev. 6/95)

## STATEMENT OF RELATED CASES
## INFORMATION REQUIRED BY LOCAL RULE 104
## UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA

1.  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of such prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    n/a

2.  (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    n/a

3.  (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    n/a

4.  (If petitioner is an individual) A petition under the Bankruptcy Reform Act, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at ___San Mateo___, California.

Dated ____7/17/01____

_____
Debtor

_____
Joint Debtor

07/19/2001 THU 12:27  [TX/RX NO 7971]

105

# Document No. 20

07/31/2001  15:14    6503430593                                                    PAGE  01

Ramin Yeganeh
724 E 4th Ave
San Mateo, CA  94401
(650) 343-6530

defendant, in pro per

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN MATEO

Edith M. Ingram, et. al.                          case# 410586
              plaintiff

                                                  Defendant's Notice Of
v.                                                Automatic Stay In The
                                                  Bankruptcy Proceedings
Ramin Yeganeh, et. al.
              defendant

_____/

    Defendant Ramin Yaganeh has filed a Chapter 13 Bankruptcy. There is
a pending automatic stay which stays all proceedings affecting the above-
entitled action, including but not limited to depositions/discovery, all
motions, and any arbitration or trial.

    This automatic stay will remain in effect until the bankruptcy case is
either dismissed voluntarily by the defendant or by the Bankruptcy Court.


July 31, 2001                        _____
                                          Ramin Yeganeh, defendant

# Document No. 21

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**FILED**

AUG - 2 2001

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

In re                              )        Case No. 01-31983 SFC13
                                   )
R. Yaganeh                         )        Debtor's Voluntary Dismissal
                                   )
_____)

    The petitioner/debtor in the above-entitled case hereby
voluntarily dismisses this bankruptcy case.

_____
            R. Yaganeh/debtor

112

# Document No. 22

Form B1 (Official Form) 1 (Rev. 3/98)

# UNITED STATES BANKRUPTCY COURT
Northern District of California

**Voluntary Petition**

| Name of Debtor (If Individual, enter Last, First, Middle): Yeganeh, Ramin | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years (include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years (include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all) ~~xxx-xx~~-6634 | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code) 724 E 4th Ave San Mateo, CA 94401 | Street Address of Joint Debtor (No. & Street, City, State, & Zip Code) |
| County of Residence or of the Principal Place of Business: San Mateo County | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor (if different from street address above): | |

## Information Regarding the Debtor (Check the Applicable Boxes)

**Venue** (Check any applicable box)
- ☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.
- ☐ This petition is being filed by a corporation or partnership under chapter 11 and the debtor acknowledges that a Venue Disclosure Form is required to be filed by General Order 97-02.

| Type of Debtor (Check all boxes that apply) | Chapter or Section of Bankruptcy Code Under Which the Petition is Filed (Check one box) |
|---|---|
| ☑ Individual(s)  ☐ Railroad | ☐ Chapter 7  ☐ Chapter 11  ☑ Chapter 13 |
| ☐ Corporation  ☐ Stockbroker | ☐ Chapter 9  ☐ Chapter 12 |
| ☐ Partnership  ☐ Commodity Broker | ☐ Sec. 304 - Case Ancillary to foreign proceeding |
| ☐ Other _____ | |

| Nature of Debts (Check one box) | Filing Fee (Check one box) |
|---|---|
| ☑ Consumer/Non-Business  ☐ Business | ☐ Full Filing Fee attached |
| **Chapter 11 Small Business** (Check all boxes that apply) | ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |
| ☐ Debtor is a small business as defined in 11 U.S.C. § 101 | |
| ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional) | |

**Statistical/Administrative Information** (Estimates only)
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☑ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

Estimated Number of Creditors

| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|
| ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0 - 50,000 | $50,001 - $100,000 | $100,001 - $500,000 | $500,001 - $1 million | $1,000,001 - $10 million | $10,000,001 - $50 million | $50,000,001 - $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |

Estimated Debts

| $0 - 50,000 | $50,001 - $100,000 | $100,001 - $500,000 | $500,001 - $1 million | $1,000,001 - $10 million | $10,000,001 - $50 million | $50,000,001 - $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |

```
Case # : 05-30047-TEC13
Debtor  : RAMIN YEGANEH
Judge   : Thomas Carlson
Trustee : David Burchard
341 Mtg: To be assigned by Trustee
------------------------------------
Chapter: 13          Office 3 - SF
Receipt# 30036557    Deputy : JG
Amount : $194.00
From   : YEGANEH, RAMIN
------------------------------------
Filed : January 07, 2005  02:29 PM
        Order for Relief
        Clerk, U.S. Bankruptcy Court
        Northern District of California
```

398

**ER - 169**

Form B1 (Official Form 1) Page Two - (Rev. 3/98)

| Voluntary Petition | Name of Debtor(s): | FORM B1, |
| *(This page must be completed and filed in every case)* | Yeganeh, Ramin | Page 2 |

**Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)**

| Location<br>Where Filed: | Case Number: | Date Filed: |

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)**

| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct. [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

(650) 343-6530
Telephone and Fax Number (if not represented by attorney)

1/7/05
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

X _____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Signature of Attorney

X _____
Signature of Attorney for Debtor(s)

_____
Printed Name of Attorney for Debtor(s)

_____
Firm Name

_____
Address

_____
Telephone and Fax Number

_____
Date          Bar Number

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed or Typed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.

### Exhibit "A"

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐  Exhibit A is attached and made a part of this petition.

### Exhibit "B"

(To be completed if debtor is an individual whose debts are primarily consumer debts) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____
Signature of Attorney for Debtor(s)          Date

399

Gray Cary LLP
4365 Executive Drive
Suite 1100
San Diego, CA 92121

Form B1 (Official Form) (Rev. 1/98)

## UNITED STATES BANKRUPTCY COURT
Northern District of California

**Voluntary Petition**

| Name of Debtor (If Individual, Last, First, Middle): Yeganeh, Ramin | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years (Include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years (Include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (If more than one, state all) ___-__-6634 | Soc. Sec./Tax I.D. No. (If more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code) 724 E 4th Ave San Mateo, CA 9440, | Street Address of Joint Debtor (No. & Street, City, State, & Zip Code) |
| County of Residence or of the Principal Place of Business: San Mateo County | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (If different from street address): | Mailing Address of Joint Debtor (If different from street address): |
| Location of Principal Assets of Business Debtor (If different from street address above): | |

### Information Regarding the Debtor (Check the Applicable Boxes)

**Venue** (Check any applicable box)
- ☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.
- ☐ This petition is being filed by a corporation or partnership under chapter 11 and the debtor acknowledges that a Venue Disclosure Form is required to be filed by General Order 97-02.

| Type of Debtor (Check all boxes that apply) | | Chapter or Section of Bankruptcy Code Under Which the Petition is Filed (Check one box) |
|---|---|---|
| ☑ Individual(s) | ☐ Railroad | ☐ Chapter 7   ☐ Chapter 11   ☑ Chapter 13 |
| ☐ Corporation | ☐ Stockbroker | ☐ Chapter 9   ☐ Chapter 12 |
| ☐ Partnership | ☐ Commodity Broker | ☐ Sec. 304 - Case Ancillary to foreign proceeding |
| ☐ Other | | |

| Nature of Debts (Check one box) | Filing Fee (Check one box) |
|---|---|
| ☑ Consumer/Non-Business   ☐ Business | ☐ Full Filing Fee attached |

**Chapter 11 Small Business** (Check all boxes that apply)
- ☐ Debtor is a small business as defined in 11 U.S.C. § 101
- ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional)

☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3.

**Statistical/Administrative Information** (Estimates only)
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☑ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

Estimated Number of Creditors

| 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|
| ☑ | ☐ | ☐ | ☐ | ☐ | ☐ |

Estimated Assets

| $0 - 50,000 | $50,001- $100,000 | $100,001- $500,000 | $500,001- $1 million | $1,000,001- $10 million | $10,000,001- $50 million | $50,000,001- $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ |

Estimated Debts

| $0 - 50,000 | $50,001- $100,000 | $100,001- $500,000 | $500,001- $1 million | $1,000,001- $10 million | $10,000,001- $50 million | $50,000,001- $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |

```
Case # : 05-30047-TEC13
Debtor : RAMIN YEGANEH
Judge  : Thomas Carlson
Trustee: David Burchard
341 Mtg: To be assigned by Trustee
----------------------------------------
Chapter: 13           Office 3 - SF
Receipt# 30036557    Deputy : JG
Amount .$194.00
From   : YEGANEH, RAMIN
----------------------------------------
Filed : January 07, 2005 02:29 PM
        Order for Relief
   Clerk, U.S. Bankruptcy Court
   Northern District of California
```

401

Form B1 (Official Form 1) Page Two - (Rev. 1/35)

| Voluntary Petition | Name of Debtor(s): | FORM B1, |
| (This page must be completed and filed in every case) | Yeganeh, Ramin | Page 2 |

**Prior Bankruptcy Case Filed Within Last 6 Years** (if more than one, attach additional sheet)

| Location Where Filed: | Case Number: | Date Filed: |

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** (if more than one, attach additional sheet)

| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct. [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _Ramin_____
Signature of Debtor

X _____
Signature of Joint Debtor

(650) 343-6530
Telephone and Fax Number (if not represented by attorney)

1/7/05
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

X _____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Signature of Attorney

X _____
Signature of Attorney for Debtor(s)

_____
Printed Name of Attorney for Debtor(s)

_____
Firm Name

_____
Address

_____

_____
Telephone and Fax Number

_____     _____
Date                Bar Number

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed or Typed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.

### Exhibit "A"

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐  Exhibit A is attached and made a part of this petition .

### Exhibit "B"

(To be completed if debtor is an individual whose debts are primarily consumer debts) I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____    _____
Signature of Attorney for Debtor(s)    Date

402

Gray Cary LLP
4365 Executive Drive
Suite 1100
San Diego, CA 92121

# Document No. 23

1  Charles P. Maher, State Bar No. 124748
   Jeffrey L. Fillerup, State Bar No. 120543
2  Nhung Le, State Bar No. 209552
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
4  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
5
   Attorneys for Plaintiff
6  CHARLES E. SIMS, Trustee in Bankruptcy

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                            Chapter 7
12
            Debtor.
13

14  CHARLES E. SIMS, Trustee,              Adversary Proceeding
                                           No. 05-3241
15            Plaintiff,

16       v.                                **DECLARATION OF CHARLES E. SIMS
                                           IN SUPPORT IN SUPPORT OF (1)
17  ALLIED MANAGEMENT TRUST and K.         MOTION FOR SUMMARY JUDGMENT
    YEGANEH aka KEN YEGANEH aka            BASED ON ACTUAL FRAUD, AND (2)
18  KAIKHOSROW YEGANEH,                    MOTION TO PRECLUDE TESTIMONY
                                           AND EXCLUDE EVIDENCE OR IN THE
19            Defendants.                  ALTERNATIVE, MOTION TO COMPEL
                                           DISCOVERY**
20

21
                                           Date:   October 6, 2006
22                                         Time:   9:30 a.m.
                                           Place:  235 Pine Street, 23rd Floor
23                                         Court:  Hon. Thomas E. Carlson

24

25       I, Charles E. Sims, declare as follows:

26       1.      On or about January 7, 2005, the above Debtor filed a petition for relief under

27  Chapter 13 of the United States Bankruptcy Code.  I am informed and believe that, on or about

28  January 21, 2005, a hearing was held on the motion of Edith Ingram and Nozipo Wobogo for an

                                           1

1    order converting the case to a Chapter 7 proceeding and that the Court granted the motion. Upon

2    conversion of the case, I was appointed interim trustee of the Debtor's estate. Upon the

3    conclusion of the Section 341(a) meeting, my appointment as permanent trustee was confirmed by

4    operation of law. As the trustee in this case, I have personal knowledge of the facts stated in this

5    declaration and could testify thereto, unless otherwise indicated.

6        2.    The Debtor filed his initial schedules of assets and liabilities on February 25, 2005,

7    and subsequently amended those schedules on May 23, 2005. Attached as **Exhibits A and B,**

8    respectively, are the two versions of the Debtor's Schedule A in which the Debtor was required to

9    disclose all of his interests in real property.

10       3.    On January 28, 2005, I met with several of the attorneys for Ms. Ingram and Ms.

11   Wobogo, who are plaintiffs in the suit captioned *Wobogo v. Yeganeh,* San Mateo County Superior

12   Court, Case No. 410586 ("State Court Case"). I and my counsel reviewed documents from

13   Wobogo's counsel (DLA Piper Rudnick) relating to Wobogo's suit against the Debtor.

14       4.    Based on my review and my counsel's review of these public records, it appeared

15   to me that the Debtor had transferred certain real property interests during the pendency of

16   litigation against him by Ms. Ingram and Ms. Wobogo. The public records also reflected that the

17   attorneys for Ms. Ingram and Ms. Wobogo succeeded in obtaining orders from the San Mateo

18   County Superior Court permitting them to record a second modified preliminary judgment to

19   encumber the real property interests in question.

20       5.    Based on my review and my counsel's review, I am informed and believe that on

21   March 21, 2003, for no consideration or for inadequate consideration, the Debtor transferred to

22   Defendant Allied Management Trust the real property commonly known as (a) 2462 Taylor

23   Avenue, Oakland, California (APN 048-5597-001-00); (b) 1012 73rd Avenue, Oakland, California

24   (APN 041-4144-009-00); (c) 1278 79th Avenue, Oakland, California (APN 041-4198-052-00); and

25   (d) 1086 69th Avenue, Oakland, California (APN 041-4148-040-00); and that on May 6, 2003, the

26   Debtor transferred, for no consideration or for inadequate consideration, the real property

27   commonly known as 2300 Auseon Avenue, Oakland, California (APN 043-4610-023). The

28   Debtor did not include these properties in the disclosures referred to in paragraph 2 above.

2

6.    The circumstances surrounding the transfers led me to believe that the Debtor transferred the real property for the purpose of avoiding, hindering, or delaying his creditors and that the Debtor continued to exercise control over each property, collecting rents, and paying any mortgages secured by the real property.

7.    This adversary action was filed under 11 U.S.C. § 544(a), incorporating Section 3439 et seq. of the California Code of Civil Procedure, for the purpose of recovering for the estate and its creditors the real property transferred by the Debtor to the defendants. The claims asserted in this adversary proceeding are the property of the Debtor's bankruptcy estate.

8.    I am informed and believe that the Debtor made the transfers of the five properties described above to the so-called trust controlled by the Debtor's father. I am informed and believe that all five properties should be assets of the estate. There are currently several significant claims against the estate that cannot be paid by the estate unless and until these properties are recovered by the estate and become assets of the estate. The plaintiffs in the State Court Case filed claims against the estate for $4,724,708, which I understand includes the amount of the judgment that those plaintiffs have obtained against the Debtor in the State Court Case, awards of attorney's fees and costs ($3,485,261 in the aggregate) awarded to the plaintiffs' attorneys in the State Court Case, and $839,501 in post-judgment fees and costs. I subsequently obtained approval of a compromise of this claim by which it has been reduced by $700,000. If the court finds that the transfers of these three properties were fraudulent transfers and the properties are recovered by the estate, it is my plan to sell the three properties and use the proceeds of the sales to pay creditors.

I declare under penalty of perjury that the above statements are true and that if called as a witness I could and would testify to their truthfulness. This declaration is executed on the **11** day of August 2006 in ~~Sonoma~~ **NAPA**, California.



_____
Charles E. Sims, Trustee

204225.1

3

# EXHIBIT A

Form B6
(6/90)

# United States Bankruptcy Court
# Northern District of California
# San Francisco Division

In re   Ramin Yeganeh

Case No.   05-30047 TEC 7

Chapter   7

# SUMMARY OF SCHEDULES

AMOUNTS SCHEDULED

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | YES | 1 | $ 4,500,000.00 | | |
| B - Personal Property | YES | 3 | $ 1,400.00 | | |
| C - Property Claimed as Exempt | YES | 1 | | | |
| D - Creditors Holding Secured Claims | YES | 1 | | $ 915,000.00 | |
| E - Creditors Holding Unsecured Priority Claims | YES | 2 | | $ 0.00 | |
| F - Creditors Holding Unsecured Nonpriority Claims | YES | 2 | | $ 3,670,000.00 | |
| G - Executory Contracts and Unexpired Leases | YES | 1 | | | |
| H - Codebtors | YES | 1 | | | |
| I - Current Income of Individual Debtor(s) | YES | 1 | | | $ 0.00 |
| J - Current Expenditures of Individual Debtor(s) | YES | 1 | | | $ 400.00 |
| Total Number of sheets in ALL Schedules ➤ | | 14 | | | |
| Total Assets ➤ | | | $ 4,501,400.00 | | |
| Total Liabilities ➤ | | | | $ 4,585,000.00 | |

FORM B6A
(6/90)

In re:  __Ramin Yeganeh_____,    Case No.   __05-30047 TEC 7__
           Debtor                                                        (If known)

# SCHEDULE A - REAL PROPERTY

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| 150 Broadway Street, Redwood City, CA (Rental Property). | Fee Owner | | $ 750,000.00 | $ 330,000.00 |
| 1611 Shore View Avenue, San Mateo, CA (Rental Property). | Fee Owner | | $ 750,000.00 | $ 295,000.00 |
| 182 Dublin Street, San Francisco, CA (Vacant Rental Property). | Fee Owner | | $ 750,000.00 | $  0.00 |
| 3912 Kent Way, South San Francisco, CA (Rental Property) | Fee Owner | | $ 700,000.00 | $  0.00 |
| 786 5th Avenue, Redwood City, CA (Rental Property) | Fee Owner | | $ 600,000.00 | $ 290,000.00 |
| Debtor's residence at 724 East 4th Avenue, San Mateo, CA | Fee Owner | | $ 650,000.00 | $  0.00 |
| Vacant Lot | Fee Owner | | $ 300,000.00 | $  0.00 |

                                        Total    ➤  |  $4,500,000.00  |

(Report also on Summary of Schedules.)

# EXHIBIT B

Form B6
(6/90)

FILED

MAY 2 3 2005

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

## United States Bankruptcy Court
## Northern District of California
## San Francisco Division

In re   **Ramin Yeganeh**

Case No.   05-30047

Chapter   **7**

Amended
# SUMMARY OF SCHEDULES



| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A - Real Property | YES | 1 | $ 4,500,000.00 | | |
| B - Personal Property | YES | 3 | $ 1,400.00 | | |
| C - Property Claimed as Exempt | YES | 1 | | | |
| D - Creditors Holding Secured Claims | YES | 1 | | $ 915,000.00 | |
| E - Creditors Holding Unsecured Priority Claims | YES | 2 | | $ 0.00 | |
| F - Creditors Holding Unsecured Nonpriority Claims | YES | 2 | | $ 3,670,000.00 | |
| G - Executory Contracts and Unexpired Leases | YES | 1 | | | |
| H - Codebtors | YES | 1 | | | |
| I - Current Income of Individual Debtor(s) | YES | 1 | | | $ 0.00 |
| J - Current Expenditures of Individual Debtor(s) | YES | 1 | | | $ 400.00 |
| Total Number of sheets in ALL Schedules ► | | 14 | | | |
| Total Assets ► | | | $ 4,501,400.00 | | |
| Total Liabilities ► | | | | $ 4,585,000.00 | |

AMOUNTS SCHEDULED

FORM B6A
(6/90)

In re:  **Ramin Yeganeh** _____ ,    Case No. _____
      Debtor                        (If known)

# SCHEDULE A - REAL PROPERTY

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| 150 Broadway Street, Redwood City, CA  (Rental Property). | Fee Owner | | $ 750,000.00 | $ 330,000.00 |
| 1611 Shore View Avenue, San Mateo, CA (Rental Property). | Fee Owner | | $ 750,000.00 | $ 295,000.00 |
| 182 Dublin Street, San Francisco, CA (Vacant Rental Property). | Fee Owner | | $ 750,000.00 | $    0.00 |
| 3912 Kent Way, South San Francisco, CA (Rental Property) | Fee Owner | | $ 700,000.00 | $    0.00 |
| 786 5th Avenue, Redwood City, CA (Rental Property) | Fee Owner | | $ 600,000.00 | $ 290,000.00 |
| Debtor's residence at 724 East 4th Avenue, San Mateo, CA | Fee Owner | | $ 650,000.00 | $    0.00 |
| Vacant Lot | Fee Owner | | $ 300,000.00 | $    0.00 |

                 Total  ▶   **$4,500,000.00**
                       (Report also on Summary of Schedules.)

# Document No. 24

Charles P. Maher, State Bar No. 124748
Nhung Le, State Bar No. 209552
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
Rincon Center II, 121 Spear Street, Suite 200
San Francisco, California 94105-1582
Telephone No.: 415.356.4600
Fax No.: 415.356.4610

Attorneys for Plaintiff Charles E. Sims
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re RAMIN YEGANEH, | Case No. 05-30047 TEC<br>Chapter 7 |
| Debtor. | |
| CHARLES E. SIMS, Trustee, | Adversary Proceeding<br>No. |
| Plaintiff, | |
| vs. | |
| ALLIED MANAGEMENT TRUST, | |
| Defendant. | |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**

Plaintiff Charles E. Sims, Trustee in bankruptcy of the estate of the above Debtor ("Plaintiff" or "Trustee"), alleges as follows:

1.     On January 7, 2005, Ramin Yeganeh filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code.

2.     The case was converted to a Chapter 7 proceeding by order dated January 21, 2005. Plaintiff Charles E. Sims is Trustee in bankruptcy of the Debtor's estate.

1

3.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § § 151, 157(b)(2), and 1334, and under Rule 5011-1 of the Bankruptcy Local Rules for the Northern District of California.

4.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O).

5.      Venue is proper under 28 U.S.C. § 1409.

6.      Based on information provided by the Debtor, Plaintiff is informed and believes that Defendant Allied Management Trust is a trust created by the Debtor under the laws of California.

7.      Plaintiff is informed and believes that the Debtor using an alias "R. Rad" made the following transfers of real property to the Defendant:

(a)     2462 Taylor Avenue, Oakland, California (APN 048-5597-001-00),
        on March 21, 2003;

(b)     2300 Auseon Avenue, Oakland, California (APN 043-4610-023),
        on May 6, 2003;

(c)     1012 73rd Avenue, Oakland, California (APN 041-4144-009-00),
        on March 21, 2003;

(d)     1278 79th Avenue, Oakland, California, (APN 041-4198-052-00),
        on March 21, 2003;

(e)     1086 69th Avenue, Oakland, California (APN 041-4148-040-00),
        on March 21, 2003.

8.      The transfers identified in paragraph 7 above and any other transfers that may be proved are subsequently called the "Transfers."

9.      Plaintiff is informed and believes that the Debtor has consistently maintained in pleadings in Court, and under oath that Defendant Allied Management Trust had no relationship to him, and that the Debtor and Defendant actively concealed that the Debtor had created Defendant Allied Management Trust and that the Transfers were made for no value.  This action is brought within three years of discovery of the facts constituting the fraudulent nature of the Transfers.

2

417

**ER - 185**

**FIRST CLAIM FOR RELIEF**
**Avoidance of Fraudulent Transfers**
**(11 U.S.C. § 544(a); California Civil Code Sections 3934.04)**

10.     Plaintiff realleges the allegations set forth in paragraphs 1 through 9 above and incorporates them by reference.

11.     Plaintiff alleges that the Transfers were transfers of interests of the Debtor in property and were made within four years of the date on which the Debtor filed his bankruptcy petition.

12.     Plaintiff alleges that the Debtor received less than a reasonably equivalent value in exchange for the Transfers.

13.     Plaintiff alleges that the Debtor was insolvent on the dates the Transfers were made or became insolvent as a result of the Transfers, or was engaged in a business or transaction or was about to engage in a business or transaction for which any property remaining with the Debtor was unreasonably small capital.

WHEREFORE Plaintiff requests judgment as set forth below.

**SECOND CLAIM FOR RELIEF**
**Avoidance of Fraudulent Transfers**
**(11 U.S.C. § 544(a); California Civil Code Section 3934.04)**

14.     Plaintiff realleges the allegations set forth in paragraphs 1 through 9 above and incorporates them by reference.

15.     Plaintiff alleges that the Transfers were transfers of interests of the Debtor in property and were made within four years of the date on which the Debtor filed his bankruptcy petition.

16.     Plaintiff alleges that the Debtor made the Transfers and incurred obligations relating to those transfers with actual intent to hinder, delay, or defraud any creditor of the Debtor.

WHEREFORE Plaintiff requests judgment as set forth below.

**REQUEST FOR RELIEF**

Plaintiff requests judgment as follows:

A.     On the first and second claims for relief, for a judgment against the Defendant avoiding the Transfers and any other transfer to the Defendant that may be proved under 11

3

418

ER - 186

1  U.S.C. § § 544 and 550, and California Civil Code Sections 3439 et seq., and preserving those

2  transfers for the benefit of the estate under 11 U.S.C. § 551.

3    B.    For prejudgment interest on any money judgment.

4    C.    For costs of suit.

5    D.    For other relief the Court deems appropriate.

6

7  Dated: February 18, 2005          LUCE, FORWARD, HAMILTON & SCRIPPS, LLP

8

9                          By:  /s/    Charles P. Maher
                                State Bar No. 144748
10                               Counsel for John W. Richardson, Trustee

11

12  175446 1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

419

ER - 187

# Document No. 25

Recording Requested by:
and

**WHEN RECORDED MAIL TO:**

K. Yeganeh
331 36th Ave
San Mateo, CA 94403



2005070809    02/22/2005 10:54 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:    10.00



2 PGS

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 048-5597-001
043-4610-023
041-4198-052
041-4148-040
041-4144-009

The undersigned Grantor(s) declare(s) that the **DOCUMENTARY TRANSFER TAX IS:** $ 0/none    $ 0/none    City

X  Computed on the consideration or value of property conveyed; OR
___  Computed on the consideration or value less or encumbrances remaining at time of sale.

transfer out of trust
*not pursuant to sale*

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
Allied Management Trust

hereby GRANT(S) to
K. Yeganeh,

all the real property situated in the City of Oakland, County of Alameda, State of California, described as:

see attached Exhibit "A"

Dated: 11/29/04

STATE OF CALIFORNIA
COUNTY OF SAN MATEO } ss
On Nov. 29, 2004 before me MARK DAHL,
NOTARY PUBLIC
personally appeared K. YEGANEH

~~personally known to me or~~ proved to me on this basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature

**MAIL TAX
STATEMENTS TO:**  above

K. Yeganeh, trustee of
Allied Management Trust &
beneficiary of Allied Management
Trust

MARK DAHL
Commission # 1316064
Notary Public - California
San Mateo County
My Comm. Expires Aug 30, 2005

(This area for official notarial seal)

49

**Exhibit "A"**

Portion of Lot 3, Block A, Map of Toler Heights, filed September 30, 1907, Map Book 23, page 34, Alameda County Records, described as follows:

Beginning at a point on the Southeastern line of Taylor Avenue, distant thereon Southeasterly line of Thermal(formerly Derby) Street as shown on said map; thence South 32 degrees 23'40" East to the Southeastern line of said Block A; thence South 71 degrees 33' West along said line of said Block A, to the Northeastern line of MacArthur (formerly Foothill) Boulevard, as shown on said map; thence Northwesterly and along said line of MacArthur Boulevard, 17.49 feet to the Southeastern line of Taylor Avenue; thence Northeasterly thereon, 94.84 feet, more or less, to the point of beginning.
APN: 048-5597-001


Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda County Records.
APN: 041-4198-052


Commencing at a point on the Southeastern line of 68th Avenue seventy-two feet, two inches Southwesterly from the intersection thereof with the Southwestern line of Hamilton Street, as the said Avenue and street are shown upon the Map hereinafter referred to; running thence Southwesterly along the said line of 68th Avenue thirty-five feet; thence at right angles Southeasterly one hundred feet; thence at right angles Northeasterly thirty-five feet; thence at right angles Northwesterly one hundred feet to the point of beginning. Being a portion of lots numbered 1, 2, and 5 in Block numbered 25, as the said Lots and Block are shown upon that certain Map entitled, "Fitchburg Homestead Lots;"filed June 25, 1870 in the Office of the County Recorder of Alameda County.
APN: 041-4148-040


Lots 41 and 42, Block 21, Map of Resubdivision of the Townsite of Fitchburg, formerly Fitchburg, Lots, filed May 18, 1892, Map Book 17, page 9, Alameda County Records.
APN: 041-4144-009


Lot 1, Block 11, Auseon's Moss Tract, filed September 11, 1907 in Book 23, Page 31 of Maps, Alameda County Records.
APN 043-4610-023

50

# Document No. 26

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                       COUNTY OF SAN MATEO

3

4    EDITH M. INGRAM,            )
     on behalf of herself,       )
5    and NOZIPO WOBOGO,          )
     on behalf of the general    )
6    public,                     )
                                 )
7              Plaintiffs,       )
                                 )
8    vs.                         )     CASE No. 410586
                                 )
9    RAMIN YEGANEH, dba          )
     American Mortgage Realty,   )
10   and dba American Mortgage   )
     Realty, And Invest,         )
11   et al.,                     )        CERTIFIED
                                 )        COPY
12             Defendants.       )
     _____)

13

14

15                    Proceeding re:

16                    RAMIN YEGANEH

17              Thursday, April 18, 2002

18

19   Reported by:

20   BRENDA CALABRO-COLLINS, CSR No. 12165

21   _____

22

23                ROBERT BARNES ASSOCIATES
                 760 Market Street, Suite 1044
24               San Francisco, California 94102

25

                                    **ER - 190**        440

1          THE WITNESS:  Yes.  I strongly object to

2    this.  I think that it is private information that if he

3    has any questions, he should ask me directly which is

4    the purpose this order was all about.

5          PRO TEM JUDGE BLACKMAN:  If it turns out to

6    be private, I can always order it to be stricken.  And

7    we will take care of that.  For right now, what I would

8    like Mr. Tracy to do is start asking the questions and

9    see if we can get some of this on the record.

10   BY MR. TRACY:

11         Q.  Sir, will you please state your full name and

12   spell it for the record.

13         A.  Ramin, R-A-M-I-N, last name, Y-E-G-A-N-E-H.

14         Q.  And your present residence address?

15         A.  724 East Fourth Avenue, San Mateo, California

16   94401.

17         Q.  And for how long a period of time has that

18   been your principal residence?

19         A.  For up -- for up -- I want to say around 7

20   years or possibly 8 years.

21         Q.  Are there any documents in your possession

22   that would allow you to specifically identify the date

23   upon which that became your principal residence?

24         A.  No, I don't think so.

25         Q.  Your date of birth?

**ER - 191**                    441

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re RAMIN YEGANEH, | Case No. C 07-03256 JSW |
| Debtor. | |
| CHARLES E. SIMS, Trustee, | Bankruptcy Case No. 05-30047 TEC |
| Appellee, | Adversary Pro. No. 05-3241 TEC |
| v. | |
| ALLIED MANAGEMENT TRUST, and KEN YEGANEH, | |
| Appellants. | |

**APPELLEE'S EXCERPT OF RECORD**

**(Volume II)**

Charles A. Bird, CSB 56566
Charles P. Maher, CSB 124748
LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
121 Spear Street, Suite 200
San Francisco, CA 94105
Telephone:  (415) 356-4600
Facsimile:   (415) 356-4610

Attorneys for Appellee Andrea A. Wirum,
Successor-in-Interest to Charles E. Sims

# **TABLE OF CONTENTS**

## Volume II of III

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| R. Yeganeh April 18, 2002 Testimony, pp. 118-121 | 58 | 27 | ER-192 |
| Excerpts from the transcript of the Deposition of Ken Yeganeh in *Sims v. Allied* taken on March 28, 2006 ("K. Yeganeh Depo Transcript") , ex. 4 | 56 | 28 | ER-197 |
| R. Yeganeh Depo Transcript, pp. 16-18, 27, 28 | 56 | 29 | ER-200 |
| Declaration of Yosef Peretz in Support of Trustee's Reply to Opposition to Motion for Summary Judgment Based on Actual Fraud (with Exhibit B only) | 81 | 30 | ER-206 |
| Declaration of Jeffrey L. Fillerup in Support of Trustee's Reply to Opposition to Motion for Summary Judgment Based on Actual Fraud (with Exhibit B only) | 81 | 31 | ER-213 |
| R. Yeganeh April 18, 2002 Testimony, pp. 104, 118-121 | 58 | 32 | ER-220 |
| R. Yeganeh Depo Transcript, p. 127 | 56 | 33 | ER-226 |
| Declaration signed by Ramin Yeganeh and dated May 28, 2003 filed in support of his Opposition to Plaintiff's Ex Parte Application for Order to Show Cause re Contempt of Court | 58 | 34 | ER-228 |
| Excerpts from the June 20, 2003 contempt hearing *Wobogo, et al. v. Yeganeh*, pp. 52-53 | 58 | 35 | ER-233 |
| K. Yeganeh Depo Transcript, ex. 5 | 56 | 36 | ER-236 |
| K. Yeganeh Depo Transcript, pp. 25-26 | 56 | 37 | ER-238 |
| K. Yeganeh Depo Transcript, pp. 11, 28 | 56 | 38 | ER-241 |
| K. Yeganeh Depo Transcript, p. 45 | 56 | 39 | ER-244 |
| K. Yeganeh Depo Transcript, pp. 17, 20, 32 | 56 | 40 | ER-246 |
| K. Yeganeh Depo Transcript, pp. 28, 29, 45 | 56 | 41 | ER-250 |
| K. Yeganeh Depo Transcript, p. 30 | 56 | 42 | ER-254 |
| R. Yeganeh April 18, 2002 Testimony, pp. 47, 48, 94 | 58 | 43 | ER-256 |

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| Excerpts from the transcript of a March 9, 2005 Meeting of Creditors regarding Ramin Yeganeh ("R. Yeganeh Meeting of Creditors Transcript"), pp. 10, 11, 51, 52, 57 | 58 | 44 | ER-260 |
| Excerpts from the transcript of a June 9, 2005 Rule 2004 Examination of Ramin Yeganeh ("R. Yeganeh June 9, 2005 Transcript"), pp. 359-360, 483-486 | 58 | 45 | ER-266 |
| Excerpts from the transcript of a November 30, 2004 examination of Ramin Yeganeh in *Wobogo, et al. v. Yeganeh*, pp. 90-91, 103, 177, 181-185 | 58 | 46 | ER-273 |
| Excerpts from the transcript of a December 10, 2004 examination of Ramin Yeganeh in *Wobogo, et al. v. Yeganeh*, pp. 264-265 | 58 | 47 | ER-283 |
| R. Yeganeh Meeting of Creditors Transcript, pp. 51-52 | 58 | 48 | ER-286 |
| Excerpts from the transcript of a June 24, 2005 examination of Kaikhosrow Yeganeh ("K. Yeganeh June 24, 2005 Transcript"), pp. 94, 96-97, 102, 103 | 58 | 49 | ER-289 |
| K. Yeganeh June 2005 Transcript, Corrections to June 24, 2005 transcript by Kaikhosrow Yeganeh dated August 5, 2005 | 58 | 50 | ER-295 |
| Request for Admissions (Set One – K. Yeganeh) dated August 10, 2005, propounded by Plaintiff Charles E. Sims, Trustee | 56 | 51 | ER-301 |
| Defendant's Responses to Request for Admissions dated October 21, 2005 | 56 | 52 | ER-315 |
| Interrogatories (Set One – K. Yeganeh) dated August 10, 2005, propounded by Plaintiff Charles E. Sims, Trustee | 56 | 53 | ER-324 |
| Defendant's Responses to Interrogatories dated October 21, 2005 | 56 | 54 | ER-332 |

# Document No. 27

1      SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              COUNTY OF SAN MATEO

3

4    EDITH M. INGRAM,           )
     on behalf of herself,      )
5    and NOZIPO WOBOGO,         )
     on behalf of the general   )
6    public,                    )
                                )
7              Plaintiffs,       )
                                )
8    vs.                        )    CASE No. 410586
                                )
9    RAMIN YEGANEH, dba         )
     American Mortgage Realty,  )
10   and dba American Mortgage  )
     Realty, And Invest,        )
11   et al.,                    )
                                )
12             Defendants.       )
     _____)

13

14

15              Proceeding re:

16              RAMIN YEGANEH

17          Thursday, April 18, 2002

18

19   Reported by:

20   BRENDA CALABRO-COLLINS, CSR No. 12165

21   _____

22

23           ROBERT BARNES ASSOCIATES
             760 Market Street, Suite 1044
24           San Francisco, California 94102

25

**CERTIFIED
COPY**

**ER - 192**                                    440

1          A.   No idea.

2          Q.   The first lien, did you ever pay that off?

3          A.   Yeah.

4          Q.   And when did you pay it off?

5          A.   I don't remember when I paid it off.  But I

6     think it was -- I think it was like 2000 or 2001.

7          Q.   And what proceeds did you use to pay it off?

8          A.   What do you mean?  It was a due-on-sale

9     clause.  I used my own proceeds to pay it off.  And

10    later on, I refinanced the property.

11         Q.   Where did your proceeds come from to pay off

12    the first mortgage?

13         A.   I think it came from the refinance of either

14    one of those Shoreview properties or property on 5th

15    Avenue.  Because what happened was that I paid off that

16    Great Western loan.  Because that Great Western had a

17    due-on-sale clause.  And they want their money right

18    then and there.  And I paid them.  And then later on I

19    ended up refinancing that property.

20         Q.   And when did you refinance the first loan?

21         A.   I had refinanced  --  I want to say 2000 or

22    2001, something like that.

23         Q.   And who was the lender on the refinance?

24         A.   It was also a private lender.

25         Q.   And who was the private lender?

461

1           A.   It was the same individual as the property on

2     Kent.

3           Q.   R. Rad?

4           A.   Yes.

5           Q.   And is the person's name "Rick" Rad?

6           A.   Yes, that's one of the individuals.

7           Q.   How many loans has Mr. Rad financed for you?

8           A.   Only two loans.  Because one of them was paid

9     off.  So I want to say two loans.

10          Q.   What's your relationship with Mr. Rad?

11          A.   None.

12          Q.   And how did you come to know about Mr. Rad to

13    know about a potential lender on property?

14          A.   What do you mean?

15          PRO TEM JUDGE BLACKMAN:  In other words, I

16    think what he's asking you, you got a sizable loan from

17    a private individual.  How did that come to be?

18          THE WITNESS:  I'm a mortgage broker.  I know

19    a lot of people who are private lenders.  I mean --

20          PRO TEM JUDGE BLACKMAN:  Did somebody

21    introduce you to him or did he introduce himself to you?

22          THE WITNESS:  Yes, I think he introduced

23    himself to me.  Or maybe the other way around.  But as a

24    mortgage broker, I know a lot of private lenders.  I

25    knew a lot of conventional lenders.  I know a lot of

**ER - 194**

1    institutional lenders.

2              PRO TEM JUDGE BLACKMAN:  Do you know Mr.

3    Rad's whereabouts now?

4              THE WITNESS:  I think he is in San Jose area.

5              PRO TEM JUDGE BLACKMAN:  When is the last

6    time you were in contact with him.

7              THE WITNESS:  Something like 2001.

8              PRO TEM JUDGE BLACKMAN:  Go ahead, Mr. Tracy,

9    next question.

10             MR. TRACY:  Thank you, Your Honor.

11   BY MR. TRACY:

12        Q.  You refinanced the first loan with a loan of

13   $300,000?

14        A.  No.  I paid off that first loan which was

15   with Great Western.  I paid it off completely.  And then

16   what happened was that later on, I ended up needing some

17   money for my troubles with you guys, and I ended up

18   refinancing that same property.

19        Q.  And you did that through Mr. Rad?

20        A.  Yes.

21        Q.  And what year did you do that?

22        A.  Either 2000 or 2001.  One of those years.

23        Q.  Did you use an escrow company or escrow agent

24   for that transaction?

25        A.  No.

                                                    463

1          Q.  Did you use a title company for that $300,000

2     loan transaction?

3          A.  No.

4          Q.  Do you have current --

5          A.  I mean, the title was insured, but I don't

6     know who the title insurance company was.  But the

7     answer is no.

8          Q.  Do you have any documents in your possession

9     which relate to the $300,000 loan transaction?

10         A.  No.

11         Q.  Did you ever have any documents relating to

12    the $300,000 loan?

13         A.  Yes, at some point in the past I did.

14         Q.  And at some point from that time to the

15    present did you discard those materials?

16         A.  Yes, I may have discarded it, yes.

17         Q.  Well, if you may have discarded it, does that

18    also include the possibility that you did not discard

19    it?

20         A.  No.

21         Q.  Then the answer isn't maybe, the answer is

22    you discarded it?

23         A.  Yes.

24         Q.  Do you recall when you discarded it?

25         A.  No.

                                                    464

# Document No. 28

1      IN THE UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                    - - -

   In Re

4                                    )

   RAMIN YEGANEH,

5              Debtor.              )

   ------------------------------------

6   CHARLES E. SIMS, Trustee        )      No. 05-30047 TEC

7              Plaintiff,           )      Adversary Proceeding

8   vs.                            )      No. 05-3241

9   ALLIED MANAGEMENT TRUST, K.     )

10  YEGANEH aka KEN YEGANEH, etc.   )

11             Defendant.           )      CERTIFIED COPY

   ------------------------------------

12

13

14

15              DEPOSITION OF

16              KEN YEGANEH

17         REDWOOD CITY, CALIFORNIA

18             MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23  COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1

ALLIED MANAGEMENT TRUST

DECLARATION AND INSTRUMENT OF TRUST

**I. Trust Name**

This trust shall be known as the Allied Management Trust.

**II. Trust Properties**

The trust shall hold the trust properties for the benefit of the beneficiary who holds beneficial interest in the trust properties. The trust properties are:

     1086 69th Ave, Oakland
     1012 73rd Ave, Oakland
     1278 79th Ave, Oakland
     2300 Auseon Ave, Oakland
     2462 Taylor Ave, Oakland

**III. Trust Beneficiary**

The Allied Management Trust is set up for the benefit of the beneficiary, K. Yeganeh, whose beneficial interest is held by the trust.

The trust properties have been bought for the beneficiary.

**IV. Trustee**

The trustee of Allied Management Trust is R. Rad-Yeganeh who is the son of K. Yeganeh. The trustee shall manage the trust properties for the benefit of and according to the wishes of the beneficiary of the trust, until the trustee is replaced by the successor trustee.

**V. Successor Trustee**

If at any time as certified by a licensed physician, the trustee becomes physically or mentally incapacitated, then the successor trustee shall replace the trustee.

If at any time as certified by a licensed physician, the trustee dies, then the successor trustee shall replace the trustee.

If at any time the trustee is unable to serve or if he becomes unavailable, or if he resigns as the trustee, then the trustee shall be replaced with the successor trustee.

The successor trustee shall be K. Yeganeh, who is also the beneficiary of this trust.

**VI. Reserved Powers Of The Beneficiary**

The beneficiary reserves the power to amend, modify, or revoke this trust at any time during his lifetime.

In the event of the death of the beneficiary, this trust shall become irrevocable and may not be amended, altered, or modified.

If at any time, as certified by a licensed physician, the beneficiary becomes physically or mentally incapacitated, then the trustee shall apply for the beneficiary any amount of trust income or proceeds necessary for the proper healthcare, support, comfort, or welfare of the beneficiary until the beneficiary, as certified by a licensed physician, has recovered or until his death.

In the event of the death of the beneficiary, the trustee

1



PLAINTIFF'S
EXHIBIT
4
3/28/06

193

shall distribute the trust properties outright to Farin Yeganeh.
VII. Reserved Powers Of The Trustee

The trustee shall administer the trust and the trust pro-
perties for the benefit of the beneficiary.

The trustee may resign at any time by delivering a signed
Notice Of Resignation to the beneficiary.

No bond shall be required of the trustee or the successor
trustee.

No accounting shall be required of the trustee or the
successor trustee.
VIII. Trustee's Powers And Duties

The trustee shall have the power and authority conferred
on a trustee under the laws of the State Of California and
subject to the trustee's fiduciary duties to the beneficiary.

Trustee's powers shall include but are not limited to the
power to sell, transfer, encumber, lease, maintain, or manage
the trust properties.

Trustee's powers shall include but are not limited to the
power to execute any and all documents related to the sale,
transfer, encumbrance, lease, maintenance, or management of
the trust properties.

Trustee's powers shall include but are not limited to the
power to hire or employ and pay reasonable fees to attorneys,
physicians, or other professionals.
IX. Severability And General Provisions

If any provision of this Declaration And Instrument Of
Trust is ruled unenforceable or invalid, the remaining pro-
visions shall remain in full force and effect. The validity
of this trust and any of its provisions shall be governed by
the laws of the State Of California.
X. Trustee's Certification

The trustee hereby certifies that he has read and under-
stood this Declaration And Instrument Of Trust and that it
correctly states the powers and duties of the trustee and the
terms and conditions under which the trust shall exist.

Dated: _5/6/2003_                    _R. R_

                    R. Rad-Yeganeh, trustee of
                    Allied Management Trust



2

# Document No. 29

| | |
|---|---|
| 1 | IN THE UNITED STATES BANKRUPTCY COURT |
| 2 | NORTHERN DISTRICT OF CALIFORNIA |
| 3 | - - - |

In Re: RAMIN YEGANEH,                           CERTIFIED COPY
4                    Debtor.
------------------------------------)
5   CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                     Plaintiff,        ) Adversary Proceeding
6   vs.                                ) No. 05-3243
                                       )
7   ADVANTA TRUST and FARIN YEGANEH,   )
    aka F. NAMDARAN aka FRAN NAMDARAN  )
8   aka FARIN NAMDARAN aka FRAN        )
    YEGANEH,                           )
9                    Defendants.       )
------------------------------------)
10  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                     Plaintiff,        ) Adversary Proceeding
11  vs.                                ) No. 05-3240
                                       )
12  F. NAMDARAN aka FRAN NAMDARAN aka  )
    FARIN NAMDARAN aka FARIN YEGANEH   )
13  aka FRAN YEGANEH,                  )
                     Defendants.       )
14  ------------------------------------)
    CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
15                   Plaintiff,        ) Adversary Proceeding
    vs.                                ) No. 05-3241
16                                     )
    ALLIED MANAGEMENT TRUST and K.     )
17  YEGANEH aka KEN YEGANEH aka        )
    KAIKHOSROW YEGANEH,                )
18                   Defendants.       )
------------------------------------)
19  CHARLES E. SIMS, Trustee,          ) No. 05-30047
                     Plaintiff,        ) Adversary Proceeding
20  vs.                                ) No. 05-3242
                                       )
21  COAST DEVELOPMENT TRUST and FARIN  )
    YEGANEH aka F. NAMDARAN aka FRAN   )
22  NAMDARAN aka FARIN NAMDARAN aka    )DEPOSITION OF
    FRAN YEGANEH,                      )RAMIN YEGANEH
23                   Defendants.       )REDWOOD CITY, CALIFORNIA
------------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033

1

1    were mentally capable of preparing that document, that quitclaim

2    deed on their own without assistance from anyone?

3    A    I don't know.

4    Q    Would that surprise you if they had done that on their

5    own without assistance from anyone?

6    A    Would it surprise me, I don't know how to answer a

7    question like that.  Some times my parents do things that really

8    surprises me.  So I-- you know, I don't know.

9    Q    In adversary proceeding 05-3243, which is Sims versus

10   Advanta Trust and Fran Yeganeh, the trustee is seeking to

11   recover for the bankruptcy estate two pieces of property; 394

12   Sparling and 6853 Simpson.  Is that your understanding?

13   A    Yes.

14   Q    And in that case is it your understanding that the

15   trustee's contention is that those properties in fact belong to

16   you and were your properties and not your parents?  Do you

17   understand that that's the trustees contention?

18   A    Right.  That's the trustee allegation, yes.

19   Q    And do you believe that the trustee's contention is

20   incorrect?

21   A    Yes.

22   Q    And why do you think the trustee's contention is

23   incorrect?

24   A    Because those properties belong to my parents before the

25   alleged transfers occurred.  I really have a problem with the

16

1    word that you use, "transfers."  Bottom line is that these

2    properties belonged to my parents in the first place and they

3    simply put those properties into their trust name and eventually

4    they took it out.

5        So, that's all there is to it.

6    Q    Do you have any other information to support your claim

7    that the trustee's contentions are incorrect?

8    A    The-- my parents produced documentations that prove the

9    trustee's allegations are incorrect.  And the trustee's

10   allegations just as the trustee put down in his Complaint, it

11   just doesn't make any sense.  It just doesn't make any sense.

12   Q    And why doesn't it make any sense?

13   A    Because if you look at the Complaint, the trustee alleges

14   that in-- well first of all, these properties, these two

15   properties were purchased sometime in 1990's, okay.  The monies

16   to purchase these properties came from my parents.

17       Just because my parents don't remember the name of the

18   bank okay, and obviously because they don't remember the name of

19   the bank, and even if they knew the name of the bank, the bank

20   would not keep records of the cashier's checks or the checks

21   they used to purchase these properties; that doesn't mean my

22   parents are not the ones who purchased them.  Okay.

23       Bottom line is, I mean you heard my dad yesterday, you

24   heard my mom yesterday, they're the ones who paid the money.

25   They had good jobs, they were making good money, they gave me

1  the money.  They said "Ray, go buy these properties for me, for

2  us, for our retirement."  And I did purchase these properties

3  for them.

4      And what happened was that eventually they put the

5  properties into their trust name, not all of them but some of

6  them they did put into their trust name and later they took it

7  out of the trust name they put it back-- they put it into their

8  own individual names.

9      So, there is nothing wrong with that.  There is nothing

10  fraudulent about that, people do that all the time.  You know

11  it's a simple transaction, you know.  If people have trusts,

12  they put properties in the trust name.  If they don't like the

13  trust, they take it out.

14  Q    Did your parents give you money to buy the 394 Sparling

15  Drive property before you bought that property?

16  A    Before, you mean before the actual transaction occurred

17  you mean?  Yeah, they paid the money, and I don't know if it was

18  before or when the transaction occurred itself.  So, but the

19  money came from them.

20  Q    So what you're saying is that you don't know whether your

21  parents gave you the money to buy 394 Sparling before or after

22  you bought 394 Sparling?

23  A    When I say before, I'm talking about when the actual

24  transaction was happening.  Okay.  I don't know if they gave it

25  to me the day before or right then, when I purchased the

18

1  recollection and whether you have a specific recollection of how

2  they gave you funds to buy that property?

3      A    No, I don't remember specifically from way back in 1990's

4  how or what form of funds they gave me.

5      Q    Okay.  And the same would be true for 115 Francisco and

6  139 Francisco; you can't specifically remember whether they gave

7  you cash, a personal check or cashier's check?

8      A    That's correct.

9      Q    Now, in the Sims versus Allied Trust case which is

10  05-3241, there are five properties at issue.  2462 Taylor, 1012

11  73rd Avenue, 1278 79th Avenue, 1086 69th Avenue and 2300 Auseon

12  Avenue.

13      The trustee's contention in Sims versus Allied Trust is

14  that these five properties actually are part of the estate

15  because they were your properties and not your parents'

16  properties or not the property of Allied Trust.

17      Do you think that the trustee's position is incorrect or

18  false in that case?

19      A    Yes.

20      Q    And why?

21      A    Well, it's because again my parents are the ones, I think

22  it was my dad in this case is the one who gave me the money to

23  purchase these properties for him.  These properties, five

24  properties that you mentioned are in Oakland.  And he's the one

25  who gave me the money to purchase these properties for them.

27

1    The properties are his, he put it in his trust first and

2  then later he took the properties out of his trust and put it in

3  his own name.  So these are his properties and yesterday he

4  testified that these are his properties.

5    Q    Now, is it correct that as you sit here today you have no

6  specific recollection of whether you were given money by your

7  parents to buy these five properties before or after you

8  actually closed on the purchase of the five properties?

9    A    Well, again these properties were purchased a long time

10 ago.  I don't think they were purchased as long a time ago as

11 the other properties, but yeah.

12    I don't have a specific, exact recollection as to what

13 happened but I know for a fact that my dad is the one who gave

14 me the money to purchase these properties for him.  Okay.

15    Q    And as you sit here today you have no specific

16 recollection of whether that was before or after you bought the

17 properties; correct?

18    A    I don't have a specific recollection but it just makes

19 sense, makes common sense that my dad must have given the money

20 before I purchased the properties.  So --

21    Q    Do you have any specific recollection as you sit here

22 today as to whether your father had given you cash, a cashier's

23 check or personal check for the purchase of these five

24 properties?

25    A    Well, I don't have a specific recollection but most

# Document No. 30

Charles P. Maher, State Bar No. 124748
Jeffrey L. Fillerup, State Bar No. 120543
Nhung Le, State Bar No. 209552
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
Rincon Center II, 121 Spear Street, Suite 200
San Francisco, California 94105-1582
Telephone No.: 415.356.4600
Fax No.: 415.356.4610

Attorneys for Andrea A. Wirum
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re RAMIN YEGANEH,<br><br>           Debtor. | Case No. 05-30047 TEC<br>Chapter 7 |
| CHARLES E. SIMS, Trustee,<br><br>           Plaintiff,<br><br>v.<br><br>F. NAMDARAN aka FRAN NAMDARAN aka FARIN NAMDARAN aka FARIN YEGANEH aka FRAN YEGANEH,<br><br>           Defendant. | Adversary Proceeding<br>No. 05-3240 TC |
| CHARLES E. SIMS, Trustee,<br><br>           Plaintiff,<br><br>v.<br><br>ALLIED MANAGEMENT TRUST and K. YEGANEH aka KEN YEGANEH aka KAIKHOSROW YEGANEH,<br><br>           Defendants. | Adversary Proceeding<br>No. 05-3241 TC |

1

| | | |
|---|---|---|
| 1 | CHARLES E. SIMS, Trustee, | Adversary Proceeding<br>No. 05-3242 TC |
| 2 | Plaintiff, | |
| 3 | v. | |
| 4 | COAST DEVELOPMENT TRUST and<br>FARIN YEGANEH aka F. NAMDARAN aka | |
| 5 | FRAN NAMDARAN aka FARIN<br>NAMDARAN aka FRAN YEGANEH, | |
| 6 | Defendants. | |
| 7 | | |

| | | |
|---|---|---|
| 8 | | |
| 9 | CHARLES E. SIMS, Trustee, | Adversary Proceeding<br>No. 05-3243 TC |
| 10 | Plaintiff, | **DECLARATION OF YOSEF PERETZ IN**<br>**SUPPORT OF TRUSTEE'S REPLY TO** |
| 11 | v. | **OPPOSITION TO MOTION FOR**<br>**SUMMARY JUDGMENT BASED ON** |
| 12 | ADVANTA TRUST and FARIN YEGANEH<br>aka F. NAMDARAN aka FRAN | **ACTUAL FRAUD** |
| 13 | NAMDARAN aka FARIN NAMDARAN aka<br>FRAN YEGANEH, | Date: November 15, 2006<br>Time: 9:30 a.m. |
| 14 | Defendants. | Dept: 23 |
| 15 | | |

16    I, Yosef Peretz, declare as follows:

17    1.    I am an attorney at law duly admitted to practice before this Court and a partner

18    with the law firm of Kletter & Peretz, attorney of records for plaintiff Phyllis Suzy-Q Shoop in the

19    case entitled *Shoop v. Jones, et al.*, Alameda County Superior Court, Case No. 04-141525 ("*Shoop*

20    *v. Jones, et al.*"). Ramin Yeganeh, the debtor in the above-referenced bankruptcy case, is named

21    as a defendant in *Shoop v. Jones, et al.* I make this declaration of my own personal knowledge,

22    and if called as a witness, I could and would testify competently to the matters set forth herein.

23    2.    In connection with the *Shoop v. Jones, et al.* case, I took the deposition of

24    defendant Farin Yeganeh on December 27, 2004, and a written transcript was prepared of that

25    deposition.    Attached hereto as **Exhibit A** are true and correct copies of portions of the deposition

26    testimony of Farin Yeganeh given at her deposition on December 27, 2004.

27    3.    In connection with the *Shoop v. Jones, et al.* case, I took the deposition of

28    defendant Kaikhosrow (a.k.a Ken) Yeganeh on December 27, 2004, and a written transcript was

2

1    prepared of that deposition.   Attached hereto as **Exhibit B** are true and correct copies of portions

2    of the deposition   testimony of Kaikhosrow Yeganeh given   at his deposition on December 27,

3    2004.

4         I declare under penalty of perjury under the laws of the State of California and of the

5    United States that the above statements are true and that if called as a witness I could and would

6    testify to their truthfulness.  This declaration was executed on the  10  day of November 2006 in

7    San Francisco, California.

8

9                                        _____
                                         Yosef Peretz

209107.1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

--oOo--


PHYLLIS SUZY-Q SHOOP, et al.,

       Plaintiffs,

    -vs-                  NO. RG 04-141525

JAMES JONES and MICHAEL JONES,
et al.,


       Defendants.

_____/

AND RELATED CROSS-ACTION.

_____/



**DEPOSITION OF**

KAIKHOSROW YEGANEH


_____

MONDAY, DECEMBER 27, 2004




Reported by:
Alison L. Strubberg, CSR, RPR, CRR
Certificate No. 7858


MACCHELLO & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
P.O. BOX 475277
SAN FRANCISCO, CA 94147-5277
(415) 898-0401

1  just trying to avoid answering this question by

2  saying --

3      A.  No, I cannot remember.

4      Q.  I mean, you say you have a trust.

5      A.  Sure.

6      Q.  And you just can't remember why you put it

7  together?

8      A.  No, I cannot remember.

9      Q.  This document is signed by your son.  It's a

10  declaration about putting five different properties in

11  Oakland in a trust, okay?

12      A.  Yes.

13      Q.  And appointing you as a beneficiary of the

14  trust.

15      A.  Yes.

16      Q.  Meaning the one who will get benefits from the

17  trust.

18      A.  Yes.

19      Q.  Do you understand that?

20      A.  Yes, it is written here.  Yes.

21      Q.  Okay.  Did you pay any money for your son to

22  get this property in the trust and be a beneficiary in

23  the trust?

24          THE WITNESS:  Did I give you money?

25          MR. RAD-YEGANEH:  Don't ask me.

ER - 211

1          MR. PERETZ:   Q.   I'm asking you, did you give

2    your son any money to get this property?

3          A.   I cannot remember.   Excuse me.   They come, they

4    eat, they go.   I cannot remember this question that you

5    are asking me.

6          Q.   You can't remember that?

7          A.   No, I cannot remember.

8          Q.   You know, unfortunately I don't trust you now

9    when you tell me that you don't remember.

10         A.   It doesn't matter you trust me or not, you

11   know.   I cannot remember.   You should come to my house.

12   In 38 years, come to my house, they come, whatever the

13   mom cook, they want to eat, whatever they want to get

14   it, whatever they want, they go away.   I cannot

15   remember.

16         Q.   That's great.   You know what, when I go home,

17   my mom cooks.

18         A.   I have so many involved in my life, I didn't

19   care about this.   What my wife, she give it to them,

20   what they get it.   It really doesn't matter you trust me

21   or not.   You trust me one billion dollar, I will bring

22   it back and I give it to you.   You don't believe it, I

23   will do it.

24         Q.   You know why I don't trust you?   I'll tell you

25   why.

**ER - 212**

# Document No. 31

1   Charles P. Maher, State Bar No. 124748
    Jeffrey L. Fillerup, State Bar No. 120543
2   Nhung Le, State Bar No. 209552
    LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3   Rincon Center II, 121 Spear Street, Suite 200
    San Francisco, California 94105-1582
4   Telephone No.: 415.356.4600
    Fax No.: 415.356.4610
5
    Attorneys for Andrea A. Wirum
6   Trustee in Bankruptcy

7

8                 UNITED STATES BANKRUPTCY COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                            Chapter 7
12
            Debtor.
13
    ───────────────────────────────
14  CHARLES E. SIMS, Trustee,              Adversary Proceeding
                                           No.  05-3240 TC
15          Plaintiff,

16  v.

17  F. NAMDARAN aka FRAN NAMDARAN
    aka FARIN NAMDARAN aka FARIN
18  YEGANEH aka FRAN YEGANEH,

19          Defendant.

20  ───────────────────────────────
    CHARLES E. SIMS, Trustee,              Adversary Proceeding
21                                         No.  05-3241 TC
            Plaintiff,
22
    v.
23
    ALLIED MANAGEMENT TRUST and K.
24  YEGANEH aka KEN YEGANEH aka
    KAIKHOSROW YEGANEH,
25
            Defendants.
26

27

28

                             1

| | | |
|---|---|---|
| 1 | CHARLES E. SIMS, Trustee, | Adversary Proceeding |
| 2 | Plaintiff, | No. 05-3242 TC |
| 3 | v. | |
| 4 | COAST DEVELOPMENT TRUST and | |
| 5 | FARIN YEGANEH aka F. NAMDARAN aka FRAN NAMDARAN aka FARIN NAMDARAN aka FRAN YEGANEH, | |
| 6 | | |
| 7 | Defendants. | |

CHARLES E. SIMS, Trustee,

   Plaintiff,

v.

ADVANTA TRUST and FARIN YEGANEH aka F. NAMDARAN aka FRAN NAMDARAN aka FARIN NAMDARAN aka FRAN YEGANEH,

   Defendants.

Adversary Proceeding
No. 05-3243 TC

**DECLARATION OF JEFFREY L. FILLERUP IN SUPPORT OF TRUSTEE'S REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BASED ON ACTUAL FRAUD**

Date: November 15, 2006
Time: 9:30 a.m.
Dept: 23

I, Jeffrey L. Fillerup, declare as follows:

  1. I am an attorney licensed to practice in all state and federal courts in the State of California. I am one of the lawyers representing the trustee, Andrea A. Wirum (the "Trustee" or "Plaintiff"), in the above-referenced bankruptcy. I am a litigation partner in the law firm of Luce, Forward, Hamilton & Scripps LLP ("Luce, Forward"). Luce, Forward has been authorized by this Court to represent the Trustee in this bankruptcy. Luce, Forward filed four adversary proceedings in this case, which are identified as Adversary Proceeding Nos. 05-3240, 05-3241, 05-3242, and 05-3243. I make this declaration of my own personal knowledge, and if called as a witness, I could and would testify competently to the matters set forth herein. I make this declaration in support of the Trustee's reply brief in support of her motion for summary judgment.

  2. I am the attorney primarily handling the discovery and litigation in Adversary Proceeding Nos. 05-3240, 05-3241, 05-3242, and 05-3243. I have taken the following

depositions on behalf of the Trustee in the four adversary proceedings:  Ramin Yeganeh (the "Debtor");  the Debtor's mother, Farin Yeganeh aka F. Namdaran;  and the Debtor's father,  K. Yeganeh aka "Ken" Yeganeh.

3.    I took the deposition of defendant Farin Yeganeh on March 27, 2006, and a written transcript was prepared of that deposition.    Attached hereto as **Exhibit A** are true and correct copies of portions of the deposition  testimony of Farin Yeganeh given  at her deposition on March 27, 2006 in *Sims v. Advanta*.

4.    I took the deposition of defendant Ken Yeganeh on March 28, 2006, and a written transcript was prepared of that deposition.    Attached hereto as **Exhibit B** are true and correct copies of portions of the deposition  testimony of Ken Yeganeh given  at his deposition on March 28, 2006 in *Sims v. Allied*.

I declare under penalty of perjury that the above statements are true and that if called as a witness I could and would testify to their truthfulness. This declaration was executed on the ___ day of November 2006 in San Francisco, California.

Jeffrey L. Fillerup

209096.1

# EXHIBIT B

1        IN THE UNITED STATES BANKRUPTCY COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                    - - -

    In Re

4                                  )

    RAMIN YEGANEH,

5              Debtor.            )

    ----------------------------------

6   CHARLES E. SIMS, Trustee      )      No. 05-30047 TEC

7              Plaintiff,         )      Adversary Proceeding

8   vs.                          )      No. 05-3241

9   ALLIED MANAGEMENT TRUST, K.   )

10  YEGANEH aka KEN YEGANEH, etc. )

11             Defendant.         )      CERTIFIED COPY

    ----------------------------------

12

13

14

15                  DEPOSITION OF

16                  KEN YEGANEH

17            REDWOOD CITY, CALIFORNIA

18               MARCH 28, 2006

19

20

21

22

    ATKINSON-BAKER, INC.

23  COURT REPORTERS

    (800) 288-3376

24

    REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1    A    I don't know, I cannot tell you that.  But I do know I

2  pay money for that.

3    Q    You paid money for the five pieces property in Oakland?

4    A    Yes.

5    Q    And when did you pay that money?

6    A    Several years ago.

7    Q    In what year?

8    A    I'm sorry.  I told you, I have a poor memory.  At night I

9  have insomnia, I cannot sleep.  I take lots of pills.  You see.

10    Q    Did you give your son money to buy the five pieces of

11  property in Oakland?

12    A    Yes, we give them.

13    Q    And how much money did you give him?

14    A    I was physician surgeon, I worked too much.  I had, so I

15  give it to him to get it.

16    Q    How much money did you give him?

17    A    Cannot remember that.  That's go back past.

18    Q    Did you give him a check or cash?

19    A    Cash, check, whatever.  My money all there.  What you

20  call, cashier check and so forth.

21    Q    So you as you sit here today, you can't remember how much

22  you gave him or whether you gave him a check, a cashier's check

23  or cash?

24    A    Yeah.  Let's do it this way.  You have a children, do you

25  have a son?

1    Q    I'm asking you questions.

2    A    No, I am asking too.

3    Q    You're not entitled --

4    A    You give them money, you get a receipt you get a check,

5    no.  Just give it.  That is if you want to ask me.  That is the

6    only son I have.

7    Q    Is it true that you cannot remember whether you gave him

8    a check or cash?

9    A    Yeah, that is true too.

10    Q    And is it true that at the time you gave this money to

11    your son, you can't remember anything else about what he did

12    with that money?

13    A    That is my son.  I don't know what to say.

14         MR. CHANCE:    Also object.  The question has been asked

15    and answered.

16    BY MR. FILLERUP:

17    Q    Can you remember what your son did with that money?

18    A    No.  Cannot remember that.

19    Q    Well, the trustee is seeking to recover five pieces of

20    property in Oakland.

21    A    Yes.

22    Q    One of those properties is 2462 Taylor Avenue in Oakland.

23    Did your son use that money to buy the 2462 Taylor Avenue

24    property?

25    A    I cannot remember.

# Document No. 32

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN MATEO

3

4   EDITH M. INGRAM,              )
    on behalf of herself,        )
5   and NOZIPO WOBOGO,           )
    on behalf of the general     )
6   public,                      )
                                 )
7            Plaintiffs,          )
                                 )
8   vs.                          )    CASE No. 410586
                                 )
9   RAMIN YEGANEH, dba           )
    American Mortgage Realty,    )
10  and dba American Mortgage    )
    Realty, And Invest,          )
11  et al.,                      )
                                 )
12           Defendants.          )
    ─────────────────────────────)

13

14

15                    Proceeding re:

16                    RAMIN YEGANEH

17              Thursday, April 18, 2002

18

19  Reported by:

20  BRENDA CALABRO-COLLINS, CSR No. 12165

21  ─────────────────────────────────────────

22

23              ROBERT BARNES ASSOCIATES
                760 Market Street, Suite 1044
24              San Francisco, California 94102

25

                              **ER - 220**              440

1        A.   Estimate?

2             PRO TEM JUDGE BLACKMAN:  Or a guess.

3             THE WITNESS:  No, I don't.

4   BY MR. TRACY:

5        Q.   Do you have any recollection of who provided

6   you with the $400,000 loan?

7        A.   It was a private lender --  I don't know.  I

8   don't.

9        Q.   Who is Rad, R, or R. Rad?

10       A.   I think the guy's name is Rick.  And that may

11  have been the private owner.

12       Q.   Somebody gives you a $400,000 loan and you

13  can't remember the person's name?  Is that your

14  testimony?

15       A.   Yeah.  I mean, I don't want to tell you

16  something and later on you hold me to it.  So if I don't

17  know something exactly I'll tell you.

18            PRO TEM JUDGE BLACKMAN:  It's okay.  Go a few

19  more minutes and we will try to wrap this one.

20  BY MR. TRACY:

21       Q.   And you have no documentation which would

22  indicate who R. Rad is?  Is that your testimony, sir?

23       A.   Not at this point.

24       Q.   And when did this loan take place?

25       A.   I had --
                                              457

1        A.  No idea.

2        Q.  The first lien, did you ever pay that off?

3        A.  Yeah.

4        Q.  And when did you pay it off?

5        A.  I don't remember when I paid it off.  But I

6   think it was -- I think it was like 2000 or 2001.

7        Q.  And what proceeds did you use to pay it off?

8        A.  What do you mean?  It was a due-on-sale

9   clause.  I used my own proceeds to pay it off.  And

10  later on, I refinanced the property.

11       Q.  Where did your proceeds come from to pay off

12  the first mortgage?

13       A.  I think it came from the refinance of either

14  one of those Shoreview properties or property on 5th

15  Avenue.  Because what happened was that I paid off that

16  Great Western loan.  Because that Great Western had a

17  due-on-sale clause.  And they want their money right

18  then and there.  And I paid them.  And then later on I

19  ended up refinancing that property.

20       Q.  And when did you refinance the first loan?

21       A.  I had refinanced  --  I want to say 2000 or

22  2001, something like that.

23       Q.  And who was the lender on the refinance?

24       A.  It was also a private lender.

25       Q.  And who was the private lender?

                                                      461

1          A.  It was the same individual as the property on

2     Kent.

3          Q.  R. Rad?

4          A.  Yes.

5          Q.  And is the person's name "Rick" Rad?

6          A.  Yes, that's one of the individuals.

7          Q.  How many loans has Mr. Rad financed for you?

8          A.  Only two loans.  Because one of them was paid

9     off.  So I want to say two loans.

10         Q.  What's your relationship with Mr. Rad?

11         A.  None.

12         Q.  And how did you come to know about Mr. Rad to

13    know about a potential lender on property?

14         A.  What do you mean?

15         PRO TEM JUDGE BLACKMAN:  In other words, I

16    think what he's asking you, you got a sizable loan from

17    a private individual.  How did that come to be?

18         THE WITNESS:  I'm a mortgage broker.  I know

19    a lot of people who are private lenders.  I mean --

20         PRO TEM JUDGE BLACKMAN:  Did somebody

21    introduce you to him or did he introduce himself to you?

22         THE WITNESS:  Yes, I think he introduced

23    himself to me.  Or maybe the other way around.  But as a

24    mortgage broker, I know a lot of private lenders.  I

25    knew a lot of conventional lenders.  I know a lot of

**ER - 223**

1    institutional lenders.

2              PRO TEM JUDGE BLACKMAN:  Do you know Mr.

3    Rad's whereabouts now?

4              THE WITNESS:  I think he is in San Jose area.

5              PRO TEM JUDGE BLACKMAN:  When is the last

6    time you were in contact with him.

7              THE WITNESS:  Something like 2001.

8              PRO TEM JUDGE BLACKMAN:  Go ahead, Mr. Tracy,

9    next question.

10             MR. TRACY:  Thank you, Your Honor.

11   BY MR. TRACY:

12        Q.  You refinanced the first loan with a loan of

13   $300,000?

14        A.  No.  I paid off that first loan which was

15   with Great Western.  I paid it off completely.  And then

16   what happened was that later on, I ended up needing some

17   money for my troubles with you guys, and I ended up

18   refinancing that same property.

19        Q.  And you did that through Mr. Rad?

20        A.  Yes.

21        Q.  And what year did you do that?

22        A.  Either 2000 or 2001.  One of those years.

23        Q.  Did you use an escrow company or escrow agent

24   for that transaction?

25        A.  No.

                                                        463

1          Q.   Did you use a title company for that $300,000

2     loan transaction?

3          A.   No.

4          Q.   Do you have current --

5          A.   I mean, the title was insured, but I don't

6     know who the title insurance company was.  But the

7     answer is no.

8          Q.   Do you have any documents in your possession

9     which relate to the $300,000 loan transaction?

10         A.   No.

11         Q.   Did you ever have any documents relating to

12    the $300,000 loan?

13         A.   Yes, at some point in the past I did.

14         Q.   And at some point from that time to the

15    present did you discard those materials?

16         A.   Yes, I may have discarded it, yes.

17         Q.   Well, if you may have discarded it, does that

18    also include the possibility that you did not discard

19    it?

20         A.   No.

21         Q.   Then the answer isn't maybe, the answer is

22    you discarded it?

23         A.   Yes.

24         Q.   Do you recall when you discarded it?

25         A.   No.

# Document No. 33

1               IN THE UNITED STATES BANKRUPTCY COURT
2                  NORTHERN DISTRICT OF CALIFORNIA
3                             - - -
  In Re: RAMIN YEGANEH,                   CERTIFIED COPY
4              Debtor.
  ----------------------------------)
5  CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
                Plaintiff,           ) Adversary Proceeding
6  vs.                               ) No. 05-3243
                                     )
7  ADVANTA TRUST and FARIN YEGANEH   )
   aka F. NAMDARAN aka FRAN NAMDARAN )
8  aka FARIN NAMDARAN aka FRAN       )
   YEGANEH,                          )
9              Defendants.           )
  ----------------------------------)
10 CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
                Plaintiff,           ) Adversary Proceeding
11 vs.                               ) No. 05-3240
                                     )
12 F. NAMDARAN aka FRAN NAMDARAN aka )
   FARIN NAMDARAN aka FARIN YEGANEH  )
13 aka FRAN YEGANEH,                 )
               Defendants.           )
14 ----------------------------------)
   CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
15              Plaintiff,           ) Adversary Proceeding
   vs.                               ) No. 05-3241
16                                   )
   ALLIED MANAGEMENT TRUST and K.    )
17 YEGANEH aka KEN YEGANEH aka       )
   KAIKHOSROW YEGANEH,               )
18              Defendants.          )
  ----------------------------------)
19 CHARLES E. SIMS, Trustee,         ) No. 05-30047
                Plaintiff,           ) Adversary Proceeding
20 vs.                               ) No. 05-3242
                                     )
21 COAST DEVELOPMENT TRUST and FARIN )
   YEGANEH aka F. NAMDARAN aka FRAN  )
22 NAMDARAN aka FARIN NAMDARAN aka   )DEPOSITION OF
   FRAN YEGANEH,                     )RAMIN YEGANEH
23              Defendants.          )REDWOOD CITY, CALIFORNIA
  ----------------------------------)MARCH 29, 2006
24 ATKINSON-BAKER, INC.
   (800) 288-3376
25 REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
   FILE NO. 9F09033

                                                        1

1    A    No.   In 2003 I had no creditors.   The creditors didn't

2    come into picture until June of 2004 or September of 2004.   So

3    we're talking about a year, year and a half before there was any

4    creditors.

5    Q    Isn't it true that you had claimed that you didn't know

6    who R. Rad was at one point in time?

7    A    I may have said that.

8    Q    And when you said that, that was false; correct?

9    A    Correct.   I may have be confused or I may have misspoken.

10   I don't know why I said that, but that's not true.   Yes, that's

11   correct.

12   Q    And I mean you've also said that you took steps to

13   prevent GrayCary from tracking down your property.   I mean

14   you've said that; correct?

15   A    My own personal properties, I mean my own properties or

16   are you talking about my parents' properties?

17   Q    Both.

18   A    Well, okay.   Look.   The-- first of all, GrayCary

19   creditors, they were not creditors until either June of 2004 or

20   September of 2004.   Okay.   It is true that I didn't want them to

21   harass my parents, but they were not creditors at that time.

22   So,--

23   Q    I didn't ask you that.   What I asked you was you've

24   admitted in the past that you took steps to make it difficult

25   for GrayCary to track down assets of you and your parents;

127

# Document No. 34

WILLIAM E. GILG
Attorney at Law, St Bar #151991
305 San Bruno Avenue West
San Bruno, CA 94066
(650) 871-8647
(650) 873-3168 (fax)

Attorney for Defendant

SUPERIOR COURT OF CALIFORNIA, LIMITED JURISDICTION

COUNTY OF SAN MATEO

EDITH INGRAM, on behalf of herself,      ) Case No.: 410586,
                                         )
and NOZIPO WOBOGO, on behalf of the      )
                                         ) OPPOSITION TO PLAINTIFF'S EX
general public,                          ) PARTE APPLICATION FOR ORDER
                                         ) TO SHOW CAUSE RE CONTEMPT OF
            Plaintiffs,                   ) COURT
                                         )
      vs.                                )
                                         )
RAMIN YEGANEH, ET AL,                    ) Date: May 28, 2003
                                         ) Time: 2:00 PM
            Defendants.                   ) Dept: Dept 8

I, R. YEGANEH, declare as follows:

1. I am the defendant in the above-entitled case. The only issue left in this action is the amount of restitution, if any, due the claimants. This case has dragged on for about four years and the plaintiff's attorneys have constantly churned their files in pursuit of their almighty attorney's fees. This very same application brought by the plaintiffs is no exception. There have been numerous ex parte applications by the plaintiff based on half-truths and misinformation.

Opposition to Ex Parte Application re Contempt         -1-

2  I oppose plaintiff's ex parte application. My attorney just received approximately
   160 pages of documentation from the plaintiff's late yesterday afternoon. Due to
   other business matters he was not able to adequately review, research, investigate,
   and prepare an effective opposition.

3. In regards to the properties listed at paragraph 2 of the plaintiff's ex parte application,
   I only own the first five properties. The remaining properties belong to an
   independent investor. The plaintiff's allegations are untrue and based on
   misinformation.

4. In any event, I have no objection to the Court imposing liens on my properties.

5. I do oppose any sanctions for contempt and any other relief the plaintiff is requesting.
   Additionally, any order of contempt must be pursuant to a noticed motion. (See CCP
   ( 1212.)

   I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct. Executed at San Bruno, California on May 28, 2003.


_____
RAMIN YEGANEH,
Defendant


Opposition to Ex Parte Application re Contempt        -2-



1 | EMILY L. MAXWELL (Bar. No 185646)
  | GRAY CARY WARE & FREIDENRICH LLP
2 | 153 Townsend Street, Suite 800
  | San Francisco, CA 94107
3 | Tel: (415) 836-2584
  | Fax: (415) 836-2501
4 |
5 | MICHAEL S. TRACY (Bar No. 101456)
  | GRAY CARY WARE & FREIDENRICH LLP
  | 4365 Executive Drive, Suite 1100
6 | San Diego, CA 92121-2133
  | Tel: (858) 638-6820
7 | Fax: (858) 677-1401
8 | R. RENEE GLOVER (Bar No. 157793)
  | 444 Bell Street
9 | East Palo Alto, CA 94303
  | Tel: (650) 325-0668
10 | Fax: (650) 325-5020

11 | Attorneys for Plaintiff NOZIPO WOBOGO

13 | SUPERIOR COURT OF CALIFORNIA

14 | COUNTY OF SAN MATEO

15 | EDITH M. INGRAM, on behalf of herself, | CASE NO.  410586
   | and NOZIPO WOBOGO, on behalf of the
16 | general public, | **EX PARTE APPLICATION FOR AN ORDER**
   | | **TO SHOW CAUSE RE CONTEMPT,**
17 | Plaintiffs, | **MODIFIED PRELIMINARY INJUNCTION**
   | | **(INCLUDING REAL PROPERTY LIENS),**
18 | v. | **AND ORDER TO VIEW CONFIDENTIAL**
   | | **RECORDS**
19 | RAMIN YEGANEH, d/b/a American
   | Mortgage Realty and d/b/a American
20 | Mortgage Realty, and Invest, and DOES 1 | Date:    May 28, 2003
   | through 100, | Time:    2:00 p.m.
21 | | Dept.:    8
   | Defendants. | Judge:    Hon. Mark R. Forcum
22 | | Date Action Filed: October 4, 1999

-1-

SFJ\088610.1
9959050-900117

EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE REGARDING
CONTEMPT. LIENS. ETC.

1    Plaintiff Nozipo Wobogo, on behalf of the general public, hereby requests that the Court

2    issue the following orders:

3        1.    That Defendant Ramin Yeganeh is ordered to appear at a date and time specified

4    by the Court to show good cause why he should not be punished for contempt of this Court's

5    Orders dated March 21, 2000 and/or October 3, 2001.

6        2.    An order granting Plaintiff liens (and order recordation of the liens) on the

7    following properties held by Ramin Yeganeh (aka R. Rad) and/or American Mortgage Realty

8    and/or American Mortgage Realty and Invest, and/or any other business or fictitious name used or

9    controlled by Ramin Yeganeh (including, but not limited to Allied Management Trust)

10    (hereinafter "Defendants"):

11        724 E. 4th Avenue, San Mateo, CA  94401-3315; 786 5th Avenue,
         Redwood City, CA  94063-3913; 3912 Kent Way, South San
12        Francisco, CA  94080-3944; 182 Dublin Street, San Francisco, CA
         94112-2834; 1611 Shoreview Avenue, San Mateo, CA  94401-
13        3033; 1278 79th Ave, Oakland California 94621; 1086 69th Ave,
         Oakland CA 94621; 2462 Taylor Ave, Oakland CA 94605; 1012
14        73rd Ave., Oakland, CA  94621; 2300 Auseon Ave., Oakland, CA
         94605; and No Address:  Parcel # 043232120; Vacant Lot in San
15        Mateo.

16        3.    That Plaintiff's counsel and agents be allowed access to any confidentially

17    recorded documents involving Defendants located at any County Recorder's Office in California.

18        Plaintiff requests the above-referenced orders on the basis set forth in the memorandum of

19    points and authorities served and filed herewith, including but not limited to, the fact that

20    Defendants have violated this Court's orders dated March 21, 2000 and October 3, 2001 by

21    attempting to evict someone, selling, purchasing and transferring real property, that liens are

22    necessary to prevent further violations of these orders and dissipation of assets necessary to

23    satisfy a judgment in this case and that access to confidentially recorded transactions involving

24    Defendants is necessary to ferret out further violations of this Court's orders and obfuscation of

25    assets.

26        Plaintiff gave notice of this ex parte application, including the date, time, location, relief

27    requested and basis thereof, via facsimile to Plaintiff's counsel, William Gilg.  The notice was

28    sent in the letter attached to the Declaration of Emily L. Maxwell as Exhibit G.  Opposition to this

-1-

GRAY CARY WARE    SFJ\ON8610.1      EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE REGARDING
& FREIDENRICH LLP   9999050-900117    CONTEMPT, LIENS, ETC.

ER - 231

1   request is expected. This notice was provided before 10:00 a.m. on the day before this ex parte

2   appearance as required by California Rule of Court, Rule 379. (Maxwell Decl. ¶ 10.)

3   Dated: May 27, 2003



4                      GRAY CARY WARE & FREIDENRICH LLP

5

6           By_____
                   EMILY V. MAXWELL

7                    Attorneys for NOZIPO WOBOGO
                   on behalf of the General Public

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

# Document No. 35

COPY

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF SAN MATEO

3

4

5    EDITH INGRAM, ET AL.,                    )

6    PLAINTIFFS,                              )

7    VERSUS                         NO. CIV-410586

8    RAMIN YEGANEH, ET AL.,                   )

9    DEFENDANTS.                              )

10   _____)

11

12         REPORTER'S TRANSCRIPT OF PROCEEDINGS

13      BEFORE:  HON. MARGARET J. KEMP, JUDGE

14              DEPARTMENT 17

15              JUNE 20, 2003

16   PAGES 1-94

17

18   A-P-P-E-A-R-A-N-C-E-S-:-

19

     FOR THE PLAINTIFF:      EMILY MAXWELL
20                     GRAY CARY WARE & FREIDENRICH, LLP
                       153 TOWNSEND STREET, SUITE 800
21                     SAN FRANCISCO, CA. 94107
                       RENEE GLOVER
22                     MICHAEL TRACY
                       ATTORNEY AT LAW
23

24   FOR THE DEFENDANT:      WILLIAM E. GILG
                            ATTORNEY AT LAW
25

26

GOVERNMENT CODE SECTION 69954(d)
RESTRICTS COPYING THIS TRANSCRIPT                Page 1

1          MS. MAXWELL:

2     Q          AND DO YOU RECALL AT THAT DEPOSITION, AT THAT

3     HEARING BEFORE JUDGE BLACKMAN, YOU WERE GIVING

4     TESTIMONY?  WERE, DO YOU RECALL BEING ASKED TO PRODUCE

5     YOUR DRIVER'S LICENSE?

6     A          I'M SORRY, TO WHAT?  PRODUCE MY DRIVER'S

7     LICENSE?

8     Q          YES.

9     A          YES.

10    Q          AND DID YOU PULL OUT YOUR DRIVER'S LICENSE?

11    A          NO I DIDN'T, BECAUSE I TOLD THEM, THAT'S A

12    PRIVATE, YOU KNOW, THAT'S A PRIVATE THING.  THAT'S A

13    PRIVACY ISSUE.  AND I THINK AT THE TIME HE--

14    Q          I THINK YOU ANSWERED THE QUESTION.

15    A          YEAH.

16    Q          NO YOU DIDN'T, CORRECT?

17    A          NO.  EXACTLY.

18    Q          YOU REFUSED, CORRECT?

19    A          I DON'T REMEMBER IF I REFUSED OR NOT.  BUT I

20    THINK I TOLD THEM, IT'S A PRIVACY ISSUE AND I'M NOT

21    GOING TO DO IT.  OKAY?

22    Q          WHO OWNS ALLIED MANAGEMENT TRUST?

23    A          WHAT DO YOU MEAN, WHO OWNS?  IT'S A TRUST.

24    Q          SOMEONE OWNS A TRUST.

25    A          THIS IS NOT A BUSINESS.  THAT'S THE THING YOU

26    PUT ON YOUR DECLARATION.  I KNOW WHAT YOU'RE TRYING TO

                                             Page 52

1    DO. THIS IS NOT A D B A. OKAY. A TRUST, IS A TRUST,

2    IS A TRUST IS DIFFERENT THAN A D B A.

3    Q      WHO IS BENEFICIARY OF THE TRUST?

4    A      OKAY. I AM. I THINK YOU ALREADY KNOW THAT.

5    I'M THE TRUSTEE OF THE TRUST. LET'S PUT IT THIS WAY.

6    Q      YOU'RE THE TRUSTEE OF THE TRUST?

7    A      RIGHT.

8    Q      DO YOU RECALL SUBMITTING A DECLARATION IN THIS

9    MATTER WHICH YOU SIGNED ON MAY 28, 2003 IN OPPOSITION

10   TO THE EX PARTE APPLICATION TO OBTAIN LIENS ON

11   PROPERTIES?

12            DO YOU RECALL THAT DECLARATION?

13   A      YEAH, UH HUM.

14   Q      DO YOU RECALL INDICATING THAT AS TO, I'M GOING

15   TO READ NOW FROM YOUR DECLARATION.

16   A      I KNOW.

17   Q      IN REGARDS TO THE PROPERTIES LISTED AT

18   PARAGRAPH 2 OF PLAINTIFFS EX PARTE APPLICATION, I ONLY

19   OWN THE FIRST FIVE PROPERTIES. THE REMAINING

20   PROPERTIES BELONG TO AN INDEPENDENT INVESTOR.

21            PLAINTIFFS ALLEGATIONS ARE UNTRUE AND BASED

22   ON MISINFORMATION.

23            WHO IS THE INDEPENDENT INVESTOR TO WHOM YOU

24   REFERRED IN PARAGRAPH 3 OF YOUR DECLARATION?

25   A      OKAY. FIRST OF ALL, YOU'RE TAKING--

26            (TALKING OVER ONE ANOTHER).

                                            Page 53

# Document No. 36

1        IN THE UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                   - - -

In Re

4                              )

RAMIN YEGANEH,

5              Debtor.          )

------------------------------------

6    CHARLES E. SIMS, Trustee    )      No. 05-30047 TEC

7              Plaintiff,        )      Adversary Proceeding

8    vs.                         )      No. 05-3241

9    ALLIED MANAGEMENT TRUST, K. )

10   YEGANEH aka KEN YEGANEH, etc. )

11             Defendant.        )      CERTIFIED COPY

------------------------------------

12

13

14

15                    DEPOSITION OF

16                    KEN YEGANEH

17              REDWOOD CITY, CALIFORNIA

18                  MARCH 28, 2006

19

20

21

22

ATKINSON-BAKER, INC.

23   COURT REPORTERS

     (800) 288-3376

24

REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25   FILE NO. 9F09032

1

I hereby resign as the trustee of Allied Management Trust.

date: 7/11/03



PLAINTIFF'S
EXHIBIT
5
3/28/06

# Document No. 37

1             IN THE UNITED STATES BANKRUPTCY COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                          - - -

   In Re

4                                    )

   RAMIN YEGANEH,

5                  Debtor.          )

   ------------------------------------

6  CHARLES E. SIMS, Trustee         )      No. 05-30047 TEC

7                  Plaintiff,       )      Adversary Proceeding

8  vs.                              )      No. 05-3241

9  ALLIED MANAGEMENT TRUST, K.      )

10 YEGANEH aka KEN YEGANEH, etc.    )

11                 Defendant.       )      CERTIFIED COPY

   ------------------------------------

12

13

14

15                   DEPOSITION OF

16                   KEN YEGANEH

17              REDWOOD CITY, CALIFORNIA

18                  MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23 COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25 FILE NO. 9F09032

                                                              1

1          MR. FILLERUP:   And does that mean that he won't, the

2    Witness won't answer any questions relating to the identity of

3    tenants and any lease agreements with tenants?

4          MR. CHANCE:   Yes.

5          MR. FILLERUP:   And you will instruct him to answer-- not

6    to answer those questions based on the Fifth Amendment?

7          MR. CHANCE:   Yes.   Because the answers to those

8    questions could reasonably lead to information that may cause my

9    client to believe he may face incrimination or government

10   prosecution as a result.

11   BY MR. FILLERUP:

12    Q    Mr. Yeganeh, is it true that your son Ramin always

13   managed these five pieces of property in Oakland; is that

14   correct?

15    A    Most of the time.

16    Q    Did he collect the rent on those properties?

17         MR. CHANCE:   You can answer the question if you know it.

18         THE WITNESS:    Fifth Amendment.

19         MR. CHANCE:   No, just if you don't know the answer, just

20   answer his question.

21         THE WITNESS:   Yes.

22   BY MR. FILLERUP:

23    Q    So, your son always collected rent on those five pieces

24   of property?

25    A    Yes.

25

1    Q    Did your son always pay the property taxes on those five

2    pieces of property?

3    A    Usually we do our legal work to the federal and state,

4    but I don't know.

5    Q    Do you know whether your son always paid the property

6    taxes on the five pieces of property in Oakland?

7         THE WITNESS:  What this?

8         MR. CHANCE:   He's asking do you know if your son paid

9    the property taxes on the properties in Oakland, if you know the

10   answer.

11        THE WITNESS:   Fifth Amendment.

12        MR. CHANCE:   Don't take the fifth.  Can you answer that

13   question or not?

14        THE WITNESS:   I cannot remember this.

15        MR. CHANCE:   Well, that's your answer.

16   BY MR. FILLERUP:

17   Q    So, you cannot remember?

18   A    No.

19   Q    Can you remember whether your son always paid the

20   property insurance on the five pieces of property in Oakland?

21   A    Mostly they pay, yes.  Should have it.

22   Q    Now when you say they pay, who paid the property

23   insurance payments?

24   A    Usually my son arrange for that insurance and this sort

25   of thing.

# Document No. 38

1          IN THE UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                    - - -

   In Re

4                              )

   RAMIN YEGANEH,

5              Debtor.          )

   ----------------------------------

6  CHARLES E. SIMS, Trustee    )      No. 05-30047 TEC

7              Plaintiff,       )      Adversary Proceeding

8  vs.                          )      No. 05-3241

9  ALLIED MANAGEMENT TRUST, K.  )

10 YEGANEH aka KEN YEGANEH, etc. )

11             Defendant.        )      CERTIFIED COPY

   ----------------------------------

12

13

14

15                  DEPOSITION OF

16                   KEN YEGANEH

17             REDWOOD CITY, CALIFORNIA

18                 MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23 COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25 FILE NO. 9F09032

1   A    I don't know, I cannot tell you that.  But I do know I

2   pay money for that.

3   Q    You paid money for the five pieces property in Oakland?

4   A    Yes.

5   Q    And when did you pay that money?

6   A    Several years ago.

7   Q    In what year?

8   A    I'm sorry.  I told you, I have a poor memory.  At night I

9   have insomnia, I cannot sleep.  I take lots of pills.  You see.

10  Q    Did you give your son money to buy the five pieces of

11  property in Oakland?

12  A    Yes, we give them.

13  Q    And how much money did you give him?

14  A    I was physician surgeon, I worked too much.  I had, so I

15  give it to him to get it.

16  Q    How much money did you give him?

17  A    Cannot remember that.  That's go back past.

18  Q    Did you give him a check or cash?

19  A    Cash, check, whatever.  My money all there.  What you

20  call, cashier check and so forth.

21  Q    So you as you sit here today, you can't remember how much

22  you gave him or whether you gave him a check, a cashier's check

23  or cash?

24  A    Yeah.  Let's do it this way.  You have a children, do you

25  have a son?

1  five pieces of property in Oakland?

2      MR. CHANCE:   Objection.  The question is misleading, it

3  assumes that the funds were actually Ramin Yeganeh's as you've

4  stated in the question, Counsel.  It's a bit misleading.

5  BY MR. FILLERUP:

6    Q    Do you know how much was paid for the five pieces of

7  property?

8    A    No, I cannot remember.

9    Q    Do you know if there are currently mortgages on the five

10 pieces of property in Oakland?

11   A    What?

12      MR. CHANCE:   He's asking are there any mortgages now on

13 the five pieces of property in Oakland?

14      THE WITNESS:  Yes, we have mortgage.

15      MR. CHANCE:   Tell him.

16      THE WITNESS:  Yes, mortgage has.

17 BY MR. FILLERUP:

18   Q    How many mortgages are there?

19   A    How many, but we pay mortgage.

20   Q    How many are there?

21   A    I cannot remember but I know we give mortgage, yes.

22   Q    Who is the lender?

23   A    Who is the lender?  Did you give them the paper?

24      RAMIN:  Yeah, they got the paper.

25      MR. FILLERUP:   Don't say anything.  Don't say one word.

# Document No. 39

1      IN THE UNITED STATES BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3                  - - -

  In Re

4                                    )

  RAMIN YEGANEH,

5           Debtor.               )

  -----------------------------------

6   CHARLES E. SIMS, Trustee       )     No. 05-30047 TEC

7            Plaintiff,            )     Adversary Proceeding

8   vs.                           )     No. 05-3241

9   ALLIED MANAGEMENT TRUST, K.    )

10  YEGANEH aka KEN YEGANEH, etc.  )

11           Defendant.            )     CERTIFIED COPY

  -----------------------------------

12

13

14

15              DEPOSITION OF

16              KEN YEGANEH

17        REDWOOD CITY, CALIFORNIA

18           MARCH 28, 2006

19

20

21

22

  ATKINSON-BAKER, INC.

23  COURT REPORTERS

  (800) 288-3376

24

  REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1

1   A   No.

2   Q   Do you know the value of the 2462 Taylor property?

3   A   No.

4   Q   Do you know if there is a mortgage on that property?

5   A   I cannot remember.  Should have.

6   Q   Do you know the value of the 1012--

7   A   No, I don't know any of them.

8   Q   Do you know the value of the 1012 73rd Avenue property?

9   A   No.

10  Q   Do you know if there is a mortgage on that property?

11  A   No, I cannot remember.

12  Q   Do you know the value of the 1278 79th Avenue property?

13  A   No.

14  Q   Do you know if there is a mortgage on that property?

15  A   I cannot remember.

16  Q   Do you know the value of the 69th, the 1086 69th Avenue

17  property?

18  A   No, I cannot remember.

19  Q   Do you know if there is a mortgage on that property?

20  A   I cannot remember.

21  Q   Do you know the value of the 2300 Auseon Avenue property?

22  A   No.

23  Q   Do you know if there is a mortgage on that property?

24  A   I cannot remember.  I had a cardiac catheterization, I

25  had to get medicine at night.  I have insomnia, I cannot

# Document No. 40

1          IN THE UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        - - -

   In Re

4                                    )

   RAMIN YEGANEH,

5                 Debtor.            )

   -----------------------------------

6  CHARLES E. SIMS, Trustee          )      No. 05-30047 TEC

7                 Plaintiff,         )      Adversary Proceeding

8  vs.                               )      No. 05-3241

9  ALLIED MANAGEMENT TRUST, K.       )

10 YEGANEH aka KEN YEGANEH, etc.     )

11                Defendant.         )      CERTIFIED COPY

   -----------------------------------

12

13

14

15                  DEPOSITION OF

16                   KEN YEGANEH

17             REDWOOD CITY, CALIFORNIA

18                 MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23 COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25 FILE NO. 9F09032

                                                              1

1   Q    Are all five pieces of property residences, are they

2   homes?

3   A    Should be.  Yes.

4   Q    Are you unsure about that?

5   A    I cannot remember believe me.  I cannot remember.  But

6   usually there is.

7   Q    Now, have these five pieces of property been-- strike

8   that.  During the time that Allied Management Trust owned these

9   five pieces of property, were they rental properties?  Rental

10  properties?

11  A    Yeah, should be.

12  Q    So, were there tenants at these properties?

13  A    I cannot remember.  Fifth Amendment.

14  Q    You're taking the Fifth Amendment?

15  A    Yeah.

16  Q    And so you won't answer my question whether these five

17  pieces of property were rental properties?

18  A    Because they are rental but I don't know if there are

19  somebody there or not.  I cannot remember.  That is a lot to

20  take.

21  Q    So you don't know --

22  A    Turn me around and around.

23  Q    You don't know whether there were ever tenants at these

24  properties?

25  A    There were some.

17

1    Q    So you can remember some things and other things you

2    can't remember; correct?

3    A    Not, no don't interpret more than sentence you know.

4    Most of the time I forget everything you know.  Most of the

5    time.

6    Q    Isn't it true you're just pretending not remember certain

7    things that you don't want to tell me?

8         MR. CHANCE:   Objection.  It's misleading, argumentative

9    question.

10        THE WITNESS:  No.  Please, please.  Don't judge this way

11   you know.

12   BY MR. FILLERUP:

13   Q    Did the rent payments for these five pieces of property

14   in Oakland go to your son?

15        MR. CHANCE:   Objection.  It's a misleading question.

16   BY MR. FILLERUP:

17   Q    Were the rent payments paid to your son?

18   A    What he say that now?

19   Q    Were the rent payments from these five piece of property

20   paid to your son?

21   A    Some times he get it but he will spend mostly toward the

22   loan and repair and this sort of thing.

23   Q    Were any of the rent payments on these five pieces of

24   property put in your bank account?

25   A    Doesn't have a positive.

1    Q    Did you pay expenses for the five pieces of property?

2    A    Most of the time we pay for everything.

3    Q    Did you write checks from your checking account?

4    A    I cannot remember please.  Fifth Amendment.

5    Q    Have you ever written a check to pay an expense for any

6    one of these five pieces of property.

7         (Whereupon, a discussion was held off the Record.)

8         MR. CHANCE:   Do you mind re-asking the question.

9         THE WITNESS:   Fifth Amendment.  I cannot remember.

10   BY MR. FILLERUP:

11   Q    I'll re-ask the question:  Do you ever recall writing a

12   check to pay for an expense relating to one of the five pieces

13   of property?

14   A    I cannot remember.

15   Q    Was it usually Ray that wrote checks to pay for expenses

16   relating to the four pieces of property?

17        MR. CHANCE:   Do you mean five pieces?

18        MR. FILLERUP:   I'm sorry, five pieces of property.

19        THE WITNESS:   Usually he maintenance, but I don't know

20   about the rest of that.

21   BY MR. FILLERUP:

22   Q    Do you refer to your son as Ray or Ramin?

23   A    Ramin is the real but Ray, change to Ray.  He became Ray.

24   He's Ray now.

25   Q    So, do you call him Ray?

# Document No. 41

1                IN THE UNITED STATES BANKRUPTCY COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                              - - -

In Re

4                                      )

RAMIN YEGANEH,

5                    Debtor.           )

-----------------------------------

6    CHARLES E. SIMS, Trustee          )      No. 05-30047 TEC

7                    Plaintiff,        )      Adversary Proceeding

8    vs.                               )      No. 05-3241

9    ALLIED MANAGEMENT TRUST, K.       )

10   YEGANEH aka KEN YEGANEH, etc.     )

11                   Defendant.        )      CERTIFIED COPY

-----------------------------------

12

13

14

15                      DEPOSITION OF

16                      KEN YEGANEH

17                 REDWOOD CITY, CALIFORNIA

18                     MARCH 28, 2006

19

20

21

22

ATKINSON-BAKER, INC.

23   COURT REPORTERS

(800) 288-3376

24

REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25   FILE NO. 9F09032

1   five pieces of property in Oakland?

2       MR. CHANCE:   Objection.  The question is misleading, it

3   assumes that the funds were actually Ramin Yeganeh's as you've

4   stated in the question, Counsel.  It's a bit misleading.

5   BY MR. FILLERUP:

6    Q   Do you know how much was paid for the five pieces of

7   property?

8    A   No, I cannot remember.

9    Q   Do you know if there are currently mortgages on the five

10  pieces of property in Oakland?

11   A   What?

12      MR. CHANCE:   He's asking are there any mortgages now on

13  the five pieces of property in Oakland?

14      THE WITNESS:  Yes, we have mortgage.

15      MR. CHANCE:   Tell him.

16      THE WITNESS:  Yes, mortgage has.

17  BY MR. FILLERUP:

18   Q   How many mortgages are there?

19   A   How many, but we pay mortgage.

20   Q   How many are there?

21   A   I cannot remember but I know we give mortgage, yes.

22   Q   Who is the lender?

23   A   Who is the lender?  Did you give them the paper?

24      RAMIN:  Yeah, they got the paper.

25      MR. FILLERUP:   Don't say anything.  Don't say one word.

1   You say one more word and you're out of here.  You understand

2   me?  Don't say a word.  I'm not giving you warnings.

3   BY MR. FILLERUP:

4     Q    Now, who is the lender?

5     A    Excuse me.  I cannot remember exact but we give the name

6   of that to you here as a printing.  We give it to you.

7     Q    All right.  So, you can't remember as you sit here today

8   who any of the lenders are?

9     A    I --

10        MR. CHANCE:   I think what he's saying though is we

11  produced documents to you in the course of our supplemental

12  production which could be used to refresh his recollection as to

13  the identity and the answer to that question, Counsel.

14        MR. FILLERUP:   Well, I'm entitled to know whether he

15  knows the answer to the question and that's what I'm asking him.

16  If he doesn't know, he doesn't know.

17        MR. CHANCE:   Then he's answered that question.

18  BY MR. FILLERUP:

19    Q    Have you ever had an appraisal done on any of the five

20  pieces of property in Oakland?

21    A    Appraisal?   Cannot remember.

22    Q    Have you ever paid your son for managing the five pieces

23  of property in Oakland?

24    A    I pay money for managing?

25    Q    Correct.

29

1    A    No.

2    Q    Do you know the value of the 2462 Taylor property?

3    A    No.

4    Q    Do you know if there is a mortgage on that property?

5    A    I cannot remember.  Should have.

6    Q    Do you know the value of the 1012--

7    A    No, I don't know any of them.

8    Q    Do you know the value of the 1012 73rd Avenue property?

9    A    No.

10   Q    Do you know if there is a mortgage on that property?

11   A    No, I cannot remember.

12   Q    Do you know the value of the 1278 79th Avenue property?

13   A    No.

14   Q    Do you know if there is a mortgage on that property?

15   A    I cannot remember.

16   Q    Do you know the value of the 69th, the 1086 69th Avenue

17   property?

18   A    No, I cannot remember.

19   Q    Do you know if there is a mortgage on that property?

20   A    I cannot remember.

21   Q    Do you know the value of the 2300 Auseon Avenue property?

22   A    No.

23   Q    Do you know if there is a mortgage on that property?

24   A    I cannot remember.  I had a cardiac catheterization, I

25   had to get medicine at night.  I have insomnia, I cannot

# Document No. 42

1          IN THE UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    - - -

   In Re

4                              )

   RAMIN YEGANEH,

5            Debtor.            )

   -----------------------------------

6  CHARLES E. SIMS, Trustee     )      No. 05-30047 TEC

7            Plaintiff,         )      Adversary Proceeding

8  vs.                          )      No. 05-3241

9  ALLIED MANAGEMENT TRUST, K.  )

10 YEGANEH aka KEN YEGANEH, etc.)

11           Defendant.         )      CERTIFIED COPY

   -----------------------------------

12

13

14

15              DEPOSITION OF

16              KEN YEGANEH

17          REDWOOD CITY, CALIFORNIA

18             MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23 COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25 FILE NO. 9F09032

1      MR. CHANCE:  Do you understand the question?

2      THE WITNESS:  I pay for the management he does?

3      MR. CHANCE:  He's asking you if you've ever paid Ray

4  money for his management of the properties.

5      THE WITNESS: No, I cannot remember I do.  That is my son

6  you know.  Kid come to your house, they live with you, you pay

7  them money?

8      MR. FILLERUP:  This will be exhibit 4.

9      (Whereupon, Exhibit 4 was marked for Identification.)

10  BY MR. FILLERUP:

11   Q    Mr. Yeganeh, you've been handed what's been marked as

12  Exhibit 4 to your deposition.  Have you ever seen this document

13  before?

14      MR. CHANCE:  Take your time to review that okay, and

15  then you can answer his questions.

16      THE WITNESS: You have it all here.  Why you're asking

17  me, keep asking me?

18  BY MR. FILLERUP:

19   Q    Have you seen this document before?

20   A    Yes.

21   Q    Would you look at the first page at the top it lists five

22  pieces of property, do you see that?

23   A    Yeah, yeah.

24   Q    And so those are the five pieces of property in Oakland

25  that I've be asking you about; correct?

# Document No. 43

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                        COUNTY OF SAN MATEO

3

4  EDITH M. INGRAM,           )
   on behalf of herself,      )
5  and NOZIPO WOBOGO,         )
   on behalf of the general   )
6  public,                    )
                              )
7           Plaintiffs,       )
                              )
8  vs.                        )    CASE No. 410586
                              )
9  RAMIN YEGANEH, dba         )
   American Mortgage Realty,  )
10 and dba American Mortgage  )
   Realty, And Invest,        )
11 et al.,                    )          CERTIFIED
                              )            COPY
12          Defendants.       )
   ───────────────────────────)

13

14

15                    Proceeding re:

16                    RAMIN YEGANEH

17              Thursday, April 18, 2002

18

19 Reported by:

20 BRENDA CALABRO-COLLINS, CSR No. 12165

21 ─────────────────────────────────────────────

22

23              ROBERT BARNES ASSOCIATES
                760 Market Street, Suite 1044
24              San Francisco, California 94102

25
                                                    440

1   Go ahead, Mr. Tracy.

2   BY MR. TRACY:

3       Q.  The plumbing things that you did, what did

4   you do?

5       A.  It was remodeled the bathroom in general,

6   painting the bathroom.  I guess the sewer line was

7   clogged up.  We fixed that and put a new sewer line.

8   You know, things of that sort.

9       Q.  You put in a new sewer line?

10      A.  Yes.

11      Q.  And do you have a receipt for that?  And who

12  paid for that?

13      A.  I did.

14      Q.  And do you have any documentation for that?

15      A.  No, I don't.  I don't have any of that stuff.

16      Q.  Have you ever kept such records?

17      A.  Yes, in the past I did.

18      Q.  Any other plumbing things -- strike that.  In

19  the past, what do you mean by "the past"?

20      A.  Prior to 1999.

21      Q.  So prior to 1999, it's your testimony that

22  you had kept all records?

23      A.  I kept most records.  I don't want to say

24  all, but I had kept most important records.

25      Q.  And what do you define as an "important

1    record"?

2        A.    Important    --    I don't know how to define

3    that for you.   Big receipts.   Things of that sort.

4        Q.    What's a big receipt?

5        A.    You know, receipts over a certain amount of

6    money.

7        Q.    And what was that amount?

8        A.    I don't remember.   Maybe over a thousand

9    maybe over 5 thousand.   I don't remember any specific

10   amount.

11       Q.    Well, was it a thousand?

12       A.    It may have been a thousand.

13       Q.    Was it a thousand?

14       A.    I don't remember if it was a thousand or a

15   different number.

16       Q.    Do you have anything in your possession which

17   would help you recall what the amount was for which you

18   kept records prior to 1999?

19       A.    No.

20       Q.    Do you have an estimate as to what the

21   remodeling would have cost for the remodel of the 786

22   5th Avenue property?

23       A.    No, I don't have an estimate.

24       Q.    No estimate at all?

25       A.    No.   I think it was right around -- it was

1          A.   I don't know if you want to call it

2     "destroyed".

3          Q.   Have you discarded them?

4          A.   Yeah, I may have discarded them.  But I don't

5     recall what, when or where or specifically, I can't.

6          Q.   Do you have any loan documents from

7     Countrywide regarding the $300,000 loan that it provided

8     on 786 5th Street?

9          A.   No, I may have had at some point, but I don't

10    keep that stuff anymore.

11         Q.   And why not?

12         A.   Well, as I explained to you before, you know,

13    I have had -- considering the experiences I have had

14    with the district attorney, okay.  And how they emptied

15    out my house, I'm very nervous, jittery.  I don't keep

16    anything anymore.  Okay.

17         Q.   The $345,000 loan with 150 Broadway, with

18    whom did you conduct that loan?

19         A.   Same.  Same thing, Countrywide.

20         Q.   With the $320,000?

21         A.   Yes.  Same.

22         Q.   And do you have any documents from either the

23    $345,000 loan on 150 Broadway or on 1611 Shoreview from

24    Countrywide?

25         A.   No.  I don't.

                                              455

# Document No. 44

IN THE UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re RAMIN YEGANEH,                    )
                                        )
                Debtor                  )
                                        )
                                        )CASE No. 05-30047 TEC
                                        )
                                        )
                                        )
_____ )

MEETING OF CREDITORS

**RAMIN YEGANEH**

Thursday, March 9, 2005

# CERTIFIED COPY

BEMA REPORTING
553 Laidley Street
San Francisco, California 94131
(415) 585-4009
FAX(415) 585-9282

REPORTED BY:   LAVERNE VIAT, CSR NO. 4463

1     A.   It's in San Mateo County.  It's actually I

2  guess within the city limits of Belmont.

3     Q.   Do you have an address?

4     A.   There is no address.

5     Q.   What street is it on?

6     A.   I don't know what street it's on.  It's just a

7  vacant lot in the city of -- in the incorporated portion

8  of the City of Belmont within San Mateo County.

9         (Mr. Kletter enters the proceeding.)

10        MR. SIMS:  Q.  When did you buy 150 Broadway in

11  Redwood City?

12     A.   I purchased it back in 1990s sometime.  I don't

13  remember the date exactly.

14     Q.   1990?

15     A.   1990s.  I don't remember the exact year.

16     Q.   You don't have a date?

17     A.   I don't remember the exact date.

18     Q.   How much did you pay for it?

19     A.   I don't remember how much I paid for it.  I

20  think it was a lot cheaper than now.

21     Q.   You have no idea how much you paid for that

22  property?

23     A.   No, no figure comes to my mind.  That was a

24  long time ago.

25     Q.   All right.  What about 1611 Shoreview?

                                             10

1      A.    Same thing, I purchased it back sometime in

2    1990s.  And I don't remember how much I paid for it.

3      Q.    Do you have any documents that would reflect

4    how much you did pay for it?

5      A.    No, no, I don't.

6      Q.    You don't have any documents that reflect how

7    much you paid for any of these properties?

8      A.    No.

9      Q.    Is that true?

10     A.    That's correct, unless you want to look at the

11   deed or something itself.

12     Q.    You don't have any properties that reflect the

13   price you paid for any of these properties that you have

14   here listed, is that true?

15     A.    That's correct because they are from a long

16   time ago.

17     Q.    182 Dublin Street, when did you buy that?

18     A.    That was also sometime in 1990s.  And I don't

19   remember the exact year.

20     Q.    You don't know how much you paid?

21     A.    I don't remember how much I paid.

22     Q.    3912 Kent Way?

23     A.    Same thing, I purchased it back sometime in

24   1990s.  And I don't remember exactly how much I paid for

25   it.

                                                     11

1    your social security card or some wage earning

2    statement?

3        A.   I'll get it to you -- if I can go back home and

4    get it, I'll give it to you today.

5        Q.   I'm not going to wait around.

6            MR. McLAUGHLIN:  Would it be satisfactory if

7    Mr. Yeganeh provides that to Mr. Maher and Mr. Maher

8    provides that directly to you?

9            MR. MAHER:  I'll need to see the original

10   social security card.

11           THE WITNESS:  That's not a problem.

12           MR. SIMS:  Q.  Yes.  And I am going to make a

13   date certain so we're going to leave this open.  And

14   when we get that, then we'll conclude it.

15       A.   Okay.

16           MR. SIMS:  So we'll -- first of all, any

17   creditors wish to ask any questions regarding this

18   gentleman's finances?

19           MR. KLETTER:  I have a couple of questions.

20   This is Cary Kletter.  And I represent Phyllis Susie Q.

21   Shoop and Robert and Melissa Scott.

22       Q.   Mr. Yeganeh, why don't you have any records

23   regarding your purchases and sales of real property?

24       A.   What do you mean, why I don't?  I don't keep --

25   I don't keep those records.

                                                      51

MEETING OF CREDITORS

1          MR. MAHER:  Question is why.

2          THE WITNESS:  I may have misplaced them or they

3     may be lost.

4          MR. MAHER:  They may be lost.  You may have

5     misplaced them.  You told the trustee that you don't

6     have them.

7          THE WITNESS:  That's correct.

8          MR. MAHER:  Q.  Why?

9     A.    I just explained it to you.

10     Q.    We're using additional language.  May have

11     misplaced them, you may.

12     A.    I don't keep them.

13     Q.    Why?

14     A.    Because I'm involved in this lawsuit where they

15     are trying to hang me with every piece of information

16     whether I tell the truth or not tell the truth.  They

17     use anything against me, it's just crazy, including you.

18     Q.    If you had a document that said you applied for

19     a loan in connection with the purchase of real property,

20     you wouldn't keep that as part of your records?

21     A.    No, I just don't have it.

22     Q.    So you just decided to discard those records?

23     A.    No, it's not that I just decide to discard the

24     records.  Some of them may have been discarded or lost.

25          MR. SIMS:  Q.  Mr. Yeganeh, let me tell you

                                                            52

1          (Off the record from 12:15 p.m. to 12:20 p.m.)

2          MR. McLAUGHLIN:  I'm not trying to obstruct

3   your examination, but I do want to be sure that

4   Mr. Yeganeh understands the import of the questions

5   before he answers the questions.  Okay?

6          MR. TRACY:    That's fair.

7          MR. KLETTER:  Q.  Mr. Yeganeh, do you currently

8   have any records regarding the real property that we've

9   discussed here today including deeds and bills from

10  mortgage companies?

11     A.   As I explained to you, I do not keep those

12  records.

13         MR. SIMS:  Mr. Yeganeh --

14         MR. McLAUGHLIN:  Just say yes or no.

15         THE WITNESS:  Okay, the ones --

16         MR. McLAUGHLIN:  Go from there.

17         MR. SIMS:  Q.  Do you have any tax bills for

18  any of these properties we have mentioned today?

19     A.   Yes, I do.

20     Q.   You do?

21     A.   Yes, I do.

22     Q.   Property tax bills?

23     A.   Property tax bills.

24     Q.   All of these properties that we mentioned

25  today?

                                                    57

# Document No. 45

1     IN THE UNITED STATES BANKRUPTCY COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3         ---o0o---

4

5 In re:

6 RAMIN YEGANEH,     Case No.:  05-30047 TEC 7

7     Debtor.

8

9 _____/

 Rule 2004 Examination of

10

   RAMIN YEGANEH

11    VOLUME II

12 Thursday, June 9th, 2005

13

14

15

16

17

18

19 REPORTED BY:  DEBORAH FUQUA, CSR #12948

20

21

22

23

24    NOGARA REPORTING SERVICE
    130 Battery Street,  Suite 580
25   San Francisco,  California 94111
     (415) 398-1889

            602

1    the properties that, as you have testified, are in your

2    parents' name or belong to your parents, but you took

3    out the loan?

4         A.   I'm sorry.  What was the question again?

5         Q.   Well, we talked about some properties earlier

6    that you -- 48 North Grant Street.  You testified you

7    took out a loan on that property.  And that was when we

8    were talking about the proof of claim.  Do you remember

9    that?

10        A.   Right.  That was back in the 1990s.

11        Q.   Right.  Do you have any documents regarding

12   that loan?

13        A.   No.

14        Q.   What about the loan for 627 Prospect Row?

15        A.   Same thing, it's the same company.

16        Q.   Right.  But it's a different question.

17        A.   Same thing, the loan was also in the 1990s, and

18   that -- that --

19        Q.   So you don't have any documents?

20        A.   Correct.

21        Q.   And you testified earlier that you put loans on

22   your own properties, right?

23        A.   Right.  I also refinanced my own properties.

24        Q.   And you don't have any documents regarding

25   those?

647

RAMIN YEGANEH, VOLUME II - 6/9/05

1      A.  No.  The only documents I had I did produce,

2  which was, I believe, the promissory note and the deeds

3  of trust.

4      Q.  You produced those to me?

5      A.  No, not to you.  But those loans were taken

6  back in 2000 or 2001.  It's a long time.

7      Q.  And do you have any documents regarding those

8  loans?

9      A.  The only documents I have are the promissory

10 notes and the deeds of trust.

11     Q.  And why didn't you produce those?

12     A.  Because you only asked from 2004 or 2003

13 forwards.

14     Q.  Have you ever destroyed any financial

15 documents?

16     A.  Destroyed on purpose?  No.

17     Q.  You've never intentionally destroyed documents?

18     A.  No.

19     Q.  Do you recall a superior court judge

20 instructing you not to destroy financial documents?

21     A.  I don't recall anyone instructing me, but I

22 don't destroy documents on purpose.

23     Q.  I recall some testimony by you, and I don't

24 recall the date, that you testified that you did, in

25 fact, destroy documents.  And the reason that you had

648

1       THE WITNESS:  You mean January 7.

2       MS. MAXWELL:  Strike that.

3           Between December 3, 2004 and January 7, 2005,

4   did you take rent from any of your tenants in cash?

5       THE WITNESS:  I do not remember.  Okay?

6       MS. MAXWELL:  Would you --

7       THE WITNESS:  I think some tenants took their money

8   and gave it to the levying officer, who was the sheriff.

9       MS. MAXWELL:  That was not my question.

10          Did you take money during that time frame from

11  any of your tenants in cash?

12      THE WITNESS:  I do not remember.

13      MS. MAXWELL:  Okay.  Mr. Yeganeh, did you ever

14  receive cash from your tenants for rent, ever?

15      THE WITNESS:  Ever?

16      MS. MAXWELL:  Yes.

17      THE WITNESS:  I'm sure in the past, yes, I did.

18      MS. MAXWELL:  Did you give them receipts when they

19  paid you in cash?

20      THE WITNESS:  Yes.

21      MS. MAXWELL:  How did you give them receipts?

22      THE WITNESS:  What do you mean, "how"?

23      MS. MAXWELL:  Did you have a receipt book?

24      THE WITNESS:  Yeah.  Sometimes I had a receipt book

25  with me, I gave them receipts back.  Sometimes I wrote

                            657

< NOGARA REPORTING SERVICE >

ER - 269

RAMIN YEGANEH, VOLUME II - 6/9/05

1    it down for them.  That's it.

2        MS. MAXWELL:  Mr. Yeganeh, did you provide the

3    receipt book to Mr. Sims when he requested your records?

4        THE WITNESS:  I don't remember when it was.  So

5    what are you talking about?  Mr. Sims requested a whole

6    lot of stuff which I did not have.

7        MS. MAXWELL:  Mr. Yeganeh, did you have a receipt

8    book that you were using in December of 2004?

9        THE WITNESS:  I do not know.

10       MS. MAXWELL:  It was only seven months ago.  You

11   don't know if you had a receipt book in December of

12   2004?

13       THE WITNESS:  Listen, I don't even know some of the

14   stuff I did last week.  I told you.  Okay?

15            But if some people gave me cash, I'm sure I

16   gave them some kind of a receipt.  Okay?

17       MS. GLOSSON:  Mr. Yeganeh, we have a receipt

18   from Mr. Mendieta with your handwriting on it for rent

19   for December.

20            In fact, let's just go ahead and mark that one

21   now.

22            (Trustee's Exhibit W marked for identification)

23       MS. GLOSSON:  Q.  What's been marked as Exhibit W

24   is before you Mr. Yeganeh.  Will you please review it

25   and let me know when you're finished.

                                            658

< NOGARA REPORTING SERVICE >

ER - 270

RAMIN YEGANEH, VOLUME II - 6/9/05

1    A.  Okay, I've reviewed it.

2    MS. MAXWELL:  Have you had a chance to review

3  Exhibit W, Mr. Yeganeh?

4    THE WITNESS:  Yes.

5    MS. MAXWELL:  Is that your handwriting on the

6  receipt, Mr. Yeganeh?

7    THE WITNESS:  Yes, it is.

8    MS. MAXWELL:  Is that the kind of a receipt that

9  comes out of a receipt book?

10   THE WITNESS:  Yes.

11   MS. MAXWELL:  Did it come out of your receipt book?

12   THE WITNESS:  It looks like it.

13   MS. MAXWELL:  You see the receipt is numbered.

14  Could you read number on the receipt?

15   THE WITNESS:  376344.

16   MS. MAXWELL:  Can you tell me what the range of

17  receipts in your current receipt book is?

18   THE WITNESS:  What do you mean, my current receipt

19  book?  What are you talking about?

20   MS. MAXWELL:  Well, let me ask you this.

21   THE WITNESS:  I have no idea.

22   MS. MAXWELL:  This receipt book that this came out

23  of, it's carbon copy, right?

24   THE WITNESS:  I think so.  I think it was carbon

25  copy, yeah.

659

485

< NOGARA REPORTING SERVICE >

1        MS. MAXWELL:  Where is the receipt book that held

2   this receipt, 376344, currently located?

3        THE WITNESS:  I don't know.

4        MS. GLOSSON:  Q.  Did you destroy that receipt

5   book?

6        A.  I don't know what I did.  I don't know if it

7   was misplaced or what.

8        Q.  Did you think that that receipt book was

9   something that you needed to turn over to Mr. Sims when

10  he made the request of you for all of your financial

11  documents, including rent rolls?

12       A.  I didn't have it.  That's why I didn't produce

13  it.

14       Q.  You didn't have it?

15       A.  Yeah.

16       Q.  What happened to it?

17       A.  I don't know.

18       Q.  Did you destroy it?

19       A.  I don't know.  When I filed the bankruptcy,

20  there was no -- he's the one who was going to --

21       Q.  It's not that long.  The time difference is not

22  all that much.  What is the date on there?

23       A.  December 30th, 2004.

24       Q.  Okay.  You filed bankruptcy January 7th, 2005.

25       A.  Right.

                                              660

# Document No. 46

1

2              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

3                          COUNTY OF SAN MATEO

4                               --oOo--

5    EDITH M. INGRAM, et al.,            )
                                         )
6              Plaintiffs,               )
                                         )
7         vs.                            )      No. 410586
                                         )
8    RAMIN YEGANEH, et al.,              )
                                         )
9              Defendants.               )
     _____)

10

11

12                                CERTIFIED COPY

13

14                                 OEX OF

15                              RAMIN YEGANEH

16            _____

17                    Tuesday, November 30, 2004

18                      Volume I (Pages 1 - 224)

19

20

21

     REPORTED BY:  NIKI MAKELA, CSR 11024              359521

22

23

24

25



LEGALINK
A WORDWAVE COMPANY

LegaLink San Francisco        tel (415) 359-2040    www.legalink.com
601 Van Ness Ave, Suite 2052  tel (800) 869-9132
San Francisco, CA 94102       fax (415) 359-2050

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Ramin Yeganeh

```
 1    mailing address.  It's like a p.o. box or something.
 2    It's a p.o. box, whatever.
 3        Q.   Do you have their 800 number?
 4        A.   Sometimes they have the envelope along with the
 5    mortgage statement.
 6        Q.   My question is different.  If you don't receive
 7    that envelope with the statement that doesn't have the
 8    address or the phone number, where do you look to get
 9    the address or the phone number so that you could still
10    send your payment in?
11        A.   You call the 800 number.  They have the p.o.
12    box.  They tell you to send it to such and such p.o.
13    box, and you send it in.
14        Q.   Do you know the loan number for the $300,000
15    loan?
16        A.   No.
17        Q.   Is there a way you could find out the loan
18    number?
19        A.   No, not really.  Aside from the mortgage
20    statement, no, not really.
21            MS. GLOVER-CHANTLER:  Do you still have in your
22    possession the mortgage statement that you used to make
23    the November 1st, 2004 payment?
24            THE WITNESS:  No.
25            MS. GLOVER-CHANTLER:  Did you destroy it?
```

Ramin Yeganeh

1    THE WITNESS:  I didn't keep it.

2    MS. GLOVER-CHANTLER:  Did you destroy it?

3    THE WITNESS:  There you go again with the word

4    destroy.  Why you are so fixated on the word destroy?

5    MS. GLOVER-CHANTLER:  Did you throw it out?

6    THE WITNESS:  Tossed, throw out, yeah.  Why

7    should I keep things like that?  Why should I keep

8    things like that?  Then what?  Send it to you?

9    MS. GLOVER-CHANTLER:  Is that a yes?

10   THE WITNESS:  The answer to your question is --

11   look, I don't want to fill up my house with garbage.  So

12   the answer is sometimes I toss them.  Sometimes it gets

13   misplaced.  Sometimes it gets destroyed if you want to

14   call it that, whatever.

15   MS. GLOVER-CHANTLER:  I'm asking about the

16   statement for which you used to make --

17   THE WITNESS:  Yes, I already explained it to

18   you.

19   MS. GLOVER-CHANTLER:  You did not.  Yes or no,

20   did you destroy it?

21   THE WITNESS:  I don't remember what I did with

22   it.

23   MS. LYON:  Q.  How do you know that the

24   statements that Countrywide sends you are for the loans

25   that you have with them?

486

ER - 275

Ramin Yeganeh

1      Q.    Was there more than one check that went to
2   Countrywide for the three loans?
3      A.    Yes.
4      Q.    Did you write three separate checks?
5      A.    Yes.
6      Q.    Did you send them separately or did you put
7   them in one envelope?
8      A.    I think I put them in one envelope.
9      Q.    Did you receive a mortgage statement for your
10  November 1st, 2004 payment for the $340,000 loan?
11     A.    Yes.
12     Q.    Do you still have that mortgage statement?
13     A.    No.
14     Q.    And what did you do with that mortgage
15  statement?
16     A.    I don't remember what I did.
17     Q.    Did you throw it out?
18     A.    I don't remember.  Yeah, I may have.
19     Q.    Do you have any documents relating to the
20  $340,000 loan?
21     A.    No, I don't.
22     Q.    Do your attorneys have any documents?
23     A.    No.
24     Q.    Do your parents?
25     A.    No.

Ramin Yeganeh

1   acquisition of the Pacifica property that reflects that

2   you were purchasing it for someone other than yourself?

3          THE WITNESS:  I don't remember.

4          MS. LYON:  I think we probably should stop at

5   this point.

6          MS. GLOVER-CHANTLER:  I just wanted to make

7   clear on the record we are adjourning this for today,

8   but this is --

9          MR. TRACY:  We are adjourning for a court

10  appearance that Judge Forcum has requested of the

11  lawyers.  If this is over soon enough, we will come back

12  and we will continue until 5 o'clock.

13         (Recess taken.)

14         MS. LYONS:  Back on the record.

15     Q.   What books and records do you keep regarding

16  your receipts and disbursements?

17     A.   Receipts and disbursements for?

18     Q.   For your particular properties that you own.

19     A.   I don't keep any.

20     Q.   Do you pay any water bills on any of those

21  properties?

22     A.   Water bills for myself or I own?

23     Q.   Let's start with the property that you own and

24  you reside in, your principal place of residence.

25         Do you receive water bills for that property?

LegaLink San Francisco  (415) 359-2040

Ramin Yeganeh

1    net income?

2        A.    Yeah, I guess if you want to call it that.

3    That's a strange way of putting it, but I guess so.

4        Q.    Why did you not file a tax return for 2003, a

5    federal tax return?

6        A.    Because my expenses -- my expenses have simply

7    overcome any gross rental income, if you want to call it

8    that.  Do you understand what I'm saying?

9        Q.    What record do you have of expenses?

10       A.    You are talking about -- you know, all the

11   expenses.  We are talking about mortgages.  At least the

12   mortgages were totally overcome anything else.

13       Q.    So let me --

14       A.    I'm sorry.  Just one thing.  I just realized --

15   any way we can make it sooner?  I mean December 10th is

16   fine.

17           MS. LYONS:  Let's go off the record.

18           (Discussion off the record.)

19           MS. LYONS:  Back on the record.

20       Q.    Going back to the federal income tax return for

21   2003, it's your testimony that you did not file that

22   federal income tax return because your expenses exceeded

23   your income?

24       A.    Yes.

25       Q.    Do you have any record of those expenses for

Ramin Yeganeh

```
 1    the year 2003?

 2         A.    No.

 3         Q.    You don't have any documents that --

 4         A.    No.  It's just simple math that my mortgages --

 5         Q.    Just say yes or no.

 6         A.    No.

 7         Q.    Does your attorney have any?

 8         A.    No.

 9         Q.    Do you have an accountant?

10         A.    No.

11         Q.    Have you ever had an accountant?

12         A.    Not that I recall, no.

13         Q.    In the last five years, have you used an

14    accountant?

15         A.    No.

16         Q.    In the last ten years, have you used an

17    accountant?

18         A.    I don't think so, no.

19         Q.    Did you file any state income tax returns for

20    the year 2003?

21         A.    No.

22         Q.    What was the reason you did not file?

23         A.    The same reason.

24         Q.    And that reason was?

25         A.    No net income.  No income period.
```

Ramin Yeganeh

```
 1      Q.    Is it your testimony that you had no income for

 2    2003?

 3      A.    No net income.

 4      Q.    Your definition of net income means what?

 5      A.    Basically means that the gross -- that the

 6    outgo, meaning the expenses such as mortgage payments

 7    and so on, is more than the income.

 8      Q.    Did you file a federal income tax return for

 9    2002?

10      A.    No.

11      Q.    And why did you not file a federal income tax

12    return?

13      A.    Same reason.

14      Q.    I'm sorry to keep asking you.  If you could

15    just repeat it.

16      A.    Same reason that my -- for instance, my

17    mortgage payments -- the mortgage payments totally --

18    the expenses in general out -- what is the word for

19    it -- overcome any net income for the rentals.

20      Q.    And did you file a state income tax return for

21    2002?

22      A.    No.

23      Q.    For the year 2004, do you have any documents

24    relating to your expenses that you would use to

25    determine whether your gross income -- whether you had
```

LegaLink San Francisco  (415) 359-2040

183

**ER - 280**

Ramin Yeganeh

1   any net income?

2       A.    For the year 2004?

3       Q.    Yes.

4       A.    No, I don't have any documents.

5       Q.    How do you determine -- how do you know exactly

6   how much you --

7       A.    It's just simple.  If the mortgage payments per

8   month -- if you want to take it per month -- by

9   themselves totally overcome any rental payments that I

10  get.  And that is assuming the tenants actually pay.  A

11  lot of the tenants don't even pay because like you said,

12  you contact them.  Like you said in court, you contact

13  them and you tell them not to pay me.  So I get screwed

14  out of the rents.

15      Q.    My question is more specific than that.  It's

16  your testimony that you have no documents -- strike

17  that.

18            It's your testimony that you have no documents

19  for the year 2004 relating to any of your expenses on

20  any of the properties --

21      A.    Yes.

22      Q.    -- that you would use to offset any gross

23  income that you would receive; is that correct?

24      A.    Yes.

25      Q.    Do you have any documents relating to the gross

LegaLink San Francisco  (415) 359-2040

Ramin Yeganeh

1    income that you received for 2004?

2        A.    No.

3        Q.    What are your average monthly expenses?

4        A.    Average monthly expenses -- I cannot really

5    average it out because every month is different.

6    Something pops up.

7        Q.    What was your average?  What was your monthly

8    expense for the month of October?

9        A.    You can't take -- you cannot isolate something

10   because in the expenses, you also have to include

11   attorney fees paid and court cost and so on and so

12   forth.  I can't give you an average.  I can't.

13       Q.    Do you know how much you spent on expenses in

14   the month of October?

15       A.    I have no idea.  I know for a fact that taking

16   the rentals alone the expenses overcome any gross rents

17   received.  I know that for a fact.

18       Q.    Is it your testimony that you don't know

19   exactly what your expenses are for the month of October?

20       A.    Correct.

21       Q.    Is it also your testimony that you do not

22   really know any of your expenses for any specific month

23   for the year 2004?

24       A.    Correct.

25       Q.    Do you have a MasterCard?

# Document No. 47

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

--oOo--

EDITH M. INGRAM, on behalf of   )
herself, and NOZIPO WOBOGO, on  )
behalf of the general public,   )
                                )
         Plaintiffs,            )
                                )
   vs.                          )   Case No. 410586
                                )
RAMIN YEGANEH, dba American     )
Mortgage Realty, and dba        )
American Mortgage Realty and    )
Invest, et al.,                 )
                                )   CERTIFIED COPY
                                )
         Defendants.            )
_____ )


DEBTOR'S EXAM OF

RAMIN YEGANEH

_____

December 10, 2004

VOLUME II

(Pages 225 - 373)


REPORTED BY:  SARAH LUCIA BRANN, CSR 3887   (01-359973)


**LEGALINK**
A **WORDWAVE** COMPANY

LegaLink San Francisco    tel (415) 359-2040    www.legalink.com
601 Van Ness Ave, Suite 2052    tel (800) 869-9132
San Francisco, CA 94102    fax (415) 359-2050

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

503

Ramin Yeganeh

1    A.    I can get it.  I can get it from the tax
2  collectors.
3    Q.    Are you going to be getting that document from
4  the tax collectors so that you can pay your taxes?
5    A.    I can't pay my taxes now, because --
6    Q.    Again, if you answer the questions I ask --
7    A.    I don't have any money to pay my taxes now.
8    Q.    My question, I guess, was more specific.  How
9  would you know how much you owe for your tax -- for your
10  taxes on the property?
11    A.    Well, I just go to the tax collector and get
12  the bill and pay it, if I have the money.
13        MS. CHANTLER:  Isn't it true that the County
14  of San Mateo sends an invoice at least 30 days prior to
15  the due date for all property taxes due and payable for
16  each taxing year?
17        THE WITNESS:  Yes, I guess that's correct.
18        MS. CHANTLER:  So, therefore, isn't it true
19  that you would have been sent such a statement for the
20  property at 724 East Fourth Avenue at least 30 days
21  prior to today?
22        THE WITNESS:  Yes, if I have, yes.
23        MS. LYON:  Q.  Is it your testimony --
24    A.    But I think I mentioned that to you last time.
25    Q.    Is it your testimony that you do not have that

Ramin Yeganeh

1    property tax statement?

2        A.    Correct.

3        Q.    Do you recall --

4        A.    Because I mentioned that to you last time,

5    which was during the November 30th OEX, that I didn't

6    keep those.

7        Q.    Do you recall actually receiving that property

8    tax statement?

9        A.    I don't recall, but I may have received it, so

10   I don't remember.  I am not sure.

11       Q.    Do you know how much it was for?

12       A.    No.  How can I remember that?  It's impossible

13   to remember a figure.  It could have been any figure.

14           MS. CHANTLER:  Isn't it true that the property

15   tax statement that you receive annually is calculated as

16   a percentage of the assessed value of your home,

17   Mr. Yeganeh?

18           THE WITNESS:  No.  It's -- depends on when I

19   purchased it.

20           MS. CHANTLER:  I didn't ask you that.

21           THE WITNESS:  The assessed value at the time,

22   plus a certain percentage that keeps going up every

23   year.

24           MS. CHANTLER:  You are claiming that the

25   percentage added on to assessed value increases every

265

505

ER - 285

# Document No. 48

IN THE UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re RAMIN YEGANEH,           )
                                      )
           Debtor         )
                                      )
                                    )CASE No. 05-30047 TEC
                                      )
                                      )
                                      )
_____)

MEETING OF CREDITORS

**RAMIN YEGANEH**

Thursday, March 9, 2005

## CERTIFIED COPY

**BEMA REPORTING**
553 Laidley Street
San Francisco, California 94131
(415) 585-4009
FAX(415) 585-9282

REPORTED BY:   LAVERNE VIAT, CSR NO. 4463

1  your social security card or some wage earning

2  statement?

3     A.   I'll get it to you -- if I can go back home and

4  get it, I'll give it to you today.

5     Q.   I'm not going to wait around.

6        MR. McLAUGHLIN:  Would it be satisfactory if

7  Mr. Yeganeh provides that to Mr. Maher and Mr. Maher

8  provides that directly to you?

9        MR. MAHER:  I'll need to see the original

10  social security card.

11        THE WITNESS:  That's not a problem.

12        MR. SIMS:  Q.  Yes.  And I am going to make a

13  date certain so we're going to leave this open.  And

14  when we get that, then we'll conclude it.

15     A.   Okay.

16        MR. SIMS:  So we'll -- first of all, any

17  creditors wish to ask any questions regarding this

18  gentleman's finances?

19        MR. KLETTER:  I have a couple of questions.

20  This is Cary Kletter.  And I represent Phyllis Susie Q.

21  Shoop and Robert and Melissa Scott.

22     Q.   Mr. Yeganeh, why don't you have any records

23  regarding your purchases and sales of real property?

24     A.   What do you mean, why I don't?  I don't keep --

25  I don't keep those records.

                                              51

```
 1              MR. MAHER:  Question is why.

 2              THE WITNESS:  I may have misplaced them or they

 3   may be lost.

 4              MR. MAHER:  They may be lost.  You may have

 5   misplaced them.  You told the trustee that you don't

 6   have them.

 7              THE WITNESS:  That's correct.

 8              MR. MAHER:  Q.  Why?

 9        A.   I just explained it to you.

10        Q.   We're using additional language.  May have

11   misplaced them, you may.

12        A.   I don't keep them.

13        Q.   Why?

14        A.   Because I'm involved in this lawsuit where they

15   are trying to hang me with every piece of information

16   whether I tell the truth or not tell the truth.  They

17   use anything against me, it's just crazy, including you.

18        Q.   If you had a document that said you applied for

19   a loan in connection with the purchase of real property,

20   you wouldn't keep that as part of your records?

21        A.   No, I just don't have it.

22        Q.   So you just decided to discard those records?

23        A.   No, it's not that I just decide to discard the

24   records.  Some of them may have been discarded or lost.

25              MR. SIMS:  Q.  Mr. Yeganeh, let me tell you
                                                          52
```

# Document No. 49

1     U.S. BANKRUPTCY COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3

4

5  In re

6   RAMIN YEGANEH,    No. 05-30047 TEC 7

7     Debtor.    Chapter 7

8  _____/

9  DEPOSITION OF
   KAIKHOSROW YEGANEH

10

11  Friday, June 24, 2005

12

13

14

15

16

17

18

19

20

21   REPORTED BY:  GISELLE CASEY, CSR #8098

22

23    NOGARA REPORTING SERVICE
    130 Battery Street, Suite 580

24    San Francisco, California  94111
     (415) 398-1889

25

            714

1    Q.    And when you say "him," you gestured to your son.

2    Do you mean Ramin Yeganeh?

3    A.    Yes.

4    Q.    Sir, if these properties were purchased for you

5    with your money, why did you have the properties put in

6    the name of "R. Rad"?

7    A.    I did not put it.  He got it, and we put in the

8    trust because I getting old.  I say in case I -- you know,

9    I don't get anybody give me money, you know, to have

10   something.

11   Q.    Are you aware that these properties were in your

12   son's name before they were put in the trust, sir?

13   A.    Fifth Amendment.

14        MS. MAXWELL:  I'd like to certify the following

15   question:  Are you aware that these properties were put in

16   your son's name before they were put in the trust?

17        THE WITNESS:  Excuse me.  This lady -- may I ask

18   your -- I am curious.

19        MS. GLOSSON:  Mr. Yeganeh, there's no question --

20   Mr. Yeganeh, Mr. Yeganeh, there -- there's no question

21   pending.

22        THE WITNESS:  Just close my eyes, come here, sign

23   here.

24        MS. GLOSSON:  No one has asked you to sign

25   anything.

                                              716

1          MS. MAXWELL:  Thank you.

2          (A brief recess was taken.)

3          MS. GLOSSON:  Mr. Yeganeh, we're going to go back

4     on the record.

5          THE WITNESS:  Please.

6          MS. GLOSSON:  Okay?  Ms. Maxwell has a few more

7     questions for you, and we will be out of here shortly.

8     Okay?

9          THE WITNESS:  Thank you.

10         MS. MAXWELL:  Q.  Mr. Yeganeh, do you have any

11    checks showing the money that you allegedly gave to your

12    son, Ramin, to purchase any of the properties listed on

13    Exhibit E?

14         A.    Fifth Amendment.  I cannot remember.  Fifth

15    Amendment.  Fifth Amendment.

16         Q.    Are you asserting the Fifth Amendment because you

17    can't remember, or because you want to assert the Fifth

18    Amendment, sir?  It's different.

19         A.    Fifth Amendment.

20         MS. MAXWELL:  I'd like to certify the following

21    question:  Do you have any documents which would show any

22    payment by you to Ramin Yeganeh for any of the properties

23    listed on Exhibit E?

24         THE WITNESS:  Fifth Amendment.

25         MS. MAXWELL:  Q.  Mr. Yeganeh, do you have any

                                                            717

1    mortgage documents related to any of the properties listed

2    on Exhibit E?

3         A.    Should have.  When you have a mortgage, you have

4    to pay.  But document, I don't know.  I cannot --

5              MR. TRACY:  I'm sorry.  Ms. Court Reporter, did

6    you understand that answer?

7              THE REPORTER:  No.

8              MR. TRACY:  Thank you.

9              MS. GLOSSON:  Mr. Yeganeh, when you give an

10   answer, you need to speak clearly, and you need to refrain

11   from mumbling and saying things under your breath.

12             THE WITNESS:  Excuse me.  I am a sick person -- I

13   don't know -- and keep repeating and repeating and

14   repeating.  Perhaps this lady got tired, too.  I don't

15   know.  Go ahead.  Repeat.

16             MS. MAXWELL:  Q.  Mr. Yeganeh, do you know if you

17   have mortgages on any of the properties listed on

18   Exhibit E, which you claim to own?

19        A.    Fifth Amendment.

20             MS. MAXWELL:  I'd like to certify the following

21   question:  Mr. Yeganeh, do you know if you have mortgages

22   on any of the properties listed in Exhibit E, which you

23   claim to own?

24        Q.    Mr. Yeganeh, do you have a bank account?

25        A.    Fifth Amendment.

                                              718

1    question:  Mr. Yeganeh, have you ever received rent checks

2    from any of the tenants at the five properties you claim

3    to own?

4          THE WITNESS:  You told two, three questions.

5    This guy keep until midnight.

6          Go ahead, please.

7          MS. MAXWELL:  Q.  Mr. Yeganeh, have you ever

8    declared any income from rent on your taxes related to any

9    of those properties listed on Exhibit E?

10        A.    What was that now?  Excuse me.  Income what?

11        Q.    Have you ever declared any rental income, the

12    money you got from the rent, have you ever declared that

13    on your income taxes?

14        A.    Fifth Amendment.

15        MS. MAXWELL:  I'd like to certify the following

16    question:  Mr. Yeganeh, have you ever declared any rental

17    income from the five properties listed on Exhibit E?  And

18    Mr. Yeganeh has taken the Fifth Amendment.

19        Q.    Mr. Yeganeh, is it your testimony that you cannot

20    recall the form of the payment that you made to your son

21    for any of those properties listed on Exhibit E?  You

22    can't remember if it was cash or check or cashier's check

23    or money order?

24        A.    Fifth Amendment.

25        Q.    And, Mr. Yeganeh, is it your testimony that you

                                                    721

1    can't remember how much you paid to buy any of those

2    properties listed on Exhibit E?

3        A.   I cannot remember.  I had some money, I give it

4    to him.  That's it.

5        Q.   And you cannot remember how much money you gave.

6    Is that your testimony, sir?

7        A.   No.  No.  Do you have a children?  You are very

8    small, your kids.  This Mr. -- maybe has it.  When you

9    give money to your child, get a receipt?  You give him

10   check?  You give him cashier check?  What kind of talking

11   is that?  It's just give it.

12          Go ahead, please.  Repeat it again.  Go ahead.

13       Q.   Did you give money to any of your other children

14   to buy property, other than Ramin?

15       A.   I cannot remember.  Fifth Amendment.  Fifth

16   Amendment.

17       Q.   If your son said that he owned 2462 Taylor Avenue

18   at some point in time, would that have been correct?

19       A.   What is -- what she want to say?  What is it?

20          MS. MAXWELL:  Let the record reflect that

21   Mr. Yeganeh is searching through the exhibits --

22          THE WITNESS:  Now, what you want to say?  Excuse

23   me, miss?

24          MS. MAXWELL:  Q.  Mr. Yeganeh, I didn't ask you a

25   question about the exhibits.

                                              722

# Document No. 50

1          U.S. BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4

5    In re

6       RAMIN YEGANEH,        No. 05-30047 TEC 7

7          Debtor.          Chapter 7

8    _____/

9    DEPOSITION OF
     KAIKHOSROW YEGANEH
10
     Friday, June 24, 2005
11

12

13

14

15

16

17

18

19

20

21       REPORTED BY:  GISELLE CASEY, CSR #8098

22

23          NOGARA REPORTING SERVICE
           130 Battery Street, Suite 580
24         San Francisco, California  94111
              (415) 398-1889
25

                                    714

**Date:**       August 5, 2005

**Re:**         IN RE: RAMIN YEGANEH

**Deposition of:** Kaikhosrow Yeganeh

**Taken:**      June 24, 2005


TO ALL COUNSEL:

☐       Please be advised that the deponent in the above-entitled action has read
        his/her deposition and has stated that there are no corrections to be attached.

☒       Please be advised that the deponent in the above-entitled action has made
        certain corrections and clarifications to his/her deposition, herewith enclosed.
        Copies of the corrections have been sent to all counsel of record.

        ☒       The corrections have been attached to the original transcript.

        ☐       These corrections were received after the statutory period allotted for
                corrections . Pursuant to the California Code of Civil Procedure, Section
                2025(q)(1) or the Federal Rules of Civil Procedure, Section 30(e), the
                corrections have not been attached to the original transcript.

☐       _____

        _____


Thank you for your assistance in this matter.

Sincerely,

NOGARA REPORTING SERVICE



Enclosure


726

130 Battery Street, Suite 580    San Francisco, California 94111
415-398-1889   800-362-6622   Fax:415-398-0611   E-mail:depos@nogara.com

**ER - 296**

Case:
Witness:
Control #:
Reporter:

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____  No changes need to be made to the transcript.

___/___  Changes listed below.

Witness Signature _K. Yaganeh_____     Date signed _8/3/05_

NOTE: Please check the appropriate column for add (+) or delete (-).  If you wish to add anything to the deposition, use the exact words you want to add.  If you wish to delete anything from the deposition, please use the exact words you want to delete.  Thank you.

| Page | Line | + | - | Wording to be added/deleted |
|------|------|---|---|------------------------------|
| 17 | 2 | | | (delete) no no no .... (add) Sometimes. |
| 18 | 5 | | | (delete) no .... (add) Sometimes. |
| 18 | | | | |
| 31 | 15 | | | (add) Yes, most of the time. |
| 33 | 16 | | | ... I had give it to give to seller. |
| 34 | 20 | | | (delete) fifth amendment. (add) no. |
| 34 | 22 | | | (delete) Yeah. (add) no. |
| 35 | 2 | | | (delete) Just fifth amendment. |
| 35 | 6 | | | (delete) It's just fifth amendment. |
| 39 | 2 | | | (delete) Fifth Amendment. (add) I don't remember. |
| 39 | 7 | | | (delete) Fifth Amendment. |
| 39 | 10 | | | (delete) No. (add) I can't remember. |
| 40 | 7 | | | (delete) No. (add) I don't remember. |
| 41 | 19 | | | (delete) No. (add) I can't remember. |
| 44 | 14 | | | (delete) Fifth Amendment. |
| 45 | 6 | | | (delete) Call it Fifth Amendment. |
| 46 | 13 | | | (delete) Fifth Amendment. Fifth Amendment. |
| 46 | 22 | | | (delete) Fifth Amendment. (add) yes. |
| 46 | 25 | | | (delete) Just fifth Amendment. (add) no. |
| 49 | 21 | | | (delete) Fifth Amendment. |
| 50 | 3 | | | (delete) Fifth Amendment. (add) no. |

NOGARA REPORTING SERVICE

Case:
Witness:
Control #:
Reporter:

( 2 )

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____  No changes need to be made to the transcript.

\_\_\_\_✓ Changes listed below.

Witness Signature _Ka Yegane_          Date signed _8/3/05_

<u>NOTE:</u>  Please check the appropriate column for add (+) or delete (-).  If you wish to <u>add</u> anything to the deposition, use the <u>exact</u> words you want to add.  If you wish to <u>delete</u> anything from the deposition, please use the exact words you want to delete.  Thank you.

| Page | Line | + | - | Wording to be added/deleted |
|------|------|---|---|-----------------------------|
| 50 | 6 | | | (delete) Fifth Amendment. (add) no . |
| 50 | 10 | | | (delete) " " . (add) no . |
| 51 | 8 | | | (delete) " " . (add) no . |
| 53 | 18 | | | (delete) I say that's Fifth Amendment, you know. |
| 53 | 22 | | | (delete) Yeah. (add) ~~I don't know~~ what ? |
| ~~54~~ | | | | |
| 55 | 22 | | | (add) Yeah it did. |
| 55 | 24 | | | (add) Yeah it did. |
| 58 | 22 | | | (add) Yes it was. |
| 59 | 10 | | | (add) My son to give to sellers to buy properties. |
| 60 | 1 | | | (delete) No. (add) I can't remember. |
| ~~61~~ | ~~15~~ | | | ~~            ~~ |
| 62 | 6 | | | (delete) Fifth Amendment. (add) no . |
| 64 | 24 | | | (delete) No . |
| 68 | 17 | | | (delete) Before 2000 . |
| ~~69~~ | ~~20~~ | | | |
| 72 | 2 | | | (delete) Fifth Amendment. (add) yes . |
| 72 | 21 | | | (delete) Yes. (add) The property was in my trust's name before, now its under my name only. |
| 77 | 5 | | | (add) I am hard on hearing ... |
| 78 | 20 | | | (delete) Fifth Amendment. (add) I can not remember. |

Case:
Witness:
Control #:
Reporter:

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____  No changes need to be made to the transcript.

___✓  Changes listed below.

Witness Signature _K. Yeganeh_      Date signed _Aug. 3, 05_

<u>NOTE:</u>  Please check the appropriate column for add (+) or delete (-).  If you wish to <u>add</u> anything to the deposition, use the <u>exact</u> words you want to add.  If you wish to <u>delete</u> anything from the deposition, please use the exact words you want to delete.  Thank you.

| Page | Line | + | - | Wording to be added/deleted |
|------|------|---|---|------------------------------|
| 78 | 24 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 80 | 10 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 80 | 17 | | | (delete) Sure. (Add) I can not remember. |
| 83 | 6 | | | (delete) Fifth Amendment. |
| 83 | 12 | | | (delete) Yes. Fifth Amendment... (add) I can not remember. |
| 84 | 1 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 84 | 23 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 85 | 5 | | | (delete) yes (add) I can not remember. |
| 85 | 8 | | | (delete) Fifth Amendment... (add) I can not remember. |
| 86 | 12 | | | (delete) Fifth Amendment... (add) I can not remember. |
| 86 | 17 | | | (delete) Fifth Amendment. (add) " " " " |
| 87 | 9 | | | (delete) Fifth Amendment. |
| 88 | 3 | | | (delete) Fifth Amendment. |
| 91 | 2 | | | (delete) Fifth Amendment. |
| 91 | 6 | | | (delete) Fifth Amendment. |
| 92 | 1 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 92 | 8 | | | (delete) yes. (add) I can not remember. |
| 92 | 13 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 93 | 3 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 94 | 13 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 96 | 14 | | | (delete) Fifth Amendment. (add) I can not remember. |

<u>NOGARA  REPORTING  SERVICE</u>

729

Case:
Witness:
Control #:
Reporter:

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____ No changes need to be made to the transcript.

___✓___ Changes listed below.

Witness Signature _K. Yeganeh_    Date signed _Aug. 3, 05_

NOTE:  Please check the appropriate column for add (+) or delete (-).  If you wish to add anything to the deposition, use the exact words you want to add.  If you wish to delete anything from the deposition, please use the exact words you want to delete.  Thank you.

| Page | Line | + | - | Wording to be added/deleted |
|------|------|---|---|-----------------------------|
| 96 | 19 | | | (delete) Fifth Amendment. (add) I don't understand. |
| 96 | 24 | | | (delete) Fifth Amendment. (add) I don't know. |
| 97 | 19 | | | (delete) Fifth Amendment. (add) Yes. |
| 97 | 25 | | | (delete) Fifth Amendment. (add) Yes. |
| 98 | 20 | | | (delete) Fifth Amendment. |
| 98 | 22 | | | (delete) Fifth Amendment. (add) I can not remember. |
| 98 | 25 | | | (delete) Fifth " (add) " " " " . |
| 99 | 3 | | | (delete) " " (add) " " " " . |
| 99 | 10 | | | (delete) " " (add) " " " " . |
| 99 | 13 | | | (delete) " " (add) " " " " . |
| 100 | 2 | | | (delete) " " . ~~(add)~~ |
| 100 | 5 | | | (delete) " " . |
| 101 | 2 | | | (delete) " " . |
| 101 | 24 | | | (delete) " " . (add) Yes. |
| 102 | 14 | | | (delete) " " . (add) Yes. |
| 102 | 24 | | | (delete) " " . (add) I can not remember. |
| 103 | 15 | | | (delete) " " . |
| 105 | 18 | | | (delete) " " . |
| 106 | 2 | | | (delete) Yeah. (add) I can not remember. |
| | | | | |
| | | | | |

NOGARA REPORTING SERVICE

# Document No. 51

1  Charles P. Maher, State Bar No. 124748
   Jeffrey L. Fillerup, State Bar No. 120543
2  Nhung Le, State Bar No. 209552
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
4  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
5

6  Attorneys for Plaintiff Charles E. Sims
   Trustee in Bankruptcy
7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11  In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                            Chapter 7
12              Debtor.

13  _____

14  CHARLES E. SIMS, Trustee,               Adversary Proceeding
                                            No. 05-3241
15              Plaintiff,

16  vs.

17  ALLIED MANAGEMENT TRUST and K.          **REQUEST FOR ADMISSIONS**
    YEGANEH aka KEN YEGANEH aka             **(Set One – K. Yeganeh)**
18  KAIKHOSROW YEGANEH,

19              Defendants.

20  _____

21  PROPOUNDING PARTY:    Plaintiff Charles E. Sims, trustee in bankruptcy

22  RESPONDING PARTY:     Defendant K. Yeganeh

23  SET:                  One (Nos. 1 through 47)

24        Plaintiff, Charles E. Sims, Trustee in bankruptcy, requests that Defendant K. Yeganeh aka

25  Ken Yeganeh aka Kaikhosrow Yeganeh respond to the following *Requests For Admission* within

26  thirty (30) days after date of service thereon pursuant to Federal Rule of Civil Procedure 36 and

27  Bankruptcy Rule of Procedure 7036.

28

                                        1

# DEFINITIONS

Unless the context indicates otherwise, the following words and phrases will be defined and used herein as follows:

1.    "ALLIED" refers to the defendant Allied Management Trust, and, if any, its past and present trustee, attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor corporations, partnerships or anyone else acting on its behalf or otherwise subject to its control.

2.    "YOU", "YOUR", and "K. YEGANEH" refers to defendant K. Yeganeh aka Ken Yeganeh aka Kaikhosrow Yeganeh, and, if any, his past and present trustee, attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor corporations, partnerships or anyone else acting on his behalf or otherwise subject to his control.

3.    "PLAINTIFF" refers to the Plaintiff, Charles E. Sims, Trustee in bankruptcy.

4.    "DEBTOR" refers to Ramin Yeganeh aka R. Rad, and, if any, his past and present attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor corporations, partnerships or anyone else acting on his behalf or otherwise subject to his control.

5.    "PERSON" as used herein refers to and includes a natural person, firm, association, organization, corporation, partnership, joint venture, business trust, public entity, and all other forms of entities.

6.    "DOCUMENT" and/or "DOCUMENTS" as used herein refers to and includes any kind of handwritten, typewritten or printed material, any kind of graphic material, or any kind of electronic or mechanically recorded material, however produced or reproduced, and includes, without limitation, papers, books, accounts, letters, photographs, sound recording tapes or video recording tapes, whether draft or final, whether signed or unsigned, including each original and each non-identical copy, whether different from the original by means of notes made on such copy or otherwise, and if the original is not in existence, the best copy or reproduction thereof, and embraces the term "writing" as defined in Federal Rule of Evidence 1001.

7.    "EACH" as used herein means each and every.

8.    "ANY" as used herein shall be understood to include and encompass "or", and "or"

2

1    shall be understood to include and encompass "and."

2        9.    "DATE" as used herein means the day of the month, the month, and the year. If

3    only the approximate date is known or available, please state the approximate date, indicating that

4    it is an approximate only.

5        10.    "RELATING TO" as used herein means evidencing, summarizing, describing,

6    regarding, containing any record of, reference to or indication of, or referring to in any way.

7        11.    "COMPLAINT" refers to the First Amended Complaint for Avoidance and

8    Recovery of Fraudulent Transfers filed by the Plaintiff in this Adversary Proceeding.

9        12.    "ANSWER" refers to the Answer to First-Amended Complaint filed by defendants

10    in this Adversary Proceeding.

11        13.    "TAYLOR AVENUE PROPERTY" means the real property located at 2462

12    Taylor Avenue, Oakland, California (APN 048-5597-001).

13        14.    "73rd AVENUE PROPERTY" means the real property located at 1012 73rd

14    Avenue, Oakland, California (APN 041-4144-009).

15        15.    "79th AVENUE PROPERTY" means the real property located at 1278 79th Avenue,

16    Oakland, California (APN 041-4198-052).

17        16.    "69th AVENUE PROPERTY" means the real property located at 1086 69th Avenue,

18    Oakland, California (APN 041-4148-040).

19        17.    "AUSEON AVENUE PROPERTY" means the real property located at 2300

20    Auseon Avenue, Oakland, California (APN 043-4610-023).

21        18.    "TRANSFERRED PROPERTIES" means the Taylor Avenue Property, 73rd

22    Avenue Property, 79th Avenue Property, 69th Avenue Property and Auseon Avenue Property.

23        19.    "MARCH 21, 2003 GRANT DEED" means the grant deed dated March 21, 2003,

24    executed by the DEBTOR, recorded in the Alameda County Official Records on March 21, 2003

25    as Document Number 2003162534 attached as **Exhibit A** to this *Request for Admissions (Set One)*

26    and incorporated herein by reference.

27        20.    "MAY 5, 2003 GRANT DEED" means the grant deed dated May 5, 2003,

28    executed by the DEBTOR, recorded in the Alameda County Official Records on May 6, 2003 as

3

1    Document Number 2003265730 attached as **Exhibit B** to this *Request for Admissions (Set One)*

2    and incorporated herein by reference.

3        21.    "WOBOGO CASE" means and refers to the litigation initiated by Nozipo Wobogo,

4    on behalf of the general public, on October 4, 1999, pursuant to Business and Professions Code

5    § 17200, filed in San Mateo Superior Court, Case No. 410586.

6        22.    "PETITION DATE" means and refers to the date the DEBTOR filed his voluntary

7    petition for relief under Chapter 13 of the Bankruptcy Code, i.e., January 7, 2005.

8

9                            **INSTRUCTIONS**

10       1.    YOU must respond in writing to EACH request by:

11            a.    Admitting the response;

12            b.    Declaring that YOU have made a reasonable inquiry and that the

13    information known or obtainable by YOU is insufficient to enable YOU to admit or deny the

14    request;

15            c.    Denying part of the request and admitting the remainder;

16            d.    Denying the request; or

17            e.    Objecting to a part or all of the request and responding to the remainder.

18       2.    If YOU deny part of a request, YOU must state the part of the request which YOU

19    admit is true and qualify or deny the remainder.

20       3.    If YOU object to a part or all of the request, YOU must identify the basis for the

21    objection. If YOUR objection is based on a privilege or protection, YOU must state the privilege

22    or protection, explain why it applies, and respond to ANY part of the request which is not covered

23    by the privilege or protection.

24       4.    YOUR failure to respond to a request may result in an award of attorneys' fees

25    against YOU, as well as the request being deemed admitted.

26       5.    YOUR failure to admit a request may result in an award of attorneys' fees against

27    YOU, after the PLAINTIFF proves the matter is true.

28

4

1

2 **ADMISSIONS**

3     Admit each of the following statements:

4 **REQUEST FOR ADMISSION NO. 1:**

5     Admit that the DEBTOR was the sole owner of the TAYLOR AVENUE PROPERTY,

6 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY, and 69TH AVENUE PROPERTY

7 prior to March 20, 2003.

8 **REQUEST FOR ADMISSION NO. 2:**

9     Admit that the DEBTOR was the sole owner of the AUSEON AVENUE PROPERTY

10 prior to May 5, 2003.

11 **REQUEST FOR ADMISSION NO. 3:**

12     Admit that neither ALLIED nor K. YEGANEH ever had any interest in the TAYLOR

13 AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY, and 69TH

14 AVENUE PROPERTY before March 20, 2003.

15 **REQUEST FOR ADMISSION NO. 4:**

16     Admit that neither ALLIED nor K. YEGANEH ever had any interest in the AUSEON

17 AVENUE PROPERTY before March 20, 2003.

18 **REQUEST FOR ADMISSION NO. 5:**

19     Admit that the only written records of the DEBTOR's conveyance of the TRANSFERRED

20 PROPERTIES to ALLIED are the MARCH 21, 2003 GRANT DEED and the MAY 5, 2003

21 GRANT DEED.

22 **REQUEST FOR ADMISSION NO. 6:**

23     Admit that YOU knew that the DEBTOR was using the alias "R. Rad" at the time the

24 MARCH 21, 2003 GRANT DEED and MAY 5, 2003 GRANT DEED were executed.

25 **REQUEST FOR ADMISSION NO. 7:**

26     Admit that YOU knew as of March 21, 2003, that the DEBTOR had transferred the

27 TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY,

28 and 69TH AVENUE PROPERTY to ALLIED by way of the MARCH 21, 2003 GRANT DEED.

5

1

**REQUEST FOR ADMISSION NO. 8:**

Admit that YOU knew as of May 5, 2003, that the DEBTOR had transferred the AUSEON AVENUE PROPERTY to ALLIED by way of the MAY 5, 2003 GRANT DEED.

**REQUEST FOR ADMISSION NO. 9:**

Admit that YOU participated with the DEBTOR in having the TRANSFERRED PROPERTIES conveyed to ALLIED by way of the MARCH 21, 2003 GRANT DEED and MAY 5, 2003 GRANT DEED.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the DEBTOR has never been an agent, trustee, or employee of YOU of any kind or nature, in relation to the TRANSFERRED PROPERTIES.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YOU did not take any action to prevent the DEBTOR from transferring the TRANSFERRED PROPERTIES to ALLIED by way of the MARCH 21, 2003 GRANT DEED and MAY 5, 2003 GRANT DEED.

**REQUEST FOR ADMISSION NO. 12:**

Admit that on or before March 21, 2003, YOU knew that on September 8, 1999, the DEBTOR had been arrested and his business records had been seized based upon information that the DEBTOR had violated the criminal provisions of California Civil Code Section 2945, which governs the business practices of mortgage foreclosure consultants.

**REQUEST FOR ADMISSION NO. 13:**

Admit that on or before March 21, 2003, YOU knew that on March 20, 2001, the DEBTOR pled no contest to four separate felony counts under California Civil Code Section 2945, which governs the business practices of mortgage foreclosure consultants.

**REQUEST FOR ADMISSION NO. 14:**

Admit that at the time the MARCH 21, 2003 GRANT DEED and MAY 5, 2003 GRANT DEED were executed, YOU knew that the DEBTOR was a convicted felon.

6

**REQUEST FOR ADMISSION NO. 15:**

Admit that by the time the DEBTOR had conveyed the TRANSFERRED PROPERTIES to ALLIED, YOU knew that the San Mateo Superior Court had granted the plaintiff's motion for summary adjudication against the DEBTOR in the WOBOGO CASE.

**REQUEST FOR ADMISSION NO. 16:**

Admit that YOU knew after October, 2001, that on October 3, 2001, the San Mateo Superior Court in the WOGOBO CASE issued an injunction against the DEBTOR that prohibited the DEBTOR from transferring directly or indirectly any real property in San Mateo, Santa Clara, San Francisco or Alameda counties.

**REQUEST FOR ADMISSION NO. 17:**

Admit that YOU knew after October 3, 2001, that the DEBTOR had violated the preliminary injunction order issued on October 3, 2001 by the San Mateo Superior Court in the WOGOBO CASE, which prohibited the DEBTOR from transferring directly or indirectly any real property in San Mateo, Santa Clara, San Francisco, or Alameda counties.

**REQUEST FOR ADMISSION NO. 18:**

Admit that YOU did not treat the TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY, and 69TH AVENUE PROPERTY as YOUR own property after March 21, 2003 and before January 1, 2005.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU did not treat the AUSEON AVENUE PROPERTY as YOUR own property after May 5, 2003 and before January 1, 2005.

**REQUEST FOR ADMISSION NO. 20:**

Admit that YOU treated the TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY, and 69TH AVENUE PROPERTY as though it was still owned by the DEBTOR after March 21, 2003 and before January 1, 2005.

**REQUEST FOR ADMISSION NO. 21:**

Admit that YOU treated the AUSEON AVENUE PROPERTY as though it was still owned by the DEBTOR after May 5, 2003 and before January 1, 2005.

7

**REQUEST FOR ADMISSION NO. 22:**

Admit that the DEBTOR continued to pay expenses relating to the TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY, and 69TH AVENUE PROPERTY after March 21, 2003 and before January 1, 2005

**REQUEST FOR ADMISSION NO. 23:**

Admit that the DEBTOR continued to pay expenses relating to the AUSEON AVENUE PROPERTY after May 5, 2003 and before January 1, 2005

**REQUEST FOR ADMISSION NO. 24:**

Admit that the DEBTOR continued to receive income from the TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY, and 69TH AVENUE PROPERTY after March 21, 2003 and before January 1, 2005

**REQUEST FOR ADMISSION NO. 25:**

Admit that the DEBTOR continued to receive income from the AUSEON AVENUE PROPERTY after May 5, 2003 and before January 1, 2005

**REQUEST FOR ADMISSION NO. 26:**

Admit that YOU believe that the DEBTOR misrepresented the DEBTOR's ownership in the TRANSFERRED PROPERTIES in the DEBTOR's federal and state income tax returns for the years 2002 and 2003.

**REQUEST FOR ADMISSION NO. 27:**

Admit that YOU did not pay any money or provide anything of value in exchange for the conveyance to ALLIED of the TRANSFERRED PROPERTIES on March 21, 2003 and May 5, 2003.

**REQUEST FOR ADMISSION NO. 28:**

Admit that YOU have never filed a state or federal income tax return with the California Franchise Tax Board or the Internal Revenue Service.

**REQUEST FOR ADMISSION NO. 29:**

Admit that prior to January 1, 2005, YOU have never declared any income from the TRANSFERRED PROPERTIES as YOUR income on any filings with the California Franchise

8

1  Tax Board and the Internal Revenue Service.

2  **REQUEST FOR ADMISSION NO. 30:**

3      Admit that YOU have never paid any insurance premiums for insurance on the

4  TRANSFERRED PROPERTIES before January 1, 2005.

5  **REQUEST FOR ADMISSION NO. 31:**

6      Admit that prior to January 1, 2005, the DEBTOR paid the insurance premiums on the

7  TRANSFERRED PROPERTIES.

8  **REQUEST FOR ADMISSION NO. 32:**

9      Admit that YOU never paid any property taxes on the TRANSFERRED PROPERTIES

10  before January 1, 2005.

11  **REQUEST FOR ADMISSION NO. 33:**

12      Admit that  YOU were aware in March, 2003 that the DEBTOR had transferred the

13  TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY,

14  and 69TH AVENUE PROPERTY to ALLIED on March 21, 2003 in order to avoid the plaintiffs in

15  the WOBOGO CASE from obtaining a judgment against the DEBTOR and executing on the

16  TAYLOR AVENUE PROPERTY, 73RD AVENUE PROPERTY, 79TH AVENUE PROPERTY,

17  and 69TH AVENUE PROPERTY to collect the judgment.

18  **REQUEST FOR ADMISSION NO. 34:**

19      Admit that  YOU were aware in May, 2003 that the DEBTOR had transferred the

20  AUSEON AVENUE PROPERTY to ALLIED on May 5, 2003 in order to avoid the plaintiffs in

21  the WOBOGO CASE from obtaining a judgment against the DEBTOR and executing on the

22  AUSEON AVENUE PROPERTY to collect the judgment.

23  **REQUEST FOR ADMISSION NO. 35:**

24      Admit that YOU believe that the TRANSFERRED PROPERTIES are not subject to

25  execution based on the judgment entered in the WOGOBO CASE.

26  **REQUEST FOR ADMISSION NO. 36:**

27      Admit that the transfers of the TRANSFERRED PROPERTIES to ALLIED were

28  fraudulent conveyances as alleged in the First Claim for Relief in the Complaint in this case.

9

**REQUEST FOR ADMISSION NO. 37:**

Admit that the transfers of the TRANSFERRED PROPERTIES to ALLIED were fraudulent conveyances as alleged in the Second Claim for Relief in the Complaint in this case.

**REQUEST FOR ADMISSION NO. 37:**

Admit that each of the transfers of the TRANSFERRED PROPERTIES to ALLIED by the DEBTOR on March 21, 2003 and May 6, 2003 was a transfer of an interest of the DEBTOR in property.

**REQUEST FOR ADMISSION NO. 38:**

Admit that each of the transfers of the TRANSFERRED PROPERTIES to ALLIED by the DEBTOR on March 21, 2003 and May 6, 2003 was made within four years of the PETITION DATE.

**REQUEST FOR ADMISSION NO. 39:**

Admit that DEBTOR received less than reasonably equivalent value from ALLIED in exchange for the transfers of each of the TRANSFERRED PROPERTIES.

**REQUEST FOR ADMISSION NO. 40:**

Admit that the DEBTOR was insolvent on the dates the MARCH 21, 2003 GRANT DEED and MAY 5, 2003 GRANT DEED were recorded.

**REQUEST FOR ADMISSION NO. 41:**

Admit that the DEBTOR became insolvent as a result of each of the conveyances of the TRANSFERRED PROPERTIES to ALLIED.

**REQUEST FOR ADMISSION NO. 42:**

Admit that the DEBTOR's conveyances of the TRANSFERRED PROPERTIES to ALLIED constituted a transaction for which any property remaining with the DEBTOR was an unreasonably small capital.

**REQUEST FOR ADMISSION NO. 43:**

Admit that the DEBTOR conveyed the TRANSFERRED PROPERTIES to ALLIED with actual intent to hinder, delay or defraud creditors of the DEBTOR, including but not limited to the judgment creditors from the WOBOGO CASE.

10

1    **REQUEST FOR ADMISSION NO. 44:**

2        Admit that the DEBTOR used his own monies to pay for the purchase of the

3    TRANSFERRED PROPERTIES .

4    **REQUEST FOR ADMISSION NO. 45:**

5        Admit that the DEBTOR created ALLIED for his benefit.

6    **REQUEST FOR ADMISSION NO. 46:**

7        Admit that "R. Rad" is the DEBTOR.

8    **REQUEST FOR ADMISSION NO. 47:**

9        Admit that YOU did not provide any consideration to ALLIED in exchange for the

10   conveyance of the TRANSFERRED PROPERTIES to YOU on or about February 22, 2005.

11   Dated: August 10, 2005                    LUCE, FORWARD, HAMILTON & SCRIPPS, LLP

12

13                                    By: _____

14                                        Nhung Le,
                                         Counsel for Plaintiff Charles E. Sims, Trustee
15   184892.1

16

17

18

19

20

21

22

23

24

25

26

27

28

Recording Requested by:

and

WHEN RECORDED MAIL TO:

Allied Management Trust
2462 Taylor Avenue
Oakland, CA 94605

2003162534 03/21/2003 03:20 PM
OFFICIAL RECORDS OF RECORDING FEE: 20.00
ALAMEDA COUNTY COUNTY TAX: 11.00
PATRICK O'CONNELL CITY TAX: 150.00

2 PGS

THIS SPACE FOR RECORDER'S USE ONLY:

## GRANT DEED

APN: 048-5597-001
041-4198-052
041-4148-040
041-4144-009

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 11.00　　　　　　　　　　　$ 150.00　　　　City
X　　Computed on the consideration or value of property conveyed; OR
___　Computed on the consideration or value less or encumbrances
　　　remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

　　R. Rad, a single man

hereby GRANT(S) to

　　Allied Management Trust

all the real property situated in the City of Oakland, County of Alameda . State of California, described as:

　　see attached Exhibit "A"

Dated: March 21, 2003

R. Rl
R. Rad

STATE OF CALIFORNIA
COUNTY OF Alameda　　　}ss
On 3-21-2003 before me Karen M. Scott

personally appeared R. Rad

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Karen H Scott

KAREN M. SCOTT
COMM. #1300130
Notary Public-California
ALAMEDA COUNTY
My Comm. Exp. May 27, 2005

2005

MAIL TAX
STATEMENTS TO: above

(This area for official notarial seal)

EXHIBIT A

Exhibit "A"

Portion of Lot 3, Block A, Map of Toler Heights, filed September 30, 1907, Map Book 23, page 34, Alameda County Records, described as follows:
Beginning at a point on the Southeastern line of Taylor Avenue, distant thereon Southeasterly line of Thermal(formerly Derby) Street as shown on said map; thence South 32 degrees 23'40" East to the Southeastern line of said Block A; thence South 71 degrees 33' West along said line of said Block A, to the Northeastern line of MacArthur (formerly Foothill) Boulevard, as shown on said map; thence Northwesterly and along said line of MacArthur Boulevard, 17.49 feet to the Southeastern line of Taylor Avenue; thence Northeasterly thereon, 94.84 feet, more or less, to the point of beginning.
APN: 048-5597-001

Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda County Records.
APN: 041-4198-052

Commencing at a point on the Southeastern line of 68th Avenue seventy-two feet, two inches Southwesterly from the intersection thereof with the Southwestern line of Hamilton Street, as the said Avenue and street are shown upon the Map hereinafter referred to; running thence Southwesterly along the said line of 68th Avenue thirty-five feet; thence at right angles Southeasterly one hundred feet; thence at right angle Northeasterly thirty-five feet; thence at right angles Northwesterly one hundred feet to the point of beginning. Being a portion of lots numbered 1, 2, and 5 in Block numbered 25, as the said Lots and Block are shown upon that certain Map entitled, "Fitchburg Homestead Lots;"filed June 25, 1870 in the Office of the County Recorder of Alameda County.
APN: 041-4148-040

Lots 41 and 42, Block 21, Map of Resubdivision of the Townsite of Fitchburg, formerly Fitchburg, Lots, filed May 18, 1892, Map Book 17, page 9, Alameda County Records.
APN: 041-4144-009

Recording Requested by:

and

WHEN RECORDED MAIL TO:

Allied Management Trust
2462 Taylor Ave
Oakland, CA 94605



2003265730    05/06/2003 02:58 PM

OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:        7.00
COUNTY TAX:           1.10
CITY TAX:            15.00

1    PG

THIS SPACE FOR RECORDER'S USE ONLY:

## GRANT DEED

APN: 043-4610-023

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ _____                    $ 15        City

X    Computed on the consideration or value of property conveyed; OR

___    Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
   R. Rad, a single man

hereby GRANT(S) to

   Allied Management Trust

all the real property situated in the City of Oakland, County of Alameda    , State of California, described as:

   Lot 1, Block 11, Auseon's Moss Tract, filed September 11, 1907
   in Book 23, Page 31 of Maps, Alameda County Records.
   APN 043-4610-023

Dated: MAY 5, 2003

STATE OF CALIFORNIA
COUNTY OF ALAMEDA              }ss
On MAY 6, 2003 before me Betty J. Moore

personally appeared R. RAD

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

MAIL TAX
STATEMENTS TO:      above

R. Rad

BETTY J. MOORE
Commission # 1260701
Notary Public - California
Alameda County
My Comm. Expires Apr 14, 2004

(This area for official notarial seal)

EXHIBIT B

.

# Document No. 52

1  JONATHAN G. CHANCE, ESQ.
   JC LAW OFFICES
2  1605 Middlefield Rd.
   Redwood City, CA 94063
3  Tel: 650-299-1269
   Fax: 650-429-2048
4
5  Attorney For K. YEGANEH
   Trustee of Allied Management Trust
6
7            IN THE UNITED STATES BANKRUPTCY COURT
8            FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10  In re RAMIN YEGANEH,              ) Case No. 05-30047 TEC
                                      )
11         Debtor.                    ) Chapter 7
                                      )
12  _____ )
13  CHARLES E. SIMS, Trustee,         ) Adversary Proceeding No. 05-3241
                                      )
14         Plaintiff,                 )
                                      )
15      vs.                           )
                                      )
16                                    )
17  ALLIED MANAGEMENT TRUST,          ) DEFENDANT'S RESPONSES TO
    And K. YEGANEH, ET AL             ) REQUESTS FOR ADMISSIONS
18                                    )
19                                    )
                                      )
20         Defendants.                )
    _____ )
21
22  PROPOUNDING PARTY: Plaintiff Charles E. Sims, Trustee in Bankruptcy
23  RESPONDING PARTY: Defendant K. Yeganeh
24  SET NUMBER: ONE
25
26        COMES NOW Defendant K. Yeganeh and responds to Plaintiff Charles E. Sims'
27  Request for Admissions as follows:
28

                                    -1-

Defendant responds to these requests for admissions with the understanding that discovery has not yet been completed. Defendant responds to these requests for admissions in good faith and with the understanding that additional and further information may subsequently be discovered and that, therefore, these requests for admissions are responded to without prejudice to defendant's rights to amend or modify said responses.

1. Denied.

2. Denied.

3. Denied.

4. Denied.

5. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". In light of this objection, this request is denied.

6. Defendant objects to the term "alias" and also objects to plaintiff's definition of same. In light of that objection, this request is denied.

7. Denied.

8. Denied.

9. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection,

defendant refers to said properties the "subject properties". Defendant also objects to the term "participated" as vague and ambiguous. In light of these objections, this request is denied.

10. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". In light of this objection, this request is denied.

11. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Defendant also objects to the term "action" as vague and ambiguous. This request is denied.

12. Denied.

13. Denied.

14. Denied.

15. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

16. Denied.

17. Denied.

18. Denied.

19. Denied.

20. Denied.

21. Denied.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

27. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

28. Defendant objects on the grounds that this request is irrelevant to any claim or defense in this action as well as irrelevant to the subject matter of this action. (See FRCP, Rule 26(b)(1); Hickman v. Taylor

-4-

(1947) 329 U.S. 495, 506-507.)  Defendant also objects on privacy

grounds.  (<u>Smith v. Bader</u> (SD NY 1979) 83 FRD 437, 438; <u>SEC</u>

<u>Cymaticolor Corp.</u> (SD NY 1985) 106 FRD 545, 547; <u>Premium Serv.</u>

<u>Corp. v. Sperry & Hutchinson Co.</u> (9th Cir. 1975) 511 F.2d 225, 229.)

Defendant also objects on the grounds of the Fifth Amendment's

privilege against self-incrimination.  (<u>Hoffman v. United States</u> (1951)

341 U.S. 479, 486-488.)

29. Defendant objects to the term "Transferred Properties" and also

objects to plaintiff's definition of same.  In light of that objection,

defendant refers to said properties the "subject properties".  Defendant

objects on the grounds that this request is irrelevant to any claim or

defense in this action as well as irrelevant to the subject matter of this

action.  (See FRCP, Rule 26(b)(1); <u>Hickman v. Taylor</u> (1947) 329

U.S. 495, 506-507.)  Defendant also objects on privacy grounds.

(<u>Smith v. Bader</u> (SD NY 1979) 83 FRD 437, 438; <u>SEC Cymaticolor</u>

<u>Corp.</u> (SD NY 1985) 106 FRD 545, 547; <u>Premium Serv. Corp. v.</u>

<u>Sperry & Hutchinson Co.</u> (9th Cir. 1975) 511 F.2d 225, 229.)

Defendant also objects on the grounds of the Fifth Amendment's

privilege against self-incrimination.  (<u>Hoffman v. United States</u> (1951)

341 U.S. 479, 486-488.)

30. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

31. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

32. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

33. Denied.

34. Denied.

35. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". In light of this objection, admitted.

36. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection,

defendant refers to said properties the "subject properties". This request is denied.

37.(A) Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied. 37.(B) Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

38. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

39. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

40. Denied.

41. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection,

defendant refers to said properties the "subject properties". This request is denied.

42. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

43. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

44. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied.

45. Denied.

46. Admitted.

47. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is admitted.

1  October 21, 2005

2  Jonathan G. Chance, Esq.

3  Attorney For K. YEGANEH,
   Defendant
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Document No. 53

1  Charles P. Maher, State Bar No. 124748
   Jeffrey L. Fillerup, State Bar No. 120543
2  Nhung Le, State Bar No. 209552
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  Rincon Center II, 121 Spear Street, Suite 200
   San Francisco, California 94105-1582
4  Telephone No.: 415.356.4600
   Fax No.: 415.356.4610
5

6  Attorneys for Plaintiff Charles E. Sims
   Trustee in Bankruptcy
7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10
   In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
11                                         Chapter 7

12           Debtor.

13
   _____

14 CHARLES E. SIMS, Trustee,              Adversary Proceeding
                                          No. 05-3241
15           Plaintiff,

16 vs.
                                          **INTERROGATORIES**
17 ALLIED MANAGEMENT TRUST and K.         **(Set One – K. Yeganeh)**
   YEGANEH aka KEN YEGANEH aka
18 KAIKHOSROW YEGANEH,,

19           Defendants.

20
   PROPOUNDING PARTY:    Plaintiff Charles E. Sims, trustee in bankruptcy
21
22 RESPONDING PARTY:     Defendant K. Yeganeh

23 SET:                  One (Nos. 1 through 25)

24        Plaintiff, Charles E. Sims, Trustee in bankruptcy, requests that Defendant K. Yeganeh aka

25 Ken Yeganeh aka Kaikhosrow Yeganeh respond to the following *Interrogatories* within thirty

26 (30) days after date of service thereon pursuant to Federal Rule of Civil Procedure 33 and

27 Bankruptcy Rule of Procedure 7033.

28

# DEFINITIONS

Unless the context indicates otherwise, the following words and phrases will be defined and used herein as follows:

1.     "ALLIED" refers to defendant Allied Management Trust and, if any, its past and present trustee, attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor corporations, partnerships or anyone else acting on its behalf or otherwise subject to its control.

2.     "YOU", "YOUR", and "K. YEGANEH" refers to defendant K. Yeganeh aka Ken Yeganeh aka Kaikhosrow Yeganeh, and, if any, his past and present trustee, attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor corporations, partnerships or anyone else acting on his behalf or otherwise subject to his control.

3.     "PLAINTIFF" refers to the Plaintiff, Charles E. Sims, Trustee in bankruptcy.

4.     "DEBTOR" refers to Ramin Yeganeh aka R. Rad, and, if any, his past and present attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor corporations, partnerships or anyone else acting on his behalf or otherwise subject to his control.

5.     "PERSON" as used herein refers to and includes a natural person, firm, association, organization, corporation, partnership, joint venture, business trust, public entity, and all other forms of entities.

6.     "DOCUMENT" and/or "DOCUMENTS" as used herein refers to and includes any kind of handwritten, typewritten or printed material, any kind of graphic material, or any kind of electronic or mechanically recorded material, however produced or reproduced, and includes, without limitation, papers, books, accounts, letters, photographs, sound recording tapes or video recording tapes, whether draft or final, whether signed or unsigned, including each original and each non-identical copy, whether different from the original by means of notes made on such copy or otherwise, and if the original is not in existence, the best copy or reproduction thereof, and embraces the term "writing" as defined in Federal Rule of Evidence 1001.

7.     "EACH" as used herein means each and every.

8.     "ANY" as used herein shall be understood to include and encompass "or", and "or"

1    shall be understood to include and encompass "and."

2    9.    "DATE" as used herein means the day of the month, the month, and the year.  If

3    only the approximate date is known or available, please state the approximate date, indicating that

4    it is an approximate only.

5    10.    "RELATING TO" as used herein means evidencing, summarizing, describing,

6    regarding, containing any record of, reference to or indication of, or referring to in any way.

7    11.    "IDENTIFY," "IDENTITY" or "IDENTIFICATION," when used with reference to

8    a document, means to set forth, with respect to the original and each copy thereof, the following

9    information:

10    a.    Its title or, if untitled, its nature (e.g., letter, memorandum, telegram, note,

11    chart, photograph, sound reproduction, computer printout, etc.);

12    b.    Its date;

13    c.    The identity of the person or persons who composed or originated it;

14    d.    The identity of each person, file and business entity to whom the original or

15    a copy was sent;

16    e.    Its substance;

17    f.    The name and last known address of each person who presently has custody

18    of it;

19    g.    If the document is no longer in your possession, custody or control, state

20    whether it was lost, destroyed or otherwise disposed of and describe the circumstances, including

21    your authorization and the date of such disposition; and

22    h.    If you claim any privilege against disclosure of any of the above

23    information with respect to any document, describe each such document sufficiently to allow

24    defendant to move the Court to compel its disclosure.

25    12.    "IDENTIFY," "IDENTITY" or "IDENTIFICATION," when applied to a person,

26    means to set forth the following information:

27    a.    His or her full name and last known home and business address;

28    b.    The identity of his or her employer or employers; and

3

1          c.      Each title and position he or she has held in a business entity by date, salary

2  and function (e.g., research, distribution, advertising, etc.).

3          13.     "IDENTIFY," "IDENTITY" or "IDENTIFICATION," when used with reference to

4  a business entity, means to set forth the following:

5          a.      The nature of its trade or business;

6          b.      The identity of its chief executive officer; and

7          c.      Its principal place of business.

8          14.     "IDENTIFY" or "DESCRIBE," when used with reference to an act, activity,

9  transaction, event, occurrence, meeting, agreement or communication, means to set forth the

10 following information:

11         a.      The date(s), time(s) and place(s) it occurred;

12         b.      The identity of each person and business entity participating therein; and

13         c.      Its nature (e.g., negotiations, etc.) and substance.

14         15.     "COMPLAINT" refers to the First Amended Complaint for Avoidance and

15 Recovery of Fraudulent Transfers filed by the Plaintiff in this Adversary Proceeding.

16         16.     "ANSWER" refers to the Answer to First-Amended Complaint filed by Defendant

17 in this Adversary Proceeding.

18         17.     "TAYLOR AVENUE PROPERTY" means the real property located at 2462

19 Taylor Avenue, Oakland, California (APN 048-5597-001).

20         18.     "73rd AVENUE PROPERTY" means the real property located at 1012 73rd

21 Avenue, Oakland, California (APN 041-4144-009).

22         19.     "79th AVENUE PROPERTY" means the real property located at 1278 79th Avenue,

23 Oakland, California (APN 041-4198-052).

24         20.     "69th AVENUE PROPERTY" means the real property located at 1086 69th Avenue,

25 Oakland, California (APN 041-4148-040).

26         21.     "AUSEON AVENUE PROPERTY" means the real property located at 2300

27 Auseon Avenue, Oakland, California (APN 043-4610-023).

28         22.     "TRANSFERRED PROPERTIES" means the Taylor Avenue Property, 73rd

Avenue Property, 79th Avenue Property, 69th Avenue Property and Auseon Avenue Property.

## INSTRUCTIONS

1.    Whenever an INTERROGATORY may be answered by referring to a document, the DOCUMENT may be attached as an exhibit to the response and referred to in the response. If the DOCUMENT has more than one page, refer to the page and section where the answer to the INTERROGATORY can be found.

2.    EACH answer must be as complete and straightforward as the information reasonably available to YOU permits. If an INTERROGATORY cannot be answered completely, answer it to the fullest extent possible.

3.    If YOU do not have enough personal knowledge to fully answer an INTERROGATORY, say so, but make a good, reasonable and good faith effort to obtain the information by asking other PERSONs or organizations.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

If YOUR response to any request for admission contained in *Plaintiff's Request for Admissions (Set One)*, served concurrently herewith, is anything but an unqualified admission, then please state each and every reason that YOU are not unqualifiedly admitting such request for admission.

**INTERROGATORY NO. 2:**

If YOUR response to any request for admission contained in *Plaintiff's Request for Admission (Set One)*, served concurrently herewith, is anything but an unqualified admission, then IDENTIFY each and every DOCUMENT that supports or relates to YOU not unqualifiedly admitting such request for admission.

//

//

5

**INTERROGATORY NO. 3:**

State the date and amount of each and every payment made to the DEBTOR in consideration or exchange for the    DEBTOR's    conveyances    of    the    TRANSFERRED PROPERTIES to YOU.

**INTERROGATORY NO. 4:**

State the date and amount of each payment YOU have made for taxes or insurance for any of the TRANSFERRED PROPERTIES at any time after March 1, 2003.

**INTERROGATORY NO. 5:**

With respect to each of the TRANSFERRED PROPERTIES, IDENTIFY the tenant for each of the TRANSFERRED PROPERTIES as of the date this adversary proceeding was filed (February 18, 2005) and the date these interrogatories are answered.

**INTERROGATORY NO. 6:**

With respect to each of the TRANSFERRED PROPERTIES, list the amount of the monthly rent that is paid for each of the TRANSFERRED PROPERTIES as of the date this adversary proceeding was filed (February 18, 2005)   and the date these interrogatories are answered.

**INTERROGATORY NO. 7:**

IDENTIFY by address and parcel number all real property in the State of California that was owned, in whole or part,   by  ALLIED or K. YEGANEH as of the date that this adversary proceeding was filed (February 18, 2005).

**INTERROGATORY NO. 8:**

IDENTIFY by address and parcel number all real property in the State of California that provided any income to  ALLIED or K. YEGANEH as of the date that this adversary proceeding was filed (February 18, 2005).

**INTERROGATORY NO. 9:**

IDENTIFY all trusts in which YOU are a trustee or beneficiary or in which YOU have any interest.

1  **INTERROGATORY NO. 10:**

2      IDENTIFY by address and parcel number, all transfers of real property in California

3  between YOU and the DEBTOR during the period January 1, 2001 to the date these

4  interrogatories are answered.

5  **INTERROGATORY NO. 11:**

6      State all facts which support YOUR contention that ALLIED or K. YEGANEH is the

7  legitimate owner of the TRANSFERRED PROPERTIES and that such properties are not subject

8  to PLAINTIFF's fraudulent conveyance claims alleged in the complaint.

9  **INTERROGATORY NO. 12:**

10      State all facts upon which YOU base your denial of all of the allegations of the

11  COMPLAINT.

12  **INTERROGATORY NO. 13:**

13      Identify all DOCUMENTS which refer, relate to, or evidence the facts set forth in YOUR

14  answer to Interrogatory No. 12.

15  **INTERROGATORY NO. 14:**

16      State all facts upon which YOU base your affirmative defenses set forth in the ANSWER.

17  **INTERROGATORY NO. 15:**

18      Identify all DOCUMENTS which refer, relate to, or evidence the facts set forth in YOUR

19  answer to Interrogatory No. 14.

20  **INTERROGATORY NO. 16:**

21      What do YOU contend the value of the TAYLOR AVENUE PROPERTY was at the time

22  the property was transferred from the DEBTOR to ALLIED on or about March 21, 2003?

23  **INTERROGATORY NO. 17:**

24      What do YOU contend the value of 73rd AVENUE PROPERTY was at the time the

25  property was transferred from the DEBTOR to ALLIED on or about March 21, 2003?

26  **INTERROGATORY NO. 18:**

27      What do YOU contend the value of the 79th AVENUE PROPERTY was at the time the

28  property was transferred from the DEBTOR to ALLIED on or about March 21, 2003?

7

1  **INTERROGATORY NO. 19:**

2      What do YOU contend the value of the 69th AVENUE PROPERTY was at the time the

3  property was transferred from the DEBTOR to ALLIED on or about March 21, 2003?

4  **INTERROGATORY NO. 20:**

5      What do YOU contend the value of the AUSEON AVENUE PROPERTY was at the time

6  the property was transferred from the DEBTOR to ALLIED on or about May 6, 2003?

7  **INTERROGATORY NO. 21:**

8      Describe the DEBTOR's relationship to YOU.

9  **INTERROGATORY NO. 22:**

10      Explain why the DEBTOR used the name R. Rad when he signed the grant deeds

11  conveying the TRANSFERRED PROPERTIES to ALLIED.

12  **INTERROGATORY NO. 23:**

13      Why were the TAYLOR AVENUE PROPERTY, 73rd AVENUE PROPERTY, 79th

14  AVENUE PROPERTY and 69th AVENUE PROPERTY  in the DEBTOR's name prior to March

15  21, 2003?

16  **INTERROGATORY NO. 24:**

17      Why was the AUSEON AVENUE PROPERTY in the DEBTOR's name prior to May 5,

18  2003?

19  **INTERROGATORY NO. 25:**

20      Explain why ALLIED conveyed the TRANSFERRED PROPERTIES to YOU on or about

21  February 22, 2005.

22  Dated: August 10, 2005                    LUCE, FORWARD, HAMILTON & SCRIPPS, LLP

23

24                                            By: _____

25                                                 Nhung Le,

26  184893.1                                       Counsel for Plaintiff Charles E. Sims, Trustee

27

28

# Document No. 54

1  JONATHAN G. CHANCE, ESQ.
   JC LAW OFFICES
2  1605 Middlefield Rd.
   Redwood City, CA 94063
3  Tel: 650-299-1269
   Fax: 650-429-2048
4
5  Attorney For K. YEGANEH
   Trustee of Allied Management Trust
6
7             IN THE UNITED STATES BANKRUPTCY COURT
8             FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10 In re RAMIN YEGANEH,              ) Case No. 05-30047 TEC
                                     )
11         Debtor.                   ) Chapter 7
                                     )
12 _____  )
   CHARLES E. SIMS, Trustee,        ) Adversary Proceeding No. 05-3241
13                                   )
14         Plaintiff,                )
                                     )
15    vs.                            )
                                     )
16                                   )
17 ALLIED MANAGEMENT TRUST,         ) DEFENDANT'S RESPONSES TO
   And K. YEGANEH, ET AL            ) INTERROGATORIES
18                                   )
19                                   )
                                     )
20         Defendants.               )
   _____  )
21
22 PROPOUNDING PARTY: Plaintiff Charles E. Sims, Trustee in Bankruptcy
23 RESPONDING PARTY: Defendant K. Yeganeh
24 SET NUMBER: ONE
25
26         COMES NOW Defendant K. Yeganeh and responds to Plaintiff Charles E. Sims'
27 Interrogatories as follows:
28

-1-

Defendant responds to these interrogatories with the understanding that discovery has not yet been completed. Defendant responds to these interrogatories in good faith and with the understanding that additional and further information may subsequently be discovered and that, therefore, these interrogatories are responded to without prejudice to defendant's rights to amend or modify said responses.

INTERROGATORY NO. 1

Defendant objects to this interrogatory as overly broad and unduly burdensome. Subject to and without waiving this objection, Defendant responds as follows:

1. Denied. Though the debtor was on title for a short period of time prior to March 20, 2003, defendant was and still is the owner of the subject properties.

2. Denied. Though the debtor was on title for a short period of time prior to May 5, 2003, defendant was and still is the owner of the subject property.

3. Denied. Debtor purchased the subject properties for the defendant who was and is the owner.

4. Denied. Debtor purchased the subject property for the defendant who was and still is the owner.

5. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection,

-2-

defendant refers to said properties the "subject properties". In light of this objection, this request is denied. Defendant is not sure that the only written records are the grant deeds.

6. Defendant objects to the term "alias" and also objects to plaintiff's definition of same. In light of that objection, this request is denied. R. Rad is not an alias.

7. Denied. Defendant is not sure when he knew and found out that the debtor had recorded that grant deed.

8. Denied. Defendant is not sure when he knew and found out that the debtor had recorded that grant deed.

9. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Defendant also objects to the term "participated" as vague and ambiguous. In light of these objections, this request is denied. The term "participated" is too vague for defendant to respond.

10. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". In light of this objection, this request is denied. Defendant does not know

whether the debtor was considered his agent, trustee, or employee of any kind or nature when the grant deeds were recorded on the subject properties.

11. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Defendant also objects to the term "action" as vague and ambiguous. This request is denied. Defendant does not remember if he took any "action" or not.

12. Denied. Defendant did not follow the debtor's criminal case and was not aware of the specific nature of the debtor's criminal case.

13. Denied. Defendant did not follow the debtor's criminal case and was not aware of the specific nature of the debtor's criminal case.

14. Denied. Defendant did not follow the debtor's criminal case and was not aware of the specific nature of the debtor's criminal case. Defendant did not know that the debtor was considered a convicted felon.

15. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection,

-4-

defendant refers to said properties the "subject properties". This request is denied. Defendant did not follow debtor's civil case.

16. Denied. Defendant did not follow debtor's civil case and did not have any specific information about that case.

17. Denied. Defendant did not follow debtor's civil case and did not have any specific information about that case.

18. Denied. Defendant did treat the subject properties as his own and the same before and after March 21, 2003.

19. Denied. Defendant did treat the subject property as his own and the same before and after May 5, 2003.

20. Denied. Defendant did treat the subject properties as his own and the same before and after March 21, 2003.

21. Denied. Defendant did treat the subject property as his own and the same before and after May 5, 2003.

22. Denied. Debtor paid only some of the expenses related to the subject properties on my behalf.

23. Denied. Debtor paid only some of the expenses related to the subject property on my behalf.

24. Denied. Debtor did not receive any income from the subject properties.

ER - 336

25. Denied.  Debtor did not receive any income from the subject property.

26. Defendant objects to the term "Transferred Properties" and also

    objects to plaintiff's definition of same.  In light of that objection,

    defendant refers to said properties the "subject properties".  This

    request is denied.  Defendant does not know what the debtor

    represented in his tax returns for 2002 and 2003.

27. Defendant objects to the term "Transferred Properties" and also

    objects to plaintiff's definition of same.  In light of that objection,

    defendant refers to said properties the "subject properties".  This

    request is denied.  Debtor purchased the subject properties with

    defendant's money.  The subject properties were mine to start with.

28. Defendant objects on the grounds that this request is irrelevant to any

    claim or defense in this action as well as irrelevant to the subject

    matter of this action.  (See FRCP, Rule 26(b)(1); Hickman v. Taylor

    (1947) 329 U.S. 495, 506-507.)  Defendant also objects on privacy

    grounds.  (Smith v. Bader (SD NY 1979) 83 FRD 437, 438; SEC

    Cymaticolor Corp. (SD NY 1985) 106 FRD 545, 547; Premium Serv.

    Corp. v. Sperry & Hutchinson Co. (9th Cir. 1975) 511 F.2d 225, 229.)

    Defendant also objects on the grounds of the Fifth Amendment's

privilege against self-incrimination.  (Hoffman v. United States (1951)

341 U.S. 479, 486-488.)

29. Defendant objects to the term "Transferred Properties" and also

objects to plaintiff's definition of same.  In light of that objection,

defendant refers to said properties the "subject properties".  Defendant

objects on the grounds that this request is irrelevant to any claim or

defense in this action as well as irrelevant to the subject matter of this

action.  (See FRCP, Rule 26(b)(1); Hickman v. Taylor (1947) 329

U.S. 495, 506-507.)  Defendant also objects on privacy grounds.

(Smith v. Bader (SD NY 1979) 83 FRD 437, 438; SEC Cymaticolor

Corp. (SD NY 1985) 106 FRD 545, 547; Premium Serv. Corp. v.

Sperry & Hutchinson Co. (9th Cir. 1975) 511 F.2d 225, 229.)

Defendant also objects on the grounds of the Fifth Amendment's

privilege against self-incrimination.  (Hoffman v. United States (1951)

341 U.S. 479, 486-488.)

30. Defendant objects to the term "Transferred Properties" and also

objects to plaintiff's definition of same.  In light of that objection,

defendant refers to said properties the "subject properties".  This

request is denied.  Defendant has paid some insurance premiums on

the subject properties.

31. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied. Debtor has paid some insurance premiums on the subject properties on my behalf.

32. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied. Defendant did pay some property taxes on the subject properties.

33. Denied. Defendant did not follow debtor's civil case. There were no judgments against the debtor back in 2003. There were no judgments against the debtor back in 2003 for anyone to collect on.

34. Denied. Defendant did not follow debtor's civil case. There were no judgments against the debtor back in 2003 for anyone to collect on.

35. Admitted.

36. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This

-8-

request is denied.   The recording of the grant deeds do not constitute fraudulent conveyances.

37.(A) Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same.  In light of that objection, defendant refers to said properties the "subject properties".  This request is denied.  The recording of the grant deeds do not constitute fraudulent conveyances.  37.(B) Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same.  In light of that objection, defendant refers to said properties the "subject properties".  This request is denied.  The recording of the grant deeds were do not constitute transfers of debtor's interest.

38.Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same.  In light of that objection, defendant refers to said properties the "subject properties".  This request is denied.  The recording of the grant deeds were not transfers.

39.Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same.  In light of that objection, defendant refers to said properties the "subject properties".  This request is denied.  Properties were defendant's to start with.

40. Denied.  Debtor did not become insolvent and was not insolvent as a
result of recordings of the grant deeds on  March 21, 2003 and on
May 5, 2003.  There were no judgments against the debtor in 2003.

41. Defendant objects to the term "Transferred Properties" and also
objects to plaintiff's definition of same.  In light of that objection,
defendant refers to said properties the "subject properties".  This
request is denied.  Debtor did not become insolvent and was not
insolvent as a result of recordings of the grant deeds on  March 21,
2003 and on May 5, 2003.  There were no judgments against the
debtor in 2003.

42. Defendant objects to the term "Transferred Properties" and also
objects to plaintiff's definition of same.  In light of that objection,
defendant refers to said properties the "subject properties".  This
request is denied.  Debtor did not become insolvent and was not
insolvent as a result of recordings of the grant deeds on  March 21,
2003 and on May 5, 2003.  There were no judgments against the
debtor in 2003.  Debtor's properties in 2003 were not of an
unreasonable small value.

43. Defendant objects to the term "Transferred Properties" and also
objects to plaintiff's definition of same.  In light of that objection,

-10-

defendant refers to said properties the "subject properties". This request is denied. There were no judgments against the debtor in 2003.

44. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is denied. Debtor used defendant's monies to purchase the subject properties for the defendant and for defendant's benefit.

45. Denied. Defendant created Allied Management Trust for his benefit.

46. Admitted.

47. Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". This request is admitted.

<u>INTERROGATORY NO. 2</u>

Defendant objects to this interrogatory as overly broad and unduly burdensome. Subject to and without waiving this objection, Defendant refers to its responses to Requests for Production of Documents.

<u>INTERROGATORY NO. 3</u>

Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Defendant was the owner of the properties to begin with.

## INTERROGATORY NO. 4

Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Other than the responses to Interrogatory No. 2, the defendant cannot find any additional records or documents responsive to this interrogatory.

## INTERROGATORY NO. 5

Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Defendant also objects on the grounds that this interrogatory is irrelevant to any claim or defense in this action as well as irrelevant to the subject matter of this action. (See FRCP, Rule 26(b)(1); Hickman v. Taylor (1947) 329 U.S. 495, 506-507.) Defendant also objects on privacy grounds. (12 U.S.C. { 3401.) Defendant also objects on the grounds of the Fifth Amendment's

privilege against self-incrimination.  (<u>Hoffman v. United States</u> (1951)

341 U.S. 479, 486-488.)

INTERROGATORY NO. 6

Defendant objects to the term "Transferred Properties" and also objects

to plaintiff's definition of same.  In light of that objection, defendant

refers to said properties the "subject properties".  Defendant also objects

on the grounds that this interrogatory is irrelevant to any claim or defense

in this action as well as irrelevant to the subject matter of this action.

(See FRCP, Rule 26(b)(1); <u>Hickman v. Taylor</u> (1947) 329 U.S. 495, 506-

507.)  Defendant also objects on privacy grounds.  (12 U.S.C. { 3401.)

Defendant also objects on the grounds of the Fifth Amendment's

privilege against self-incrimination.  (<u>Hoffman v. United States</u> (1951)

341 U.S. 479, 486-488.)

INTERROGATORY NO. 7

Defendant objects on the grounds that this interrogatory is irrelevant to

any claim or defense in this action as well as irrelevant to the subject

matter of this action.  (See FRCP, Rule 26(b)(1); <u>Hickman v. Taylor</u>

(1947) 329 U.S. 495, 506-507.)  Defendant also objects on privacy

grounds.  (12 U.S.C. { 3401.)  Defendant also objects on the grounds of

the Fifth Amendment's privilege against self-incrimination.  (<u>Hoffman v.</u>

<u>United States</u> (1951) 341 U.S. 479, 486-488.)

INTERROGATORY NO. 8

Defendant objects on the grounds that this interrogatory is irrelevant to

any claim or defense in this action as well as irrelevant to the subject

matter of this action.  (See FRCP, Rule 26(b)(1); <u>Hickman v. Taylor</u>

(1947) 329 U.S. 495, 506-507.)  Defendant also objects on privacy

grounds.  (12 U.S.C. { 3401.)  Defendant also objects on the grounds of

the Fifth Amendment's privilege against self-incrimination.  (<u>Hoffman v.</u>

<u>United States</u> (1951) 341 U.S. 479, 486-488.)

INTERROGATGORY NO. 9

Allied Management Trust.

INTERROGATORY NO. 10

The only alleged transferred properties are the subject properties.

INTERROGATORY NO. 11

Defendant objects to the term "Transferred Properties" and also objects

to plaintiff's definition of same.  In light of that objection, defendant

refers to said properties the "subject properties".  See answer to

complaint and responses to Interrogatory No. 1.

INTERROGATORY NO. 12

-14-

See answer to complaint and responses to Interrogatory No. 1.

INTERROGATORY NO. 13

See responses to Requests for Production of Documents.

INTERROGATORY NO. 14

See answer to complaint and responses to Interrogatory No. 1.

INTERROGATORY NO. 15

See responses to Interrogatory No. 1 and responses to Requests for Production of Documents.

INTERROGATORY NO. 16

Defendant does not know the value of that property at that time.

INTERROGATORY NO. 17

Defendant does not know the value of that property at that time.

INTERROGATORY NO. 18

Defendant does not know the value of that property at that time.

INTERROGATORY NO. 19

Defendant does not know the value of that property at that time.

INTERROGATORY NO. 20

Defendant does not know the value of that property at that time.

INTERROGATORY NO. 21

Debtor is defendant's son.

<u>VERIFICATION</u>

I am the defendant in the above-entitled action. I have read and am familiar with the request for interrogatories propounded by Plaintiff Charles E. Sims and the foregoing responses thereto. I have personal knowledge regarding the factual background of these responses and declare under penalty of perjury under the laws of the State of California and the United States of America that these responses are true and correct to the best of my knowledge.

Executed at San Mateo, California on October 21, 2005.

K. YEGANEH,
Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re RAMIN YEGANEH, | Case No. C 07-03256 JSW |
| Debtor. | |
| CHARLES E. SIMS, Trustee, | Bankruptcy Case No. 05-30047 TEC |
| Appellee, | Adversary Pro. No. 05-3241 TEC |
| v. | |
| ALLIED MANAGEMENT TRUST, and KEN YEGANEH, | |
| Appellants. | |

**<u>APPELLEE'S EXCERPT OF RECORD</u>**

**(Volume III)**

Charles A. Bird, CSB 56566
Charles P. Maher, CSB 124748
LUCE, FORWARD, HAMILTON & SCRIPPS, LLP
121 Spear Street, Suite 200
San Francisco, CA 94105
Telephone:  (415) 356-4600
Facsimile:  (415) 356-4610

Attorneys for Appellee Andrea A. Wirum,
Successor-in-Interest to Charles E. Sims

## TABLE OF CONTENTS

### Volume III of III

| Document | Docket No. | Document No. | Page No. |
|---|---|---|---|
| Request for Production of Documents (Set One – K. Yeganeh) dated August 10, 2005, propounded by Plaintiff Charles E. Sims, Trustee | 56 | 55 | ER-348 |
| Defendant's Responses to Requests for Production of Documents dated October 21, 2005 | 56 | 56 | ER-352 |
| K. Yeganeh Depo Transcript, pp. 15, 21 | 56 | 57 | ER-368 |
| K. Yeganeh Depo Transcript, pp. 17-18 | 56 | 58 | ER-371 |
| K. Yeganeh Depo Transcript, pp. 21-24 | 56 | 59 | ER-374 |
| K. Yeganeh Depo Transcript, p. 32 | 56 | 60 | ER-379 |
| K. Yeganeh Depo Transcript, p. 36 | 56 | 61 | ER-381 |
| K. Yeganeh Depo Transcript, p. 48 | 56 | 62 | ER-383 |
| R. Yeganeh Depo Transcript, pp. 57, 64-67 | 56 | 63 | ER-385 |
| R. Yeganeh Depo Transcript, pp. 65-67, 80 | 56 | 64 | ER-391 |
| R. Yeganeh Depo Transcript, pp. 95-96 | 56 | 65 | ER-396 |
| R. Yeganeh Depo Transcript, pp. 170-171 | 56 | 66 | ER-399 |
| K. Yeganeh Depo Transcript, p. 11 | 56 | 67 | ER-402 |
| R. Yeganeh April 18, 2002 Testimony, pp. 46-48 | 56 | 68 | ER-404 |
| R. Yeganeh June 9, 2005 Transcript, pp. 508-513 | 56 | 69 | ER-408 |
| Correspondence dated March 17, 2006 from Jonathan G. Chance, attorney for K. Yeganeh and Allied Management Trust, to Jeffrey Fillerup, attorney for Plaintiff Charles E. Sims | 56 | 70 | ER-415 |
| Correspondence dated March 21, 2006 from William E. Gilg to Jeffrey Fillerup, attorney for Plaintiff Charles E. Sims | 56 | 71 | ER-418 |
| Correspondence dated March 27, 2006 from Jeffrey L. Fillerup to Jonathan G. Chance | 56 | 72 | ER-420 |

# Document No. 55

1    Charles P. Maher, State Bar No. 124748
     Jeffrey L. Fillerup, State Bar No. 120543
2    Nhung Le, State Bar No. 209552
     LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3    Rincon Center II, 121 Spear Street, Suite 200
     San Francisco, California 94105-1582
4    Telephone No.: 415.356.4600
     Fax No.: 415.356.4610
5

6    Attorneys for Plaintiff Charles E. Sims
     Trustee in Bankruptcy
7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11   In re RAMIN YEGANEH,                    Case No. 05-30047 TEC
                                             Chapter 7
12                      Debtor.

13   _____

14   CHARLES E. SIMS, Trustee,              Adversary Proceeding
                                            No. 05-3241
15                      Plaintiff.

16   vs.

17   ALLIED MANAGEMENT TRUST and K.         **REQUEST FOR PRODUCTION OF**
     YEGANEH aka KEN YEGANEH aka            **DOCUMENTS**
18   KAIKHOSROW YEGANEH,,                   **(Set One – K. Yeganeh)**

19                      Defendants.

20   _____

21   PROPOUNDING PARTY:    Plaintiff Charles E. Sims, trustee in bankruptcy

22   RESPONDING PARTY:     Defendant K. Yeganeh

23   SET:                  One (Nos. 1 through 7)

24          Plaintiff Charles E. Sims, Trustee in bankruptcy, requests that Defendant K. Yeganeh aka

25   Ken Yeganeh aka Kaikhosrow Yeganeh produce complete and legible copies of the following

26   documents to the office of Luce, Forward, Hamilton & Scripps LLP, whose address is 121 Spear

27   Street, Suite 200, San Francisco, California 94105, within thirty (30) days after date of service

28   thereon pursuant to Federal Rule of Civil Procedure 34 and Bankruptcy Rule of Procedure 7034.

                                             1

                                         ER - 348

1                              **DEFINITIONS**

2          Unless the context indicates otherwise, the following words and phrases will be defined

3     and used herein as follows:

4          1.      "YOU", "YOUR", and "K. YEGANEH" refers to defendant K. Yeganeh aka Ken

5     Yeganeh aka Kaikhosrow Yeganeh, and, if any, his past and present trustee, attorneys,

6     accountants, employees, agents, representatives, corporations, predecessors or successor

7     corporations, partnerships or anyone else acting on his behalf or otherwise subject to his control.

8          2.      "PLAINTIFF" refers to the Plaintiff, Charles E. Sims, Trustee in bankruptcy.

9          3.      "DEBTOR" refers to Ramin Yeganeh aka R. Rad, and, if any, his past and present

10    attorneys, accountants, employees, agents, representatives, corporations, predecessors or successor

11    corporations, partnerships or anyone else acting on his behalf or otherwise subject to his control.

12         4.      "PERSON" as used herein refers to and includes a natural person, firm, association,

13    organization, corporation, partnership, joint venture, business trust, public entity, and all other

14    forms of entities.

15         5.      "DOCUMENT" and/or "DOCUMENTS" as used herein refers to and includes any

16    kind of handwritten, typewritten or printed material, any kind of graphic material, or any kind of

17    electronic or mechanically recorded material, however produced or reproduced, and includes,

18    without limitation, papers, books, accounts, letters, photographs, sound recording tapes or video

19    recording tapes, whether draft or final, whether signed or unsigned, including each original and

20    each non-identical copy, whether different from the original by means of notes made on such copy

21    or otherwise, and if the original is not in existence, the best copy or reproduction thereof, and

22    embraces the term "writing" as defined in Federal Rule of Evidence 1001.

23         6.      "EACH" as used herein means each and every.

24         7.      "ANY" as used herein shall be understood to include and encompass "or", and "or"

25    shall be understood to include and encompass "and."

26         8.      "DATE" as used herein means the day of the month, the month, and the year. If

27    only the approximate date is known or available, please state the approximate date, indicating that

28    it is an approximate only.

                                        2

9.     "RELATING TO" as used herein means evidencing, summarizing, describing, regarding, containing any record of, reference to or indication of, or referring to in any way.

10.    "COMPLAINT" refers to the First Amended Complaint for Avoidance and Recovery of Fraudulent Transfers filed by the Plaintiff in this Adversary Proceeding.

11.    "ANSWER" refers to the Answer to First-Amended Complaint filed by Defendant in this Adversary Proceeding.

12.    "TAYLOR AVENUE PROPERTY" means the real property located at 2462 Taylor Avenue, Oakland, California (APN 048-5597-001).

13.    "73rd AVENUE PROPERTY" means the real property located at 1012 73rd Avenue, Oakland, California (APN 041-4144-009).

14.    "79th AVENUE PROPERTY" means the real property located at 1278 79th Avenue, Oakland, California (APN 041-4198-052).

15.    "69th AVENUE PROPERTY" means the real property located at 1086 69th Avenue, Oakland, California (APN 041-4148-040).

16.    "AUSEON AVENUE PROPERTY" means the real property located at 2300 Auseon Avenue, Oakland, California (APN 043-4610-023).

17.    "TRANSFERRED PROPERTIES" means the Taylor Avenue Property, 73rd Avenue Property, 79th Avenue Property, 69th Avenue Property and Auseon Avenue Property.

## DOCUMENTS REQUESTED

**REQUEST NO. 1**

All documents described or identified by YOUR Answers to Plaintiff's *Interrogatories (Set One)* served on YOU concurrently with these *Request For Production of Documents.*

**REQUEST NO. 2**

All DOCUMENTS RELATING TO, referring to or evidencing Allied Management Trust, including but not limited to the trust agreement.

//

3

1    **REQUEST NO. 3**

2    All DOCUMENTS RELATING TO, referring to or evidencing any agreement between the

3    DEBTOR and YOU RELATING TO the TRANSFERRED PROPERTIES

4    **REQUEST NO. 4**

5    All DOCUMENTS RELATING TO, referring to or evidencing any consideration paid by

6    YOU to the DEBTOR in exchange for the TRANSFERRED PROPERTIES.

7    **REQUEST NO. 5**

8    All DOCUMENTS RELATING TO, referring to or evidencing any source of income YOU

9    receive from January 2004 to the present date.

10   **REQUEST NO. 6**

11   Any and all written lease agreement for the TRANSFERRED PROPERTIES.

12   **REQUEST NO. 7**

13   Any and all DOCUMENTS evidencing any property, real or personal, owned by YOU or

14   in which YOU have an interest.

15   Dated: August 10, 2005                    LUCE, FORWARD, HAMILTON & SCRIPPS, LLP

16

17

18   By: _____

19   Nhung Le,
     Counsel for Plaintiff Charles E. Sims, Trustee

20   184894.1

21

22

23

24

25

26

27

28

# Document No. 56

1  JONATHAN G. CHANCE, ESQ.
   JC LAW OFFICES
2  1605 Middlefield Rd.
   Redwood City, CA 94063
3  Tel:  650-299-1269
   Fax: 650-429-2048
4
   Attorney For K. YEGANEH
5  Trustee of Allied Management Trust
6
7              IN THE UNITED STATES BANKRUPTCY COURT

8             FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 In re RAMIN YEGANEH,              ) Case No. 05-30047 TEC
                                     )
11          Debtor.                  ) Chapter 7
                                     )
12 _____  )
   CHARLES E. SIMS, Trustee,         ) Adversary Proceeding No. 05-3241
13                                   )
14          Plaintiff,               )
                                     )
15     vs.                           )
                                     )
16                                   )
   ALLIED MANAGEMENT TRUST,          ) DEFENDANT'S RESPONSES TO
17 And K. YEGANEH, ET AL             ) REQUESTS FOR PRODUCTION
                                     ) OF DOCUMENTS
18                                   )
19                                   )
                                     )
20          Defendants.              )
   _____  )
21

22 PROPOUNDING PARTY: Plaintiff Charles E. Sims, Trustee in Bankruptcy

23 RESPONDING PARTY: Defendant K. Yeganeh

24 SET NUMBER: ONE

25

26        COMES NOW Defendant K. Yeganeh and responds to Plaintiff Charles E. Sims'

27 Request for Production of Documents as follows:

28

                              -1-

                          ER - 352

1       Defendant responds to these requests with the understanding that discovery has
2
3   not yet been completed.  Defendant responds to these requests in good faith and with the
4   understanding that additional and further information may subsequently be discovered
5   and that, therefore, these requests are responded to without prejudice to defendant's rights
6   to amend or modify said responses.
7
8   REQUEST NO. 1:
9
10  Defendant will comply with plaintiff's request and all documents in his
11  possession, custody, or control, regarding his response to plaintiff's
12  interrogatories will be produced.  See attached.
13
14  REQUEST NO. 2
15  Other than the attached documents, defendant does not have any other
16
17  documents regarding this request.  A diligent search and reasonable inquiry
18  have been made.
19
20  REQUEST NO. 3
21  Defendant objects to the term "Transferred Properties" and also objects to
22  plaintiff's definition of same.  In light of that objection, defendant refers to
23
24  said properties the "subject properties".   After a diligent search and
25  reasonable inquiry, defendant maintains that there are no such documents.
26
27  REQUEST NO. 4
28

ER - 353

Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". After a diligent search and reasonable inquiry, defendant maintains that there are no such documents. The subject properties were the defendant's to start with.

REQUEST NO. 5

Defendant objects on the grounds that this request is irrelevant to any claim or defense in this action as well as irrelevant to the subject matter of this action. (See FRCP, Rule 26(b)(1); Hickman v. Taylor (1947) 329 U.S. 495, 506-507.) Defendant also objects on privacy grounds. (12 U.S.C. { 3401.) Defendant also objects on the grounds of the Fifth Amendment's privilege against self-incrimination. (Hoffman v. United States (1951) 341 U.S. 479, 486-488.)

REQUEST NO. 6

Defendant objects to the term "Transferred Properties" and also objects to plaintiff's definition of same. In light of that objection, defendant refers to said properties the "subject properties". Defendant also objects on the grounds that this request is irrelevant to any claim or defense in this action as well as irrelevant to the subject matter of this action. (See FRCP, Rule 26(b)(1); Hickman v. Taylor (1947) 329 U.S. 495, 506-507.) Defendant also

objects on privacy grounds. (12 U.S.C. { 3401.) Defendant also objects on the grounds of the Fifth Amendment's privilege against self-incrimination. (Hoffman v. United States (1951) 341 U.S. 479, 486-488.)

REQUEST NO. 7

Defendant objects on the grounds that this request is irrelevant to any claim or defense in this action as well as irrelevant to the subject matter of this action. (See FRCP, Rule 26(b)(1); Hickman v. Taylor (1947) 329 U.S. 495, 506-507.) Defendant also objects on privacy grounds. (12 U.S.C. { 3401.) Defendant also objects on the grounds of the Fifth Amendment's privilege against self-incrimination. (Hoffman v. United States (1951) 341 U.S. 479, 486-488.)

October 21, 2005

_____
Jonathan G. Chance, Esq.
Attorney For K. YEGANEH,
Defendant

-4-

EXHIBIT A

Recording Requested by:
and

WHEN RECORDED MAIL TO:

    K. Yeganeh
    331 36th Ave
    San Mateo, CA 94403



2005078809    02/22/2005 10:54 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:        10.00

                                    2    PGS

---

## GRANT DEED

APN: 048-5597-001
     043-4610-023
     041-4198-052
     041-4148-040
     041-4144-009

THIS SPACE FOR RECORDER'S USE ONLY:

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANS
TAX IS: $ 0/none                            $  0/none
X    Computed on the consideration or value of property conveyed; OR
___    Computed on the consideration or value less or encumbrances
       remaining at time of sale.

                                    transfer out of trust
                                    not pursuant to sale

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
    Allied Management Trust

hereby GRANT(S) to
    K. Yeganeh,

all the real property situated in the City of Oakland, County of Alameda , State of California, described as:

    see attached Exhibit "A"

Dated: 11/29/04

STATE OF CALIFORNIA
COUNTY OF  SAN MATEO
On Nov. 29 2004 before me MARK DAHL,
NOTARY PUBLIC
personally appeared  K. YEGANEH

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature

K. Yeganeh, trustee of
Allied Management Trust &
beneficiary of Allied Management
Trust

MARK DAHL
Commission # 1316064
Notary Public - California
San Mateo County
My Comm. Expires Aug 30, 2005

(This area for official notarial seal)

MAIL TAX
STATEMENTS TO:  above

## Exhibit "A"

Portion of Lot 3, Block A, Map of Toler Heights, filed September 30, 1907, Map Book 23, page 34, Alameda County Records, described as follows:

Beginning at a point on the Southeastern line of Taylor Avenue, distant thereon Southeasterly line of Thermal(formerly Derby) Street as shown on said map; thence South 32 degrees 23'40" East to the Southeastern line of said Block A; thence South 71 degrees 33' West along said line of said Block A, to the Northeastern line of MacArthur (formerly Foothill) Boulevard, as shown on said map; thence Northwesterly and along said line of MacArthur Boulevard, 17.49 feet to the Southeastern line of Taylor Avenue; thence Northeasterly thereon, 94.84 feet, more or less, to the point of beginning. APN: 048-5597-001

Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda County Records.
APN: 041-4198-052

Commencing at a point on the Southeastern line of 68th Avenue seventy-two feet, two inches Southwesterly from the intersection thereof with the Southwestern line of Hamilton Street, as the said Avenue and street are shown upon the Map hereinafter referred to; running thence Southwesterly along the said line of 68th Avenue thirty-five feet; thence at right angles Southeasterly one hundred feet; thence at right angle Northeasterly thirty-five feet; thence at right angles Northwesterly one hundred feet to the point of beginning. Being a portion of lots numbered 1, 2, and 5 in Block numbered 25, as the said Lots and Block are shown upon that certain Map entitled, "Fitchburg Homestead Lots;"filed June 25, 1870 in the Office of the County Recorder of Alameda County.
APN: 041-4148-040

Lots 41 and 42, Block 21, Map of Resubdivision of the Townsite of Fitchburg, formerly Fitchburg, Lots, filed May 18, 1892, Map Book 17, page 9, Alameda County Records.
APN: 041-4144-009

Lot 1, Block 11, Auseon's Moss Tract, filed September 11, 1907 in Book 23, Page 31 of Maps, Alameda County Records.
APN 043-4610-023

Recording Requested by:

and

WHEN RECORDED MAIL TO:

Allied Management Trust
2462 Taylor Avenue
Oakland, CA  94605

20031862534 03/21/2003 03:20 PM
OFFICIAL RECORDS OF    RECORDING FEE: 20.00
ALAMEDA COUNTY        COUNTY TAX:    11.00
PATRICK O'CONNELL     CITY TAX:     150.00

2  PGS

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 048-5597-001
     041-4198-052
     041-4148-040
     041-4144-009

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS: $ 11.00                        $ 150.00
X   Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances
    remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

   R. Rad, a single man

hereby GRANT(S) to

   Allied Management Trust

all the real property situated in the City of  Oakland, County of Alameda  , State of California, described as:

   see attached Exhibit "A"

Dated: March 21, 2003

STATE OF CALIFORNIA
COUNTY OF Alameda                    }ss
On 3-21-2003 before me Karen M. Scott

personally appeared  R. Rad

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature  Karen M Scott

MAIL TAX
STATEMENTS TO:    above

R. Rad
R. Rad



KAREN M. SCOTT
COMM. #1306139
Notary Public-California
ALAMEDA COUNTY
My Comm. Exp. May 27, 2005

2005

(This area for official notarial seal)

ER - 359

### Exhibit "A"

Portion of Lot 3, Block A, Map of Toler Heights, filed September 30, 1907, Map Book 23, page 34, Alameda County Records, described as follows:

Beginning at a point on the Southeastern line of Taylor Avenue, distant thereon Southeasterly line of Thermal(formerly Derby) Street as shown on said map; thence South 32 degrees 23'40" East to the Southeastern line of said Block A; thence South 71 degrees 33' West along said line of said Block A, to the Northeastern line of MacArthur (formerly Foothill) Boulevard, as shown on said map; thence Northwesterly and along said line of MacArthur Boulevard, 17.49 feet to the Southeastern line of Taylor Avenue; thence Northeasterly thereon, 94.84 feet, more or less, to the point of beginning.
APN: 048-5597-001

Lot 17, Block "C" East Fourteenth Street, Villa Tract, City of Oakland, filed December 12, 1905, Map Book 18, page 87, Alameda County Records.
APN: 041-4198-052

Commencing at a point on the Southeastern line of 68th Avenue seventy-two feet, two inches Southwesterly from the intersection thereof with the Southwestern line of Hamilton Street, as the said Avenue and street are shown upon the Map hereinafter referred to; running thence Southwesterly along the said line of 68th Avenue thirty-five feet; thence at right angles Southeasterly one hundred feet; thence at right angle Northeasterly thirty-five feet; thence at right angles Northwesterly one hundred feet to the point of beginning. Being a portion of lots numbered 1, 2, and 5 in Block numbered 25, as the said Lots and Block are shown upon that certain Map entitled, "Fitchburg Homestead Lots;"filed June 25, 1870 in the Office of the County Recorder of Alameda County.
APN: 041-4148-040

Lots 41 and 42, Block 21, Map of Resubdivision of the Townsite of Fitchburg, formerly Fitchburg, Lots, filed May 18, 1892, Map Book 17, page 9, Alameda County Records.
APN: 041-4144-009



Recording Requested by:

and

WHEN RECORDED MAIL TO:

Allied Management Trust
2462 Taylor Ave
Oakland, CA  94605



20032G..0    05/06/2003 02:58 PM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICE O'CONNELL
RECORDING FEE:
COUNTY TAX:        7.00
CITY TAX:          1.10
                  18.00

1    PG

THIS SPACE FOR RECORDER'S USE ONLY:

# GRANT DEED

APN: 043-4610-023

The undersigned Grantor(s) declare(s) that the DOCUMENTARY TRANSFER
TAX IS $ 1.10                        $ 15 _____  City
X ___ Computed on the consideration or value of property conveyed; OR
___ Computed on the consideration or value less or encumbrances
remaining at time of sale.

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
R. Rad, a single man

hereby GRANT(S) to

Allied Management Trust

all the real property situated in the City of Oakland, County of Alameda    , State of California, described as:

Lot 1, Block 11, Auseon's Moss Tract, filed September 11, 1907
in Book 23, Page 31 of Maps, Alameda County Records.
APN 043-4610-023

Dated: MAY 5, 2003

STATE OF CALIFORNIA
COUNTY OF ALAMEDA                    }ss
On MAY 6, 2003 before me Betty J. Moore

personally appeared R. RAD

personally known to me or proved to me on this basis of
satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

MAIL TAX
STATEMENTS TO:        above

R. Rad

BETTY J. MOORE
Commission # 1246708
Notary Public - California
Alameda County
My Comm. Expires Apr 14, 2004

(This area for official notarial seal)

1

2

## ALLIED MANAGEMENT TRUST

3

### DECLARATION AND INSTRUMENT OF TRUST

4

I. Trust Name

This trust shall be known as the Allied Management Trust.

5

II. Trust Properties

6

The trust shall hold the trust properties for the benefit of the beneficiary who holds beneficial interest in the trust properties. The trust properties are:

7

    1086 69th Ave, Oakland
    1012 73rd Ave, Oakland

8

    1278 79th Ave, Oakland
    2300 Auseon Ave, Oakland

9

    2462 Taylor Ave, Oakland

III. Trust Beneficiary

10

The Allied Management Trust is set up for the benefit of the beneficiary, K. Yeganeh, whose beneficial interest is held by the trust.

11

The trust properties have been bought for the beneficiary.

IV. Trustee

12

The trustee of Allied Management Trust is R. Rad-Yeganeh

13

who is the son of K. Yeganeh. The trustee shall manage the trust properties for the benefit of and according to the wishes of the beneficiary of the trust, until the trustee is replaced by the

14

successor trustee.

V. Successor Trustee

15

If at any time as certified by a licensed physician, the

16

trustee becomes physically or mentally incapacitated, then the successor trustee shall replace the trustee.

17

If at any time as certified by a licensed physician, the trustee dies, then the successor trustee shall replace the

18

trustee.

If at any time the trustee is unable to serve or if he

19

becomes unavailable, or if he resigns as the trustee, then the trustee shall be replaced with the successor trustee.

20

The successor trustee shall be K. Yeganeh, who is also the beneficiary of this trust.

21

VI. Reserved Powers Of The Beneficiary

The beneficiary reserves the power to amend, modify, or revoke this trust at any time during his lifetime.

22

In the event of the death of the beneficiary, this trust

23

shall become irrevocable and may not be amended, altered, or modified.

24

If at any time, as certified by a licensed physician, the beneficiary becomes physically or mentally incapacitated, then the trustee shall apply for the beneficiary any amount of trust

25

income or proceeds necessary for the proper healthcare, support, comfort, or welfare of the beneficiary until the beneficiary, as

26

certified by a licensed physician, has recovered or until his death.

27

In the event of the death of the beneficiary, the trustee

28

1

shall distribute the trust properties outright to Farin Yeganeh.
VII. Reserved Powers Of The Trustee

The trustee shall administer the trust and the trust pro-
perties for the benefit of the beneficiary.

The trustee may resign at any time by delivering a signed
Notice Of Resignation to the beneficiary.

No bond shall be required of the trustee or the successor
trustee.

No accounting shall be required of the trustee or the
successor trustee.

VIII. Trustee's Powers And Duties

The trustee shall have the power and authority conferred
on a trustee under the laws of the State Of California and
subject to the trustee's fiduciary duties to the beneficiary.

Trustee's powers shall include but are not limited to the
power to sell, transfer, encumber, lease, maintain, or manage
the trust properties.

Trustee's powers shall include but are not limited to the
power to execute any and all documents related to the sale,
transfer, encumbrance, lease, maintenance, or management of
the trust properties.

Trustee's powers shall include but are not limited to the
power to hire or employ and pay reasonable fees to attorneys,
physicians, or other professionals.

IX. Severability And General Provisions

If any provision of this Declaration And Instrument Of
Trust is ruled unenforceable or invalid, the remaining pro-
visions shall remain in full force and effect. The validity
of this trust and any of its provisions shall be governed by
the laws of the State Of California.

X. Trustee's Certification

The trustee hereby certifies that he has read and under-
stood this Declaration And Instrument Of Trust and that it
correctly states the powers and duties of the trustee and the
terms and conditions under which the trust shall exist.

Dated: 5/6/2003          R. Rd
                         _____
                         R. Rad-Yeganeh, trustee of
                         Allied Management Trust



BETTY J. MOORE
Commission # 1240701
Notary Public - California
Alameda County
My Comm. Expires Apr 14, 2004

2

ER - 363

I hereby resign as the trustee of Allied Management
Trust.

date: 7/11/03

For Fiscal Year Beginning July 1, 2005 and Ending    30, 2006

# ALAMEDA COUNTY
## SECURED PROPERTY TAX STATEMENT

Donald R. White, Treasurer and Tax Collector
1221 Oak Street
Oakland, California  94612-4285

| Parcel Number | Tracer Number | Tax-Rate Area | Special Handling |
|---|---|---|---|
| 48-5597-1 | 098686 | 17-045 | |

Location of Property
2482 TAYLOR AVE
Assessed to on January 1, 2005
ALLIED MANAGEMENT TRUST

YEGANEH K
331 36TH AVE
SAN MATEO CA 94403

### Tax-Rate Breakdown

| Taxing Agency | Tax Rate | Tax Amount |
|---|---|---|
| COUNTYWIDE TAX | 1.0000% | 2,013.64 |
| VOTER APPROVED DEBT SERVICE : | | |
| CITY OF OAKLAND 1 | .2054% | 409.57 |
| SCHOOL UNIFIED | .0780% | 157.06 |
| SCHOOL COMM COLL | .0258% | 47.92 |
| BAY AREA RAPID TRANSIT | .0048% | 9.67 |
| EAST BAY REGIONAL PARK | .0057% | 11.48 |
| EBMUD SPEC DIST 1 | .0072% | 14.50 |
| TOTAL | 1.3229% | 2,663.84 |

| Description | Phone | Amount |
|---|---|---|
| MOSQUITO ABATEMENT | (510)783-7744 | 1.74 |
| CSA PARAMEDIC | (510)618-2055 | 49.92 |
| CSA VECTOR CONTROL | (510)567-6800 | 21.60 |
| CITY EMERG MEDICAL | (510)238-7472 | 21.54 |
| CITY PARAMEDIC SRV | (510)238-7472 | 17.16 |
| SCHOOL MEASURE E | (510)879-8155 | 195.00 |
| VIOLENCE PREV TAX | (510)238-7472 | 91.96 |
| FLOOD BENEFIT 12 | (510)670-5682 | 32.00 |
| AC TRANSIT MEAS BB | (877)299-1190 | 48.00 |
| CITY LIBRARY SERV. | (510)238-7472 | 79.32 |
| EBMUD WETWEATHER | (510)287-0449 | 88.20 |
| EAST BAY TRAIL LLD | (800)273-5167 | 5.44 |
| CITY LANDSCP/LIGHT | (510)238-7472 | 230.18 |
| **Total Fixed Charges and Special Assessments** | | **882.06** |

### Tax Computation Worksheet

| Description | Full Valuation | x Tax Rate | = Tax Amount |
|---|---|---|---|
| LAND | 47,691 | | |
| IMPROVEMENTS | 155,673 | | |
| FIXTURES | | | |
| TOTAL REAL PROPERTY | 201,364 | | |
| PERSONAL PROPERTY | | | |
| GROSS ASSESSMENT & TAX | 201,364 | 1.3229% | 2,663.84 |
| HOMEOWNERS EXEMPTION | | | |
| OTHER EXEMPTION | | | |
| NET ASSESSMENT AND TAX | 201,364 | 1.3229% | 2,663.84 |
| | | | 2,663.84 |

| First Installment | Second Installment | Total Amount Due |
|---|---|---|
| $1,772.95 | $1,772.95 | $3,545.90 |

---

### PLEASE READ IMPORTANT MESSAGES

☑ RETURN CHECK CHARGE $10.00

💳 CREDIT CARD ACCEPTED BY PHONE OR ONLINE @www.acgov.org

### PLEASE SEE REVERSE FOR MORE INFORMATION

☎ Tax Collector's Office
Payment Questions/Credit Card Payments
(510) 272-6800

☎ Assessor's Office
Valuation/Exemption
(510) 272-3787    (510) 272-3770

Form 114-SC01 (rev. 9/05)

---

## SECOND INSTALLMENT PAYMENT, 2005-2006

PARCEL NO.  48-5597-1
TRACER NO.  098686

**2**

THIS AMOUNT DUE   FEB. 1, 2006 →    $1,772.95

Pay this amount after APRIL 10, 2006
(This includes delinquent penalty of 10%
and $10.00 cost)
$1,960.24

Do Not Use This Stub Aft
June 30, 2006

SEND THIS STUB WITH
YOUR SECOND PAYME

Make checks payable to: Donald R. White, Tax Collector, Alameda County

Your cancelled check is your receipt.

52006 1098686002 3000177295 00000000

## FIRST INSTALLMENT PAYMENT, 2005-2006

PARCEL NO.  48-5597-1
TRACER NO.  098686

**1**

THIS AMOUNT DUE   NOV. 1, 2005 →    $1,772.95

Pay this amount after DECEMBER 10, 2005
(This includes delinquent penalty of 10%)
$1,950.24

Do Not Use This Stub Aft
June 30, 2006

SEND THIS STUB WITH
YOUR FIRST PAYMENT

$3,545.90
Make checks payable to: Donald R. White, Tax Collector, Alameda County

Your cancelled check is your receipt.

52006 3098686001 3000177295 00000000

# ALAMEDA COUNTY
# SECURED PROPERTY TAX STATEMENT

Donald R. White, Treasurer and Tax Collector
1221 Oak Street
Oakland, California  94612-4285

| Parcel Number | Tracer Number | Tax-Rate Area | Special Handling |
|---|---|---|---|
| 41-4144-9 | 085313 | 17-032 | |

Location of Property
1012 73RD AVE
Assessed to on January 1, 2005
ALLIED MANAGEMENT TRUST

YEGANEH K
331 36TH AVE
SAN MATEO CA 94403

### Tax-Rate Breakdown

| Taxing Agency | Tax Rate | Tax Amount |
|---|---|---|
| COUNTYWIDE TAX | 1.0000% | 1,142.94 |
| VOTER APPROVED DEBT SERVICE : | | |
| CITY OF OAKLAND 1 | .2034% | 232.46 |
| SCHOOL UNIFIED | .0780% | 89.15 |
| SCHOOL COMM COLL | .0238% | 27.20 |
| BAY AREA RAPID TRANSIT | .0048% | 5.49 |
| EAST BAY REGIONAL PARK | .0057% | 6.51 |
| EBMUD SPEC DIST 1 | .0072% | 8.23 |
| | | |
| TOTAL | 1.3229% | 1,511.98 |

| Description | Phone | Amount |
|---|---|---|
| MOSQUITO ABATEMENT | | 1.74 |
| CSA PARAMEDIC | (510)783-7744 | 24.96 |
| CSA VECTOR CONTROL | (510)618-2055 | 7.20 |
| CITY EMERG.MEDICAL | (510)567-6800 | 10.76 |
| CITY PARAMEDIC SRV | (510)238-7472 | 8.58 |
| CSA LEAD ABATEMENT | (510)238-7472 | 10.00 |
| SCHOOL MEASURE E | (510)567-8280 | 195.00 |
| VIOLENCE PREV TAX | (510)879-8155 | 88.00 |
| FLOOD BENEFIT 12 | (510)238-7472 | 16.00 |
| AC TRANSIT MEAS BB | (510)670-5582 | 48.00 |
| CITY LIBRARY SERV. | (877)299-1190 | 48.00 |
| EBMUD WETWEATHER | (510)238-7472 | 75.90 |
| EAST BAY TRAIL LLD | (510)287-0449 | 58.80 |
| EBRP PARK SAFETY/M | (800)273-5167 | 5.44 |
| CITY LANDSCP/LIGHT | (800)273-5167 | 12.00 |
| | (510)238-7472 | 102.64 |
| Total Fixed Charges and Special Assessments | | 665.02 |

### Tax Computation Worksheet

| Description | Full Valuation | x Tax Rate | = Tax Amount |
|---|---|---|---|
| LAND | 34,288 | | |
| IMPROVEMENTS | 80,006 | | |
| FIXTURES | | | |
| TOTAL REAL PROPERTY | 114,294 | | |
| PERSONAL PROPERTY | | | |
| GROSS ASSESSMENT & TAX | 114,294 | 1.3229% | 1,511.98 |
| HOMEOWNERS EXEMPTION | | | |
| OTHER EXEMPTION | | | |
| NET ASSESSMENT AND TAX | 114,294 | 1.3229% | 1,511.98 |
| | | | 1,511.98 |

| First Installment | Second Installment | Total Amount Due |
|---|---|---|
| $1,088.50 | $1,088.50 | $2,177.00 |

## PLEASE READ IMPORTANT MESSAGES

☑ RETURN CHECK CHARGE $10.00

🏦 CREDIT CARD ACCEPTED BY PHONE OR ONLINE @www.acgov.org

## PLEASE SEE REVERSE FOR MORE INFORMATION

🏦 Tax Collector's Office
Payment Questions/Credit Card Payments
(510) 272-6800

🏦 Assessor's Office
Valuation/Exemption
(510) 272-3787      (510) 272-3770

---

## SECOND INSTALLMENT PAYMENT, 2005-2006

PARCEL NO. 41-4144-9
TRACER NO. 085313

**2**

THIS AMOUNT DUE   FEB. 1, 2006 → $1,088.50

Pay this amount after APRIL 10, 2006
(This includes delinquent penalty of 10%
and $10.00 cost)

$1,207.35

Do Not Use This Stub Aft
June 30, 2006

SEND THIS STUB WITH
YOUR SECOND PAYMEN

Make checks payable to: Donald R. White, Tax Collector, Alameda County
Your cancelled check is your receipt.

52006  9085313002  9000108850  00000000

## FIRST INSTALLMENT PAYMENT, 2005-2006

PARCEL NO. 41-4144-9
TRACER NO. 085313

**1**

THIS AMOUNT DUE   NOV. 1, 2005 → $1,088.50

Pay this amount after DECEMBER 10, 2005
(This includes delinquent penalty of 10%)

$1,197.35

Do Not Use This Stub Afte
June 30, 2006

SEND THIS STUB WITH
YOUR FIRST PAYMENT

$2,177.00

Make checks payable to: Donald R. White, Tax Collector, Alameda County
Your cancelled check is your receipt.

52006  1085313001  9000108850  00000000

orm 114-SC01 (rev. 9/05)

**2005-2006**
For Fiscal Year Beginning July 1, 2005 and Ending June 30, 2006

# ALAMEDA COUNTY
## SECURED PROPERTY TAX STATEMENT
Donald R. White, Treasurer and Tax Collector
1221 Oak Street
Oakland, California  94612-4285

| Parcel Number | Tracer Number | Tax-Rate Area | Special Handling |
|---|---|---|---|
| 41-4198-52 | 085975 | 17-032 | |

Location of Property
1278 79TH AVE
Assessed to on January 1, 2005
ALLIED MANAGEMENT TRUST

YEGANEH K
331 36TH AVE
SAN MATEO CA 94403

### Tax-Rate Breakdown

| Taxing Agency | Tax Rate | Tax Amount |
|---|---|---|
| COUNTYWIDE TAX | 1.0000% | 1,402.70 |
| VOTER APPROVED DEBT SERVICE : | | |
| CITY OF OAKLAND 1 | .2034% | 285.30 |
| SCHOOL UNIFIED | .0780% | 109.41 |
| SCHOOL COMM COLL | .0238% | 33.38 |
| BAY AREA RAPID TRANSIT | .0048% | 6.73 |
| EAST BAY REGIONAL PARK | .0057% | 8.00 |
| EBMUD SPEC DIST 1 | .0072% | 10.10 |
| TOTAL | 1.3229% | 1,855.62 |

| Description | Phone | Amount |
|---|---|---|
| MOSQUITO ABATEMENT | (510)783-7744 | 1.74 |
| CSA PARAMEDIC | (510)618-2055 | 24.96 |
| CSA VECTOR CONTROL | (510)567-6800 | 7.20 |
| CITY EMERG.MEDICAL | (510)238-7472 | 10.76 |
| CITY PARAMEDIC SRV | (510)238-7472 | 8.58 |
| CSA LEAD ABATEMENT | (510)567-8280 | 10.00 |
| SCHOOL MEASURE E | (510)879-8155 | 195.00 |
| VIOLENCE PREV TAX | (510)238-7472 | 88.00 |
| FLOOD BENEFIT 12 | (510)670-5582 | 16.00 |
| AC TRANSIT MEAS BB | (877)299-1190 | 48.00 |
| CITY LIBRARY SERV. | (510)238-7472 | 75.90 |
| EBMUD WETWEATHER | (510)287-0449 | 58.80 |
| EAST BAY TRAIL LLD | (800)273-5167 | 5.44 |
| EBRP PARK SAFETY/M | (800)273-5167 | 12.00 |
| CITY LANDSCP/LIGHT | (510)238-7472 | 102.64 |
| Total Fixed Charges and Special Assessments | | 665.02 |

### Tax Computation Worksheet

| Description | Full Valuation | x Tax Rate | = Tax Amount |
|---|---|---|---|
| LAND | 42,081 | | |
| IMPROVEMENTS | 98,189 | | |
| FIXTURES | | | |
| TOTAL REAL PROPERTY | 140,270 | | |
| PERSONAL PROPERTY | | | |
| GROSS ASSESSMENT & TAX | 140,270 | 1.3229% | 1,855.62 |
| HOMEOWNERS EXEMPTION | | | |
| OTHER EXEMPTION | | | |
| NET ASSESSMENT AND TAX | 140,270 | 1.3229% | 1,855.62 |
| | | | 1,855.62 |

| First Installment | Second Installment | Total Amount Due |
|---|---|---|
| $1,260.32 | $1,260.32 | $2,520.64 |

### PLEASE READ IMPORTANT MESSAGES

☑ **RETURN CHECK CHARGE $10.00**

**CREDIT CARD ACCEPTED BY PHONE OR ONLINE @www.acgov.org**

### PLEASE SEE REVERSE FOR MORE INFORMATION

☎ **Tax Collector's Office**
Payment Questions/Credit Card Payments
(510) 272-6800

☎ **Assessor's Office**
Valuation/Exemption
(510) 272-3787     (510) 272-3770

Form 114-SC01 (rev. 9/05)

---

## SECOND INSTALLMENT PAYMENT, 2005-2006
PARCEL NO. 41-4198-52
TRACER NO. 085975

**2**

THIS AMOUNT DUE  FEB. 1, 2006 →  | $1,260.32

Pay this amount after APRIL 10, 2006
(This includes delinquent penalty of 10%
and $10.00 cost)

$1,396.35

Do Not Use This Stub After
June 30, 2006

SEND THIS STUB WITH
YOUR SECOND PAYMENT

Make checks payable to: Donald R. White, Tax Collector, Alameda County
Your cancelled check is your receipt.

52006 8085975002 2000126032 00000000

## FIRST INSTALLMENT PAYMENT, 2005-2006
PARCEL NO. 41-4198-52
TRACER NO. 085975

**1**

THIS AMOUNT DUE  NOV. 1, 2005 →  | $1,260.32

Pay this amount after DECEMBER 10, 2005
(This includes delinquent penalty of 10%)

$1,386.35

Do Not Use This Stub After
June 30, 2006

SEND THIS STUB WITH
YOUR FIRST PAYMENT

$2,520.64

Make checks payable to: Donald R. White, Tax Collector, Alameda County
Your cancelled check is your receipt.

52006 0085975001 2000126032 00000000

# Document No. 57

1          IN THE UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        - - -

In Re

4                                    )

RAMIN YEGANEH,

5                    Debtor.         )

-----------------------------------

6    CHARLES E. SIMS, Trustee        )      No. 05-30047 TEC

7                    Plaintiff,      )      Adversary Proceeding

8    vs.                            )      No. 05-3241

9    ALLIED MANAGEMENT TRUST, K.     )

10   YEGANEH aka KEN YEGANEH, etc.   )

11                   Defendant.      )      CERTIFIED COPY

-----------------------------------

12

13

14

15                   DEPOSITION OF

16                   KEN YEGANEH

17              REDWOOD CITY, CALIFORNIA

18                 MARCH 28, 2006

19

20

21

22

ATKINSON-BAKER, INC.

23   COURT REPORTERS

(800) 288-3376

24

REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25   FILE NO. 9F09032

1        THE WITNESS:  Fifth Amendment.  I don't know what you

2   want to say.

3        MR. CHANCE:   You've already invoked the Fifth Amendment,

4   you don't have to say anything more.

5        MR. FILLERUP:   Are you instructing him to take the

6   Fifth?

7        MR. CHANCE:   Yes, I am.

8   BY MR. FILLERUP:

9    Q    So, are you going to listen to your lawyer and take the

10   Fifth Amendment and not tell me who your current bank is?

11   A    No, doesn't mean that but he will be helpful for me.

12   Excuse me, I have hard hearing, forgetfulness.  He will help me

13   some.

14   Q    Who is your current bank?

15        MR. CHANCE:  He's asking who is your current bank.

16        THE WITNESS:  Fifth Amendment.

17   BY MR. FILLERUP:

18   Q    So, you are going to listen to your lawyer's instruction

19   and not answer my question asking you who your current bank is?

20   A    No, that is I told you, Fifth Amendment.

21   Q    You are aware aren't you, that Allied Management Trust

22   owned five pieces of property in Oakland?

23   A    Um-hum.

24   Q    Did you buy any of those five pieces of property, you

25   personally?

1    Q    I didn't understand the answer.  Were any of the rent

2    payments deposited in your bank account?

3         MR. CHANCE:   I'm going object on the ground of Fifth

4    Amendment and instruct the Witness not to answer that particular

5    question.

6         THE WITNESS:   Yes, Fifth Amendment.

7    BY MR. FILLERUP:

8    Q    So you refuse to answer that question?

9    A    Fifth Amendment.

10   Q    Have you ever-- strike that.  Have you reported income

11   from any of these five pieces of property in Oakland to the

12   state and federal government as part of your federal and state

13   income tax returns?

14        MR. CHANCE:   I'm going to object on the ground of Fifth

15   Amendment privilege and instruct the Witness not to answer that

16   question.

17        THE WITNESS:   Yes.

18   BY MR. FILLERUP:

19   Q    Did you file a state and federal income tax return in the

20   year 2001?

21        MR. CHANCE:   Same objection.  Fifth Amendment.  Instruct

22   the Witness not to answer.

23        THE WITNESS:  Fifth Amendment.

24   BY MR. FILLERUP:

25   Q    Have you ever filed a state or federal income tax return?

21

# Document No. 58

1          IN THE UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

In Re

4                                    )

RAMIN YEGANEH,

5              Debtor.            )

----------------------------------

6   CHARLES E. SIMS, Trustee      )     No. 05-30047 TEC

7              Plaintiff,         )     Adversary Proceeding

8   vs.                           )     No. 05-3241

9   ALLIED MANAGEMENT TRUST, K.   )

10  YEGANEH aka KEN YEGANEH, etc. )

11             Defendant.         )     CERTIFIED COPY

----------------------------------

12

13

14

15                DEPOSITION OF

16                 KEN YEGANEH

17            REDWOOD CITY, CALIFORNIA

18               MARCH 28, 2006

19

20

21

22

ATKINSON-BAKER, INC.

23  COURT REPORTERS

    (800) 288-3376

24

REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1

1    Q    Are all five pieces of property residences, are they

2    homes?

3    A    Should be.  Yes.

4    Q    Are you unsure about that?

5    A    I cannot remember believe me.  I cannot remember.  But

6    usually there is.

7    Q    Now, have these five pieces of property been-- strike

8    that.  During the time that Allied Management Trust owned these

9    five pieces of property, were they rental properties?  Rental

10   properties?

11   A    Yeah, should be.

12   Q    So, were there tenants at these properties?

13   A    I cannot remember.  Fifth Amendment.

14   Q    You're taking the Fifth Amendment?

15   A    Yeah.

16   Q    And so you won't answer my question whether these five

17   pieces of property were rental properties?

18   A    Because they are rental but I don't know if there are

19   somebody there or not.  I cannot remember.  That is a lot to

20   take.

21   Q    So you don't know --

22   A    Turn me around and around.

23   Q    You don't know whether there were ever tenants at these

24   properties?

25   A    There were some.

1          MR. CHANCE:    Just answer whatever you remember to the

2     best of your ability.

3          THE WITNESS:    I cannot remember, I tell you the truth.

4     BY MR. FILLERUP:

5     Q    What happened to the rent from the tenants at the five

6     properties?

7     A    What happened to them?

8     Q    Yes, who collected the rent?

9     A    Fifth Amendment.  Collect some, they give some, some they

10    don't, some they leave, some they stay.

11    Q    Who collected the rent on the five pieces of property?

12         MR. CHANCE:    You can answer that question.

13         THE WITNESS:    Fifth Amendment.

14    BY MR. FILLERUP:

15    Q    You won't answer the question?

16    A    Yeah.

17    Q    Did your son tell you to take the Fifth Amendment today?

18    A    No, no, no.  I am retired physician, I go to the library,

19    reading book, all kind book you know.  Law book.  That Fifth

20    Amendment self, that is one of the rule of this lawyer people.

21    You know.  And until now four, five time I was in this.

22    Q    You're taking the Fifth Amendment to try to protect these

23    five pieces of property so your son's creditors don't get them;

24    isn't that true?

25         MR. CHANCE:    Objection.  That's an argumentative

# Document No. 59

1          IN THE UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

   In Re

4                                    )

   RAMIN YEGANEH,

5              Debtor.              )

   -----------------------------------

6  CHARLES E. SIMS, Trustee        )      No. 05-30047 TEC

7              Plaintiff,          )      Adversary Proceeding

8  vs.                             )      No. 05-3241

9  ALLIED MANAGEMENT TRUST, K.     )

10  YEGANEH aka KEN YEGANEH, etc.   )

11              Defendant.          )      CERTIFIED COPY

   -----------------------------------

12

13

14

15                  DEPOSITION OF

16                  KEN YEGANEH

17            REDWOOD CITY, CALIFORNIA

18               MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23  COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1

1    Q    I didn't understand the answer.  Were any of the rent

2  payments deposited in your bank account?

3          MR. CHANCE:    I'm going object on the ground of Fifth

4  Amendment and instruct the Witness not to answer that particular

5  question.

6          THE WITNESS:    Yes, Fifth Amendment.

7  BY MR. FILLERUP:

8    Q    So you refuse to answer that question?

9    A    Fifth Amendment.

10   Q    Have you ever-- strike that.  Have you reported income

11 from any of these five pieces of property in Oakland to the

12 state and federal government as part of your federal and state

13 income tax returns?

14         MR. CHANCE:    I'm going to object on the ground of Fifth

15 Amendment privilege and instruct the Witness not to answer that

16 question.

17         THE WITNESS:    Yes.

18 BY MR. FILLERUP:

19   Q    Did you file a state and federal income tax return in the

20 year 2001?

21         MR. CHANCE:    Same objection.  Fifth Amendment.  Instruct

22 the Witness not to answer.

23         THE WITNESS:  Fifth Amendment.

24 BY MR. FILLERUP:

25   Q    Have you ever filed a state or federal income tax return?

1   MR. CHANCE: Same objection. Fifth Amendment, instruct

2 the Witness not to answer the question.

3   THE WITNESS: Fifth Amendment.

4 BY MR. FILLERUP:

5  Q All right. So, you will not answer whether you've ever

6 filed an income tax return?

7   MR. CHANCE: That's been asked and answered. He's

8 taken-- the Record speaks for itself.

9   THE WITNESS: Fifth Amendment. Excuse me, you are

10 telling and you interpret the word two again, it's me. That is

11 I tell you the truth. You told one word, I answer you. That's

12 it.

13 BY MR. FILLERUP:

14  Q Did your son Ramin report income from these five pieces

15 of property on his income tax returns?

16   MR. CHANCE: You can answer it if you know

17   THE WITNESS: Fifth Amendment.

18 MR. FILLERUP:

19  Q Will you answer that question?

20  A No, Fifth Amendment. I don't know what to say.

21  Q Mr. Yeganeh, the trustee in bankruptcy is seeking to

22 recover these five pieces of property in Oakland and the basis

23 that the trustee is seeking to recover the property is the

24 trustee believes that these properties were owned by your son

25 and not by you.

1      Do you have any information that these properties were

2  actually owned by you and not by your son?

3  A    Fifth Amendment.

4  Q    So, you're taking the Fifth Amendment to that question?

5      MR. CHANCE:    Actually, I'm going to object.    The

6  question is argumentative, seeks a legal conclusion from the

7  Witness and improperly shifts the burden of proof on my client.

8      It's the trustee's burden of proof to show that the

9  properties were in fact purchased with Mr. Yeganeh's money, his

10  son's money and I don't believe the trustee has established

11  that.    So, he doesn't have an obligation to prove your case for

12  you.

13      MR. FILLERUP:    Yes, he has does as a matter of fact.

14  Because this is a civil case, it's not a criminal case, so he

15  does have an obligation to answer the question.

16      MR. CHANCE:    You can answer the question if you can

17  understand it.

18      THE WITNESS:    No, I cannot understand.    Fifth Amendment.

19  BY MR. FILLERUP:

20  Q    So, you're refusing to answer that question based on the

21  Fifth Amendment?

22      MR. CHANCE:    Can I --

23      THE WITNESS:    Fifth Amendment.

24      MR. CHANCE:    Can I just take a short break?

25      MR. FILLERUP:    Let's go off the Record.

1    VIDEOGRAPHER:   We're off the Record at 9:56 a.m.

2        (Whereupon, a brief recess was taken.)

3    VIDEOGRAPHER:   We're back on the Record at 10:05 a.m.

4    MR. CHANCE:   I just want to make something clear on the

5 Record, that to the extent you're going to be asking questions

6 of my client that go towards his individual tax returns, federal

7 or state, whether any possible income from rental properties he

8 reported, and the identities of tenants and terms of lease

9 agreements; if you're asking him those questions as an

10 individual, I'm letting you know on the Record I'm going to

11 instruct the Witness not to answer those subject areas based on

12 the Fifth Amendment privilege.

13    So, in hopes of both making the Record clear and maybe

14 streamlining some of the deposition.

15    MR. FILLERUP:   I understand your objection, I don't

16 think the objection and instruction is well taken.  The tax

17 returns have been filed, they're with the state of California

18 and the federal government.  I can get them and there is no

19 Fifth Amendment privilege with respect to them.

20    They're in the hands of the government.  So, I just think

21 that objection and instruction is totally baseless.  And I guess

22 we'll have to have the judge deal with that.

23    MR. CHANCE:   Yeah, we'll have to have Judge Carlson.

24 I'm just letting you know that's the standing objection to those

25 lines of inquiry in this deposition.

# Document No. 60

1          IN THE UNITED STATES BANKRUPTCY COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

In Re

4                                    )

RAMIN YEGANEH,

5                 Debtor.           )

------------------------------------

6   CHARLES E. SIMS, Trustee        )     No. 05-30047 TEC

7                 Plaintiff,        )     Adversary Proceeding

8   vs.                             )     No. 05-3241

9   ALLIED MANAGEMENT TRUST, K.     )

10  YEGANEH aka KEN YEGANEH, etc.   )

11                Defendant.        )     CERTIFIED COPY

------------------------------------

12

13

14

15                  DEPOSITION OF

16                   KEN YEGANEH

17            REDWOOD CITY, CALIFORNIA

18                MARCH 28, 2006

19

20

21

22

ATKINSON-BAKER, INC.

23  COURT REPORTERS

    (800) 288-3376

24

REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1

1    Q    Did you pay expenses for the five pieces of property?

2    A    Most of the time we pay for everything.

3    Q    Did you write checks from your checking account?

4    A    I cannot remember please.  Fifth Amendment.

5    Q    Have you ever written a check to pay an expense for any

6    one of these five pieces of property.

7         (Whereupon, a discussion was held off the Record.)

8         MR. CHANCE:   Do you mind re-asking the question.

9         THE WITNESS:    Fifth Amendment.  I cannot remember.

10   BY MR. FILLERUP:

11    Q    I'll re-ask the question:  Do you ever recall writing a

12   check to pay for an expense relating to one of the five pieces

13   of property?

14    A    I cannot remember.

15    Q    Was it usually Ray that wrote checks to pay for expenses

16   relating to the four pieces of property?

17        MR. CHANCE:   Do you mean five pieces?

18        MR. FILLERUP:   I'm sorry, five pieces of property.

19        THE WITNESS:   Usually he maintenance, but I don't know

20   about the rest of that.

21   BY MR. FILLERUP:

22    Q    Do you refer to your son as Ray or Ramin?

23    A    Ramin is the real but Ray, change to Ray.  He became Ray.

24   He's Ray now.

25    Q    So, do you call him Ray?

32

# Document No. 61

1          IN THE UNITED STATES BANKRUPTCY COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                        - - -

   In Re

4                              )

   RAMIN YEGANEH,

5                  Debtor.      )

   ----------------------------------

6  CHARLES E. SIMS, Trustee    )      No. 05-30047 TEC

7                  Plaintiff,  )      Adversary Proceeding

8  vs.                         )      No. 05-3241

9  ALLIED MANAGEMENT TRUST, K. )

10 YEGANEH aka KEN YEGANEH, etc. )

11                 Defendant.   )      CERTIFIED COPY

   ----------------------------------

12

13

14

15                  DEPOSITION OF

16                  KEN YEGANEH

17             REDWOOD CITY, CALIFORNIA

18                MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23 COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25 FILE NO. 9F09032

1

1    couldn't afford it because I have expenses.  So I work as a

2    family physician.

3       Q    Can you tell me today what properties that you own other

4    than these five pieces of property in Oakland?

5       A    That's Fifth Amendment, you know.

6          MR. CHANCE:    You can answer that question.

7    BY MR. FILLERUP:

8       Q    Can you tell me what properties you own in addition to

9    five pieces of property in Oakland?

10      A    I told you Fifth Amendment.

11         MR. CHANCE:    No.  I'm not instructing you to take that

12   objection.  I think you should answer the question to the best

13   of your ability.  What properties do you own besides the five

14   pieces of property in Oakland.  You can answer that.

15         THE WITNESS:  We have, but I prefer-- it doesn't concern

16   you.

17   BY MR. FILLERUP:

18      Q    So, you refuse to answer that question?

19      A    It doesn't mean refuse but it doesn't concern you, you

20   know.

21      Q    If you don't refuse to answer --

22      A    Excuse me.  I have in Iran.  I write it and give it to

23   you.  You go there, get it.  Whatever you get, 50 percent for

24   you, 70 percent of that for you.  You go get it over there too.

25   Do you go?

.

# Document No. 62

1              IN THE UNITED STATES BANKRUPTCY COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                           - - -

   In Re

4                                      )

   RAMIN YEGANEH,

5                    Debtor.           )

   -----------------------------------

6   CHARLES E. SIMS, Trustee           )        No. 05-30047 TEC

7                    Plaintiff,        )        Adversary Proceeding

8   vs.                                )        No. 05-3241

9   ALLIED MANAGEMENT TRUST, K.        )

10  YEGANEH aka KEN YEGANEH, etc.      )

11                   Defendant.        )        CERTIFIED COPY

   -----------------------------------

12

13

14

15                     DEPOSITION OF

16                      KEN YEGANEH

17               REDWOOD CITY, CALIFORNIA

18                   MARCH 28, 2006

19

20

21

22

   ATKINSON-BAKER, INC.

23  COURT REPORTERS

   (800) 288-3376

24

   REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25  FILE NO. 9F09032

1    Q    Can you explain why there is certain things you can

2    remember and other things you can't from five years ago?

3    A    Go ask neurologist, psychologist.  I don't know.  Not

4    because of you, but I can-- believe me I cannot remember.

5    Q    Well, why is it that you can remember that you gave money

6    to your son to buy property for you but you can't remember how

7    much it was?

8    A    Fifth Amendment.

9    Q    You can't tell me whether it was a thousand dollars or

10   $500,000; isn't that right?

11       MR. CHANCE:    Objection to this line of questioning.

12   You're harassing the client, the Witness.  He's already told you

13   has numerous physical problems, he's elderly, his memory is

14   sporadic at best.

15       You're just badgering the Witness at this point.

16   BY MR. FILLERUP:

17   Q    Can you explain why you cannot remember whether it was a

18   thousand dollars or $500,000 that you gave him?

19   A    Yes, I cannot remember.

20   Q    So it could be a thousand, it could be 500,000?

21       MR. CHANCE:    Objection.  Seeks a speculative answer from

22   the Witness.

23       THE WITNESS:    What I say?

24       MR. FILLERUP:  All right.  Well, I'm going to discontinue

25   the deposition and I'll resume the deposition after we've

.

# Document No. 63

```
1          IN THE UNITED STATES BANKRUPTCY COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                      - - -
   In Re: RAMIN YEGANEH,                    CERTIFIED COPY
4              Debtor.
   ----------------------------------)
5  CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
              Plaintiff,             ) Adversary Proceeding
6  vs.                              ) No. 05-3243
                                    )
7  ADVANTA TRUST and FARIN YEGANEH  )
   aka F. NAMDARAN aka FRAN NAMDARAN )
8  aka FARIN NAMDARAN aka FRAN      )
   YEGANEH,                         )
9              Defendants.          )
   ----------------------------------)
10 CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
              Plaintiff,             ) Adversary Proceeding
11 vs.                              ) No. 05-3240
                                    )
12 F. NAMDARAN aka FRAN NAMDARAN aka )
   FARIN NAMDARAN aka FARIN YEGANEH )
13 aka FRAN YEGANEH,                )
              Defendants.          )
14 ----------------------------------)
   CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
15            Plaintiff,             ) Adversary Proceeding
   vs.                              ) No. 05-3241
16                                  )
   ALLIED MANAGEMENT TRUST and K.   )
17 YEGANEH aka KEN YEGANEH aka      )
   KAIKHOSROW YEGANEH,              )
18            Defendants.          )
   ----------------------------------)
19 CHARLES E. SIMS, Trustee,         ) No. 05-30047
              Plaintiff,             ) Adversary Proceeding
20 vs.                              ) No. 05-3242
                                    )
21 COAST DEVELOPMENT TRUST and FARIN )
   YEGANEH aka F. NAMDARAN aka FRAN )
22 NAMDARAN aka FARIN NAMDARAN aka  )DEPOSITION OF
   FRAN YEGANEH,                    )RAMIN YEGANEH
23            Defendants.          )REDWOOD CITY, CALIFORNIA
   ----------------------------------)MARCH 29, 2006
24 ATKINSON-BAKER, INC.
   (800) 288-3376
25 REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
   FILE NO. 9F09033
```

1

1    Q    Now, during-- strike that.  Have you yourself ever lived

2    in any of the 13 properties?

3    A    No.

4    Q    What about your parents, have your parents ever lived in

5    any of the 13 properties?

6    A    No.

7    Q    Have you ever allowed anyone to live in any of the 13

8    properties rent free?

9    A    Not that I recall.

10   Q    And since the time that the 13 properties were first

11   purchased, have there been tenants who have occupied some or all

12   of the 13 properties?

13   A    I don't know.  I have to plead Fifth Amendment on that.

14   Because my parents' attorney said yesterday to you that anything

15   that has to do with the tenants or any possible income from the

16   tenants or any possible income, they're going to plead Fifth

17   Amendment with respect to my individual parents.

18   Q    So, I've asked you-- I'm not asking your parents, I'm

19   asking you whether you're aware of any tenants occupying any of

20   the 13 properties at any time?

21   A    I have to plead Fifth Amendment on that.

22   Q    Well, isn't it true that in prior depositions you've

23   testified about tenants occupying some of 13 properties?  You've

24   already testified about that; correct?

25   A    I don't remember but if I did, so what?

57

1    Q    Barry Orloff, was Barry Orloff ever a tenant at 394

2    Sparling?

3    A    I have to plead Fifth Amendment on that.  I don't know

4    where you're getting this information from but --

5    Q    Have you ever talked to Barry Orloff?

6    A    I think Barry Orloff is the Alameda County Tax

7    Collector's name.

8    Q    What about Valerie Warden, have you ever spoken to

9    Valerie Warden?

10   A    Okay.  I think I pled Fifth Amendment to all these

11   questions.  So, I'm not going to answer them.

12   Q    So, you won't say whether you've ever talked to Valerie

13   Warden?

14   A    No, I'm not going to say any of that.  I'm not going to

15   say any of that.  Besides I don't know where you're getting your

16   information.  I think for instance Barry Orloff is probably

17   Alameda County Tax Collector.  I don't know where you're getting

18   this information from.

19   Q    Is it your testimony --

20   A    You're just throwing names at me and expect me to say

21   "yes" or "no" or things like that.  You know, I've already said

22   I'm going to plead Fifth Amendment to all kinds of questions

23   which have to do with tenants, or any possible tenants I should

24   say.  Any possible income such as rents.

25   Q    You do admit that there were tenants at some of the 13

1    properties at some point in time; you will admit that won't you?

2    A    No, I won't.  Because I pled Fifth Amendment.

3    Q    Isn't it true that tenants had paid you cash rental

4    payments at the 13 properties at some point in time?

5    A    I pleaded Fifth Amendment to all kinds of questions which

6    have to do with tenants.

7    Q    So, do you deny ever receiving a cash rental payment from

8    a tenant at one of the 13 properties?

9    A    Well first of all, I pled Fifth Amendment to all

10   questions which have to do with tenants or their identity or any

11   possible rents.  So, I have to stick with that.

12   Q    Have you ever collected any rent for the 1659 Linda Mar

13   property?

14   A    Fifth Amendment.

15   Q    Have you ever collected any rent for the 115 Francisco

16   Drive property?

17   A    Fifth Amendment.

18   Q    Have you ever collected any rent for the 139 Francisco

19   Drive property?

20   A    Fifth Amendment.

21   Q    Have you ever-- do you know the identity of any tenant

22   whoever occupied 1659 Linda Mar?

23   A    Fifth Amendment.

24   Q    Do you know the name of any tenant who ever occupied 115

25   Francisco?

1    A    Fifth Amendment.

2    Q    Do you know the name of any tenant who ever occupied 139

3    Francisco?

4    A    Fifth Amendment.

5    Q    What about the five Oakland properties in the Allied

6    Management Trust case, did you ever collect any rent for any of

7    those five properties in the Allied Management Trust case?

8    A    Fifth Amendment.

9    Q    Do you know the name of any tenant who ever occupied any

10    of the five properties in the Allied Management Trust case?

11    A    I'm sorry.  What's the question again?

12    Q    The question is do you know the name of any tenant of any

13    of the five properties in the Allied Management Trust case?

14    A    Fifth Amendment.

15    Q    Did you ever collect any rent for any of the three

16    properties in the Coast manage-- the Coast Development Trust

17    case?

18    A    Fifth Amendment.

19    Q    Do you know the name of any of the tenants who had ever

20    occupied any of the three properties in the Coast Development

21    Trust case?

22    A    Fifth Amendment.

23    Q    Have you ever assisted your parents in preparing their

24    state or federal income tax returns?

25    A    No.

ER - 389

1    Q    Do you know if there are currently tenants at any of the

2    13 properties?

3    A    Fifth Amendment.

4    Q    Who is collecting rent on the 13 properties today?

5    A    Fifth Amendment.

6    Q    Do you know of anyone other than you or your parents who

7    have ever collected rent from any tenants at any of the 13

8    properties?

9    A    Fifth Amendment.

10   Q    Do you know if there were any-- strike that.  Do you know

11   if there was ever a written lease agreement for 394 Sparling?

12   A    Fifth Amendment.

13   Q    Was there ever a written lease agreement for 6853

14   Simpson?

15   A    Fifth Amendment.

16   Q    Was there ever a written lease agreement for 1659 Linda

17   Mar?

18   A    Fifth Amendment.  I'm just going to tell you for all the

19   properties, so you don't have to go through all 13 of my

20   parents' properties.

21   Q    So, you will take the Fifth Amendment and refuse to

22   answer whether there was ever a written lease agreement for any

23   of the 13 properties?

24   A    Correct.  Because I told you anything that has to do with

25   the tenants or their identity which has to do with income,

67

# Document No. 64

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                          - - -
    In Re: RAMIN YEGANEH,
 4                  Debtor.                    CERTIFIED COPY
    ---------------------------------)
 5  CHARLES E. SIMS, Trustee,        ) No. 05-30047 TEC
                    Plaintiff,       ) Adversary Proceeding
 6  vs.                              ) No. 05-3243
                                     )
 7  ADVANTA TRUST and FARIN YEGANEH  )
    aka F. NAMDARAN aka FRAN NAMDARAN)
 8  aka FARIN NAMDARAN aka FRAN      )
    YEGANEH,                         )
 9                  Defendants.      )
    ---------------------------------)
10  CHARLES E. SIMS, Trustee,        ) No. 05-30047 TEC
                    Plaintiff,       ) Adversary Proceeding
11  vs.                              ) No. 05-3240
                                     )
12  F. NAMDARAN aka FRAN NAMDARAN aka)
    FARIN NAMDARAN aka FARIN YEGANEH )
13  aka FRAN YEGANEH,                )
                    Defendants.      )
14  ---------------------------------)
    CHARLES E. SIMS, Trustee,        ) No. 05-30047 TEC
15                  Plaintiff,       ) Adversary Proceeding
    vs.                              ) No. 05-3241
16                                   )
    ALLIED MANAGEMENT TRUST and K.   )
17  YEGANEH aka KEN YEGANEH aka      )
    KAIKHOSROW YEGANEH,              )
18                  Defendants.      )
    ---------------------------------)
19  CHARLES E. SIMS, Trustee,        ) No. 05-30047
                    Plaintiff,       ) Adversary Proceeding
20  vs.                              ) No. 05-3242
                                     )
21  COAST DEVELOPMENT TRUST and FARIN)
    YEGANEH aka F. NAMDARAN aka FRAN )
22  NAMDARAN aka FARIN NAMDARAN aka  )DEPOSITION OF
    FRAN YEGANEH,                    )RAMIN YEGANEH
23                  Defendants.      )REDWOOD CITY, CALIFORNIA
    ---------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033
```

1

1  properties at some point in time; you will admit that won't you?

2   A   No, I won't.  Because I pled Fifth Amendment.

3   Q   Isn't it true that tenants had paid you cash rental

4  payments at the 13 properties at some point in time?

5   A   I pleaded Fifth Amendment to all kinds of questions which

6  have to do with tenants.

7   Q   So, do you deny ever receiving a cash rental payment from

8  a tenant at one of the 13 properties?

9   A   Well first of all, I pled Fifth Amendment to all

10  questions which have to do with tenants or their identity or any

11  possible rents.  So, I have to stick with that.

12   Q   Have you ever collected any rent for the 1659 Linda Mar

13  property?

14   A   Fifth Amendment.

15   Q   Have you ever collected any rent for the 115 Francisco

16  Drive property?

17   A   Fifth Amendment.

18   Q   Have you ever collected any rent for the 139 Francisco

19  Drive property?

20   A   Fifth Amendment.

21   Q   Have you ever-- do you know the identity of any tenant

22  whoever occupied 1659 Linda Mar?

23   A   Fifth Amendment.

24   Q   Do you know the name of any tenant who ever occupied 115

25  Francisco?

1     A     Fifth Amendment.

2     Q     Do you know the name of any tenant who ever occupied 139

3     Francisco?

4     A     Fifth Amendment.

5     Q     What about the five Oakland properties in the Allied

6     Management Trust case, did you ever collect any rent for any of

7     those five properties in the Allied Management Trust case?

8     A     Fifth Amendment.

9     Q     Do you know the name of any tenant who ever occupied any

10    of the five properties in the Allied Management Trust case?

11    A     I'm sorry.  What's the question again?

12    Q     The question is do you know the name of any tenant of any

13    of the five properties in the Allied Management Trust case?

14    A     Fifth Amendment.

15    Q     Did you ever collect any rent for any of the three

16    properties in the Coast manage-- the Coast Development Trust

17    case?

18    A     Fifth Amendment.

19    Q     Do you know the name of any of the tenants who had ever

20    occupied any of the three properties in the Coast Development

21    Trust case?

22    A     Fifth Amendment.

23    Q     Have you ever assisted your parents in preparing their

24    state or federal income tax returns?

25    A     No.

1  Q    Do you know if there are currently tenants at any of the

2  13 properties?

3  A    Fifth Amendment.

4  Q    Who is collecting rent on the 13 properties today?

5  A    Fifth Amendment.

6  Q    Do you know of anyone other than you or your parents who

7  have ever collected rent from any tenants at any of the 13

8  properties?

9  A    Fifth Amendment.

10 Q    Do you know if there were any-- strike that.  Do you know

11 if there was ever a written lease agreement for 394 Sparling?

12 A    Fifth Amendment.

13 Q    Was there ever a written lease agreement for 6853

14 Simpson?

15 A    Fifth Amendment.

16 Q    Was there ever a written lease agreement for 1659 Linda

17 Mar?

18 A    Fifth Amendment.  I'm just going to tell you for all the

19 properties, so you don't have to go through all 13 of my

20 parents' properties.

21 Q    So, you will take the Fifth Amendment and refuse to

22 answer whether there was ever a written lease agreement for any

23 of the 13 properties?

24 A    Correct.  Because I told you anything that has to do with

25 the tenants or their identity which has to do with income,

1   what you're telling me?

2   A    I'm saying the tenants' privacy is a concern, is a major

3   concern.  Okay.

4   Q    It's true sir that you receive cash rental payments from

5   tenants at these 13 properties; correct?

6   A    I'm not even going to answer that because I'm going to

7   say Fifth Amendment.  Okay.  So, I don't know where you're

8   getting this information from.  For the most part it's been a

9   figment of your imagination.

10       But I'm not even going to answer that because I'm going

11  to plead Fifth Amendment.

12  Q    Isn't it true that you had paid from your checking

13  account property tax payments on some of the 13 properties?

14  A    Yes, that is true.

15  Q    And isn't it true that you had paid the insurance, the

16  property insurance premiums on some of the 13 properties from

17  your checking account?

18  A    That is true.  If my parents told me to pay it, I paid it

19  and usually they reimbursed it.

20  Q    Have your parents ever had professional help in preparing

21  their tax returns?

22  A    I don't know.

23  Q    Do you know if your parents had ever used a tax preparer

24  in preparing their income tax returns?

25  A    I don't know.

# Document No. 65

1          IN THE UNITED STATES BANKRUPTCY COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                    - - -

In Re: RAMIN YEGANEH,                    CERTIFIED COPY
4              Debtor.
-----------------------------------)
5  CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
                Plaintiff,           ) Adversary Proceeding
6  vs.                               ) No. 05-3243
                                     )
7  ADVANTA TRUST and FARIN YEGANEH   )
   aka F. NAMDARAN aka FRAN NAMDARAN )
8  aka FARIN NAMDARAN aka FRAN       )
   YEGANEH,                          )
9              Defendants.           )
-----------------------------------)
10 CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
                Plaintiff,           ) Adversary Proceeding
11 vs.                               ) No. 05-3240
                                     )
12 F. NAMDARAN aka FRAN NAMDARAN aka )
   FARIN NAMDARAN aka FARIN YEGANEH  )
13 aka FRAN YEGANEH,                 )
               Defendants.           )
14 -----------------------------------)
   CHARLES E. SIMS, Trustee,         ) No. 05-30047 TEC
15              Plaintiff,           ) Adversary Proceeding
   vs.                               ) No. 05-3241
16                                   )
   ALLIED MANAGEMENT TRUST and K.    )
17 YEGANEH aka KEN YEGANEH aka       )
   KAIKHOSROW YEGANEH,               )
18             Defendants.           )
-----------------------------------)
19 CHARLES E. SIMS, Trustee,         ) No. 05-30047
                Plaintiff,           ) Adversary Proceeding
20 vs.                               ) No. 05-3242
                                     )
21 COAST DEVELOPMENT TRUST and FARIN )
   YEGANEH aka F. NAMDARAN aka FRAN  )
22 NAMDARAN aka FARIN NAMDARAN aka   )DEPOSITION OF
   FRAN YEGANEH,                     )RAMIN YEGANEH
23             Defendants.           )REDWOOD CITY, CALIFORNIA
-----------------------------------)MARCH 29, 2006
24 ATKINSON-BAKER, INC.
   (800) 288-3376
25 REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
   FILE NO. 9F09033

                                                          1

1    A    Yeah, I guess.  I don't know if you want to call it the

2    bottom line, but yeah I guess so.

3    Q    Was there any other reason that you filed bankruptcy in

4    January 2005 other than the Wobogo case?

5    A    No.  Well, I just remembered the other reason why I filed

6    bankruptcy was because the judgments required a bond to be

7    issued and I was not able to make that bond because the amount

8    of the bond was, the amount of the bond required to stay the

9    judgments was way out there.  I mean it was just exorbitant.

10   So--

11   Q    I want to go back and ask you about the work that you had

12   done in collecting rent and paying expenses for the 13

13   properties in the four adversary proceedings.

14        And since the year 2000, can you briefly describe what

15   responsibilities or activities you took with respect to the 13

16   properties compared to the responsibilities or activities of

17   your parents?

18   A    I don't understand the question.  You mean my

19   responsibilities as compared to my parents with respect to those

20   13 of my parents properties?

21   Q    In terms of managing the property properties, correct.

22   A    Well, from time to time if my parents asked me to help

23   them to maintain or if you want to call it managing those

24   properties, I did help them out.  They're my parents.

25   Q    Did you find tenants for the properties?

1   A    I don't remember if-- and I would like to, like I said as

2   far as the tenants and things, I'd like to assert the Fifth

3   Amendment.

4   Q    Did you ever use an agency to obtain tenants for any of

5   the 13 properties?

6   A    I don't remember.

7   Q    Did you ever, did you or your parents ever pay anyone to

8   help you get tenants for the 13 properties?

9   A    I don't remember.  You mean did my parents pay anyone,

10  that's what you're saying?

11  Q    I just said did you or your parents ever pay anyone?

12  A    I don't remember.

13  Q    How did you or your parents find tenants for the

14  properties?

15  A    I don't know.

16  Q    Did you ever advertise in any newspaper or publication

17  for tenants?

18  A    I don't know if they advertised or not.

19  Q    Did you ever advertise for tenants for any of the 13

20  properties?

21  A    I don't know.  I don't remember.

22  Q    Did you ever advertise for tenants for any of the

23  properties that you owned?

24  A    For my own properties, no.  I think it was mostly-- for

25  my own properties, it was mostly from word of mouth.  Maybe from

# Document No. 66

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                          - - -
    In Re: RAMIN YEGANEH,                    CERTIFIED COPY
 4              Debtor.
    ----------------------------------)
 5  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                Plaintiff,             ) Adversary Proceeding
 6  vs.                                ) No. 05-3243
                                       )
 7  ADVANTA TRUST and FARIN YEGANEH    )
    aka F. NAMDARAN aka FRAN NAMDARAN  )
 8  aka FARIN NAMDARAN aka FRAN        )
    YEGANEH,                           )
 9              Defendants.            )
    ----------------------------------)
10  CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
                Plaintiff,             ) Adversary Proceeding
11  vs.                                ) No. 05-3240
                                       )
12  F. NAMDARAN aka FRAN NAMDARAN aka  )
    FARIN NAMDARAN aka FARIN YEGANEH   )
13  aka FRAN YEGANEH,                  )
                Defendants.            )
14  ----------------------------------)
    CHARLES E. SIMS, Trustee,          ) No. 05-30047 TEC
15              Plaintiff,             ) Adversary Proceeding
    vs.                                ) No. 05-3241
16                                     )
    ALLIED MANAGEMENT TRUST and K.     )
17  YEGANEH aka KEN YEGANEH aka        )
    KAIKHOSROW YEGANEH,                )
18              Defendants.            )
    ----------------------------------)
19  CHARLES E. SIMS, Trustee,          ) No. 05-30047
                Plaintiff,             ) Adversary Proceeding
20  vs.                                ) No. 05-3242
                                       )
21  COAST DEVELOPMENT TRUST and FARIN  )
    YEGANEH aka F. NAMDARAN aka FRAN   )
22  NAMDARAN aka FARIN NAMDARAN aka    )DEPOSITION OF
    FRAN YEGANEH,                      )RAMIN YEGANEH
23              Defendants.            )REDWOOD CITY, CALIFORNIA
    ----------------------------------)MARCH 29, 2006
24  ATKINSON-BAKER, INC.
    (800) 288-3376
25  REPORTED BY: BARBARA H. GONZALEZ, CSR NO. 4646
    FILE NO. 9F09033
```

1

1    with Coast Development Trust?

2    A    Listen, I do not know and I do not remember my testimony

3    from 2002.  You're reading it, I'm not looking at it, okay.  I

4    don't know how to answer a question like that.  Would you like

5    me to say Fifth Amendment or would you like to, or do you want

6    you to repeat this thing over and over again.

7    Q    All you have to do is answer my question.  You haven't

8    answered any of my questions.

9    A    Yes, I have.  I answered plenty of questions you've had.

10   You're just trying to make me look bad.  You're just trying to

11   make me look bad over and over and over and over again.  Making

12   me look bad doesn't make your client look good.  Okay.  Those

13   are two independent things.

14   Q    Was there ever an Asian guy affiliated with Coast

15   Development Trust?

16   A    Okay.  Look, I'll tell you what.  I'm going to say Fifth

17   Amendment to that okay, because you keep repeating this thing

18   over and over again.  You need to move on.  Okay.  So Fifth

19   Amendment.

20   Q    Okay.  And so what you're saying is if you answer my

21   question, you're going to admit to committing perjury, so you're

22   taking the Fifth Amendment instead of answering my question?

23   A    Okay.  Look, you're insinuating something and I don't

24   know how to answer a question like that.

25   Q    In your April 2002 testimony, you were also asked who R.

1    Rad is.  And your answer was quote, I think the guy's name is

2    Rick and that may have been the private owner.  Close quote.

3         Now that was false wasn't it because R. Rad was you;

4    correct?

5    A    Well first of all, again I think-- I don't remember the

6    context of this whole conversation back in 2002.  That was over

7    four years ago, that was almost four years ago.  But like I

8    said, I thought I was being sarcastic.  Okay.  And they kept

9    using initial R. Rad and I kept you know trying to make fun of

10   them.  You know.

11        So, like I said I don't know how to answer these type of

12   questions.  Okay.  I mean I just don't know how to answer these

13   kind of questions.  So, I'm going to say Fifth Amendment.

14   Q    In your April 2002 testimony in the Wobogo case, you were

15   asked this question:   Quote, And you have no documentation

16   which would indicate who R. Rad is; is that your testimony sir?

17        And your answer was quote, Not at this time point.  Close

18   quote.  So that was false wasn't it, because you knew at that

19   time that R. Rad was you; correct?

20   A    Well like I said, there are many R. Rads out there.  And

21   I thought I was trying to make fun of these people because they

22   kept using initial R. Rad.  And I was just trying to be

23   sarcastic.

24   Q    Well, you have to agree it makes you look like a liar,

25   doesn't it?

171

# Document No. 67

1          IN THE UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

In Re

4                                    )

RAMIN YEGANEH,

5              Debtor.              )

------------------------------------

6    CHARLES E. SIMS, Trustee       )      No. 05-30047 TEC

7              Plaintiff,           )      Adversary Proceeding

8    vs.                            )      No. 05-3241

9    ALLIED MANAGEMENT TRUST, K.    )

10   YEGANEH aka KEN YEGANEH, etc.  )

11             Defendant.           )      **CERTIFIED COPY**

------------------------------------

12

13

14

15                  DEPOSITION OF

16                  KEN YEGANEH

17            REDWOOD CITY, CALIFORNIA

18               MARCH 28, 2006

19

20

21

22

ATKINSON-BAKER, INC.

23   COURT REPORTERS

     (800) 288-3376

24

REPORTED BY:   BARBARA H. GONZALEZ, CSR NO. 4646

25   FILE NO. 9F09032

                                                              1

1   A    I don't know, I cannot tell you that.  But I do know I

2   pay money for that.

3   Q    You paid money for the five pieces property in Oakland?

4   A    Yes.

5   Q    And when did you pay that money?

6   A    Several years ago.

7   Q    In what year?

8   A    I'm sorry.  I told you, I have a poor memory.  At night I

9   have insomnia, I cannot sleep.  I take lots of pills.  You see.

10  Q    Did you give your son money to buy the five pieces of

11  property in Oakland?

12  A    Yes, we give them.

13  Q    And how much money did you give him?

14  A    I was physician surgeon, I worked too much.  I had, so I

15  give it to him to get it.

16  Q    How much money did you give him?

17  A    Cannot remember that.  That's go back past.

18  Q    Did you give him a check or cash?

19  A    Cash, check, whatever.  My money all there.  What you

20  call, cashier check and so forth.

21  Q    So you as you sit here today, you can't remember how much

22  you gave him or whether you gave him a check, a cashier's check

23  or cash?

24  A    Yeah.  Let's do it this way.  You have a children, do you

25  have a son?

# Document No. 68

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             COUNTY OF SAN MATEO

3

4  EDITH M. INGRAM,      )
    on behalf of herself,  )
5  and NOZIPO WOBOGO,     )
    on behalf of the general )
6  public,             )
                      )
7         Plaintiffs,   )
                      )
8  vs.               )   CASE No. 410586
                      )
9  RAMIN YEGANEH, dba     )
    American Mortgage Realty, )
10  and dba American Mortgage )
    Realty, And Invest,    )
11  et al.,            )
                      )
12         Defendants.   )
    _____)

**CERTIFIED COPY**

13

14

15            Proceeding re:

16            RAMIN YEGANEH

17        Thursday, April 18, 2002

18

19  Reported by:

20  BRENDA CALABRO-COLLINS, CSR No. 12165

21

22

23        ROBERT BARNES ASSOCIATES
        760 Market Street, Suite 1044
24       San Francisco, California 94102

25

                             440

1    And remodeling the bathroom and things like that.

2         Q.  You remodeled the bathroom when the tenant

3    was living there?

4         A.  Yes.

5         Q.  And she gave her approval to that?

6         A.  Yes.

7         Q.  What was the cost of the remodel?

8         A.  I don't remember.

9         Q.  Do you have any documents which substantiate

10   that?

11        A.  No.

12        Q.  It is your practice to throw away such

13   documents?

14        A.  No.

15        Q.  And what is your practice of keeping such

16   documents?

17        A.  No specific practice.  But in this case, I'm

18   so jittery, I don't keep anything.  Let's put it this

19   way.  Remember the DA broke into my house and took

20   everything.  And hauled off everything, including me.

21             MR. TRACY:  Your Honor, could you instruct

22   Mr. Yeganeh to just answer my question?

23             PRO TEM JUDGE BLACKMAN:  I will.  I'll allow

24   that last comment in.  But it does help to move things

25   along more quickly if we don't have comments like that.

1    Go ahead, Mr. Tracy.

2    BY MR. TRACY:

3        Q.  The plumbing things that you did, what did

4    you do?

5        A.  It was remodeled the bathroom in general,

6    painting the bathroom.  I guess the sewer line was

7    clogged up.  We fixed that and put a new sewer line.

8    You know, things of that sort.

9        Q.  You put in a new sewer line?

10       A.  Yes.

11       Q.  And do you have a receipt for that?  And who

12   paid for that?

13       A.  I did.

14       Q.  And do you have any documentation for that?

15       A.  No, I don't.  I don't have any of that stuff.

16       Q.  Have you ever kept such records?

17       A.  Yes, in the past I did.

18       Q.  Any other plumbing things -- strike that.  In

19   the past, what do you mean by "the past"?

20       A.  Prior to 1999.

21       Q.  So prior to 1999, it's your testimony that

22   you had kept all records?

23       A.  I kept most records.  I don't want to say

24   all, but I had kept most important records.

25       Q.  And what do you define as an "important

1    record"?

2        A.   Important  --  I don't know how to define

3    that for you.  Big receipts.  Things of that sort.

4        Q.   What's a big receipt?

5        A.   You know, receipts over a certain amount of

6    money.

7        Q.   And what was that amount?

8        A.   I don't remember.  Maybe over a thousand

9    maybe over 5 thousand.  I don't remember any specific

10   amount.

11       Q.   Well, was it a thousand?

12       A.   It may have been a thousand.

13       Q.   Was it a thousand?

14       A.   I don't remember if it was a thousand or a

15   different number.

16       Q.   Do you have anything in your possession which

17   would help you recall what the amount was for which you

18   kept records prior to 1999?

19       A.   No.

20       Q.   Do you have an estimate as to what the

21   remodeling would have cost for the remodel of the 786

22   5th Avenue property?

23       A.   No, I don't have an estimate.

24       Q.   No estimate at all?

25       A.   No.  I think it was right around -- it was

# Document No. 69

1          IN THE UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  ---o0o---

4

5   In re:

6   RAMIN YEGANEH,              Case No.:  05-30047 TEC 7

7           Debtor.

8   _____/

9   Rule 2004 Examination of

10      RAMIN YEGANEH
11        VOLUME II

12   Thursday, June 9th, 2005

13

14

15

16

17

18

19   REPORTED BY:  DEBORAH FUQUA, CSR #12948

20

21

22

23

24        NOGARA REPORTING SERVICE
         130 Battery Street,  Suite 580
25      San Francisco,  California 94111
              (415) 398-1889

```
 1   difficult.  I'm just telling you, I don't have it.

 2        MS. MAXWELL:  Do your parents have the receipt

 3   book?

 4        THE WITNESS:  No, my parents don't have any of my

 5   stuff.

 6        MS. MAXWELL:  Does Mr. Gilg have your receipt book?

 7        THE WITNESS:  No, they don't.

 8        MS. MAXWELL:  Does Mr. Gilg have any of your

 9   financial records?

10        THE WITNESS:  No.

11        MS. MAXWELL:  Does anyone have any financial

12   records of yours that you haven't turned over to

13   Mr. Sims?

14        THE WITNESS:  No.

15        MS. MAXWELL:  What happened to all of the financial

16   records that were returned to you at the end of August

17   2004 from Judge Pro Tem Blackman?  What did you do with

18   those financial records?

19        THE WITNESS:  I don't know if they were financial

20   records, but the -- it was just garbage that was

21   returned to me.  And he admitted that it was just trash

22   from back in '99, '98, 96.

23        MS. MAXWELL:  There were bank statements that were

24   returned to you in August of 2004, correct?

25        THE WITNESS:  Yeah, really old ones from many, many
```

661

ER - 409

1  years ago.

2      MS. MAXWELL:  And what did you do with them?

3      THE WITNESS:  The old ones?  The old stuff?  I

4  tossed them.  They were all old.

5      MS. MAXWELL:  And there was some tax information

6  that was returned to you.  What did you do with that

7  information?

8      THE WITNESS:  Same thing.

9      MS. MAXWELL:  You threw it away?

10      THE WITNESS:  Right.  I've already mentioned that

11  to you.

12      MS. MAXWELL:  There were records that were returned

13  to you from Mr. Blackman prior to August 2004 that were

14  records of real estate transactions, some of which

15  involved the properties that we talked about today.

16  What did you do with those records?

17      THE WITNESS:  Same thing.  It was old records from

18  many, many years ago.  Why would I want to keep all that

19  crap?  You know?  My whole house would be full of junk.

20      MS. MAXWELL:  So you threw away --

21      THE WITNESS:  It would be a fire hazard if I keep

22  all that stuff.

23      MS. MAXWELL:  So you threw away the documents that

24  you obtained back from Mr. Blackman that had to do with

25  your real property transactions, correct?

662

509

< NOGARA REPORTING SERVICE >

ER - 410

1        THE WITNESS:  From many, many years ago?  Yes.

2        MS. MAXWELL:  And those --

3        THE WITNESS:  How can I possibly retain all that

4    junk?

5        MS. MAXWELL:  How many boxes did you get back from

6    Mr. Blackman?

7        THE WITNESS:  I have no idea how many boxes.  It

8    was -- it was a lot of junk.

9        MS. MAXWELL:  Wasn't it about five boxes,

10   Mr. Yeganeh?

11       THE WITNESS:  No, it was a lot more than that.

12       MS. MAXWELL:  Was it more than ten boxes?

13       THE WITNESS:  I don't remember how many boxes there

14   were.  It was many boxes of just garbage.

15       MS. MAXWELL:  Was it a hundred boxes?

16       THE WITNESS:  Listen, I don't remember.  You want

17   to go all the way to a million?

18       MS. MAXWELL:  You can't even tell us if it was more

19   than a hundred boxes, Mr. Yeganeh?

20       THE WITNESS:  I don't think it was more than a

21   hundred boxes.

22       MS. MAXWELL:  Mr. Yeganeh, didn't you fight to get

23   those records back in the Yeganeh-Wobogo litigation?

24       THE WITNESS:  Sure, when I needed them, I wanted

25   them back.  And Mr. Blackman didn't ever produce them to

663

1    me because you guys didn't allow him to produce the

2    records to me when I needed it.

3        MS. MAXWELL:  When -- you know, that's also

4    inaccurate, but I will move on to the next question,

5    which is, when you received those records back, did you

6    come to the conclusion that you would never need any

7    records about your real estate transactions ever again

8    in the future, and that's why you threw them out?

9        THE WITNESS:  What was the question again?

10       MS. MAXWELL:  You got those records back from

11   Mr. Blackman, the ones that had to deal with your real

12   estate transactions, and then you threw them away.

13       Were you under the impression at that time that

14   you would never need any records about your real estate

15   transactions again when you threw them out?

16       THE WITNESS:  About those particular ones, yeah.

17       MS. MAXWELL:  And didn't those records include

18   records about 48 North Grant, 627 Prospect, 718 Ford?

19       THE WITNESS:  I didn't even look at it.  I didn't

20   even look at that garbage because it was so messed up.

21   Okay?  It was just -- you couldn't make heads or tails.

22       MS. MAXWELL:  So you threw out a bunch of records

23   without even looking at them?

24       THE WITNESS:  I wouldn't call them "records."

25   Okay?  I don't know why you keep using the word

1    "records."  It was a lot of junk.  Okay?

2         MS. MAXWELL:  Were they documents?

3         THE WITNESS:  Probably more -- listen --

4         MS. MAXWELL:  Let's use a specific word.  Were they

5    documents?

6         THE WITNESS:  To you, a piece of napkin, to you

7    even a toilet paper is probably documents.  But the

8    point is, they were just junk.  Okay?  All right?

9         MS. MAXWELL:  When did you throw them out?

10        THE WITNESS:  I don't even remember.

11        MS. MAXWELL:  Was it in 2004?

12        THE WITNESS:  I don't remember when.

13        MS. MAXWELL:  You didn't get them back until 2004,

14   right?

15        THE WITNESS:  You're talking about two different

16   things now.  I don't remember when I got -- they came in

17   piecemeal, some boxes today, some boxes later.  I don't

18   know what and when.

19        MS. GLOSSON:  You know what, Mr. Yeganeh?  It's

20   almost 6:00.  We need to go.  Just answer the question.

21        THE WITNESS:  I don't remember.  I don't remember.

22   I don't remember when I tossed them.  A long time ago.

23        MS. MAXWELL:  So you might have thrown them away in

24   2004, correct?

25        THE WITNESS:  Maybe, but I don't remember when I

665

512

1    did.  Could be 2003.  I don't remember.  When I got

2    them, I tossed them.

3         MS. MAXWELL:  If you didn't get them back until

4    2004, you would agree you couldn't have thrown them away

5    until 2004, right?

6         THE WITNESS:  Sure.

7         MS. MAXWELL:  Okay.  I'm done.  Thank you.

8         MS. GLOSSON:  Mr. Sims?

9         MR. SIMS:  No.

10        MS. GLOSSON:  Okay.  This examination is concluded.

11            (Whereupon, the examination concluded

12            at 5:55 o'clock p.m.)

13

14

15            _____
                        RAMIN YEGANEH

16

17

18

19

20

21

22

23

24

25

666

ER - 414

< NOGARA REPORTING SERVICE >

# Document No. 70

# FAX COVER SHEET

| TO | Esq. Jeffrey Fillerup |
|---|---|
| COMPANY | Luce Forward |
| FAX NUMBER | 14153564610 |
| FROM | Jonathan Chance |
| DATE | 2006-03-21 23:37:12 GMT |
| RE | |

## COVER MESSAGE

Jeff:  This is the letter I sent you on March 17, 2006.
Please confirm you received this.  I intend to use this as
a responsive exhibit if your office proceeds with a motion
to compel and a request for attorney's fees.

www.efax.com

# Jonathan G. Chance
### Attorney at Law

205 E. 3rd Ave., Suite 411
Redwood City, California 94063

Telephone: 650-342-6200
Facsimile: (650) 429-2048
jonathan@jc-law.net
www.jc-law.net

March 17, 2006

**VIA FACSIMILE & U.S. MAIL**
Jeffrey Fillerup, Esq
Luce Forward Hamilton & Scripps
Rincon Center II, 121 Spear Street, Suite 200
Suite 200
San Francisco, CA 94105

Re: *Sims v. Allied Management Trust, et al., Case nos. 05-3240, 05-3241, 05-3242 & 05-3243.*

Dear Mr. Fillerup:

I am writing in response to your March 16, 2006 letter and proposed stipulation.

The current stipulation is far too broad and requires my clients to agree to items that are not at issue in our meet and confer.

Regarding the deposition schedules, my clients and Mr. Yeganeh have agreed to make themselves available for their depositions as noticed in your recent notices of depositions for March 27-30, 2006. Therefore, there is no need for a written stipulation regarding the deposition dates as currently noticed.

Regarding my clients' responses to the trustee's written discovery, they will supplement their responses in accordance with your requests in your March 6, 2006 meet and confer letter. To the extent they have no responsive information in their possession, custody or control, they will so indicate in their responses. Given the number of responses that will need to be supplemented, and the need for some time to locate responsive information, my clients will provide their supplemental responses at 9:30 a.m. on March 27, 2006 at the beginning of the first deposition scheduled on that date. This actually provides the trustee with my clients' supplemental responses one week earlier than the trustee was willing to accept these responses on April 3, 2006.

Please contact me today to confirm this resolution.

March 17, 2006
Page 2

Sincerely,

**DICTATED BUT NOT READ TO AVOID DELAY**

JONATHAN G. CHANCE, ESQ

# Document No. 71

**WILLIAM E. GILG**
**Attorney at Law**
**305 San Bruno Avenue West**
**San Bruno, CA 94066**
**(650) 871-8647**
**(650) 873-3168 (fax)**

March 21, 2006

JEFFREY FILLERUP, ESQ.
Luce, Forward, Hamilton & Scripps, LLP
121 Spear St., Suite 200
San Francisco, CA 94105

RECEIVED

MAR 2 1 2006

LFH&S/J.L.F.

Re: In re Ramin Yeganeh, debtor

Dear Mr. Fillerup:

I'm responding to your letter of today's date faxed to me.

On March 10, 2006, the debtor, on behalf of his parents and himself, left you two voice mail messages informing you that he and his parents would show up at their depositions as currently scheduled for the week of March 27th, and that the debtor's parents would bring their supplemental responses to your written discovery, as outlined in your March 6, 2006 meet and confer letter, along with them to their depositions.

I understand that last week you sent a proposed stipulation, along with a long list of conditions to meet, for the trustee to postpone the depositions until after the discovery cut-off. However, that stipulation and the proposed conditions were not acceptable to the debtor nor his parents. On March 17, 2006, Jonathan Chance notified the debtor and his parents that he sent a letter to you stating in writing that they will appear for their depositions as scheduled on the week of March 27, 2006, and that they would be bringing their supplemental responses as to the issues raised in your March 6, 2006 meet and confer letter with them to their depositions.

In response to your March 6, 2006 meet and confer letter at the bottom of paragraph 1, since the defendants and the debtor in this case did notify you that they are willing to supplement their written discovery responses, then neither I, nor the debtor and his parents, understand why you are bringing motions to compel seeking sanctions and attorney's fees, when in fact the debtor and his parents have already agreed to supplement their responses addressing the issues raised in the March 6, 2006 meet and confer letter.

Therefore you have no justification to further bill the estate for a spurious and unnecessary motion to compel. The debtor and his parents notified you on March 10, 2006 that they would supplement their discovery responses in answer to your March 6,

l

2006 meet and confer letter and that they would be bringing these responses to their depositions later this month, only 17 days from March 10, 2006.

Hence please drop your plans to bring any type of motion to compel. It is totally unnecessary and contradictory to your own position as outlined in your recent letters.

Your cooperation is much appreciated.

BILL GILG, Attorney at Law

2

# Document No. 72

JEFFREY L. FILLERUP, PARTNER
DIRECT DIAL NUMBER 415 356 4625
DIRECT FAX NUMBER 415 356 3883
EMAIL ADDRESS jfillerup@luce.com

March 27, 2006

33156-00005

<u>VIA FACSIMILE & U.S. MAIL</u>
(650) 429-2048

Jonathan G. Chance, Esq.
JC Law Office
205 E. Third Avenue, Suite 411
San Mateo, CA 94401

Re:  **<u>In re: Ramin Yeganeh, Case No. 05-30047 TEC, Chapter 7</u>**
     **<u>Sims v. Allied Management Trust, Adv Pro No. 05-3241</u>**
     **<u>Sims v. Advanta Trust, Adv Pro No. 05-3243</u>**
     **<u>Sims v. Coast Development Trust, Adv Pro No. 05-3242</u>**
     **<u>Sims v. F. Namdaran, Adv Pro No. 05-3240</u>**

Dear Mr. Chance:

At the deposition of Mrs. Yeganeh today, you produced additional documents in the four adversary proceedings. I have now had an opportunity to review these newly-produced documents and I have determined that the defendants have still failed to comply with their discovery obligations in this case. This is particularly disappointing inasmuch as you had given me assurances that documents would be produced at the deposition today.

The Trustee demands that the defendants produce documents at the deposition tomorrow, including the following: (1) all of the state and federal income tax returns for Mr. and Mrs. Yeganeh for the tax years 1999, 2000, 2001, 2002, 2003, 2004, and 2005; (2) all of the state and federal income tax returns for Advanta Trust, Allied Management Trust, and Coast Development Trust for the tax years 1999, 2000, 2001, 2002, 2003, 2004, and 2005; (3) all of the property tax statements for the 13 properties for the years 1999, 2000, 2001, 2002, and 2003; (4) all of the bank statements for the three trusts for the years 2000, 2001, 2002, 2003, 2004, and 2005; (5) all of the bank statements for Mr. and Mrs. Yeganeh for the periods 2000, 2001, 2002, 2003, 2004, and 2005; (6) all documents, including bank statements and investment accounts, showing the hundreds of thousands of dollars that the defendants claim were used to buy the 13 properties at issue; (7) all of the property insurance bills, invoices and statements for the 13 properties for the period 1999, 2000, 2001, 2002, 2003, 2004, and 2005; (7) all documents and correspondence between the defendants and any tenants of the properties, including all rent



Jonathan G. Chance, Esq.
March 27, 2006
Page 2

payments made by the tenants and all lease agreements; and (8) the name, address and telephone number of each tenant for each of the 13 properties for the period 1999 through the present.

The defendants were to produce all of the above documents at the deposition today, but none of these documents were produced.

I expect the defendants to produce all of these documents at the deposition tomorrow morning. The defendants were obligated to produce these documents months ago. In the past few weeks, you gave me assurances that the documents would be produced at the deposition today, but they were not produced today.

It is clear from the documents that you have produced, that the defendants have only produced documents that support or tend to support their position in the four cases, and they have refused to produce documents that do not support their position.

This letter will advise you that if all of the requested documents are not produced at the deposition tomorrow, then the Trustee will seek an order precluding the defendants from using or offering any documents in evidence to support their claims, including documents that tend to support their position. The Trustee will also seek an order barring the defendants from offering any evidence (testimony and exhibits) at trial to support their position because of the defendants failure to produce discovery to the Trustee. I expect that these discovery rulings will be so broad as to preclude the defendants from offering any evidence in support of their claims at trial.

Sincerely,

Jeffrey L. Fillerup
of
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

JLF jlr

1   Charles P. Maher, State Bar No. 124748
    Jeffrey L. Fillerup, State Bar No. 120543
2   Nhung Le, State Bar No. 209552
    LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3   Rincon Center II, 121 Spear Street, Suite 200
    San Francisco, California 94105-1582
4   Telephone No.: 415.356.4600
    Fax No.: 415.356.4610
5
    Attorneys for Appellee
6   Andrea A. Wirum, Successor-in-Interest to
    Charles E. Sims Chapter 7 Trustee
7

8

9                      UNITED STATES DISTRICT COURT
10              FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
    In re RAMIN YEGANEH,                | Case No. 07-03256 JSW
12
13              Debtor.
14  ─────────────────────────────
    CHARLES E. SIMS, Trustee,           | Bankruptcy Case No. 05-30047 TEC
15                                      | Bankruptcy Adversary Proceeding
              Appellee,                 | No.  05-3241 TC
16
    v.
17                                      | **CERTIFICATE OF SERVICE**
    ALLIED MANAGEMENT TRUST and K.
18  YEGANEH aka KEN YEGANEH aka
    KAIKHOSROW YEGANEH,
19
              Appellants.
20

21

22

23          I, Alissa V. Worthing, declare:

24          I am employed in the City and County of San Francisco, State of California.  I am over the

25  age of 18 years and not a party to the within action; my business address is Luce, Forward, Hamilton

26  & Scripps LLP, Rincon Center Two, 121 Spear Street, Suite 200, San Francisco, California 94105.

27          On the date of execution hereof, at my place of business, I served true and correct copies of

28  the following:

                                        1

1

**APPELLEE'S BRIEF**

2

**APPELLEE'S EXCERPT OF RECORD**
**(Volume I)**

3

**APPELLEE'S EXCERPT OF RECORD**
**(Volume II)**

4

5

**APPELLEE'S EXCERPT OF RECORD**
**(Volume III)**

6

**CERTIFICATE OF SERVICE**

7

on the parties listed below:

8

☒     **BY MAIL**:  By placing a true copy in an envelope addressed as shown to the parties below.  I am familiar with Luce, Forward, Hamilton & Scripps LLP's practice whereby each document is placed in an envelope, the envelope is sealed, the appropriate postage is placed thereon and the sealed envelope is placed in the office mail receptacle.  Each day the mail is collected and deposited in a United States postal mailbox at or before the close of business each day.

9

10

11

William E. Gilg, Esq.
305 San Bruno Avenue West
San Bruno, CA  94066

12

13

14

        I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on March 19, 2008, in San Francisco, California.

15

16

17

18

_____/s/ Alissa V. Worthing_____
ALISSA V. WORTHING

19

20

21

301033935.1

22

23

24

25

26

27

28

2