WILLIAM E. GILG
Attorney at Law, #151991
305 San Bruno Avenue West
San Bruno, CA 94066
(650) 871-8647
(650) 873-3168 (fax)

Attorneys for Appellants,
Allied Management Trust, K. Yeganeh

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re RAMIN YEGANEH,<br><br>               Debtor.<br>CHARLES E. SIMS, Trustee,<br><br>           Plaintiff/Appellee,<br>v.<br><br>ALLIED MANAGEMENT TRUST,<br>K. YEGANEH,<br><br>          Defendants/Appellants. | Case No. C 07-03256 JSW<br>Bankruptcy No. 05-30047 TEC<br>Adversary Proceeding No. 05-3241 TC<br><br>APPELLANTS' **REPLY** BRIEF ON APPEAL FROM THE BANKRUPTCY COURT'S "FINAL JUDGMENT" |

    Defendants/Appellants Allied Management Trust and K. Yeganeh (hereinafter "appellants") respectfully submit their reply brief on their appeal from the Bankruptcy Court's "Final Judgment" in this matter.

    Due to the appellee's misstatements and half-truths concerning the debtor and the defendants contained in her opening brief, the defendants submit the following brief statement of additional facts.

## STATEMENT OF FACTS

    The appellant, Ken Yeganeh, is a 78 year-old elderly man who is a retired medical doctor. He used to practice medicine in Oakland, California. The appellant purchased

Appellants' Reply Brief on Appeal      -1-

several properties in Oakland and put them in his trust, Appellant Allied Management Trust, back in March and May of 2003. (See appellee's excerpts of record, ER-198.) In November of 2004, the appellant removed these properties from his trust and put them into his name as an individual. (See appellee's excerpts of record, ER-188-189.) Now the appellee argues that these properties now belong to the debtor and his bankruptcy estate.

The debtor was a California licensed mortgage broker back in the 1990's. He brokered and originated hundreds of mortgage loans in the Bay Area. He never operated an illegal mortgage brokerage business. He never operated a consulting business, let alone an illegal consulting business. The debtor never "targeted and preyed on vulnerable homeowners whose mortgages were in foreclosure". (See appellee's opening brief, p. 4(2-3).) Indeed, over 95 percent of the debtor's clients had good credit and were never in foreclosure. The few clients who had bad credit, primarily due to late payments, tax liens, or judgments, may or may not have been in foreclosure at the time of their dealings with the debtor. The debtor could not discriminate and could not turn away clients simply because they had bad credit or were in foreclosure. The debtor never bought any of the claimants' homes. The debtor never bought his clients' homes using illegal tactics, etc. These allegations by the trustee in her opening brief are outright false. The debtor paid for his properties with the money he earned over the years. The appellee's modus operandi is to demonize the debtor in order to charge his estate exorbitant attorneys' fees and administrative costs. As of today, the appellee/trustee and her attorneys have charged the debtor's estate over $1 million in attorneys' fees. No doubt the appellee/trustee will have a field day if she gets her hands on the appellants' five properties which are the subject of this adversary proceeding.

On October 4, 1999, the debtor was sued in state court by Edith Ingram and Nozipo Wobogo. In October of 1999 the debtor's criminal case also involved the same Edith Ingram who alleged that the debtor did not provide her with the appropriate disclosure under Civil Code section 2945, the California Foreclosure Consultant Law. However this law doesn't even apply to California Licensed Mortgage brokers, such as the debtor. (See CC { 2945.1(b)(3).) In order to avoid a lengthy and expensive six-week criminal trial, which would have cost the debtor over $200,000 in attorney's fees, the

debtor in March of 2001 pled no contest to four minor violations of Civil Code section 2945.4(g). The San Mateo County Superior Court sentenced the debtor to five years probation, he was ordered not to engage in any mortgage broker activity in San Mateo County for five years, and his license was suspended for five years.

On April 25, 2001, Plaintiff Ingram settled all of her causes of action with the debtor. On July 30, 2001, the San Mateo County Superior Court granted a summary judgment against the debtor because the debtor did not submit a declaration explaining his pleas as he was so advised by his attorney. The superior court reasoned that without the debtor's rebuttal, his no contest pleas in the criminal case essentially established the debtor's liability to Ingram. The appellee now states that somehow the debtor's no contest pleas can be extrapolated to establish his liability to Plaintiff Wobogo and others. This is not the case and even Wobogo's attorneys admitted that this summary judgment order did not establish the debtor's blanket liability to all of his clients. (See Doc #7 ["Defendants' Sur-Rebuttal Memorandum of Points and Authorities in Support of Defendants' Opposition to Plaintiff's Summary Judgment Motion, Ex. 43, pp. 2-3].) In 2001, Plaintiff Wobogo admitted that she had no dealings whatsoever with the debtor, thus she suffered no loss or injury.

On July 31, 2001, the debtor filed a skeletal Chapter 13 bankruptcy petition in pro per. A few days later the debtor entered into a settlement agreement with Plaintiff Wobogo to end this litigation. As a result of this settlement agreement Wobogo's attorneys insisted that the debtor dismiss this petition. The debtor did so on August 2, 2001. In August of 2001, the debtor resided at the address of 395 Sequoia Avenue in Redwood City, in order to prepare that property for sale. This is the address he put on that bankruptcy petition. (See appellee's excerpts of record, ER-161.) The appellee's insistence that the debtor purposely misspelled his name and used the wrong address in this petition is a figment of her imagination. In late 2001 the settlement agreement between the parties fell apart.

In her opening brief the appellee is attempting to confuse this Court as she did in the lower court, by arguing that the debtor should have listed the adversary properties (the Allied Properties which actually belonged to Appellants Ken Yeganeh or Allied

Management Trust) on his bankruptcy Schedule A. However the Allied Properties are not the debtor's nor his estate's properties and therefore how could the debtor list them on his Schedule A?

In her opening brief, the appellee listed ten alleged "badges of fraud" on the part of the debtor and argued that the appellants did not rebut any of them in their opposition to the appellee's motion for summary judgment in the lower bankruptcy court. (See appellee's opening brief, pp. 7-10.) That is simply not true. The record on appeal speaks for itself. (See Doc #7 ["Opposition to Plaintiff's Motion for Summary Judgment Based on Actual Fraud"; Declaration of Debtor; Declaration of Ken Yeganeh; Declaration of Farin Yeganeh; Notice of Lodgment of Documentary Evidence, Exs. 1 through 43].) Appellant will go through each badge of fraud.

In her excerpts of record, the appellee has 'cherry-picked' some of her original so-called evidence from the record on appeal and has attempted to convince this Court that the summary judgment entered in her favor in the lower court was justified.

The first badge of fraud alleges that the debtor used a false name, "R. Rad", to purchase the Allied Properties. However the name "R. Rad" was not a false name. It is the debtor's naturalized citizenship name. (See Doc #7 [Plaintiff's Motion for Summary Judgment, Ex. 27].) R. Rad was an alias the debtor sometimes used, it was not a false name. The name "R. Rad" or "R. Rad-Yeganeh" was known to the creditors back in April of 2002. Thus said name did not hinder, delay, or defraud any of the creditors.

The second badge of fraud alleges that the debtor transferred the Allied Properties to an insider, a family trust and his father. The appellee's own documentation offered in support of her opening brief refutes this. The properties were already held by the trust which was set up for the benefit of K. Yeganeh, the trust's beneficiary. The trust document states: "The Allied Management Trust is set up for the benefit of the beneficiary, K. Yeganeh, whose beneficial interest is held by the trust. The trust properties have been bought for the beneficiary." (See appellee's excerpts of record, ER-198.) This clearly proves that K. Yeganeh was the beneficiary of Allied Management Trust and all interest to the Allied Properties vested with K. Yeganeh. The creditors were well aware of this fact back in 2003.

The third badge of fraud alleges that the debtor transferred the Allied Properties to an insider after the state court entered summary judgment against him. This may be true but it does not prove that these properties belonged to the debtor. Just because these properties were put in a trust in 2002 and 2003 (obviously after the entry of this summary judgment on July 31, 2001) it does not prove that these properties ever really belonged to the debtor. (See Doc #7 [Declaration of Ken Yeganeh in Opposition to Plaintiff's Motion for Summary Judgment, paragraphs 2 through 6 (Mr. Ken Yeganeh, a retired medical doctor, explaining that he used to practice medicine in Oakland and that he gave his son, the debtor, money to buy the properties in question and that the debtor put the properties into his father's trust. Mr. Ken Yeganeh has paid all property taxes on said property, all mortgage payments, and all insurance on said properties.)]; see also Doc #7 [Defendants' Notice of Lodgment of Documentary Evidence, Exs. 38 through 41.)

The fourth badge of fraud alleges that the debtor transferred the Allied Properties in violation of a preliminary injunction issued by the state court. Although the debtor was found in contempt of court, it was because the state court found that these properties were sold. The fact is these properties were never sold. They were always the properties of Ken Yeganeh or his trust. (See citation in the above-analysis for the third badge of fraud.) Ken Yeganeh simply transferred the properties from his trust back into his name as an individual. (See appellee's excerpts of record, ER-188.) The beneficiary of a trust is entitled to transfer his properties in or out of a trust as he wishes. There is nothing fraudulent about that.

The fifth badge of fraud alleges that no consideration was paid by Allied Management Trust for the Allied Properties. The fact is these properties were never sold. They were always the properties of Ken Yeganeh or his trust. (See citation in the above-analysis for the third badge of fraud.) Just because Ken Yeganeh put the properties into his trust or took them out of his trust does not mean the properties were sold. (See appellee's excerpts of record, ER-188, ER-198.)

This sixth badge of fraud alleges that the debtor gave false testimony in order to hinder, delay, or defraud creditors. That is the debtor allegedly denied that he was R. Rad in a deposition. This testimony took place in April of 2002, before any of the Allied

Properties were purchased. The Allied Properties were not purchased until June of 2002 to January of 2003. (See appellee's opening brief, p. 5(22-27).) Hence this testimony is irrelevant to this proceeding.

The seventh badge of fraud alleges that the debtor gave false testimony about Allied Management Trust. That is the debtor signed a declaration attesting that Allied Management Trust was an independent investor. This was true, the trust was set up for the benefit of Ken Yeganeh. At the contempt hearing the debtor simply misspoke when he testified that he was the beneficiary of said trust. The trust document itself indicates that the beneficiary was Ken Yeganeh and the trust was set up for his benefit. The debtor was only the trustee at the time. (See appellee's excerpts of record, ER-198.) The debtor resigned as the trustee of this trust in July of 2003. (See appellee's excerpts of record, ER-237.)

The eighth badge of fraud alleges that after the debtor transferred the Allied Properties to the trust, he continued to treat these properties as his own. The debtor acted as property manager for his elderly father. Ken Yeganeh acknowledged that from time to time his son, the debtor, managed these properties because of Ken Yeganeh's old age and poor health situation. He also averred that his son had never been the owner of these properties. (See Doc #7 [Declaration of Ken Yeganeh, paragraphs 5-7]; see also Doc #7 [Defendants' Notice of Lodgment of Documentary Evidence, Ex. 40, p. 13(24-25), p. 19(5-12), p. 33(2-9).) Ken Yeganeh is a 78 year-old elderly man in poor health. Just because he could not remember what he paid for the properties in question three years earlier and could not remember the rental income from these properties, that does not mean he is not the owner of these properties. Ken Yeganeh continued to pay the property taxes, mortgage payments, and insurance on these properties, before and after this adversary proceeding was bought against him. Just because the debtor helped his elderly father from time to time in his affairs, that does not mean that the appellants' properties belonged to the debtor.

The ninth badge of fraud alleges that the debtor and Ken Yeganeh asserted their Fifth Amendment rights in order to prevent the trustee from obtaining evidence to prove their case. Ken Yeganeh and the debtor only asserted the Fifth Amendment on the issue

of their income taxes and the identity of the tenants occupying the Allied Properties. In fact the trustee already had the debtor's tax returns. Said tax returns clearly show that the Allied Properties were not the debtor's. Thus their invocation of the Fifth Amendment did not prevent the trustee from obtaining evidence to prove her case. Moreover, when is the invocation of the Fifth Amendment, a constitutional right, a badge of fraud?

The tenth and last badge of fraud alleges that the debtor testified to destroying records relating to the Allied Properties in 1999 in order to avoid having those documents used against him by his creditors. The debtor was not the owner of these properties, Ken Yeganeh was, and Ken Yeganeh produced these records for the appellee/trustee. He produced copies of the property tax payments, insurance payments, and mortgage payments on the Allied Properties. (See Doc #7 [Defendants' Notice of Lodgment of Documentary Evidence, Exs. 38 through 41].) The debtor had no documents pertaining to the Allied Properties in 1999 or after, because he was not the owner of these properties. (See also Doc #7 [Debtor's Declaration in Opposition to Plaintiff's Motion for Summary Judgment, paragraph 52].)

In conclusion, if the debtor wished to hinder, delay, or defraud his creditors, at any time after the summary judgment of July 31, 2001, and after the October of 2001 preliminary injunction, which prohibited him from selling or transferring any of his properties, why would he want to purchase five properties? It is obvious a debtor who wishes to delay, hinder, or defraud his creditors would want to sell properties rather than purchase additional properties.

Also the badges of fraud are all about facts surrounding the alleged transfers of these Allied Properties in or out of Ken Yeganeh's trust. These facts are disputed in defendants/appellants' opposition to the plaintiff/appellee's motion for summary judgment and the declarations in support thereof. These are triable issues of fact.

//

//

I

THE BANKRUPTCY COURT ERRED AND/OR ABUSED ITS DISCRETION IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT IN THAT THERE ARE MATERIAL ISSUES OF FACT REGARDING THE ISSUE OF FRAUDULENT INTENT

Appellee attempts to make hay out of her "badges of fraud" argument. She argues that the appellant has not rebutted these badges of fraud and thus there is a presumption of actual fraud in this matter. As the above statement of facts establish, the appellants have definitely rebutted each of the ten badges of fraud in the appellee's opening brief. Moreover the appellee is misleading this Court in that no matter how many badges of fraud this Court may find, there can be no presumption of fraud made on that basis. Said badges of fraud will only support an inference of fraud, which <u>may</u> be drawn. (<u>In re Serrato</u> (Bkrtcy. N.D. Cal. 1997) 214 B.R. 219, 229; <u>Annod Corp. v. Hamilton & Samuels</u> (2002) 100 Cal.App.4th 1286, 1298; <u>T W H Homes, Inc. v. Atherwood</u> (1963) 214 Cal.App.2d 826, 844-845.)

> an actual intent to defraud 'never arises as a matter of law from the existence of any given set of facts. It must be proved just as any other material fact in issue. Its proof is peculiarly dependent upon the circumstances which surround the questioned transaction, and the inferences which the trier of the facts may reasonably draw therefrom'.

(T W M Homes, Inc., supra, at 214 Cal.App.2d 844-845.)

Nevertheless appellee seeks to hoodwink this Court into ruling otherwise. She cites two cases for her position that: "If unrebutted, evidence establishing only one or two of the badges of fraud creates a strong presumption that a transfer was fraudulent". (See appellee's opening brief, p. 17(5-7).

The first case cited is <u>McDonald v. Schumann</u> (2004) 2004 Bankr. Lexis. 819. This is not even a California case. It is a Texas case that applied Colorado law to alleged fraudulent transfers. It does not even mention California's Uniform Fraudulent Transfer Act ("UFTA") with which we are concerned with here, and is thus totally inapplicable. Moreover it doesn't even hold that any type of presumption exists based on badges of fraud: "One of these factors may be sufficient to find actual fraudulent intent; an accumulation of several such factors strongly indicates that the debtor possessed the requisite intent." (<u>Id</u>. at 2004 Bankr. Lexis *23.)

The second case is a California case, <u>Filip v. Bucurenciu</u> (2005) 129 Cal.App.4th 825, at 834.) At least the <u>Filip</u> case did deal with California law and the UFTA. However it does not hold that there can be any type of presumption of fraud no matter how may badges of fraud can be established. To the contrary it holds that said badges of fraud can, at best, only support an "inference" of fraud: "Whether a conveyance was made with fraudulent intent is a question of fact and proof often consists of inferences from the circumstances surrounding the transfer." (<u>Ibid</u>.) <u>Filip</u> did discuss these "badges of fraud" but only held that:

> these factors do not create a mathematical formula to establish actual intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other.

(<u>Ibid</u>.) <u>Filip</u> doesn't even mention the word "presumption" in that regard.

In any event, it is well-established that "when the circumstances shown, are equally consistent with fraud and with innocence, the plaintiff has failed to carry his burden of proving the fact of fraud by a <u>preponderance</u> of the evidence." (emphasis original) (<u>Liodas v. Sahadi</u> (1977) 19 Cal.3d 278, 292.) As the above-referenced Statement of Facts indicates, the appellants have explained the circumstances as to each of the ten badges of fraud and said circumstances are equally consistent with innocence.

Additionally, summary judgment will be denied where the declarations of the moving and non-moving parties are conflicting and it "cannot be categorically determined which of the two statements is true". (Sarnoff v. Ciagila (1947)165 F.2d 167, 168-169.) "The resolving of such issues must be left to the finders of fact, and not decided upon a motion for summary judgment." (Id. at 165 F.2d 169; In re Phillips and Hornsby Litigation (M.D. La. 2004) 306 F.Supp.2d 631, 638-640 [triable issues of fact found in conflicting evidence on actual intent to hinder, delay, or defraud a creditor].)

In this matter the debtor's and appellants' declarations conflict with the declarations offered by the appellee regarding debtor's alleged "actual intent to hinder, delay, or defraud any creditor." (See CC { 3439.04(a)(1).)

Hence at the very minimum, triable issues of fact exist as to each said alleged badge of fraud. As a result, the lower bankruptcy court's granting of the appellee's summary judgment motion should be reversed.

## II

### THE BANKRUPTCY COURT ERRED AND/OR ABUSED ITS DISCRETION IN DENYING APPELLANTS' CROSS-MOTION FOR SUMMARY JUDGMENT IN THAT THE APPELLEE/TRUSTEE LACKS STANDING TO EVEN PROSECUTE THIS ADVERSARY PROCEEDING SINCE THE CREDITORS HAVE SUFFERED NO AFFIRMATIVE HARM AS A RESULT OF THESE ALLEGED FRAUDULENT TRANSFERS

The appellee/trustee makes little of this argument in her opening brief, spending less than two pages worth of argument against it. (See appellee's opening brief, p.19(14)—p.21(3).) The appellee essentially argues that since the lower bankruptcy court found that the claimants' claims filed in that court, which piggybacked the attorneys' fees onto said claim even though admittedly these creditors are not entitled to one penny of these attorneys' fees, were valid, the appellant is barred from challenging this

determination because it is a collateral order. Without conceding this point, the appellee's argument misses the point.

The point is that the claimants who submitted claims have been completely paid off and the appellee admits this: "approximately $1.1 million has been paid to creditors on an interim basis – all of it paid after the hearing on the summary judgment motion at issue in this appeal". (See appellee's opening brief, p. 19(28)—p.20(2).) The creditors' claims only amounted to approximately $400,000, that is the restitutionary judgment amount of $270,000 plus prejudgment interest. The remaining amount on their claims, the piggybacked attorneys' fees amount, <u>do not</u> belong to the creditors, it belongs to the attorneys. These attorneys never submitted a claim in the lower bankruptcy court for these attorneys' fees. The appellee cannot dispute this. It has been her position all along in this litigation that the attorneys' fees belong to the attorneys, not the claimants. (See Doc #7, Notice of Lodgment of Documentary Evidence in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Exhibit #42, p. 4.)

At this point the appellee is judicially estopped from taking any other position in that regard. Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position and then later seeking an advantage by taking a clearly inconsistent position. (<u>Hamilton v. State Farm Fire & Cas. Co.</u> (9th Cir. 2001) 270 F.3d 778, 782; <u>Marshall v. Marshall</u> (C.D. Cal. 2002) 273 B.R. 822, 832.) Ninth Circuit law invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of "general considerations[s] of the orderly administration of justice and regard for the dignity of judicial proceedings", and to "protect against a litigant playing fast and loose with the courts." (<u>Hamilton</u>, supra, at 270 F.3d 782; <u>Marshall</u>, supra, at 273 B.R. 832.)

Under California law a creditor bringing an avoidance action pursuant to Civil Code section 3439, et seq., must have suffered affirmative harm. Civil Code section 3439.04(a) requires the transfer to be "fraudulent as to a creditor". (<u>Mehrtash v. Mehrtash</u> (2001) 93 Cal.App.4th 75, 80.)

> A well established principal of the law of fraudulent transfers is, 'A transfer in fraud of creditors may be attacked <u>only by one who is injured thereby</u>. Mere

intent to delay or defraud is not sufficient; <u>injury to the creditor must be shown affirmatively</u>. In other words, <u>prejudice to the plaintiff is essential</u>. It cannot be said that a creditor has been injured <u>unless the transfer puts beyond</u> [her] <u>reach property</u> [she] <u>otherwise would be able to subject to the payment of</u> [her] <u>debt</u>'. (emphasis added)

(<u>Ibid</u>; <u>Bennett v. Paulson</u> (1935) 7 Cal.App.2d 120, 123; <u>Haskins v. Certified Escrow & Mtge. Co.</u> (1950) 96 Cal.App.2d 688, 691; <u>A/S Kreditt-Finans v. Cia Venetico De Navegacion, S.A. of Panama</u> (E.D.Pa. 1983) 560 F.Supp. 705, 711, aff'd 729 F.2d 1446 (3rd Cir. 1984) ["numerous courts in other jurisdictions in which the issue has arisen have stated as though it were axiomatic the requirement that a creditor be injured by the conveyance it seeks to invalidate".] This is a principal in equity. A plaintiff/creditor seeking the equitable relief of setting aside a transfer of property must show entitlement to relief and inadequacy of a remedy at law. This is axiomatic "because ordinarily creditors do not bother to seek avoidance of debtor's conveyances without a clear prospect of profiting by the litigation." (<u>Mehrtash</u>, supra, at 93 Cal.App.4th 80.)

  Here the individual claimants who submitted their claims piggybacked with the attorneys' fees have been paid in full. That is they have been paid their collective $400,000 and have no "right to payment" of one penny of the approximate $3.5 million in attorney's fees. (CC { 3439.01(b) ["claim" in UFTA "means a right to payment"]; see 11 U.S.C. { 101(5)(a); see also CC { 3439.01's "Legislative Committee Comment— Assembly (1986 Addition) ["The definition of 'claim' is derived from (former) Section 101(4) of the Bankruptcy Code].) A "right to payment" is determined by state substantive law, here the law of UFTA and California. (<u>Butner v. United</u> States (1979) 440 U.S. 48, 55, 59 L.Ed.2d 136, 99 S.Ct. 914; In <u>re First Alliance Mortg. Co.</u> (C.D. Cal. 2001) 269 B.R. 428, 435.) According to California law, the right to payment of the attorney's fees in this matter belongs to the attorneys. (CCP { 1021.5; <u>Folsom v. Butte County Assn. of Governments</u> (19820 32 Cal.3d 668, 682 & fn. 26; <u>Flannery v. Prentice</u> (2001) 26 Cal.4th 572, 577, 582.)

  The individual creditors in this bankruptcy proceeding who have submitted claims were not harmed or prejudiced as a result of the alleged transfers in question. They are thus not entitled to relief under California's UFTA. Neither is the appellee/trustee

standing in their shoes. (Mehrtash, supra, at 93 Cal.App.4th 81.) It is that simple. Summary judgment should have been entered in favor of the appellants, not in favor of the appellee/trustee.

## CONCLUSION

For the foregoing reasons, the appellee's motion to exclude evidence should have been denied by the Bankruptcy Court[1]. The appellee cannot establish prejudice by the appellants' use of the Fifth Amendment during discovery proceedings. Said order of the Bankruptcy Court should be reversed.

Additionally, there are material issues of fact and contradictory declarations regarding whether or not the debtor possessed the requisite "actual intent to hinder, delay, or defraud" any creditor. This establishes triable issues of fact.

Also, the appellants' cross-motion for summary judgment should have been granted by the Bankruptcy Court in that the individual creditors have been paid off and have suffered no harm.

Lastly, the appellee's motion for summary judgment should have been denied by the Bankruptcy Court. The individual creditors have never been harmed as a result of any alleged transfers of the subject properties in March and May of 2003 because their claims have been satisfied from the sale of the debtor's Schedule A properties. Also there are material issues of fact and contradictory declarations regarding whether or not the debtor possessed the requisite "actual intent to hinder, delay, or defraud" any creditor. The Bankruptcy Court's judgment should be reversed in its entirety.

April 28, 2008                    Respectfully Submitted,

                                  /S/ WILLIAM E. GILG
                                  WILLIAM E. GILG,
                                  Attorney for Appellants

---

[1] Appellants refer to their argument on this issue contained in their opening brief.

## PROOF OF SERVICE

I, the undersigned, state that I am a citizen of the United States and employed in the City of San Mateo, that I am over the age of 18 and not a party to the within cause; that my business address is 305 San Bruno Avenue West, San Bruno, California; and that on the date set out below I deposited a true copy of the attached documents, listed below, on the parties to the action by one or more of the following methods:

[XX]  First Class Mail

[ ]  Fax via ( )

[]  Personal Service

--by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States Mail at San Bruno, California;


Documents Served: APPELLANTS' REPLY BRIEF ON APPEAL FROM THE BANKRUPTCY COURT'S "FINAL JUDGMENT"

Party Served:   CHARLES P. MAHER, ESQ.
               Luce, Forward, Hamilton & Scripps, LLP
               Rincon Center II, 121 Spear St., Suite 200
               San Francisco, CA 94105


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at San Bruno, California on April 28, 2008.

/S/ WILLIAM E. GILG
WILLIAM E. GILG

1